08 CV 2804

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON HOWARD, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE BEAR STEARNS COMPANIES INC., )<br>THE BEAR STEARNS COMPANIES INC. )<br>EXECUTIVE COMMITTEE, JAMES E. )<br>CAYNE, ALAN D. SCHWARTZ, )<br>WARREN J. SPECTOR, SAMUEL L. )<br>MOLINARO, JR., ALAN C. GREENBERG )<br>and JOHN DOES 1-10, )<br><br>Defendants. )<br>)<br>)<br>)<br>)<br>)<br> | MAR 17 2008<br>U.S.D.C. S.....N.Y.<br>CASHIERS<br><br>CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Aaron Howard ("Plaintiff"), by his attorneys, on behalf of The Bear Stearns Companies, Inc. Employee Stock Ownership Plan (the "ESOP") (the "Plan") and a class of similarly situated participants ("Participants") in the Plan during the proposed Class Period (defined below), alleges as follows:

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Defendants, fiduciaries of the Plan.

2.      Plaintiff was employed with The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company") and was a participant in the Plan during the Class Period, during which time the

Plan held interests in the Company's common stock. Plaintiff's retirement investment portfolio in the Plan during the Class Period included Bear Stearns stock.

3.    Plaintiff alleges that Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to him and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plan's heavy holdings of Bear Stearns stock.

4.    Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plan and the proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to offer Bear Stearns common stock as a Plan investment option for participant contributions when it was imprudent to do so; and (2) maintaining the Plan's pre-existing heavy investment in Bear Stearns equity when Company stock was no longer a prudent investment for the Plan. These actions/inactions run directly counter to the express purpose of ERISA pension plans which are designed to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

5.    Plaintiff's Count II alleges that certain Defendants failed to communicate to the Plan's participants complete and accurate information regarding the Plan's investment in Bear Stearns securities sufficient enough to advise participants of the true risks of investing their retirement savings in Company stock.

6.    Plaintiff's Count III alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

7.    Plaintiff's Count IV alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such

other fiduciaries were imprudently allowing the Plan to continue offering Bear Stearns stock as an investment option and investing Plan assets in Bear Stearns stock when it was no longer prudent to do so.

8.      Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's assets/participants' retirement savings in Bear Stearns equity throughout the Class Period, despite the fact that they clearly knew or should have known that such investment was imprudent due to, among other things, as explained in detail below: (a) the Company's failure to disclose material adverse facts about its financial well-being and ability to continue as an ongoing concern, business relationships and prospects; (b) the foreseeable deleterious consequences to the Company resulting from its substantial entrenchment in the subprime mortgage market; (c) the fact that, as a consequence of the above, the Company's stock price was artificially inflated; and (d) the fact that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants.

9.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132. Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plan-wide relief from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

### JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary places of business in this district.

3

12.     More specifically, this district is an appropriate venue for this action because, on a recent Form 5500 annual filing with the Internal Revenue Service and Department of Labor, the address listed for the sponsor of the Plan is in this district. *See* Plan 2005 Annual 5500 Return/Report to the Internal Revenue Service and Department of Labor ("DOL"), *available at* http://www.freeerisa.com ("2005 5500/ESOP Auditor's Report").. In addition, the principal executive office of Defendant Bear Stearns is located in this district. Accordingly, it is likely that many of the parties and potential witnesses, including corporate executives and many of the Plan's participants, are located in or within close proximity to this district.

## PARTIES

### Plaintiff

13.     Plaintiff Aaron Howard is a "participant," within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), in the ESOP and held Bear Stearns shares in his retirement investment portfolio during the Class Period.

### Defendants

### Bear Stearns

14.     Defendant Bear Stearns is a Delaware corporation with its principal place of business located at 383 Madison Avenue, New York, N.Y. 10179. Bear Stearns is a leading investment banking, securities and derivatives trading, clearance and brokerage firm serving corporations, governments, institutional and individual investors worldwide. It provides these services through its broker-dealer and international bank subsidiaries, including Bear, Stearns & Co. Inc., Bear Stearns Securities Corp., Bear Stearns International Limited and Bear Stearns Bank plc. *See* Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 13, 2007, for the fiscal year ended November 30, 2006 (2006 Form 10-K). The Company conducts additional activities through several wholly owned subsidiaries including EMC Mortgage Corporation and Bear Stearns Commercial Mortgage, Inc. The Company has approximately 14,000 employees worldwide.

4

15.    The Company is the named sponsor and administrator for the Plan. *See* 2005 5500/ESOP Auditor's Report.  Further, the Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and was therefore a fiduciary of the Plan in its own right.  Bear Stearns acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any Company oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

16.    Bear Stearns had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities.  Through its Board of Directors or otherwise, Bear Stearns had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plan, its participants and their beneficiaries.  Accordingly, the actions of the Board of Directors, the Plan's administrative and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

17.    The Company and its Board of Directors (the "Board") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.  Indicative of the Board's authority, upon

information and belief, the Board was ultimately responsible for monitoring and administering the Plan, appointing, monitoring and removing members of committees charged with the operation of the Plan, and for determining the amount, if any, of any additional discretionary contributions by the Company to the Plan. Upon information and belief, the Board also had the authority and obligation to appoint and remove other fiduciaries of the Plan, including, without limitation, members of the Plan's Executive Committee, if necessary in order to best serve the interests of the Plan's participants.

**Director Defendants**

**Chairman/CEO**

18.    Defendant James Cayne ("Cayne") served as the Chief Executive Officer ("CEO") of the Company and Chairman of the Board of Directors during the Class Period. Defendant Cayne became CEO of the Company on June 25, 2001 and prior thereto was President and of the Company. On January 8, 2008, Defendant Cayne announced his retirement from the Company as CEO.[1] Defendant Cayne was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

19.    Defendant Alan C. Greenberg ("Greenberg") served as the Chairman of the Executive Committee – described below - and was a director of the Company during the Class Period. Defendant Greenberg was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

---

[1] Although Defendant Cayne retired from the firm as CEO, he continues to serve in his capacity as Chairman of the Board. As noted below, he was replaced by Alan D. Schwartz as CEO.

20.     Defendant Alan D. Schwartz ("Schwartz") served as Co-President and Co-COO and was a director of the Company during the Class Period.  He became sole President on August 5, 2007 and replaced Defendant Cayne as CEO on January 8, 2008.  Defendant Schwartz was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     Defendants Cayne, Greenberg and Schwartz are hereinafter collectively referred to as the "Director Defendants."

**Executive Committee Defendants**

22.     The Company "Executive Committee" consists of "both Board and non-Board members, but may function in a manner comparable to that of a Board committee." Bear Stearns DEF 14A Notice of Proxy Statement, filed with the SEC on March 3, 2007.  The Executive Committee "has the authority to take action with respect to matters delegated to it by the Board." *Id.*  The Executive Committee generally meets weekly. *Id.*

23.     Upon information and belief, the Executive Committee was charged by the Board with responsibilities over the Plan.  Plan audit documents for Plan fiscal years 2004-2005 were directed to the "Executive Committee of The Bear Stearns Companies Inc." *See* 2005 5500/ESOP Auditor's Report. These duties, upon information and belief, included oversight of any "day-to-day" Plan administrative and/or investment individual fiduciaries or committees, monitoring of Plan investment policy and overall management/performance of Plan assets.

24.     The members of the Executive Committee during the Class Period included:

- Defendant Greenberg;
- Defendant Spector;
- Defendant Schwartz; and
- Defendant Molinaro, Jr.

25.     Defendants Greenberg, Spector, Schwartz and Molinaro are also hereinafter collectively referred to as the "Executive Committee Defendants."

26. Defendant Samuel L. Molinaro, Jr., ("Molinaro") served as Executive Vice President and Chief Financial Officer and was a director of the Company during the Class Period. On August 5, 2007 he was appointed as COO. Defendant Molinaro was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

27. Defendant Warren J. Spector ("Spector") served as Co-President and Co-Chief Operating Officer ("COO") during the Class Period. On August 5, 2007, Defendant Spector resigned from those positions. Defendant Spector was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

28. Upon information and belief, the Executive Committee Defendants Bear Stearns delegated day-to-day Plan administrative and investment responsibilities to Company personnel/Plan Committees. Plaintiff will add these "John Doe" defendants after further investigation reveals the contours and identities of any such delegation.

**Additional "John Doe" Defendants**

29. Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Plan fiduciary committees, as well as other Company officers, directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

**THE PLAN**

30. The Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of

ERISA, 29 U.S.C. § 1002(2)(A) and, further, is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

**The ESOP**

31.    The ESOP, a retirement benefit plan, upon information and belief, which is intended to qualify as an "employee stock ownership plan" -- defined as an "eligible individual account plan" ("EIAP") designed to invest primarily in employer securities pursuant to ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6).

32.    The ESOP, adopted effective October 29, 1985, is a combination of two stock bonus plans. One portion of the ESOP purportedly "constitutes a Tax credit Employee Stock Ownership Plan under Section 409 of the Code. The other portion of the [ESOP] constitutes a stock bonus plan under Section 401(a) of the Code and an employee stock ownership plan within the meaning of Section 4975(e)(7) of the code and subject to the applicable provisions of [ERISA]." *See* 2005 5500/ESOP Auditor's Report.[2]

33.    Upon information and belief, as of December 31, 2004, the ESOP covered all employees of the Company and its affiliates. *See* 2005 5500/ESOP Auditor's Report. However, effective May 1, 2004, employees were not permitted to become participants in the ESOP after December 31, 2004. *Id.*

34.    CTC is the Trustee of the ESOP. *Id.*

35.    ESOP participants are not permitted to contribute to their accounts. All Plan

---

[2] Effective April 30, 1993, "The Bear Stearns Companies Inc. 1992 Employee Stock Ownership Plan (the "1992 ESOP")" was merged with the ESOP. All assets and liabilities of the 1992 ESOP were transferred to the ESOP. *See* ESOP Auditor's Report.

investments are "nonparticipant-directed." *Id.* Effective December 31, 2004, all participants in the ESOP became fully vested in their account balances. *Id.* All participants are permitted to re-distribute a percentage of their vested assets to "The Bear Stearns Companies Inc. Cash or Deferred Compensation Plan ("401(k) Plan"). *See* 2005 5500/ESOP Auditor's Report. Indeed, the interlocked ESOP and 401(k) Plan are appropriately viewed as two components of a single "defined contribution retirement plan" for Company employees.

Upon information and belief, investments held by the ESOP consist primarily of common stock of the Company. *Id.* As of December 31, 2005, the ESOP held shares of Company stock valued at $281,796,270. *Id.*. The Plan also invested a portion of its assets in the Dreyfus Institutional Government Fund. *Id.*

## **CLASS ACTION ALLEGATIONS**

36.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between December 14, 2006 and the present (the "Class Period") and whose Plan accounts included investments in Bear Stearns stock.

37.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Bear Stearns stock.[3]

38.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the

---

[3] The 2005 5500/ESOP Auditor's Report indicates that at the beginning of that year that there were 7,978 Plan participants.

questions of law and fact common to the Class are:

    (a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

    (b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and Beneficiaries;

    (c)    whether Defendants violated ERISA; and

    (d)    whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

39.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

40.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

41.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

42.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

43.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

44.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

45.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Company, the Board and the Executive Committee were named fiduciaries of the Plan.

46.    Instead of delegating fiduciary responsibility for the Plan to external service providers, Bear Stearns chose to internalize at least certain aspects of this fiduciary function.

47.    Upon information and belief, the Company administered the Plan and the Plan's assets through the Board, the Executive Committee, and appointed day to day individual/committee fiduciaries, which had discretionary authority to manage and control the operation and administration of the Plan and investment of their assets, as noted and described above. The Company, through the Board, was upon information and belief, responsible for appointing, evaluating and monitoring the Executive Committee as well as, without limitation, any Plan investment committee and/or administrative committee, including their members and delegees.

### Additional Fiduciary Aspects of Defendants' Actions/Inactions

48.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed

fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

49.    Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and Beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).  Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions.");  *Jones v. Am. Gen. Life & Accident Ins. Co.,* 370 F.3d 1065, 1072 (11th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993).

50.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and Prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, Bear Stearns' SEC filings were incorporated into and part of the Plan's SPDs, Prospectus and/or the Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

51.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[4] concerning investment in company stock, including that:

(a)    Employees tend to interpret an investment of employee benefit plan assets in company stock as an endorsement of the company and its stock;

(b)    Out of loyalty, employees tend to invest in, and, where applicable, refrain from divesting, company stock;

(c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward; and

(d)    Employees tend not to change their investment option allocations in the plan once made;

52.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

### DEFENDANTS' CONDUCT

53.    Bear Stearns is one of the world's leading wealth management, capital market and advisory companies.    The Company provides a vast array of financial services, including investment banking, securities and derivatives trading, to corporations, governments, institutional and individual investors worldwide. *See* 2006 Form 10-K.

---

[4]  Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

54.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to Plan participants. Although they knew or should have known that the Company's stock was artificially inflated, due to the Company's mammoth involvement in the securitized subprime mortgage market, Defendants continuously reassured Plan participants and did nothing to protect the heavy investment of their retirement savings in Bear Stearns stock.

A.    **The Subprime Mortgage Industry**

55.    Subprime mortgage lending is defined as the practice of issuing high-interest or variable interest loans to customers with impaired or non-existing credit histories, who otherwise would not qualify for loans from mainstream lenders.

56.    Typically, subprime borrowers have relatively low credit scores along with little or no money to apply to a down-payment on a home. These individuals would usually be excluded from the mortgage market and, accordingly, would not have mortgages included in the secondary market.

57.    According to an article in *USA Today* on December 7, 2004, subprime mortgage lenders "offer products from fixed-rate mortgages to interest-only loans, where borrowers pay just the interest for a set number of years, or 80-20 loans, in which borrowers finance a home with an 80% mortgage at one rate and the remaining 20% through a second loan." *USA Today*, "Subprime Loan Market Grows Despite Troubles," December 7, 2004.

58.    Subprime mortgage loans represent a greater risk to lenders than prime mortgage loans. For example, one product marketed by some subprime lenders is a Pay Option ARM, which is an adjustable rate mortgage with an interest rate that changes monthly and payments that change annually. The borrower can choose from a variety of payment options, including one that is below what would be paid in an interest-only mortgage. Selection of this option would result in negative amortization, meaning that the loan's principal would actually *increase* during this period. Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed

since the loan was made. In both cases, the loan will become fully amortizing (meaning interest and principal payments will be made like a traditional mortgage. The reversion to full amortization is referred to as a "reset" or "recast" and can result in a substantial increase in a borrower's monthly mortgage payment. If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

59.    An additional product marketed by many subprime lenders is the 2/28 ARM, which is an adjustable rate mortgage that fixes rates for two years, and then resets to an ARM rate index value (*e.g.* the Treasury Bill rate or the London Inter-Bank Offering Rate (LIBOR)) plus a "margin" ("fixed percentage points above the "index " rate) after the two-year mark. For example, if the rate is 5% for two years but after two years, the index is 4% and the margin is 4.5%, a 5% loan becomes an 8.5% loan. As with the Pay Option ARM discussed above, if borrowers are unable to refinance the loan and obtain a more favorable arrangement, they may be in a position where they cannot meet their new mortgage payment once their fixed mortgage loan resets.

60.    Upon information and belief, many mortgage lenders intentionally steered borrowers into high-cost, unsuitable subprime loans. For instance, in 2006, $600 billion, or 20% of the total mortgage originations were subprime loans as compared with $40 billion in Federal Housing Administration ("FHA")-insured loans, which are typically less costly for borrowers, but less profitable for lenders. Further, FHA loans generally require borrowers to supply extensive documentation and therefore take much longer to secure approval. Evidence strongly suggests that lenders sought to profit on higher margin subprime mortgages by making subprime adjustable rate mortgages, even when borrowers could qualify for a loan through the FHA program. For example, *TheStreet.com* reported, as of April 2007, that "under current FHA requirements, approximately 18% of the 'pre-reset' subprime adjustable-rate mortgages, including those originated last year, could qualify for an FHA loan." *TheStreet.com*, "Subprime Swoon sparks an FHA Revival," April 30, 2007.

61.    Rather than hold mortgage loans, generally, lenders sell subprime mortgages "bundled into bonds and offered to individual and institutional investors. Mortgages are sold by lenders to the secondary market, pooled, securitized and sold to investors as mortgage-backed securities. The money that the lender receives for the sale of the mortgages on the secondary market is then used to fund new mortgages—increasing the lender's profits and, typically, boosting its stock price.

62.    As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans. Too often, this had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans. In other words, many lenders became less concerned with borrowers' ability to repay over the long term and more concerned with their mere volume of loans over the short term. This is because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay.

63.    Thus, as home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for these mortgages rose as well. For example, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5% in 2006, as reflected in the chart below:



Source: *The New York Times*, "Tremors at the Door," January 26, 2007.

64.     The substantial increase in mortgage loan defaults has had a tremendous impact upon the mortgage market. During the first half of 2007, dozens of lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

**B.     Bear Stearns' Heavy Participation in the Subprime Market**

65.     Generally speaking, collateralized debt obligations ("CDOs") are pools of bonds, loans and other asset-backed securities. After mortgages are written, investment banks pool them together and use the cash flows they produce to pay off mortgage-backed bonds, which are underwritten by investment banks. The mortgage bonds, in turn, are often packaged again into CDOs and sold to investors in slices. In 2006, CDOs soaked up an estimated $150 billion of mortgage-backed bonds, the vast majority of which were underpinned by subprime mortgages. A CDO usually takes several months to assemble a portfolio of bonds before it raises money from investors by issuing securities of its own. During the "ramp-up" period, CDO managers -- typically big money managers -- work with a Wall Street bank to buy and collect the securities that will be bundled together. The bank often bears the risk of short-term fluctuations in prices

18

of the bonds prior to the sale of the CDO.  Serena Ng and Michael Hudson, *Mortgage Shakeour May Roil CDO Market*, *The Wall Street Journal*, March 13, 2007.

66.    Bear Stearns was deeply entrenched in investments in the subprime mortgage market, including CDOs and other mortgage-backed securities.  By some accounts, the Company was "the biggest packager of residential U.S. mortgage-backed securities for the past three years [since 2004]."  Jed Horowitz, *Bear Stearns Says Subprime Mortgage Exposure is Negligible*, *MarketWatch*, March 29, 2007.  It was also "the top underwriter of U.S. mortgage-backed securities for the fiscal year ended in November [2006] with securitizations rising 19% to $113 billion."  *Id.*

67.    The problems in the subprime mortgage industry had investors demanding much higher returns on CDOs they buy, which had the impact of making them more difficult to sell and drove down prices.  Despite the fact that most investment banks recognized warning signs and reduced their exposure to CDOs, Bear Stearns failed to take adequate measures to address limit its exposure to losses resulting from its substantial entrenchment in the subprime mortgage market.  Even in the midst of the brewing subprime crisis, the Company absolutely refused to admit its vulnerability.  Asked to comment on the Company's potential exposure to the troubled subprime mortgage lending market, the "[C]ompany's mortgage chief said Bear Stearns has no loans outstanding to 'headline' mortgage companies that are in, or near bankruptcy, and only 'modest' exposure to the subprime sector in general."  Jed Horowitz, *Bear Stearns Says Subprime Mortgage Exposure is Negligible*, *MarketWatch*, March 29, 2007.

68.    Bear Stearns also unwisely continued to entrench itself further in the subprime market.  In February 2007, the Company purchased subprime mortgage firm Encore Credit Corp. which made $6.1 billion of loans in 2006.  *Id.*  Moreover, EMC Mortgage Corp., a subsidiary of Bear Stearns, bought about $69.2 billion of subprime and Alt-A loans in 2006.  *Id.*  Alt-A loans are made to borrowers without stringent checks of their ability to keep up with payments and include some subprime mortgages.  *Id.*

69.    Thus, when the subprime mortgage market collapsed, Bear Stearns found itself

trapped with a substantial amount of debt that investors were simply not interested in.

70.     Certain of Defendants had a clear conflict of interest, as their compensation was tied to the Company's performance. Thus, despite the fact that they knew or should have known that Bear Stearns' heavy involvement in the CDO market would lead to a substantial devaluation of the Company's stock once the truth became known, certain of Defendants had a very strong financial incentive to conceal the truth and keep the Company's stock price artificially high and write-downs for subprime losses artificially low. Just before the subprime market began to collapse certain of the Defendants cashed in their inflated earnings. Tellingly, while doing nothing to protect the Plan or its participants, Defendants Greenberg, Molinaro, Cayne and Spector sold some of their personal holdings of Company stock valued at more than $57 million during the Class Period while the stock was still significantly inflated. Brett Arends, *Bear Stearns Fat Cats Cashed Out at the Top*, TheStreet.*com,* August 8, 2007. It is reported that these executives saved themselves nearly $16 million because of the timing of their sales. *Id.*

C.     **During the Class Period, Bear Stearns Disseminated Materially Inaccurate, Incomplete and Misleading Information to Plan participants**

71.     Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plan's participants, particularly regarding the following: (1) that the Company was grossly over-exposed to the potential for substantial losses as conditions in the subprime industry deteriorated; (2) that the Company concealed the ominous dangers it faced as a result of its huge exposure to CDOs; (3) that the Company failed to take accurate and timely write-downs for losses resulting from the collapse of the subprime market; (4) that the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

72.     Bear Stearns's dissemination of inaccurate, incomplete and materially misleading statements prevented the market from realistically assessing Bear Stearns and its financial well-being, thus resulting in the overvaluation and artificial inflation of its stock. Defendants further

20

knew or should have known that the Company's stock price would plummet—and that Plan participants would suffer tremendously and unnecessarily—once the foreboding truth became known.

73.    Nonetheless, throughout the Class Period, the Company fostered a positive image to assure the market and Plan participants that Bear Stearns would not fall prey to adverse trends in the credit industry—particularly, the subprime mortgage industry.

74.    For example, on December 14, 2006, the first day of the Class Period, Bear Stearns issued a press release regarding its 2006 fourth quarter earnings.  In the press release, the Company touted its apparent success in the mortgage industry.  The press releases stated: "In the mortgage business, the record results were driven by market share gains in commercial mortgage-backed securities and the growth in captive origination volumes form the vertical integration of the mortgage platform.  In addition, collateralized loan and debt organization activities *increased* substantiall*y*."  In other words, as many other lenders were going out of business or taking losses that they were not expecting, Bear Stearns announced confidence in its performance and stated that it was moving deeper still into the murky mire of the subprime mortgage industry.  As of December 14, 2006, Bear Stearns stock was trading at just over $157 per share.

75.    On March 15, 2007, Bear Stearns issued its financial results for the first quarter of 2007, reporting strong growth in net earnings, with net income up 8% from the prior year's first quarter period or $554 million.  Defendant Cayne boasted that, "[w]e are pleased with this excellent performance, revenues for the first quarter were up for every business segment. . . . Growing the company remains a core focus as we continue to invest in our domestic and international franchises with successful results."  March 15, 2007 Press Release.

76.    Bear Stearns continued to maintain a public stance that it was immune to what appeared to be an impending subprime mortgage crises.  "To date, problems in the subprime market have not spread to the broader market" said Defendant Molinaro on March 15, 2007 in dismissing the notion that Bear Stearns was in danger.  *See* Tim McLaughlin, *Bear Stearns*

*Calms Subprime Jitters*, *Reuters*, March 15, 2007.  Others were not as confident.  "He's going to have to eat those words in a matter of months" said the almost prescient Lee Forker, president of a company that owned shares of Bear Stearns.  *Id.*  Nonetheless, Bear Stearns' public pronouncements kept its stock buoyed and above Wall Street's profit expectations.  *Id.*

77.    By the end of April 2007, Bear Stearns stock was trading above $148 per share.

78.    On June 14, 2007, in reporting its 2007 second quarter results, Bear Stearns acknowledged that "[m]ortgage-related revenues reflected both industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in the sub-prime and Alt-A mortgage sectors."  June 14, 2007 Press Release.  Nevertheless, Defendant Cayne was effusive in his praise of the Company's prospects.  According to him [t]he diversity of our franchise is clearly demonstrated in the record net revenues generated this quarter." *Id.*

79.    During June and July 2007, two hedge funds managed by the Company were devastated by mortgage losses and subsequently went bankrupt.  The failure of the two mortgage-related funds, Bear Stearns High-Grade Structured Credit Strategies Fund and High-Grade Structured Enhanced Leverage Fund, cost investors $1.6 billion.  As a result of the collapse of these two hedge funds, the Company has faced several lawsuits including one by Barclay's Bank which "accused Bear Stearns . . . of loading one of its hedge funds with about $500 million in troubled assets just weeks before it . . . collapsed."  Reuters, *Bank Sues Bear Stearns in Fund Collapse, NYtimes.com.*, December 20, 2007.  Moreover, it was recently announced that Bear Stearns may face an indictment over the collapsed hedge funds.  *See* http://www.finalternatives.com/node/3503.

80.    In the wake of the collapse of its two hedge funds, it was noted that the Company was "overexposed to the slumping mortgage market, which contributed to a 10 percent drop in net income in the first quarter" of 2007.  Landon Thomas, Jr., *Salvaging a Prudent Name, The New York Times*, June 29, 2007.  Yet the Company refused to admit its increasingly precarious position.  Instead, Defendant Cayne proudly noted, "The firm is doing really well, and we are

expanding in Asia and Europe . . . . We have a phenomenal franchise." *Id.*

81.    On September 20, 2007, the Company reported third quarter results that included approximately $200 million in losses and expenses related to collapsed mortgage-related hedge funds.  Nonetheless, Defendant Cayne maintained he was "confident in the underlying strength of our business and proud of the effort and determination displayed by our employees during these challenging times."  September 20, 2007 Press Release.

82.    Throughout autumn 2007, the stock prices of many large lenders/investment banks dropped significantly.  This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges.  Nevertheless - and despite the Plan's heavy investment in Company stock -- and Bear Stearns' own negative experience from the summer with its failed mortgage-related hedge funds, it stubbornly stood its ground and continued to deny the truth about its financial condition.

83.    In fact, it is reported that Defendant Cayne "often left for weeks at a time to attend bridge tournaments and would take the occasional Friday off during the summer, in the midst of the subprime crisis, for rounds of golf near his second home in New Jersey."  Landon Thomas, Jr., *Bear's Cayne to Quit as Chief Executive, NYtimes.com*, January 8, 2008.

**The Truth Finally Begins to Emerge: Drastic Measures to Save the Company**

84.    Finally, Bear Stearns was not able to conceal the truth anymore and had to reveal the risks and value of its mortgage-backed securities to the public and the Plan participants on November 14, 2007 when it announced a write-down of $1.2 billion of mortgaged-backed debt instruments held on its balance sheets.  By November 30, 2007, total net inventory write-downs were $1.9 billion.  December 20, 2007 Company Press Release.

85.    During 2007, the Company's profits fell 90 percent.  It reported a larger-than-expected writedown of its mortgage portfolio, leading to its first quarterly loss in its 84-year history.  *See The Truth About Mortgage.com*, December 20, 2007.  Moreover, the Company suffered a loss of $859 million for its fourth quarter 2007, down from a profit of $558 million

from the same period the year prior. Evelyn M. Rusli, *Bear Stearns: From Bad to Worse*, *Forbes.com*, December 20, 2007. *See also* Form 10-K filed with the Securities and Exchange Commission on January 29, 2008, for the fiscal year ended November 30, 2007 (2007 Form 10-K).

86.     Culminating this streak of disappointing news, on January 8, 2008, Defendant Cayne stepped down as CEO of the Company, although he maintained his position on the Board. But there was yet more bad news to come.

87.     As late as the week beginning March 10, 2008 the Company continued to deny that it was in dire straits. In a press release issued by the Company on Monday March 10, 2008, Defendant Schwartz said, "Bear Stearns' balance sheet, liquidity and capital remain strong." March 10, 2008 Press Release.

88.     However, this statement was far from the truth. Days of speculation during the week that the Company was in deep trouble – amidst the Company's public statements to the contrary - came to fruition on Thursday, March 13, 2008, when the Company sought and obtained emergency funding backed by the federal government. "In an extraordinary move, the Federal Reserve and J.P. Morgan Chase & Co. ("J.P. Morgan") stepped in to keep Bear afloat following a severe cash crunch." Kate Kelly, *Fed Races to Rescue Bear Stearns In Bid to Steady Financial System*, *The Wall Street Journal, Weekend Edition*, March 15-16, 2008.

89.     As later revealed, by Thursday afternoon, "Securities firms that had been willing to accept collateral from Bear Stearns were insisting on cash instead, and the hedge funds that use Bear Stearns to borrow money and clear trades were withdrawing cash from their accounts. Around 4:30 p.m. [Thursday, March 12, 2008], Mr. Schwartz was convinced that Bear was facing a desperate situation." Kate Kelly, *Fed Races to Rescue Bear Stearns In Bid to Steady Financial System*, *The Wall Street Journal, Weekend Edition*, March 15-16, 2008.

90.     This situation should not have come as a surprise to the Company, however, as the "pressure on Bear Stearns ha[d] built for weeks as big hedge funds like Citadel Investment Group and Renaissance Technology Corp. pulled accounts and shifted them to other prime

brokers." Gregory Zuckerman, *Bear Stearns Discovers Risk of Its Hedge-Fund Business*, *The Wall Street Journal*, March 17, 2008.

91.    The Company reached out to J.P. Morgan, the second-largest U.S. bank in stock-market value, for help. Together, the Company and J.P. Morgan, approached Federal Reserve representatives to craft a solution. Kate Kelly, *Fed Races to Rescue Bear Stearns In Bid to Steady Financial System*, *The Wall Street Journal, Weekend Edition*, March 15-16, 2008. The Federal Reserve decided Bear Stearns' situation was so dire that it invoked a seldom used Depression-era law to save the Company – at least temporarily.

92.    A 1932 provision of the Federal Reserve Act allows the Federal Reserve to lend to non-commercial banks, such as Bear Stearns, if at least five of its seven governors approve. This law was last used to make loans during the Depression. Greg Ip, *Desperate Fed Dusts Off Remedy From the Depression to Save Bear*, *The Wall Street Journal, Weekend Edition*, March 15-16, 2008. Highlighting the extreme reluctance to exercise this provision, on March 4, 2008, Federal Reserve Vice Chairman Donald Kohn told Congress "'I would be very cautious about opening that window up' to investment banks." *Id.*

93.    After consultations between Bear Stearns, New York Federal Reserve President Timothy Geithner, Mr. Kohn, Federal Reserve Chairman Ben Bernanke, Secretary of the Treasury Henry Paulson, the Securities and Exchange Commission and President George W. Bush, the Federal Reserve decided to extend a loan to Bear Stearns. *Id.* Doing so even required invocation of another section of the 1932 Federal Reserve Act that allows just four governors to approve the decision since one governor was en route from Europe and two seats are currently vacant. *Id.* The loan arrangement was consummated during the early morning business hours on Friday, March 14, 2008.

94.    Per the terms of the arrangement, Bear Stearns will have access to "desperately needed cash" for an initial 28 day period. Kate Kelly, *Fed Races to Rescue Bear Stearns In Bid to Steady Financial System*, *The Wall Street Journal, Weekend Edition*, March 15-16, 2008. J.P. Morgan will borrow the money from the Federal Reserve and relend it to Bear Stearns. The

amount to be borrowed by Bear Stearns is only limited to how much collateral it can provide. *Id.* J.P. Morgan is the conduit for the loan because (1) it already has access to the Federal Reserves' discount window – through which it can lend directly to commercial banks, (2) J.P. Morgan is supervised by the Federal Reserve, and (3) J.P. Morgan clears for Bear Stearns and knows the firm well. Greg Ip, *Desperate Fed Dusts Off Remedy From the Depression to Save Bear*, *The Wall Street Journal, Weekend Edition*, March 15-16, 2008. However, if Bear Stearns fails and the collateral it has provided is insufficient to cover the loan, the Federal Reserve, not J.P. Morgan, will take the loss. *Id.*

95.    The rarity of this relief only serves to reinforce the egregiousness of Defendant Schwartz' clearly inaccurate statements from earlier in the week. Nonetheless, the Company sought to sugar-coat the public revelation on Friday, March 14, 2008, that the Company had sought help to ease its cash crunch. In a press release, Defendant Schwartz stated "Bear Stearns has been the subject of a multitude of market rumors regarding our liquidity. We have tried to confront and dispel these rumors and parse fact from fiction. Nevertheless, amidst this market chatter, our liquidity position in the last 24 hours had significantly deteriorated. We took this important step to restore confidence in us in the marketplace, ***strengthen our liquidity and allow us to continue normal operations***." (emphasis added) March 14, 2008 Press Release.

96.    As reported in *FT.com* though, "[c]onfidence in Bear Stearns collapsed . . . after . . . [it] said it had arranged for an unspecified amount of emergency funding from JP Morgan and the Federal Reserve Bank of New York because its liquidity position had 'significantly deteriorated.'" Aline van Duyn, *Emergency Funding for Bear Stearns, FT.Com*, March 14, 2008.

97.    Leading up to Bear Stearns' announcement on Friday, the Company's stock had plunged, trading down 11.3%., or $6.42, to $50.57 in the early morning trading hours of March 13. However, this was only part of a free fall of the Company stock during the week of March 10, 2008. The Company's shares had already fallen 18.6% between Monday morning and the close of the stock market on Thursday afternoon. By the close of the New York Stock Exchange

on Friday, March 14, Bear Stearns' stock had dropped to $30, its lowest mark in nearly a decade.

98.     Bear Stearns' woes has had a substantial impact on the Company's employees. Due to Company stock sale lock-ups weeks prior to the company's earning announcements, Bear Stearns' 14,000 employees were prohibited from trading company shares and could only watch helplessly as their assets in Company stock eroded. "'We're not allowed to touch it,'" said one. 'We've just gotten toasted.'" Kate Kelly, *Fed Races to Rescue Bear Stearns In Bid to Steady Financial System, The Wall Street Journal, Weekend Edition*, March 15-16, 2008.

99.     Unfortunately for the Company's employees, the worst was yet to come. Even as Defendant Schwartz was reassuring the Companies' employees and the public in the Friday March 14 Press Release "[s]ome Wall Street executives said they thought Bear was likely to be sold, in whole or piecemeal, in a matter of days, as a way to prevent it from going under." Kate Kelly, *Fed Races to Rescue Bear Stearns In Bid to Steady Financial System, The Wall Street Journal, Weekend Edition*, March 15-16, 2008.

100.     In fact, over the weekend of March 15-16, the Company was indeed sold. J.P. Morgan, strongly encouraged by the federal government, agreed in principle to buy Bear Stearns for the paltry price of $2 a share, or $236 million. Robin Sidel, *J.P. Morgan Rescues Bear Stearns,* March 17, 2008. This proposed sale saved Bear Stearns which was "headed for almost certain insolvency." *Id.* However, this sale -- far less than the $3.54 billion stock-market value of the Company - is particularly devastating to Bear Stearns' employees–who own a third of the Company's outstanding shares. *Id.*

101.     The sale which is expected to close before the end of the second quarter has been approved by the board of directors of both J.P. Morgan and Bear Stearns. *Id.* It has also received the blessing of federal government officials. It is only subject to shareholder approval. *Id.*

102.     Overall, during the Class Period, the Company stock experienced a tremendous decline. On December 14, 2006 (the beginning of the Class Period), Bear Stearns stock closed at $157.89 per share and reached a Class Period high close of $169.61 per share on January 12,

2007 as a result of Defendants' concealment of the truth regarding the Company's artificially inflated revenues and its failure to accurately report its true financial condition.

103.    However, once the truth emerged, Plan participants suffered drastically as Bear Stearns's stock price plunged.  As noted above, on March 14, 2008, after shares of Bear Stearns closed at $30.00 per share, the Company's stock had suffered **an 81% drop from the beginning of the Class Period**.  After the sale to J.P. Morgan at $2 per share the Company stock opened at $3.17 on Monday, March 17, 2008—*a 98% drop from the beginning of the Class Period*.  This drop, especially given the Plan's enormous investment of the Plan's participants' retirement savings in Bear Stearns stock, caused hundreds of millions in losses to the Plan and the Class.

**D.    Defendants Knew or Should Have Known That Bear Stearns Stock Was An Imprudent Investment For The Plan, Yet Mislead Plan Participants.**

104.    During the Class Period, the Company concealed, distorted and misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.

105.    As a result of the enormous erosion of the value of Company stock, Plan participants, the retirement savings of whom was heavily invested in Bear Stearns stock, suffered unnecessary and unacceptable losses.

106.    At all relevant times, Defendants knew or should have known that Bear Stearns stock was an imprudent investment in the Plan, as a result of the risks to its financial well-being due to the risk associated with subprime lending as evidenced by failure of numerous mortgage lending competitors that went out of business as a result of increased delinquencies and foreclosures in the sub-prime sector; despite representations otherwise, its knowledge that it would confront a liquidity crisis which would impair future business operations; and the inevitable drop in the value of Company stock as the truth emerged regarding Bear Stearns's need for significant sums of cash as its liquidity evaporated.

107.    Through their high ranking positions within the Company- especially the Director Defendants, Defendants knew or should have known of the existence of the above-mentioned problems.

108.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Bear Stearns stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

109.    Defendants also failed to conduct an appropriate investigation into whether Bear Stearns stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Bear Stearns' deep-rooted problems so that participants could make informed decisions regarding whether to divest their Bear Stearns stock in the Plan into alternatives provided in the related 401(k) plan.

110.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Bear Stearns stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

111.    Because Defendants knew or should have known that Bear Stearns stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan' investment in Bear Stearns stock.

112.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Bear Stearns stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Bear Stearns they could not loyally

serve the Plan and its participants in connection with the Plan' acquisition and holding of Bear Stearns stock.

113.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Bear Stearns stock.   In fact, the Defendants continued to allow heavy investment of the Plan's assets in Company stock even as Bear Stearns's problems came to light.

**E.   Defendants Regularly Communicated with the Plan's Participants Regarding Investments in Bear Stearns Stock Yet Failed to Disclose the Imprudence of Plan Investment in Bear Stearns Stock**

114.   Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company whose common stock was, one of, if not the, largest assets of each of the Plan.   During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.   As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

115.   The SEC filings and related Company statements and releases issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plan's participants to hold and maintain investments in the Plan in Bear Stearns stock.

116.   These statements, their related press releases, and substantially similar SEC filings and press releases issued during the Class Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the Plan' participants of the Company's ever-increasing problems with its key product lines, including loan defaults, liquidity concerns and shrinking demand.   These statements were made with the implicit knowledge that the Plan' participants would rely upon such information in determining whether to maintain

investment in Bear Stearns stock.

F.    **Defendants Suffered From Conflicts of Interest**

117.    Bear Stearns' SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company Officers' compensation was in the form of stock option awards.

118.    Because the compensation of at least several of the Defendants was significantly tied to the price of Bear Stearns stock, Defendants had incentive to keep the Plan's assets heavily invested in Bears Stearns stock on a regular, ongoing basis. Elimination of Company stock as an investment option/vehicle for the Plan would have reduced the overall market demand for Bear Stearns stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Bear Stearns stock, resulting in reduced compensation for the Defendants.

119.    Some Defendants may have had no choice in tying their compensation to Bear Stearns stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Bear Stearns stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

120.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and Beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Hill v. BellSouth Corp.,* 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

## CLAIMS FOR RELIEF UNDER ERISA

121.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

122.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

123.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

124.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

125.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things:

a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and

accurate information material to the circumstances of participants and beneficiaries.

126.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

127.    Further, regardless of whether the Plan is more properly viewed as part of a comprehensive defined contribution retirement plan in combination with the 401(k) plan, or considered am "ESOP" under ERISA, "[b]y force of statute, Defendants had the fiduciary responsibility to disregard [any Plan document purporting to mandate Plan investment in Company stock] and eliminate Plan investments in [Company] stock if the circumstances warranted." *In re Polaroid ERISA Litig.*, 362 F.Supp. 2d 461, 474 (S.D. N.Y. 2005) (citing 29 U.S.C. § 1104(a)(1)(D)).   "As such, to the extent [Bear Stearns] stock was an imprudent investment, Defendants possessed the authority as a matter of law to exclude [Bear Stearns] stock from the ESOP . . . ." *Id.* at 474-475.

128.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

129.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

130.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

131.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

132.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

133.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plan as described herein.  Investment in the Company stock during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants'

retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

134.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.   Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

135.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and. Indirectly, Plaintiff and the Plan's other participants and Beneficiaries, lost a significant portion of their retirement investment.

136.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Provide Complete and Accurate Information
to the Plan's Participants and Beneficiaries by all Defendants
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and
405 of ERISA by the Company, Director & Executive Committee Defendants)**

137.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.    At all relevant times, as alleged above, the above-listed Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

139.    At all relevant times, the scope of the fiduciary responsibility of the above-listed Defendants included Plan-related communications and material disclosures.

140.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of whether or not to keep or divest, to the extent possible, their Company stock investments in the Plan. This duty applies to all of the Plan's investment options, including investment in Company stock.

141.    These Defendants knew that investment in Company stock carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

142.    These Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Company's difficulties with its various product lines, their concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook. These failures were particularly devastating to the Plan and their participants— losses in this investment had an enormous impact on the value of participants' retirement assets.

143.    These actions and failures to act were uniform and caused the Plan, and/or the participants and beneficiaries of the Plan, to continue to make and maintain substantial investments in Company stock in the Plan at a time when these Defendants knew or should have known that the Plan's participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments. Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company stock.

144.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries

to provide complete and accurate information regarding the Company stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy the breaches.

145.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of the Plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company stock and were material to any reasonable person's decision about whether or not to maintain any part of their invested assets of the Plan in the Company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

146.    As a consequence of these Defendants' breaches of fiduciary duty, the Plan suffered hundreds of millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

147.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest

**(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)**

148.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

149.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

150.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

151.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company's own securities; and by otherwise placing their own and the Company's interests above the interests of the participants with respect to the Plan' investment in the Company's securities.

152.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered hundreds of millions of dollars in losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

153.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count

## COUNT IV

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information**

**(Breaches of Fiduciary Duties in Violation of ERISA § 404
by Bear Stearns & Director Defendants)**

154.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

155.    At all relevant times, as alleged above, Bear Stearns and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

156.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Bear Stearns and the Director Defendants, included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Executive Committee.

157.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.   In this case, that means that the monitoring fiduciaries, Bear Stearns and the Director Defendants, had the duty to:

(1)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(4)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)    Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants. The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

158.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

159.    Bear Stearns and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation. Bear Stearns and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently continuing to invest the assets of the Plan in Bear Stearns stock when it no longer was prudent to do so. Despite this knowledge, Bear Stearns and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

160.    In addition, Bear Stearns and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Bear Stearns that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and

continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

161.    Bear Stearns and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

162.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan' other participants and beneficiaries, lost a significant portion of their retirement investments.

163.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

164.    The Plan suffered hundreds of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan' participants.

165.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

166.    As noted above, as a consequence of the Defendants' breaches, the Plan suffered significant losses.

167.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to

make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

168.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

169.    Plaintiff, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

170.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

**SECTION 404(c) DEFENSE INAPPLICABLE**

171.    The Plan suffered losses, and the Plaintiff and the other Class members suffered losses, because substantial assets in the Plan were invested in Bear Stearns Stock during the Class Period in violation of the Defendants' fiduciary duties.

172.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan

satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

173.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.    In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.    In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i).

174.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Bear Stearns stock in the Plan.    Accordingly, participants failed to exercise the requisite independent control over their investment in Bear Stearns stock in the Plan.

175.    In addition, § 404(c) does not apply to any portion of the Plan (1) derived from Company matching or profit-sharing contributions as those investments/investment vehicles were made/invested by/through the sole discretion of the Company or (2) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997).

176.    The Defendants' liability to the Plan, Plaintiff and the Class for relief stemming from the Plan's imprudent investments in Bear Stearns Stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.    An Order that Defendants allocate the Plan' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Bear Stearns maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Bear Stearns;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: March 17, 2008

Respectfully submitted,

**DEALY & SILBERSTEIN, LLP**
Milo Silberstein (MS 4637)
William J. Dealy (WD 9776)
225 Broadway, Suite 1405
New York, NY 10007
Telephone: (212) 385-0066
Facsimile:  (212) 385-2117


**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Mark K. Gyandoh
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff and Proposed Class*