**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AARON HOWARD, individually and on behalf of all others similarly situated, | ) ) |
| | ) |
| Plaintiff, | ) Case No. 08-CV-2804 |
| | ) |
| v. | ) |
| | ) |
| THE BEAR STEARNS COMPANIES INC., THE BEAR STEARNS COMPANIES INC. EXECUTIVE COMMITTEE, JAMES E. CAYNE, ALAN D. SCHWARTZ, WARREN J. SPECTOR, SAMUEL L. MOLINARO, JR., ALAN C. GREENBERG and JOHN DOES 1-10, | ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

*[additional captions follow]*

**DECLARATION OF EDWARD W. CIOLKO IN SUPPORT OF MOTION BY PLAINTIFFS AARON HOWARD AND SHELDEN GREENBERG TO: CONSOLIDATE ERISA ACTIONS; APPOINT INTERIM LEAD PLAINTIFFS, INTERIM CO-LEAD CLASS COUNSEL AND INTERIM LIAISON COUNSEL; AND FOR ENTRY OF PRETRIAL ORDER NO. 1**

| | |
|---|---|
| ESTELLE WEBER, individually, on behalf of the Bear Stearns Companies Inc. Employee Stock Ownership Plan, and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>THE BEAR STEARNS COMPANIES, INC., CUSTODIAL TRUST COMPANY, JAMES CAYNE, ALAN SCHWARTZ, WARREN SPECTOR, SAMUEL MOLINARO, ALAN GREENBERG, and JOHN DOES 1-20,<br><br>        Defendants. | Case No. 08-CV-2870 (RWS) |
| ANTHONY PISANO, individually and on behalf of all others similarly situated.<br><br>        Plaintiff,<br><br>        v.<br><br>THE BEAR STEARNS COMPANIES, INC., JAMES E. CAYNE, ALAN D. SCHWARTZ, WARREN J. SPECTOR, SAMUEL L. MOLINARO, JR., ALAN C. GREENBERG, and JOHN AND JANE DOES 1-20,<br><br>        Defendants. | Case No. 08-CV-3006 (UA) |

| | |
|---|---|
| HANS MENOS, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>THE BEAR STEARNS COMPANIES, INC., JAMES CAYNE, ALAN D. SCHWARTZ, WARREN J. SPECTOR, SAMUEL L. MOLINARO, JR., ALAN C. GREENBERG, and JOHN AND JANE DOES 1-10,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 08-CV-3035 (UA) |
| IRA GEWIRTZ, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>THE BEAR STEARNS COMPANIES, INC., JAMES E. CAYNE, ALAN D. SCHWARTZ, WARREN J. SPECTOR, SAMUEL L. MOLINARO, JR., ALAN C. GREENBERG, and JOHN AND JANE DOES 1-20,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 08-CV-3089 (RWS) |
| DREW V. LOUNSBURY, Individually and On Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>vs.<br><br>THE BEAR STEARNS COMPANIES INC. JAMES E. CAYNE; ALAN C. GREENBERG; ALAN D. SCHWARTZ; PAUL A. NOVELLY; FRANK T. NICKELL; FREDERIC V. SALERNO; VINCENT TESE; and JOHN AND JANE DOES 1-10,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 08-CV-3326 (UA) |

| | |
|---|---|
| SHELDEN GREENBERG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | |
| vs. | |
| THE BEAR STEARNS COMPANIES INC. JAMES E. CAYNE; ALAN C. GREENBERG; JEFFREY MAYER; SAMUEL L. MOLINARO, JR., ALAN D. SCHWARTZ; WARREN J. SPECTOR; and JOHN AND JANE DOES 1-10, | |
| Defendants. | |

Case No. 08-CV-3334 (UA)

| | |
|---|---|
| SCOTT WETTERSTEN, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | |
| vs. | |
| THE BEAR STEARNS COMPANIES INC., JAMES E. CAYNE, ALAN D. SCHWARTZ, WARREN J. SPECTOR, SAMUEL L. MOLINARO, ALAN C. GREENBERG, and JOHN AND JANE DOES 1-10, | |
| Defendants. | |

Case No. 08-Cv-03351 (UA)

I, Edward W. Ciolko, declare:

1.      I am a partner at Schiffrin Barroway Topaz & Kessler, LLP ("SBTK"), counsel of record for Aaron Howard.  I make this declaration in support of the Motion by Plaintiffs Aaron Howard and Shelden Greenberg to: Consolidated ERISA Actions; Appoint Interim Lead Plaintiffs, Interim Co-Lead Counsel and Interim Liaison Counsel; and for Entry of Pretrial Order No. 1.

2.      Attached hereto as Exhibit A is a true and correct copy of Plaintiff's letter to Defendant requesting documents pursuant to ERISA § 104(b)(4) dated March 21, 2008.

3.      Attached hereto as Exhibit B is a true and correct copy of Plaintiff's letter to Defendant regarding document and electronically stored information retention dated March 21, 2008.

4.      Attached hereto as Exhibit C is a true and correct copy of Plaintiff's letter to JP Morgan Chase Legal Department dated March 24, 2008.

5.      Attached hereto as Exhibit D is a true and correct copy of Plaintiff's letter to the Legal Department of Bear Stearns dated March 24, 2008.

6.      Attached hereto as Exhibit E is a true and correct copy of the firm biography of SBTK.

7.      Attached hereto as Exhibit F are true and correct copies of excerpts of the Final Fairness Hearing Transcript in *In re*: *Tyco Int'l, Ltd,* No. 02-MD-1335-B (D.N.H. Nov. 2, 2007).

8.      Attached hereto as Exhibit G is a true and correct copy of the Transcript of the Final Fairness Hearing in *In re: Citigroup Litigation*, No. 03-CV-2932 (S.D.N.Y. Nov. 15, 2006).

9.     Attached hereto as Exhibit H is a true and correct copy of the Transcript of the Final Fairness Hearing in *In re Interpublic Sec. Litig.*, No. 02-CV-6527 (S.D.N.Y. Oct. 2, 2004).

10.     Attached hereto as Exhibit I is a true and correct copy of the Transcript of the Fairness Hearing in *Woods v. Southern Co.*, No. 04-CV-1912-RWS (N.D. Ga. Aug. 14, 2007).

11.     Attached hereto as Exhibit J is a true and correct copy of the Transcript of the Final Fairness Hearing in *In re Westar Energy ERISA Litig.*, No. 03-CV-4032-JAR (D. Kan. July 27, 2006).

12.     Attached hereto as Exhibit K is a true and correct copy of the Transcript of the Final Fairness Hearing in *In re Mirant Corp. ERISA, et al.*, No. 03-cv-1027-RWS (N.D. Ga. Nov. 16, 2006).

13.     Attached hereto as Exhibit L is a true and correct copy of the Transcript of the Final Fairness Hearing in *In re Honeywell ERISA Litig.*, No. 03-CV-01214 (DRD) (D.N.J. July 19, 2005).

14.     Attached hereto as Exhibit M is a true and correct copy of the firm biography of Dealy & Silberstein, LLP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 7, 2008.

       /s/ Edward W. Ciolko
       Edward W. Ciolko

# EXHIBIT

# A

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
Attorneys at Law

www.sbtklaw.com

280 King of Prussia Road • Radnor, Pennsylvania 19087 • (610) 667-7706 • Fax: (610) 667-7056
2125 Oak Grove Road, Suite 120 • Walnut Creek, California 94598 • (925) 945-0770 • Fax: (925) 945-8792

Writer's Direct Dial: 610-822-0242
E-Mail: eciolko@sbtklaw.com

March 21, 2008

**VIA FEDERAL EXPRESS**

The Bear Stearns Companies, Inc.
383 Madison Ave
New York, NY 10179-0001
Attention:  Plan(s) Administrator c/o the Executive Committee of The Bear Stearns
            Companies Inc. Employee Stock Ownership Plan and The Bear Stearns
            Companies Inc. Cash or Deferred Compensation Plan

       Re:    ***Howard, et al. v. The Bear Stearns Companies Inc., et al.,***
              **USDC – SDNY Case No. 08-2804**

Dear Sir or Madam:

       On behalf of our client, Aaron Howard, participant in The Bear Stearns Companies,
Inc. Employee Stock Ownership Plan and The Bear Stearns Companies Inc. Cash or
Deferred Compensation Plan (collectively, the "Plans"), I am requesting copies of the
following documents regarding each of the Plans: the most recent master Plan Document,
Summary Plan Descriptions, Summaries of Material Modification created since the Plans
most recent operative versions became effective; IRS/DOL Form 5500s and SEC Form
11(k)s during the same time period; annual reports; and any other bargaining agreement,
trust agreement, contract or other instrument under which the Plans and/or any related
defined contribution plan are established or operated.    *See* ERISA  §  104(b)(4).
Additionally, this request includes any contract or instrument describing the composition
and/or role of any person(s) charged with administering the Plans, including, but not limited
to The Compensation, Management, Development and Successor Committee, The
Investment Committee, The Administrative Committee (collectively the "Committees"), and
any entity or committee of The Bear Stearns Companies Inc. ("Bear Stearns") with
oversight/appointment authority over the Committees, including any of the above named
Committees or the Board of Directors of Bear Stearns.

       As you are aware, our client is entitled to these documents under ERISA § 104(b)(4).
Please send the requested documents and any invoice for copying charges to me at the
above address within thirty (30) days of receipt of this letter.

Bear Stearns
March 21, 2008
Page Two

Thank you for your prompt attention to this matter.

Very truly yours,

Edward W. Ciolko

EWC/km

# EXHIBIT

# B



**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Attorneys at Law

www.sbtklaw.com

280 King of Prussia Road • Radnor, Pennsylvania 19087 • (610) 667-7706 • Fax: (610) 667-7056
2125 Oak Grove Road, Suite 120 • Walnut Creek, California 94598 • (925) 945-0770 • Fax: (925) 945-8792

Writer's Direct Dial: (610) 822-0242
E-Mail: eciolko@sbtklaw.com

March 21, 2008

**VIA FEDERAL EXPRESS**

The Bear Stearns Companies, Inc.
383 Madison Ave
New York, NY 10179-0001
Attention:  Plan(s) Administrator c/o the Executive Committee of The Bear Stearns
          Companies Inc. Employee Stock Ownership Plan and The Bear Stearns
          Companies Inc. Cash or Deferred Compensation Plan

> Re:  ***Howard, et al. v. The Bear Stearns Companies Inc., et al.,***
>      **USDC – SDNY Case No. 08-2804**

Dear Sir or Madam:

As you may be aware, on December 1, 2006, an amended version of FED. R. CIV. P. 26 went into effect.  The new rules make it clear that potentially all electronically stored data is discoverable.  This includes relevant e-mails sent or received by any employee, other information stored on servers, or information stored on backup tapes or other media that are capable of restoration, even if the information was deleted at some prior time.

Plaintiff in the above-captioned matter formally requests that during the pendency of this litigation, all named Defendants, as well as their respective officers, agents, employees or other third party custodians (together, "Defendants"), will preserve all accessible or inaccessible information, documents, as defined in FED. R. CIV. P. 34(a), and other tangible objects in their custody or control which are potentially relevant to this matter (together, "documents").  *See generally Quinby v. WestLB AG*, 245 F.R.D. 94, 103 (S.D.N.Y. 2006) (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004)).

All documents should be maintained in their original tangible or electronic formats, including native file formats and associated metadata, without alteration, transfer or destruction.  Specifically, Plaintiff requests that all routine destruction of electronically stored information ("ESI"), including but not limited to periodic purges of email or email

Bear Stearns
March 21, 2008
Page Two

accounts and destruction or overwriting of back-up data, cease during the pendency of this litigation or until all documents, including native file formats and associated metadata, can be copied and preserved as a complete and forensically verified copy of the files on CD/DVD-ROM, external hard drive, or other sustainable media. If potentially relevant ESI or other documents are currently held or managed by a third party on behalf of any Defendant, the third party shall be instructed to maintain and preserve that data in accordance with this request. Third parties include, but are not limited to: Outside Counsel, Accountants, Data/Application Service or Storage Providers, Consultants, and Contractors.

Documents that should be maintained in an electronic format, as described above, include but are not limited to the following:

1. Writings created using word-processing applications, such as Microsoft Word, Word Perfect, Adobe Acrobat, or other proprietary or open-source applications;

2. Charts, graphs and presentations created using graphic and spreadsheet applications such as Microsoft Excel, Microsoft PowerPoint, Desktop Publisher, Adobe Acrobat, or other proprietary or open-source applications;

3. Portals and web pages – active or archived – created and hosted on intranet, internet, portals, or other broadcast and hosting systems;

4. Images and graphics created using electronic imaging devices, such as digital still or video cameras, scanners, or graphic applications;

5. Databases and other data compilations, including information related to network activity and management (including server logs and internet usage); and

6. Messaging, both written and verbal, including e-mails, instant messaging, voice mails, or other communication systems/methods.

In addition, Plaintiff seeks preservation of certain tangible objects, including the following:

1. Data back-up systems, including tapes, CD/DVD-ROM, or internal and external hard drives;



Bear Stearns
March 21, 2008
Page Three

    2.       Network servers, including e-mail servers;

    3.       Voicemail systems;

    4.       Shared network hard drives or storage devices;

    5.       Individual storage drives on desktop or laptop computers (these drives include but are not limited to internal, external, and flash/thumb drives);

    6.       Personal data devices such as portable data devices, Personal Data Assistants, iPods, and Blackberrys/Smartphones/handheld computers;

    7.       Electronic cameras; and

    8.       Cell Phones.

All tangible objects should be maintained in their original condition.

We ask that Defendants provide confirmation that the above-described documents and tangible objects have been and will continue to be preserved during the pendency of the litigation as is required by FED. R. CIV. P. 34. Please feel free to contact me should you wish to discuss these issues in further detail.

Sincerely,

Edward W. Ciolko

EWC/km

# EXHIBIT



03/24/2008 18:08 FAX                                                                    ☒002

# DEALY & SILBERSTEIN, LLP
## ATTORNEYS AT LAW
225 Broadway, Suite 1405
New York, New York 10007
Telephone: (212) 385-0066 * Telefax: (212) 385-2117

March 24, 2008

**VIA FEDERAL EXPRESS**

JP Morgan Chase Legal Department
1 Chase Manhattan Plaza
New York, NY 10005

Re: ***Howard, et al. v. The Bear Stearns Companies Inc., et al.,***
   **No. 08-2804 (S.D. N.Y.)**

Dear Sir or Madam:

As you may be aware, on December 1, 2006, an amended version of FED. R. CIV. P. 26 went into effect. The new rules make it clear that potentially all electronically stored data is discoverable. This includes relevant e-mails sent or received by any employee, other information stored on servers, or information stored on backup tapes or other media that are capable of restoration, even if the information was deleted at some prior time.

In light of JP Morgan Chase & Co.'s pending acquisition of The Bear Stearns Companies, Inc. ("Bear Stearns"), Plaintiff in the above-captioned matter formally requests that, during the pendency of this litigation, JP Morgan Chase & Co., as well as their respective officers, agents, employees or other third party custodians (together, "JP Morgan"), will preserve all accessible or inaccessible information, documents, as defined in FED. R. CIV. P. 34(a), and other tangible objects in their custody or control which are potentially relevant to this matter (together, "documents"). *See generally Quinby v. WestLB AG*, 245 F.R.D. 94, 103 (S.D.N.Y. 2006) (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004)).

Plaintiff requests, *inter alia*, that JP Morgan retain all relevant documents regarding JP Morgan's evaluation, negotiation and communication (internal and external -- including communication with Bear Stearns, the Federal Reserve Bank of New York, and the U.S. Treasury Department) concerning JP Morgan's acquisition of Bear Stearns. For the purposes of

JP Morgan Chase Legal Department
March 24, 2008
Page 2 of 3

Plaintiff's request, "communication" includes, in addition to any written "hard copy" document, any electronic utterance, notation, or statement of any nature
whatsoever, draft or final, potential or actual, by and to whomever made or attempted to be made, including, but not limited to, correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, messages (including electronic-mail, text messages, instant messages, Company intranet, electronic bulletin board or internet site posting) and other understandings between two or more persons.

All documents should be maintained in their original tangible or electronic formats, including native file formats and associated metadata, without alteration, transfer or destruction. Specifically, Plaintiff requests that all routine destruction of electronically stored information ("ESI"), including but not limited to periodic purges of e-mail or e-mail accounts and destruction or overwriting of back-up data, cease during the pendency of this litigation or until all documents, including native file formats and associated metadata, can be copied and preserved as a complete and forensically verified copy of the files on CD/DVD-ROM, external hard drive, or other sustainable media. If potentially relevant ESI or other documents are currently held or managed by a third party on behalf of JP Morgan, the third party shall be instructed to maintain and preserve that data in accordance with this request. Third parties include, but are not limited to: Outside Counsel, Accountants, Data/Application Service or Storage Providers, Consultants, and Contractors.

Documents that should be maintained in an electronic format, as described above, include but are not limited to the following:

1.    Writings created using word-processing applications, such as Microsoft Word, Word Perfect, Adobe Acrobat, or other proprietary or open-source applications;

2.    Charts, graphs and presentations created using graphic and spreadsheet applications such as Microsoft Excel, Microsoft PowerPoint, Desktop Publisher, Adobe Acrobat, or other proprietary or open-source applications;

3.    Portals and web pages – active or archived – created and hosted on intranet, internet, portals, or other broadcast and hosting systems;

4.    Images and graphics created using electronic imaging devices, such as digital still or video cameras, scanners, or graphic applications;

5.    Databases and other data compilations, including information related to network activity and management (including server logs and Internet usage); and

6.    Messaging, both written and verbal, including e-mails, instant messaging, voice mails, or other communication systems/methods.

03/24/2008 18:09 FAX  ☑004

JP Morgan Chase Legal Department
March 24, 2008
Page 3 of 3

In addition, Plaintiff seeks preservation of certain tangible objects, including the following:

1.   Data back-up systems, including tapes, CD/DVD-ROM, or internal and external hard drives;

2.   Network servers, including e-mail servers;

3.   Voicemail systems;

4.   Shared network hard drives or storage devices;

5.   Individual storage drives on desktop or laptop computers (these drives include but are not limited to internal, external, and flash/thumb drives);

6.   Personal data devices such as portable data devices, Personal Data Assistants, iPods, and Blackberrys/Smartphones/handheld computers;

7.   Electronic cameras; and

8.   Cell Phones.

All tangible objects should be maintained in their original condition.

We ask that JP Morgan provide confirmation that the above-described documents and tangible objects have been and will continue to be preserved during the pendency of the litigation as is required by FED. R. CIV. P. 34. Please feel free to contact me should you wish to discuss these issues in further detail.

Sincerely,

Milo Silberstein                     Edward W. Ciolko

EWC/db

3

# EXHIBIT

# D

# DEALY & SILBERSTEIN, LLP
ATTORNEYS AT LAW
225 Broadway, Suite 1405
New York, New York 10007
Telephone: (212) 385-0066 * Telefax: (212) 385-2117

Writer's Direct Dial:  (610) 822-0242
E-Mail: eciolko@sbtklaw.com

March 24, 2008

**VIA FEDERAL EXPRESS**

Legal Department of Bear Stearns
The Bear Stearns Companies Inc.
383 Madison Avenue
New York, NY 10179

      **Re:**    *Howard v. The Bear Stearns Companies Inc., et al.,*
              **No. 08-2804 (S.D. N.Y.)**

Dear Sir or Madam:

      As you are aware, at least two class action complaints have been filed by shareholders of The Bear Stearns Companies Inc. ("Bear Stearns") challenging the proposed purchase of Bear Stearns by JP Morgan Chase & Co. ("JP Morgan").[1]  As you know, these types of actions tend to move at a significantly faster pace, for obvious reasons, than litigation such as the above-captioned action.  Plaintiff, on behalf of himself, The Bear Stearns Companies Inc. Employee Stock Ownership Plan (the "Plan"), and the proposed class of Plan participants, requests that all documents/communications produced to the plaintiffs in the "acquisition cases" are contemporaneously produced to Plaintiff in the above-referenced matter, as well as copies of any/all expert reports and deposition transcripts.

---

[1]  *Police and Fire Retirement System of the City of Detroit v. The Bear Stearns Companies Inc., et al.*, Case No. 3638 (Del. Ch. Mar. 20, 2008) and *Kurtz v. Cayne, et al.*, Case No. 8600780 (N.Y. Sup. Ct. Mar. 17, 2008) (collectively the "acquisition cases").

1

Legal Department of Bear Stearns
March 24, 2008
Page 2 of 2

Documents and communications regarding or implicating the acquisition's due diligence, valuation of Bear Stearns and the negotiation of the proposed transaction's terms are undeniably relevant to the instant action – which is premised, at its core, on the imprudent management/investment of Plan assets in Bear Stearns stock *through the present*. Aside from the undeniable relevance of any documents or communications produced in the acquisition cases to the instant matter, as well as any deposition or expert testimony, Plaintiff is concerned that (1) he and the proposed class not be foreclosed from real time access to information directly affecting the *ongoing* valuation of Bear Stearns *viz a viz* the acquisition[2] and (2) that Bear Stearns' electronic document and/or communication (*e.g.* electronic mail) destruction/retention procedures do not, inadvertently, eliminate relevant evidence from existence.[3] Further, simultaneous production to Plaintiff and plaintiffs in the acquisition case will eliminate duplicative costs regarding search, review and copying of relevant materials at a later date.

Plaintiff is, of course, amenable to suggestions/requests from Bear Stearns regarding the issues raised herein. Please feel free to contact either of us should you wish to discuss these issues in further detail.

Sincerely,

Milo Silberstein

Edward W. Ciolko

EWC/db

---

[2] *See, e.g.*, "J.P. Morgan in Negotiations to Raise Bear Stearns Bid," Andrew Ross Sorkin, *New York Times* Online Edition, March 24, 2008, *available at* http://www.nytimes.com.

[3] As set forth in the letter mailed to the Bear Stearns Benefits Department on Friday, March 21, 2008, under *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004), defendants must preserve all accessible or inaccessible information and documents, as defined in FED. R. CIV. P. 34(a). Plaintiff reiterates that all relevant electronic documents/communications must be retained and all routine destruction of electronically stored information, *e.g.* periodic purges of e-mail or e-mail accounts, deletion of intranet/Internet pages and destruction or overwriting of back-up data, should be placed in abeyance during the pendency of this litigation.

# EXHIBIT

# E





PROTECTING INVESTORS WORLDWIDE



- Corporate Governance
- Helping Fulfill Fiduciary Obligations
- Shareholder Litigation
- Portfolio Monitoring Services

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Attorneys at Law



## SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
### Attorneys at Law

Schiffrin Barroway Topaz & Kessler, LLP ("SBTK"), comprised of over sixty attorneys, has specialized in prosecuting complex class action litigation and protecting and recovering assets for twenty years. During this time, SBTK has recovered billions of dollars on behalf of our clients and the classes they represent, and has been a leader in implementing corporate governance reforms designed to protect shareholder rights, improve shareholder value and prevent corporate mismanagement. SBTK has developed a worldwide reputation for excellence, focusing primarily on the prosecution of securities fraud, derivative, transactional and ERISA/401K litigation brought against public companies, their officers and directors, and advisors. In addition, SBTK has represented institutional and individual consumers in antitrust and consumer fraud actions as well as in mass tort and product liability actions.

Since the passage of the Private Securities Litigation Reform Act of 1995, which specifically encouraged large investors, especially institutional investors, to participate as lead plaintiffs in securities class actions, SBTK has actively and successfully represented public and multi-employer pension funds, mutual fund managers, investment advisors, insurance companies, hedge funds and individual investors from around the world in this important role. SBTK currently works with institutional investors from the United States, Canada, United Kingdom, Netherlands, Ireland, Sweden, Denmark, Norway, Finland, Germany, Austria, Italy, and France.

**Please take some time to learn more about our firm
and contact us at any time for more information.**

**280 King of Prussia Road, Radnor, Pennsylvania 19087
610-667-7706 • Fax: 610-667-7056**

**2125 Oak Grove Road, Suite 120, Walnut Creek, California 94598
925-945-0770 • Fax: 925-945-8792**

**Please visit our website which is available in 17 languages at:**

**www.sbtklaw.com**



# OUR BACKGROUND

Schiffrin Barroway Topaz & Kessler, headquartered just outside of Philadelphia, Pennsylvania, with an office in Walnut Creek, California, specializes in representing shareholders and consumers in complex class action litigation in state and federal courts throughout the United States. Since our inception, SBTK has recovered billions of dollars on behalf of defrauded shareholders and aggrieved consumers. The firm is led by its senior partners, Richard S. Schiffrin, Andrew L. Barroway, Marc A. Topaz, and David Kessler, with assistance from partners Stuart L. Berman, Katharine M. Ryan, Gregory M. Castaldo, Michael K. Yarnoff, Joseph H. Meltzer, Darren J. Check, Tobias L. Millrood, Andrew L. Zivitz, Sean M. Handler, John A. Kehoe, Lee D. Rudy, Kay E. Sickles and Eric L. Zagar, and numerous experienced associates and staff.

SBTK focuses on the prosecution of securities fraud actions and derivative and transactional litigation brought against public companies, their officers and directors, and their auditors and investment banking firms. In addition, SBTK represents employees in ERISA/401K actions. Institutional and individual consumers are represented in antitrust and consumer fraud actions as well as mass tort and product liability actions.

Throughout our history, SBTK has represented all types of institutional investors, including public and multi-employer pension funds, mutual fund managers, hedge funds, insurance companies, investment advisors, as well as thousands of individual investors in securities fraud, derivative and transactional class actions. Currently, SBTK is serving as Lead or Co-Lead Counsel in several high profile securities class actions against companies such as Tyco, Tenet Healthcare, Sprint and Delphi. In addition, SBTK has played a prominent role in the following precedent-setting actions:

### In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):

SBTK is one of only six law firms comprising Plaintiffs' Counsel's Executive Committee, and was selected from over sixty law firms which had brought such actions. This litigation challenges the legality of the IPO allocations practices of virtually all of the major investment banking firms from 1998 through 2000, and encompasses over 300 coordinated actions.

### In re AremisSoft Corp. Securities Litigation, C.A. No. 01-CV-2486 (D.N.J. 2002):

SBTK is Lead Counsel in this extraordinarily complex securities fraud class action involving the embezzlement of hundreds of millions of dollars by former officers of the Company who are now fugitives. SBTK is particularly proud of a settlement it helped to craft with the Company. The Settlement allowed for the Company to be reorganized as a new Company so it could continue operations, while establishing a litigation trust to pursue claims against the Company's auditors and its counsel, as well as those individuals who looted the Company. The Settlement further provides the harmed shareholders with a majority of the equity in the new company, as well as their pro rata share of all monies recovered by the litigation trust. The Court-appointed co-trustees of the litigation trust have retained SBTK to continue prosecuting the actions on behalf of the litigation trust. SBTK currently is litigating this action in the Isle of Man, where it has successfully frozen more than $200 million of stolen funds from one of the fugitives, and is working hard to recover this money on behalf of all beneficiaries of the litigation trust. The litigation also is continuing with respect to the remaining fugitive.

**Please feel free to contact us by phone or e-mail for answers to any further questions you may have about the firm or the cases we are currently litigating.**

3



# MONITORING YOUR PORTFOLIO

## Securities Tracker Portfolio Monitoring Program

Institutional fiduciaries are charged with the important responsibility of protecting their investments. This responsibility takes on even greater importance considering today's well-publicized growing trend of corporate fraud and malfeasance.

SBTK offers institutional investors its valuable portfolio monitoring services at no charge. This comprehensive service is intended to allow our clients to more effectively fulfill their fiduciary obligations and efficiently track all class actions in which they have a financial interest.

SBTK requests a five-year history of securities transactions from the client or its custodial bank, preferably in electronic format, and immediately integrates that information into its proprietary database. SBTK then seeks to obtain quarterly updates to transaction information. Of course, SBTK will work with the client and its custodial bank to obtain this information in the easiest and most expeditious manner.

### Our Proprietary Tracking System

Working with database experts, SBTK has developed a proprietary monitoring system which has been dubbed "Securities Tracker." This system allows for quick and easy integration of a client's transactions. In addition, Securities Tracker allows for quick access and accurate sorting of a client's transactional history to easily identify a client's potential losses in new cases and to assist in determining if the client has a financial interest in a case in which there is a recovery on behalf of the plaintiff class.

**Securities Tracker provides a complete solution to tracking class actions which affect your investments and ensuring the recovery of all settlement monies to which you are entitled.**

### Benefits to the Client

**New Cases:** Whenever a new class action is filed and it is determined that a client may have suffered losses in that action, a brief, yet concise report which details the relevant facts, class period, jurisdiction, deadlines, and strengths and weaknesses of the case is provided to the client. In addition, this report contains the estimated losses suffered by the client and damages suffered by the class (when available at this early stage), and a recommendation for how the client should proceed.

**Quarterly Reports:** SBTK will also issue to its clients for whom it monitors a quarterly report which details the status of each class action in which a client has a financial interest regardless of whether the client is a lead plaintiff. The report further provides updates on all settled cases as well as cases which have been dismissed.

**Claims Administration:** Institutional investors do not always prepare and file Proof of Claim forms which are required to participate in recoveries. In fact, a recent study determined that only 28% of institutional investors are filing class action claim forms and are thus potentially leaving billions of dollars unclaimed. As a result, many institutions are not maximizing recoveries on behalf of their investors. The most common reason institutions fail to file claims is that the fiduciaries are not aware that a lawsuit was filed or that there was a recovery. Through SBTK's monitoring service, we assist our institutional clients with fulfilling their fiduciary responsibilities by identifying when lawsuits have been filed and resolved. In addition, upon request, SBTK will assist with completing and filing the necessary claim forms.

4

# WHY SHOULD INSTITUTIONS GET INVOLVED? _____

1. Institutional fiduciaries oversee the financial security of their funds. As such, they must take reasonable steps to monitor all real and potential claims arising from fraud and malfeasance by corporate wrongdoers.

2. Since the passage of the Private Securities Litigation Reform Act of 1995 — which specifically encouraged institutional investors to participate as lead plaintiffs in securities class actions — settlement recoveries have increased dramatically. In fact, a recent study by NERA Economic Consulting revealed that securities class actions with institutional investors as lead plaintiff settled for one-third more than those with individual investors serving as lead plaintiff.

3. Institutions typically are able to negotiate larger settlements while simultaneously lowering legal fee rates, both of which increase recoveries for investors.

4. Institutions frequently bring a certain level of sophistication and experience to each case which often proves to be an asset in developing litigation and trial strategy or negotiating a settlement.

5. Litigation has emerged as an important vehicle available to institutional investors to obtain extensive and significant corporate governance changes, such as:

- Mandate annually elected Boards controlled by independent directors;
- Separate Chairman of the Board and CEO offices;
- Require that at least two-thirds of the Board shall be independent directors;
- Require immediate public disclosure of all sales or purchases of a company's stock by any corporate officer or director;
- Establish director term limits;
- Limit the number of boards a director may sit on;
- Eliminate "super-voting" classes of stock;
- Restrict/limit stock options;
- Rotate outside auditors; and
- Limit executive compensation.

## How Can Institutions Get Involved?

The best way for institutional fiduciaries to protect their investments and to maximize the recovery of lost assets is to actively monitor market developments. Recognizing that this is a time-consuming and expensive process, SBTK offers a monitoring service designed to enable institutions to identify important events in the marketplace and discuss what effect, if any, those events have on their investments. SBTK will discuss the merits of claims filed as well as potential claims, and evaluate all legal rights and options recovery. This service allows institutional investors to efficiently assess all claims and to take any steps necessary to protect assets, without disrupting their business.

There is no cost or obligation for this service and SBTK handles all class actions on a fully contingent basis. SBTK is only paid if the litigation is successful and, win or lose, Pennsylvania law allows for the responsibility for all costs and expenses to rest with us.



5



# CORPORATE GOVERNANCE

## What Is Corporate Governance?

The term "corporate governance" refers to the policies, procedures, systems and structures by which the board of directors of a corporation oversees and manages the activities of the company for the benefit of its shareholders. Corporate governance is the instrument that defines and makes effective the relationship between the directors and managers of a company and the shareholders whom they serve. Thus, corporate governance encompasses such matters as:

- The size, structure, and membership of the board of directors and its committees
- The manner in which directors and committee members are nominated and elected
- The rights and responsibilities of directors and management
- The rights and responsibilities of shareholders
- Policies and procedures relating to accounting, auditing, and financial reporting
- Policies and procedures relating to executive compensation

## Why Is Corporate Governance Important to Shareholders?

Strong and effective corporate governance serves as a system of checks and balances that takes account of the interests of shareholders without unduly constraining the functioning of management. Ultimately, the goal of corporate governance is to maximize the long-term value of the corporation for the benefit of its shareholders. Numerous academic studies have demonstrated a strong correlation between corporate governance and company performance, and, in particular, have shown that companies with strong corporate governance produce better long-term returns for shareholders, are more profitable and less volatile, and are less likely to commit fraud or other corporate wrongdoing. Improving a company's corporate governance is one of the most effective means for institutional investors and other long-term shareholders to make their voices heard in the board room, and thereby protect and advance their long-term interests.

## What Corporate Governance Principles Are Most Important to Shareholders?

### Independence and Autonomy

The foundation for all good corporate governance is a board of directors that is not merely independent on its face, but is also willing and able to act independently of management. This means, among other things, that the vast majority of board members, including the chairperson of the board, should be "outside" directors who have no substantial personal, financial, business, or employment connections with management. Indeed, the surest way to ensure that the board of directors functions in a truly independent fashion is for directors to be nominated by shareholders rather than by management. Simply put, directors nominated and/or selected by shareholders are the only directors who have a real economic incentive to act in the best interests of shareholders rather than the interests of management. Thus, measures that expand shareholders' access to and influence on the director nomination process should be highly sought.

### Diligence and Proactivity

The interests of shareholders are best served by directors who not only diligently monitor the conduct of management with appropriate objectivity and skepticism, but who also proactively guide and oversee the activities of the corporation with an eye towards creating and preserving long-term value. Corporate governance measures designed to achieve these goals, such as limiting the number of corporate boards and committees on which directors serve, adopting reforms to strengthen internal and external auditing functions, and planning for succession of key executives and board members, all inure to the benefit of shareholders.

### Openness and Accountability

Directors are more likely to fulfill their duty to represent the interests of shareholders when the board functions in an open and accessible manner and shareholders have the means to hold directors accountable if they fail to perform. For example, corporate governance measures that require the Board to disclose the background and

6

rationale for decisions on director nominations, executive compensation, and other matters that affect the interests of shareholders, should be pursued. To hold directors accountable, director and committee-person term limits, annual election of all directors, and other measures are each designed to ensure that directors remain responsive to shareholders.

### How Does Schiffrin Barroway Topaz & Kessler Assist Shareholders in Improving Corporate Governance?

SBTK advances the corporate governance agenda on behalf of shareholders through both litigation and direct action. As one of the leading firms in the nation representing shareholders in

securities class action and shareholder derivative litigation, SBTK believes that litigation can be used not only as a means to recover monetary losses, but also as a vehicle to implement corporate governance reform in appropriate cases.

In addition to its successful litigation practice, SBTK assists shareholders in improving corporate governance through direct action, including bylaw amendments, director nominations, and other means by which shareholders can assert direct and substantial influence on the composition and functioning of boards of directors. SBTK also works closely with leading corporate governance experts, organized labor, and other shareholder advocates to promote public policies that compel or encourage corporations to adopt corporate governance measures that serve the interests of shareholders.

# ANNUAL RIGHTS AND RESPONSIBILITIES OF INSTITUTIONAL INVESTORS SEMINAR

Schiffrin Barroway Topaz & Kessler serves as the exclusive sponsor of the annual Rights and Responsibilities of Institutional Investors seminar. The seminar is presented by Institutional Investor Conferences in Amsterdam, Netherlands, and is dedicated to educating investors about their legal rights and responsibilities with respect to their investments, particularly those investments on U.S. exchanges. This annual meeting provides a forum for leaders in the investment and legal community to explore the role that active ownership and shareholder rights can play in better serving their funds and their beneficiaries.

Each year over 100 senior executives and legal and compliance professionals from public pension plans, mutual fund companies, hedge funds, insurance companies, and other institutional investors and their advisors from around the globe come together to share experiences and learn more about approaches to active ownership and what they can do to protect and enhance their assets. Speakers have included Vice President Al Gore, United States Securities and Exchange Commission Chairman Harvey L. Pitt, as well as representatives from many of the world's largest institutional investors and the academic community.

The seminar is a reflection of SBTK's commitment to not only serving as legal counsel to its clients, but also as an educator on all issues related to shareholder activism and asset protection and recovery. The firm's philosophy is that an educated client not only serves itself better, but under the right circumstances serves the interests of others as well.

To learn more about the Rights and Responsibilities of Institutional Investors, or to inquire about participating and attending, please visit www.rriiconference.com or contact Darren J. Check, Esquire.





# PRACTICE AREAS

## Securities Class Actions

The federal securities laws were designed to pro-
mote honesty and integrity within the securities
markets, which depend on full and fair disclosure
of all material facts regarding public companies.
Only when public companies adhere to this stan-
dard will there be a "level playing field" for
investors. However, when full and fair disclosure
of all material facts is not made, one or more of
the public company, its officers and directors, as
well as certain of the company's advisors may
be in violation of the federal securities laws. In
such instances, a securities class action may be
initiated by one or more investors on behalf of all
investors who are similarly situated, who suffered
damages as a result of purchasing the company's
securities at artificially inflated prices.

SBTK is currently prosecuting numerous securities
class action lawsuits as the court-appointed lead
or co-lead counsel in federal courts throughout
the country. Several of these cases are against
high-profile companies such as Tyco, Tenet
Healthcare, Sprint, Delphi, and PNC Bank, to
name a few. For a more comprehensive review of
the various cases in which SBTK has prosecuted
in its twenty-year history, please refer to the
"Noteworthy Recoveries" section of this
booklet.

## Shareholder Derivative Actions

A shareholder derivative action is a lawsuit
brought by a shareholder of a public company, on
behalf of, and for the benefit of, the company. In
essence, the shareholder is bringing an action
that the company has a right to and should bring,
but it does not, due to the improper influence an
officer and/or director is exercising over the com-
pany's affairs. Derivative actions are usually liti-
gated under state corporation laws.

For example, a derivative class action may be
appropriate where the company's officers and/or
directors are engaged in self-dealing, where the
company is selling a corporate asset to an officer
and/or director of the company at a price below
fair market value. Because the company is being
harmed, this is a legal right that the company
should enforce, but sometimes does not. Based
on this example, a plaintiff shareholder of the
company could allege that the company breached

fiduciary duties (a legal concept which usually
includes ideas of "fair dealing," "good faith" and
"loyalty") owed to company shareholders and the
company itself. If a derivative action is favorably
resolved for the plaintiffs, the officer and/or
director who was harming the company may be
required to make monetary payments to the com-
pany. In addition, a successful derivative action
may also include important corporate governance
changes, so that the type of conduct complained
of in the derivative action will not occur again.
If either one (or both) of these forms of relief is
accomplished, all current shareholders will bene-
fit and it may have a positive effect on the compa-
ny's stock price.

## Mergers and Acquisitions

These class actions are brought to protect and
defend the rights and privileges of public share-
holders whose companies have entered into man-
agement-led buyouts, mergers, or other similar
business combinations. Directors of a publicly
traded company owe the company's public share-
holders the tripartite fiduciary duties of due care,
loyalty, and full and fair disclosure. Unfortunately,
in the merger context, directors often fail to fulfill
these duties as a result of material conflicts of
interest. Shareholder interests are commonly
overlooked and/or disregarded entirely in favor of
the interests of directors, management, or a com-
pany's majority shareholder. SBTK has prosecuted
numerous class actions on behalf of shareholders
who have been unfairly or inadequately treated
in a merger or business combination. SBTK
has achieved substantial recoveries in many of
these cases, including: (1) millions of dollars in
increased consideration for shareholders' shares;
(2) the disclosure of material information which
enables a shareholder to better judge the fairness
of a proposed transaction; and (3) other types of
therapeutic relief designed to protect and maxi-
mize shareholder value.

## ERISA Litigation

SBTK is also at the forefront of protecting the
rights of employees. The firm's ERISA Litigation
Department specializes in breach of fiduciary
duty actions brought pursuant to the Employee
Retirement Income Security Act of 1974. Many of
these suits involve fiduciary breaches by a compa-
ny in the administration of an employee benefit

8

plan. For example, a company sponsoring and administering a defined contribution 401(k) plan for the benefit of its employees, has a fiduciary duty to ensure that plan assets (including employer securities) are directed to appropriate and prudent investment vehicles.

This duty is sometimes breached, particularly where a company deems investment in its own equities appropriate despite having access to information that clearly indicates otherwise. This conflict of interest and the resultant losses can be devastating to employees who often depend on their 401(k) accounts as a principal source of retirement income.

SBTK commits considerable resources to litigating claims on behalf of pension plan participants and is currently prosecuting more than two dozen ERISA actions nationwide as lead or co-lead counsel against companies including El Paso, Northwest, Polaroid, JDS Uniphase, and Schering-Plough. In addition, the firm has served as lead or co-lead counsel in cases against AOL Time Warner, Honeywell, and Bristol-Myers, which have resulted in recovery of well over $250 million for pension plan participants.

## Antitrust/Consumer Litigation

**Antitrust Litigation:** Antitrust class actions brought pursuant to federal and state antitrust laws, are initiated by claimants injured by anti-competitive conduct of suppliers, purchasers, competitors and others. This includes anti-competitive conduct occurring abroad which affects United States markets. Violations of the antitrust laws include price-fixing, bid-rigging, monopolization, resale price maintenance and price discrimination. The antitrust laws also prohibit corporate mergers and acquisitions so large and encompassing that, if consummated, would likely inhibit competition and other corporate conduct designed with the intention to be predatory or to monopolize. Recently, drug manufacturers have been the focus of many high profile antitrust actions as a result of their efforts to maintain their monopoly of certain drugs following the expiration of their patent. In an effort to extend the patents on their products manufacturers have gone so far as to initiate patent infringement suits against generic brand drug manufacturers and entered into collusive licensing arrangements with generic manufacturers.

SBTK combats this anti-competitive conduct through class action litigation and has been appointed by courts to leadership positions in several important antitrust actions filed in courts throughout the country. SBTK represents many third-party payors in these cases, including public entities and Taft-Hartley Health & Welfare funds.

**Consumer Litigation:** SBTK also specializes in litigation on behalf of consumers. More broadly, consumer fraud describes a wide range of improper practices that may involve advertising, marketing and/or the sale of goods or services. Consumer fraud class actions are initiated, for example, when a company overcharges or improperly charges consumers for goods or services, or runs deceptive or misleading ads for its products. Companies also commit consumer fraud when they interpret a contract or agreement in a manner that unfairly disadvantages consumers.

SBTK has taken a prominent role in prosecuting claims against pharmaceutical companies, medical device manufacturers, life insurance companies, private mortgage insurers, and credit card companies which have resulted in significant monetary recoveries and changes in corporate policies on a class-wide basis.

## Mass Tort Litigation

SBTK's Mass Tort Department is a powerful force for consumers and victims harmed by pharmaceutical drugs and medical device products. Over the years, pharmaceutical companies have made increasingly significant efforts to receive quicker approval for new drug applications. A natural result of the shortened time period is that the rush to approval sacrifices the careful scrutiny over safety that a drug must have before being approved. As a result, many drugs that received approval in the late 1990's, have either been withdrawn or are being petitioned for removal from the market. Additionally, the number of consumers injured by pharmaceutical products has risen since the change to fast tracking drugs. The attorneys in our Mass Tort Department work diligently to represent individuals harmed by the pharmaceutical and medical device industry, and in being among a small group of trial lawyers who are willing to fight big pharmaceutical companies. To successfully pursue such cases, the firm has brought together a team of experienced and dedicated trial attorneys. Currently, we are litigating cases involving Vioxx® (and Cox-2 Inhibitor Drugs), Hormone Replacement Therapy (Prempro/Premarin), Fen Phen, Ephedra and Baycol. Additionally, our Mass Tort attorneys continue to keep a vigilant eye on the actions of the pharmaceutical industry and its interaction with the Food and Drug Administration. All too often, pharmaceutical companies continue to fail to comply with FDA requirements to investigate or warn about drug problems. Until satisfactory regulation of this industry is once again imposed, the only corrective deterrent for this industry's behavior will come at the hands of the individuals and attorneys who are willing to stand up to big pharmaceutical companies and hold them accountable.

# NOTEWORTHY RECOVERIES

During the firm's successful history, SBTK has recovered billions of dollars for defrauded stockholders and consumers. The following are among the firm's notable achievements:

### In re Tenet Healthcare Corp. Securities Litigation, No. CV-02-8462-RSWL (Rx) (C.D. Cal. 2002):

SBTK serves as co-lead counsel on behalf of the State of New Jersey and its Division of Investment against Tenet Healthcare Corp. and certain of its former officers and directors. Among other things, the Lead Plaintiff alleges that defendants made a series of materially false or misleading statements and omissions concerning Tenet's business model and financial health from January 11, 2000 through November 7, 2002. After defeating defendants' motions to dismiss and performing substantial document and deposition discovery, a partial settlement has been reached in the amount of $216.5 million in cash which will be submitted for preliminary approval by the Court in the coming weeks. The Partial Settlement is being funded primarily by Tenet and its insurance carriers ($215 million), with personal contributions in the aggregate amount of $1.5 million being made by two of Tenet's former officers, Jeffrey Barbakow and Thomas Mackey. In addition to the substantial cash recovery, the prosecution of this action has played a prominent role in Tenet's initiation of sweeping corporate governance reforms which have led to Tenet being ranked by various institutional rating entities as among the best corporations in America for its corporate governance. The case will continue against KPMG as the Court denied KPMG's motion to dismiss the action in its entirety in December, 2005.

### In re AremisSoft Corp. Securities Litigation, C.A. No. 01-CV-2486 (D.N.J. 2002):

SBTK is particularly proud of the results recently achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, who are now fugitives. In settling the action, SBTK, as sole Lead Counsel, assisted in reorganizing the Company as a new Company to allow for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, which was recently approved, calls for the class to receive the majority of the equity in the new Company, as well as their pro rata share of any amounts recovered by the litigation trust. The Court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, have retained SBTK to continue prosecuting the actions on behalf of the litigation trust. In this capacity, we have filed an action in the Isle of Man, and have successfully frozen more than $200 million of stolen funds from one of the fugitives, and are in the process of attempting to recover the money on behalf of the trust. In addition, we are continuing to litigate the trust's claims against the remaining fugitive.

### In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):

SBTK served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock with expected distribution by early summer 2005. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised SBTK for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

### In re Digital Lightwave, Inc. Securities Litigation, Consolidated Case No. 98-152-CIV-T-24E (M.D. Fla. 1999):

The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions. After extensive litigation and negotiations, a settlement consisting primarily of stock ultimately grew to a value of over $170 million between the time in which the settlement was negotiated and the time at which it was distributed. SBTK took on the primary role in negotiating the terms of the equity component, insisting that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses. We believe that this represents the largest percentage recovery for shareholders in securities class action history.

### In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):

SBTK holds a prominent position as an Executive Committee member in this action. Of the sixty plaintiffs firms which originally filed actions in these coordinated proceedings, SBTK was one of only six selected to serve on the Executive Committee. The coordinated actions, which have been filed against 309 separate issuers of publicly traded securities, challenge the legality of the practices which accompany the allocations of shares in initial public offerings. In addition to suing the issuers of such securities, the 309 coordinated actions also name as defendants the primary investment banking firms which underwrote the offerings. This case, which has received a great deal of national and international media attention, is widely considered the largest securities class action litigation in history. At the present time, the Court has preliminarily approved a $1 billion settlement with the insurers and their officers and directors. The case is proceeding against the underwriting defendants.

### In re Global Crossing, Ltd. ERISA Litigation, No. 02 Civ. 7453 (S.D.N.Y. 2004):

SBTK served as Co-Lead Counsel in this complex and high-profile action which alleged that certain directors and officers of Global Crossing, a former high-flier of the late 1990's tech stock boom, breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 to certain company-provided 401(k) plans and their participants. These breaches surrounded the plans' alleged imprudent investment in Global Crossing stock during a time when defendants knew, or should have known, that the company was facing imminent bankruptcy. A settlement of plaintiffs' claims restoring $79 million to the Plans and their participants was approved in November 2004. At the time, this represented the largest recovery received in a company stock ERISA class action.

### In re Honeywell International ERISA Litigation, No. 03-1214 (DRD) (D.N.J. 2004):

SBTK is serving as Lead Counsel in a breach of fiduciary duty case under ERISA against Honeywell International, Inc. and certain fiduciaries of Honeywell pension plans. The suit alleges that Honeywell and the individual fiduciary defendants, allowed Honeywell's 401(k) plans and their participants to imprudently invest significant assets in company stock, despite that defendants knew, or should have known, that Honeywell's stock was an imprudent investment due to undisclosed, wide-ranging problems stemming from a consummated merger with Allied Signal and a failed merger with General Electric. A settlement f plaintiffs' claims, which includes a $14 million payment to the plans and their affected participants, and significant structural relief affording participants much greater leeway in diversifying their retirement savings portfolios, is currently pending court approval.

### In re Remeron Antitrust Litigation, No. 02-CV-2007 (D.N.J. 2004):

SBTK is Co-Lead Counsel in an action challenging Organon, Inc.'s filing of certain patents and patent infringement lawsuits as an abuse of the Hatch-Waxman Act, and an effort to unlawfully extend their monopoly in the market for Remeron. Specifically, the lawsuit alleges that defendants violated state and federal antitrust laws in their efforts to keep competing products from entering the market, and seeks damages sustained by consumers and third-party payors. After lengthy litigation, including numerous motions and over 50 depositions, the matter settled for $36 million. The settlement is pending final approval by the court.

### Henry v. Sears, et al., Case No. 98 C 4110 (N.D. Ill. 1999):

The firm served as Co-Lead Counsel for one of the largest consumer class actions in history, consisting of approximately 11 million Sears credit card holders whose interest rates were improperly increased in connection with the transfer of the credit card accounts to a national bank. SBTK successfully negotiated a settlement representing approximately 66% of all class members' damages, thereby providing a total benefit exceeding $156 million. All $156 million was distributed automatically to the Class members, without the filing of a single proof of claim form. In approving the settlement, the District Court stated: ". . . I am pleased to approve the settlement. I think it does the best that could be done under the circumstances on behalf of the class. . . . The litigation was complex in both liability and damages and required both professional skill and standing which class counsel demonstrated in abundance."

### Jordan v. State Farm Insurance Company, Case No. 97 CH 11 (Cir. Ct., McLean County, Ill. 1998):

Plaintiffs alleged that State Farm had engaged in fraudulent sales practices known as "churning," and marketing and selling "vanishing premium" policies that do not actually "vanish." After several years of discovery, motion practice and settlement negotiations, SBTK, as Liaison Counsel, successfully resolved the action for $225 million in cash, dividend enhancements and other monetary benefits for current and former State Farm policyholders.

### In re Liberate Technologies Securities Litigation, No. C-02-5017 (MJJ) (N.D. Cal. 2005):

Plaintiffs alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earnings. As sole Lead Counsel, SBTK successfully negotiated a $13.8 million settlement, which represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and competent job."

11



### In re InfoSpace, Inc. Securities Litigation, Master File No. C-01-0913-Z (D. Wash. 2001):

SBTK served as Co-Lead Counsel on behalf of plaintiffs alleging that InfoSpace and certain of its officers and directors overstated revenues by using improper accounting methods, overstated the demand for InfoSpace's wireless services, misstated InfoSpace's financial relationships with major customers, and falsely represented that InfoSpace would receive subscription fees from users of web-enabled cell phones. After two years of hard-fought litigation and complex mediation, a settlement of $34.3 million was obtained for members of the class.

### In re Riverstone Networks, Inc. Securities Litigation, Case No. CV-02-3581 (N.D. Cal. 2002):

SBTK served as sole lead counsel on behalf of plaintiffs alleging that Riverstone and certain of its officers and directors sought to create the impression that the Company, despite the industry-wide downturn in the telecom sector, had the ability to prosper and succeed and was actually prospering. In that regard, plaintiffs alleged that defendants issued a series of false and misleading statements concerning the Company's financial condition, sales and prospects, and used inside information to personally profit. After extensive litigation, the parties entered into formal mediation with the Honorable Charles Legge (Ret.). Following five months of mediation, the parties reached a settlement of $18.5 million which has been preliminarily approved by the Court.

### In re Assisted Living Concepts, Inc. Securities Litigation, Lead Case No. 99-167-AA (D. Or. 1999):

SBTK served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from the Company, its executive officers and directors, and several underwriters for their role in an alleged complex accounting fraud involving the use of a purportedly independent joint venture to absorb the Company's start-up losses. Even after this $30 million recovery, through counsel's efforts, an additional $12.5 million was obtained from the auditors providing for a total recovery of $42.5 million.

### Wanstrath v. Doctor R. Crants, et al., No. 99-1719-111 (Tenn. Chan. Ct., 20th Judicial District, 1999):

SBTK served as Lead Counsel in a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets from the Company to a private entity owned by several of the Company's top insiders. Numerous federal securities class actions were pending against the Company at this time. Through the derivative litigation, the Company's top management was ousted, the composition of the Board of Directors was significantly improved, and important corporate governance provisions were put in place to prevent future abuse. Mr. Schiffrin, in addition to achieving these desirable results, was able to personally effectuate a global settlement of all pending litigation against the backdrop of an almost certain bankruptcy. The case was resolved in conjunction with the federal securities cases for the payment of approximately $50 million by the Company's insurers and the issuance of over 46 million shares to the class members.

### In re Cumulus Media Inc. Securities Litigation, Lead Case No. 00-C-391 E.D. Wis. 2000):

SBTK served as Lead Counsel and successfully litigated the action and negotiated a settlement of $13 million in cash and 240,000 shares of freely tradable stock in Cumulus Media, which traded for approximately $19 per share, for a total settlement value of $17.5 million at the time the settlement was approved by the Court.

*"I know you know that I take this responsibility seriously and try to think hard about these issues. And I do want to compliment class counsel. I think that you behaved responsibly here and gave very good service to the class. They were well served by you."*

— The Honorable Denise Cote of the United States District Court for the Southern District of New York addressing SBTK in the context of approving the settlement of *In re The Interpublic Group of Companies Securities Litigation.*

# FREQUENTLY ASKED QUESTIONS
# ABOUT CLASS ACTIONS _____

## 1. What is a class action?

A class action is a representative lawsuit which allows an individual or entity to initiate a lawsuit on behalf of other individuals or entities that are in the same or similar circumstances with respect to a given defendant. A class action is appropriate when many people have been affected by a company's course of conduct in a similar fashion.

## 2. What is a class period?

A class period is a range of dates within which a company is alleged to have been engaged in improper conduct. The attorneys investigating and prosecuting a case will review the facts of the case, and along with the court-appointed Lead Plaintiff, determine the appropriate beginning and end of a class period. Sometimes, after an initial complaint is filed, a class period will be lengthened or shortened as an investigation continues. If you purchased the securities of a company during a class period, you are automatically a class member, regardless of whether you specifically retain a law firm to prosecute claims on your behalf. This "class membership" concept is also true with respect to consumer fraud class actions and antitrust class actions. For example, if you purchased goods from a company that was accused of improper marketing practices during the relevant period of time (the class period), you would be a member of the class for a consumer fraud class action, even if you did not personally retain an attorney.

## 3. What is a lead plaintiff?

A lead plaintiff in a class action brought pursuant to the federal securities laws, sometimes referred to as a named plaintiff or representative party, is typically appointed by the court within 90 days of the publication of a notice of the pendency of the class action. In these types of actions, the court selects the class member or members most capable of representing the interests of the "absent" class members. There is a statutory presumption that the class period investor or investors with the largest financial losses, who are otherwise typical of the "absent" class members and are adequate to represent those class members, are considered the "most adequate" plaintiff.

Courts have appointed individuals, groups of individuals, institutional investors, groups of institutions, or even combinations of both as lead plaintiff as the circumstances of each case may dictate. The lead plaintiff selects counsel to represent the lead plaintiff and the class, and these attorneys if approved by the court are lead counsel or class counsel.



## 4. How long does it take to prosecute a class action?

The time to prosecute each class action varies based on the facts, parties, and jurisdiction of a particular case. It is not unusual for a class action to take up to 3 years to complete.

13



## 5. What is contingency fee litigation?

Contingency fee litigation refers to situations where attorneys get paid only if they win the case at trial or if the action settles. Attorneys who practice on a contingent fee arrangement typically do not receive any form of monetary payment from a client at the outset of a litigation. Rather, the attorneys' fees are paid only once there is a successful resolution from any settlement or judgment that is achieved. There are no out-of-pocket expenses for the plaintiffs as Pennsylvania law allows SBTK to advance all such costs on behalf of its clients. SBTK handles virtually all of its cases on a contingency fee basis.

## 6. What will it cost to be involved in a class action?

Because SBTK prosecutes class actions on a contingency fee basis, there are no out-of-pocket fees or expenses paid by the client, regardless of the outcome of the case. If we are successful in obtaining a recovery for the class, we will apply to the court for a fee that fairly represents the work performed and risk assumed by SBTK. In securities class actions, attorneys' fees typically are awarded as a percentage of the relief achieved by the attorneys for the class. These percentages vary considerably based on the size of the recovery for the class, the length and complexity of the litigation, and several other factors.

## 7. Will my out-of-pocket loss equal my damages?

Damages are a complex legal calculation that may or may not equal your out-of-pocket loss, which is a purely economic calculation. To establish damages in securities class actions, lead counsel typically hires experts to determine the extent by which a company's stock is artificially inflated during the relevant class period. Because there are often other factors which contribute to stock movement, factors which experts readily assess, one's damages are not necessarily the equivalent of out-of-pocket loss.

## 8. Do I have to keep my stock to participate in a securities class action?

No. As long as you purchased during the class period, you are eligible to participate in any recovery that the class enjoys regardless of your current holdings.

## 9. Why should I sign up with Schiffrin Barroway Topaz & Kessler?

SBTK has specialized in class action litigation for nearly twenty years, and has represented all types of investors in recovering financial losses caused by fraud or other misconduct. SBTK has developed a nationwide reputation for excellence and has recovered over one billion dollars for victims of fraud and other corporate misconduct.

---

*"Now this goes back to the original approval of the securities fraud settlement because I found in my opinion approving the settlement that counsel for the class were to be commended because they cast their lot along with their clients. That is to say that counsel's fees were to be determined and paid in accordance with the way the class members were going to be paid; that this was, in my view, a creative and unique approach to the problem of paying fees to class counsel in a securities fraud case."*

— The Honorable Joel A. Pisano of the United States District Court for the District of New Jersey approving the settlement in *In re AremisSoft Corporation Securities Litigation.*

---



# EUROPEAN, ASIAN AND OTHER
# NON-U.S. INVESTORS




Historically, institutional investors based outside the United States have refrained from seeking leadership roles in securities fraud class actions brought in United States courts. The simple reason is that many of these institutional investors are not aware that they may assert claims in the United States. Recently, however, courts in the United States have appointed a growing number of foreign institutional investors as lead plaintiffs in class actions on behalf of both United States and foreign investors. As such, there is an increased incentive for foreign investors, especially foreign institutional investors which have suffered substantial losses, to step forward to lead securities fraud and derivative class actions in the United States.

Despite the fact that many foreign institutional investors lose many millions of dollars as a result of corporate fraud, frequently these investors are not aware that they may pursue claims based on these losses. In fact, some foreign institutions are not even aware that certain actions were filed until after the deadline for filing a lead plaintiff application has passed. Similarly, foreign institutions often miss out on recovering some or all of their financial losses when a lawsuit settles or a judgment is reached, if the proper claim form is not submitted in a timely fashion.



SBTK has extensive experience working with investors worldwide, including institutions located outside the United States, such as in Europe, Asia, Canada, Australia and South America. The firm offers the same professional services to all of its institutional clients, including those located outside the United States. One valuable service the firm provides is regularly monitoring our institutional clients' investment portfolios so that we can properly advise our clients as to potential securities claims and whether our clients had financial losses as a result. At no cost to our clients, we investigate all potential claims and cross-reference those claims against our clients' trading histories. We personally discuss all pertinent facts and legal options with our clients so that they can properly evaluate if and how they will seek to recover losses. Additionally, regardless of whether our clients decide to pursue formal legal action, we provide our clients with detailed updates on the progress of all litigation which impact our clients' interests. As a result, our clients are best positioned to protect their rights and interests at all stages of litigation.





SBTK's website is available in seventeen different languages so that our clients around the world can easily access information about the firm and the cases we are litigating. For more information about the firm or references from our institutional clients, please contact Darren J. Check, Esq. at (610) 822-2235 or via e-mail at dcheck@sbtklaw.com.






### STUDY FINDS THAT INSTITUTIONAL AND OTHER TO SECURITIES CLASS ACTIONS

*By: Darren J. Check, Esquire*

[faded body text — illegible]

## SBTK BULLETIN

The SBTK Bulletin is a quarterly newsletter for our clients and all investors and consumers. In our continuing effort to educate our clients and keep them informed the SBTK Bulletin strives to not only provide updates on the cases we are litigating, but also on trends in the law and other issues that are important to our readers. Our attorneys regularly contribute articles about the cases they are litigating, important legal precedents, and other issues relevant to our practice. Copies of the current issue and all previous issues of the Bulletin are available on our website and we welcome you to contact us to obtain a free subscription and receive the Bulletin by mail.



SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Attorneys at Law

# SBTK INSTITUTIONAL CLIENTS

*Below is a partial list of SBTK's institutional clients from around the globe.*
*Please contact us for more information or for references from our clients.*

## U.S. Pension Funds and Institutional Investors

Alameda County (California) Employees Retirement Association
Ardsley Partners, L.P.
City of Bethlehem (Pennsylvania) Retirement System
Brockton (Massachusetts) Retirement Board
Bucks County (Pennsylvania) Retirement Board
City of Fort Lauderdale General Employees' Retirement System
City of Philadelphia Board of Pensions & Retirement
City of Tallahassee Pension Plan
Erie County (Pennsylvania) Employees Retirement System
Georgia Division of Investment Services
Harrisburg Police Pension Board
Imperial County (California) Employees' Retirement System
Lehigh County (Pennsylvania) Employees Retirement Fund
Logan Capital Management
Luzerne County (Pennsylvania) Retirement System
Maine State Retirement System
Miami Beach Employees' Retirement Plan
Mississippi Public Employees' Retirement System
Montgomery County (Pennsylvania)
    Employees Retirement Board
New Orleans Harbor Police Retirement System
Oakland (California) Municipal Employee's Retirement System
Oklahoma Firefighters Pension & Retirement System
Oklahoma Police Pension & Retirement System
Oklahoma School Land Commission
Pembroke Pines (Florida) Fire & Police Pension Fund
Pennsylvania Public School Employees Retirement System
Pennsylvania State Employees' Retirement System
Pennsylvania Turnpike Commission
Plymouth County (Massachusetts) Retirement Association
Puerto Rico Government Employees Retirement System
Retirement Board of Allegheny County (Pennsylvania)
SEPTA (Southeastern Pennsylvania Transportation Authority)
State of New Jersey and its Division of Investment
U.S. Army Nonappropriated Fund Employee Retirement Plan
Westmoreland County (Pennsylvania)
    Employees Retirement Board
Wilkes-Barre (Pennsylvania) Aggregated Pension Trust Fund

## Multi-Employer Funds

American Federation of Television & Radio Artists Retirement Fund
Buffalo Laborers Pension Fund
Denver Area Meat Cutters and Employers Pension Plan
International Brotherhood of Boilermakers
    Local 154 Retirement Fund
International Brotherhood of Electrical Workers,
    Local 237
International Brotherhood of Electrical
    Workers, Local 380

Joint Council #53 Teamsters Health & Welfare Fund
Laborers District Council Construction Industry Pension Fund
League – ATPAM Welfare & Pensions Funds
Rocky Mountain UFCW Unions & Employers Pension Plan
Roofers Local Union No. 74
SEIU Pension Plans Master Trust
Teamsters Local #500 Severance Fund
Washington State Plumbers & Pipefitters

## International Pension Funds and Institutional Investors

AFA Insurance
Alecta pensionsförsäkring, ömsesidigt
AMF Pension
Seventh Swedish National Pension Fund (AP7)
ARCA S.G.R. S.p.A.
ATP
Cominvest Asset Management GmbH
Danske Invest Administration A/S
Deutcher Investment Trust (dit)
ERSTE - Sparinvest GmbH
Healthcare Employees' Pension Plan - Manitoba
Industriens Pension
Kathrein & Co. Privatgeschäf(sbank-AG
KP Pensions
Monte Paschi Asset Management S.G.R. S.p.A.
Nordea Invest Fund Management A/S
Nottinghamshire County Council, Local Authority Pension Fund
PKA Pension Funds Administration Ltd.
Raiffiesien Capital Management
SEB IM AB
Swedbank Robur Fonder AB
Universities Superannuation Scheme
Varma Mutual Pension Insurance Company



# PARTNERS



### Richard S. Schiffrin

Richard S. Schiffrin, founding partner of the firm, is licensed to practice law in Illinois and Pennsylvania, and has been admitted to practice before numerous United States District Courts. In his seven years of practice with the Office of the Public Defender of Cook County, Illinois, Mr. Schiffrin represented hundreds of clients in both bench and jury trials, as well as appeals. Mr. Schiffrin has also taught legal writing and appellate advocacy at John Marshall Law School and has served as a faculty member at numerous legal seminars, including the Annual Institute on Securities Regulation, NERA: Finance, Law & Economics — Securities Litigation Seminar, the Tulane Corporate Law Institute, and the CityBar Center for CLE (NYC): Ethical Issues in the Practice of Securities Law.

Most recently, Mr. Schiffrin spoke at the MultiPensions 2005 Conference in Amsterdam, Netherlands; the Public Funds Symposium 2005 in Washington, D.C.; the European Pension Symposium in Florence, Italy; and the *Pennsylvania Public Employees Retirement Summit (PAPERS)* in Harrisburg, Pennsylvania. Mr. Schiffrin oversees all aspects of litigation on behalf of the firm. Mr. Schiffrin has been recognized for his expertise in numerous cases, including most prominently:

### *In re AremisSoft Corp. Securities Litigation, C.A. No. 01-CV-2486 (D.N.J. 2002):*

Schiffrin Barroway Topaz & Kessler is particularly proud of the results achieved in this case before the Honorable Joel A. Pisano. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, some of whom remain fugitives. In settling the action, Schiffrin Barroway Topaz & Kessler, as sole Lead Counsel, assisted in reorganizing the Company as a new Company which allowed for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, approved by the court, enabled the class to receive the majority of the equity in the new Company, as well as their pro rata share of all amounts recovered by the litigation trust. The court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, retained Schiffrin Barroway Topaz & Kessler to further assist with prosecuting the actions on behalf of the litigation trust.

After filing an action in the Isle of Man, where the trust successfully froze more than $200 million of stolen funds from one of the fugitives, the trust achieved a settlement of this action for $200 million, which was returned to the United States and paid to the trust. Recently, the trust commenced another action in Cyprus, where it obtained a Mareva injunction and interim ancillary relief against bank accounts and assets owned and/or controlled by the other principal wrongdoer.

Thus far, counsel on behalf of the trust and its beneficiaries have achieved settlements with the Company and certain of its directors and officers as well as the Company's auditors, lawyer and underwriters, for a total of more than $250 million. The beneficiaries of the trust have already received in excess of 28% of their recognized losses.

### *Henry v. Sears, et al., Case No. 98 C 4110 (N.D. Ill. 1999):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel on behalf of the largest class of credit card holders in history. At stake was the right of Sears and its newly formed affiliate, Sears National Bank ("SNB"), to retroactively increase the interest rates on eleven million credit card accounts with outstanding balances resulting from purchases made prior to the accounts being transferred to SNB. Schiffrin Barroway Topaz & Kessler alleged that such conduct violated the Truth-in-Lending Act, the National Banking Act and state consumer fraud statutes. After extensively litigating various aspects of liability, an additional nine months were then spent determining damages. The extraordinary complexity of the damage calculations required Mr. Schiffrin and experts from both parties to develop, test and utilize a novel computer model to ascertain total damages for the class and individualized damages for each class member. Ultimately, Mr. Schiffrin and his partner, Mr. Kessler, were able to negotiate a $156 million settlement, which represented approximately 66% of total damages. In approving the settlement, District Court Judge Leinenwebber of the Northern District of Illinois stated:

> . . . I am pleased to approve the settlement. I think it
> does the best that could be done under the circumstances
> on behalf of the class. . . . The litigation was complex in
> both liability and damages and required both professional
> skill and standing which class counsel demonstrated in
> abundance.

The entire settlement fund of $156 million was distributed without the filing of a single proof of claim form by any class member.

### *Wanstrath v. Doctor R. Crants, et al., C.A. No. 99-1719-III (Tenn. Chan. Ct., 20th Judicial District, 1999):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel in

18

a derivative action filed against the officers and directors of Prison Realty Trust, Inc., challenging the transfer of assets from the Company to a private entity owned by several of the Company's top insiders. Numerous federal securities class actions were pending against the Company at this time. Through the derivative litigation, the Company's top management was ousted, the composition of the Board of Directors was significantly improved and important corporate governance provisions were put in place to prevent future abuse. Mr. Schiffrin, in addition to achieving these desirable results, was able to personally effectuate a global settlement of all pending litigation against the backdrop of an almost certain bankruptcy. The case was resolved in conjunction with the federal securities cases for the payment of approximately $50 million by the Company's insurers and the issuance of over 46 million shares to the class members.

*Jordan v. State Farm Insurance Company,*
*Case No. 97 CH 11 (Cir. Ct., McLean County, Ill. 1998):*
Schiffrin Barroway Topaz & Kessler brought a claim on behalf of multiple plaintiffs alleging that State Farm had engaged in fraudulent sales practices by "churning" policies and marketing and selling "vanishing premium" policies that never "vanished." After several years of discovery, motion practice and settlement negotiations, Mr. Schiffrin played a critical role in resolving the action for $225 million in cash, dividend enhancements and other monetary benefits for current and former State Farm policyholders. Schiffrin Barroway Topaz & Kessler also has achieved substantial settlements in 20 additional cases alleging fraudulent sales practices by various insurance companies.

Mr. Schiffrin has also represented defrauded shareholders and companies in complex class and derivative actions, including the following:

*Huscher v. Curley, et al., No. 00 Civ. 21379*
*(Mich. Cir. Ct., 2000) (In re Sotheby's Holdings, Inc.*
*Derivative Litigation):*
Schiffrin Barroway Topaz & Kessler served as Lead Counsel in a derivative action arising out of Sotheby's alleged antitrust price fixing conspiracy with auction house rival Christie's International PLC. A multi-million dollar settlement was negotiated by Mr. Schiffrin whereby Diana Brooks (Sotheby's President at the time of the alleged wrongdoing) agreed to relinquish all of her Sotheby's stock options, and the Company's insurance carrier made a substantial monetary payment to the Company. In addition, significant changes in the Company's top management and Board of Directors were achieved in conjunction with the settlement of the litigation.



## Andrew L. Barroway

Andrew L. Barroway, managing partner of the firm, received his law degree from the University of Pennsylvania Law School, where he was a member of the ABA Negotiation team. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District Court for the Eastern District of Pennsylvania. Mr. Barroway frequently lectures on securities class action and lead plaintiff issues, and recently spoke at the 2005 Institutional Investor Hedge Fund Workshop in New York City and the Public Funds Summit 2005 in Phoenix, Arizona. Mr. Barroway has been actively involved in all aspects of litigation on behalf of the firm, and co-manages the firm's securities department. Of his numerous successful representations of shareholders, the following stand out as exceptional:

*In re The Interpublic Group of Companies Securities*
*Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):*
Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised Schiffrin Barroway Topaz & Kessler for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

*In re Digital Lightwave, Inc. Securities Litigation,*
*Consolidated Case No. 98-152-CIV-T-24E*
*(M.D. Fla. 1999):*
The firm served as Co-Lead Counsel in one of the nation's most successful securities class actions. After extensive litigation and negotiations, a settlement consisting primarily of stock ultimately grew to a value of over $170 million between the time in which the settlement was negotiated and the time at which it was distributed. Schiffrin Barroway Topaz & Kessler took on the primary role in negotiating the terms of the equity component, insisting

19

that the class have the right to share in any upward appreciation in the value of the stock after the settlement was reached. This recovery represented an astounding approximately two hundred percent (200%) of class members' losses. Schiffrin Barroway Topaz & Kessler believes that this represents the largest percentage recovery for shareholders in securities class action history.

Mr. Barroway, along with his partner, Mr. Kessler, has also negotiated substantial settlements of securities class actions in which Schiffrin Barroway Topaz & Kessler was Lead or Co-Lead Counsel against Pinnacle Holdings, Cell Pathways, Gateway, Mercator and NetSolve. Mr. Barroway currently represents numerous public pension funds, private investment funds, money management firms, and individuals in securities fraud litigation as Lead or Co-Lead Counsel.

## Marc A. Topaz



Marc A. Topaz, a senior partner of the firm, received his law degree from Temple University School of Law, where he was an editor of the Temple Law Review and a member of the Moot Court Honor Society. He also received his Master of Law (L.L.M.) in taxation from the New York University School of Law, where he served as an editor of the New York University Tax Law Review. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Topaz manages the firm's derivative, transactional and antitrust departments. In this regard, Mr. Topaz has been actively involved in litigating the following prominent cases:

*In re MTC Electronic Shareholder Litigation,*
*No. CV-93-0876 (E.D.N.Y. 1993):*
Schiffrin Barroway Topaz & Kessler served as Co-Counsel in a case involving securities fraud by MTC, its officers and directors, underwriters and accountants. The case presented novel issues of Chinese law, and required the construction of a database of hundreds of thousands of documents utilized in numerous party and non-party depositions. A $72 million settlement was achieved on the eve of trial.

*In re Oppenheimer Capital, L.P., Unitholders Litigation,*
*Consolidated No. 16022NC (Del. Ch. 1997):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs alleging that a merger proposed by Pimco Advisors benefitted certain Pimco insiders by disproportionately allocating tax benefits achieved from the restructuring of a limited partnership, and failing to provide adequate compensation to the Oppenheimer shareholders. Plaintiffs moved to enjoin the transaction and a settlement was reached whereby defendants agreed to pay a special dividend to Oppenheimer limited partners of approximately $16 million.

*Wanstrath v. Doctor R. Crants, et al., C.A. No. 99-1719-III*
*(Tenn. Chan. Ct., 20th Judicial District, 1999):*
*(see description on pages 18 and 19)*



## David Kessler

David Kessler, a senior partner of the firm, graduated with distinction from the Emory School of Law. He is licensed to practice in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Prior to practicing law, Mr. Kessler was a Certified Public Accountant in Pennsylvania. Mr. Kessler is the co-managing partner of the firm along with Mr. Barroway and manages the firm's nationally recognized securities department. In addition, Mr. Kessler lectures on securities litigation and was a featured speaker on hot topics in securities litigation in a seminar entitled "The Explosion and Evolution of Class Action Law" in December 2004 in Philadelphia, Pennsylvania, and the Corporate Governance Summit on Corporate Accountability in July 2003 in New York City. Mr. Kessler has achieved the following outstanding results in federal securities cases:

### In re Initial Public Offering Securities Litigation, Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002):

Mr. Kessler, along with Mr. Schiffrin, is presently heading up the firm's litigation efforts in its prominent position as an Executive Committee member in this action. Of the sixty plaintiffs firms which originally filed actions in these coordinated proceedings, Schiffrin Barroway Topaz & Kessler was one of only six selected to serve on the Executive Committee. The coordinated actions, which have been filed against 309 separate issuers of publicly traded securities, challenge the legality of the practices which accompany the allocations of shares in initial public offerings. In addition to suing the issuers of such securities, the 309 coordinated actions also name as defendants the primary investment banking firms which underwrote the offerings. This case, which has received a great deal of national and international media attention, is widely considered the largest securities class action litigation in history. At the present time, the court has preliminarily approved a $1 billion settlement with the issuers and their officers and directors. The class has also reached an agreement in principle to resolve the action against JP Morgan for $425 million, which is in the process of being memorialized and submitted to the Court for approval. The case is proceeding against the remaining underwriting defendants.

### In re PNC Financial Services Group, Inc. Litigation, Case No. 02-CV-271 (W.D. Pa. 2002):

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from PNC and the assignment of certain claims it may have had against its audit and other third party law firms and insurance companies, with respect to an alleged fraudulent scheme wherein non-performing assets were removed from PNC's books and transferred to special purpose entities that PNC allegedly still controlled. An additional $6.6 million was recovered from the insurance company and the law firms and an agreement in principle has now been reached with the audit to resolve all claims for another $9.075 million, providing for a total recovery from the securities litigation of $45.675 million upon approval of the auditor settlement. When coupled with the $156 million restitution fund established through government actions against some of the same defendants and third parties, the total recovery for class members exceeds $200 million.

### In re Assisted Living Concepts, Inc. Securities Litigation, Lead Case No. 99-167-AA (D. Or. 1999):

Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a $30 million recovery for class members from the Company, its executive officers and directors, and several underwriters for their role in an alleged complex accounting fraud involving the use of a purportedly independent joint venture to absorb the Company's startup losses. Even after this $30 million recovery, through counsel's efforts, an additional $12.5 million was obtained from the auditors providing for a total recovery of $42.5 million.

### In re Cumulus Media Inc. Securities Litigation, Lead Case No. 00-C-391 (E.D. Wis. 2000):

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and successfully litigated the action and negotiated a settlement of $13 million in cash and 240,000 shares of freely tradable stock in Cumulus Media, which traded for approximately $19 per share, for a total settlement value of $17.5 million at the time the settlement was approved by the Court.



## Katharine M. Ryan

Katharine M. Ryan, a partner of the firm, graduated *cum laude* from Villanova University School of Law in May 1984. Ms. Ryan is admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the Court of Appeals for the Third Circuit and the United States Supreme Court. Ms. Ryan recently participated as a speaker in a legal teleconference entitled "Is the PSLRA's Safe Harbor Provision Safe?" Ms. Ryan is actively involved in litigating several of the firms most prominent cases and was integral in the excellent results achieved in the following cases:

*In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002):*
Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel in this action on behalf of an institutional investor and recently received final approval of a settlement consisting of $20 million in cash and 6,551,725 shares of IPG common stock. As of February 2005, the stock had an approximate value of $87 million, resulting in a total settlement value of approximately $107 million. In granting its approval, the Court praised Schiffrin Barroway Topaz & Kessler for acting responsibly and noted the firm's professionalism, competence and contribution to achieving such a favorable result.

*In re New Power Holdings, Inc. Securities Litigation, No. 02 Civ. 1550 (S.D.N.Y. 2002):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel and was instrumental in obtaining a recovery of $41 million in cash for class members against a bankrupt company, certain of its officers and directors and the underwriters of the Company's offering. Claims involved New Power, an offshoot of Enron, that was formed to re-enter the deregulated energy market and pursued an IPO with no viable plan to hedge against volatile energy prices.



## Stuart L. Berman

Stuart L. Berman, a partner of the firm, received his law degree from George Washington University National Law Center, and his undergraduate degree from Brandeis University. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Mr. Berman manages the firm's lead plaintiff department and has been instrumental in courts appointing many of the firm's institutional and individual clients as lead plaintiffs in important cases, such as:

*In re Tenet Healthcare Corp. Securities Litigation, No. CV-02-8462- RSWL (C.D. Cal. 2002),*

*State of New Jersey and its Division of Investment v. Sprint Corporation, et al., No. 2:03-CV-02071-JWL (D. Kan. 2003),*

*In re The Interpublic Group of Companies Securities Litigation, No. 02 Civ. 6527 (S.D.N.Y. 2002), State of New Jersey and Its Division of Investment v. Sprint Corporation, et al., No. 03-2071-JWL (D. Kan. 2003),*

*In re Delphi Corp. Sec. Litig., 1:05-CV-2637 (NRB) (S.D.N.Y. 2005),*

*In re Vaxgen Inc. Securities Litigation, No. C 03-01129 JSW (N.D. Cal. 2003),*

*In re American Business Financial Services, Inc., No. 04- 0265 (E.D. Pa. 2004) and*

*In re Autobytel, Inc. Securities Litigation, No. CV04-8987 MMM (JWJx) (C.D. Cal. 2004).*

Mr. Berman represents institutional investors worldwide in securities litigation and other related matters. In addition, Mr. Berman is a frequent speaker on securities issues, especially as they relate to institutional investors, at The European Pension Symposium in Florence, Italy; the Public Funds Symposium 2005 in Washington, D.C.; the Pennsylvania Public Employees Retirement (PAPERS) Summit in Harrisburg, Pennsylvania; the New England Pension Summit in Newport, Rhode Island; the Rights & Responsibilities of Institutional Investors 2006 in Amsterdam, Netherlands; and the European Investment Roundtable 2006 in Barcelona, Spain. He speaks with institutional investors located around the world regarding their rights and obligations associated with securities fraud class actions and individual actions. Mr. Berman works closely with the firm's institutional investors and counsels them on fulfilling their fiduciary obligations and exercising their rights in all types of securities related actions.

Mr. Berman has specialized in the area of securities litigation for the past nine years. He is particularly proud of the results achieved in In re AremisSoft Corp. Sec. Litig., C.A. No. 01-CV-2486 (D.N.J. 2002), a case on which Mr. Berman and his partner, Richard Schiffrin, have worked extensively. This case was exceedingly complicated, as it involved the embezzlement of hundreds of millions of dollars by former officers of the Company, some of whom are now fugitives. In settling the action, Schiffrin Barroway Topaz & Kessler, as sole Lead Counsel, assisted in reorganizing AremisSoft as a new Company which allowed for it to continue operations, while successfully separating out the securities fraud claims and the bankrupt Company's claims into a litigation trust. The Settlement, which was approved by the Court, called for the class to receive the majority of the equity in the new Company, as well as their pro rata share of all amounts recovered by the litiga-

tion trust. The Court-appointed co-trustees, Joseph P. LaSala, Esq. and Fred S. Zeidman, retained Schiffrin Barroway Topaz & Kessler to continue prosecuting the actions on behalf of the litigation trust. After extensive litigation in the Isle of Man, including the successful freezing of more than $200 million of stolen funds, the trust recently settled its action against one of the principal wrong-doers and recovered approximately $200 million. Thus far, the trust has distributed to beneficiaries of the trust more than 28% of their recognized losses (excluding the value of the equity of the new Company), and is poised to recover even more. Recently, the trust commenced further litigation in Cyprus, where it obtained a Mareva injunction and interim ancillary relief against bank accounts and assets owned and/or controlled by the other princi-pal wrongdoer.



### Gregory M. Castaldo

Gregory M. Castaldo, a partner of the firm, received his law degree from Loyola Law School, where he received the American Jurisprudence award in legal writing. He received his undergraduate degree from the Wharton School of Business at the University of Pennsylvania. He is licensed to practice law in Pennsylvania and New Jersey. Mr. Castaldo has been actively involved in litigating the following cases:

*In re Tenet Healthcare Corp., 02-CV-8462 (C.D.Cal.):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Tenet Healthcare and certain of its officers and directors defrauded Medicare out of hundreds of millions of dollars, materially overstated Tenet's revenues, and performed unnecessary cardiac surgeries to increase the Company's earnings. After three years of hard-fought litigation and complex mediation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement involving a $216.5 million payment from Tenet and the Company's former CEO and COO, and specific corporate governance improvements.

*In re Liberate Technologies Securities Litigation,*
*No. C-02-5017 (MJJ) (N.D. Cal. 2005):*
Plaintiffs alleged that Liberate engaged in fraudulent revenue recognition practices to artificially inflate the price of its stock, ultimately forcing it to restate its earnings. As sole Lead Counsel, Schiffrin Barroway Topaz & Kessler successfully negotiated a $13.8 million settlement, which represents almost 40% of the damages suffered by the class. In approving the settlement, the district court complimented Lead Counsel for its "extremely credible and com-petent job."

*In re Sodexho Marriott Shareholders Litigation,*
Consol. C.A. No. 18640-NC, Delaware Chancery Court, in which Class Counsel was partially responsible for creating an aggregate financial benefit of approximately $166 million for members of the class.

Mr. Castaldo is also presently litigating *State of New Jersey and Its Division of Investment v. Sprint Corporation, et al.,* No. 03-2071-JWL (D. Kan. 2003) among other actions.



### Michael K. Yarnoff

Michael K. Yarnoff, a partner of the firm, received his law degree from Widener University School of Law. Mr. Yarnoff is licensed to practice law in Pennsylvania, New Jersey, and Delaware and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey. He serves in the firm's securities litigation department and has been actively involved in a number of federal securities cases in which outstand-ing results were achieved, including the following:

*In re CVS Corporation Securities Litigation,*
*C.A. No. 01-11464 JLT (D.Mass.):*
After more than three years of contentious litigation and a series of protracted mediation sessions, Schiffrin Barroway Topaz & Kessler, serving as co-lead counsel, secured a $110 million recovery for class members in the CVS Securities Litigation. Specifically, the suit alleged that CVS violated accounting prac-tices by delaying discounts on merchandise in an effort to prop up its earnings. In addition, the suit charged that in 2001, the Company and its Chief Executive Officer, Thomas M. Ryan, improperly delayed announcement of its intention to close approximately 200 underperforming stores, and that an industry-wide pharmacist shortage would have a materially negative impact on the Company's performance. Settlement was reached just days prior to the commencement of trial, and shortly after the district court had denied the defendants' motions for summa-ry judgment. This substantial recovery, which represents the third-largest settlement in a securities class action case in the First Circuit, received final approval from District Judge Joseph Tauro on September 27, 2004.

*In re InfoSpace, Inc. Securities Litigation,*
*Master File No. C-01-0913-Z (D. Wash. 2001):*
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs alleging that InfoSpace and certain of its officers and directors overstated revenues by using improper accounting methods, overstated the demand for InfoSpace's wireless services, misstated InfoSpace's financial relationships with major customers, and falsely represented that InfoSpace would receive subscription fees from users of web-enabled cell phones. After two years of hard-fought litigation and complex mediation, a settlement of $34.3 million was obtained for members of the class.

23

*In re Riverstone Networks, Inc. Securities Litigation,*
*Case No. CV-02-3581 (N.D. Cal. 2002):*
Schiffrin Barroway Topaz & Kessler served as Lead Counsel on
behalf of plaintiffs alleging that Riverstone and certain of its offi-
cers and directors sought to create the impression that the
Company, despite the industry-wide downturn in the telecom
sector, had the ability to prosper and succeed and was actually
prospering. In that regard, plaintiffs alleged that defendants issued
a series of false and misleading statements concerning the
Company's financial condition, sales and prospects, and used
inside information to personally profit. After extensive litigation,
the parties entered into formal mediation with the Honorable
Charles Legge (Ret.). Following five-months of mediation, the
parties reached a settlement of $18.5 million.



### Joseph H. Meltzer

Joseph H. Meltzer, a partner of
the firm, received his law degree,
*with honors,* from Temple University
School of Law. He is licensed to
practice law in Pennsylvania and
New Jersey, and has been admitted
to practice before the United
States District Court for the
Eastern District of Pennsylvania,
the United States District Court
for the District of New Jersey
and the United States Court of
Appeals for the Third Circuit.

Mr. Meltzer concentrates his practice in the areas of ERISA
and antitrust complex litigation, and manages the firm's ERISA
litigation department, which has excelled in the highly specialized
area of prosecuting claims on behalf of retirement savings plans.
Mr. Meltzer is Lead Counsel in several pending nationwide class
actions brought under ERISA.

Mr. Meltzer has helped obtain several multi-million dollar
settlements on behalf of class members, including the recent
settlements in *In re Global Crossing ERISA Litigation,* No. 02
Civ. 7453 (S.D.N.Y.) ($79 million settlement) and *In re Augmentin
Antitrust Litigation,* No. 02-442 (E.D. Va.) ($29 million settle-
ment). Mr. Meltzer also prosecutes claims on behalf of third-party
payors and consumers and is currently serving as Lead Counsel
in *In re Remeron Antitrust Litigation,* No. 02-CV-2007 (D.N.J.)
and *In re Wellbutrin SR/Zyban Antitrust Litigation* (E.D. Pa.).

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr.
Meltzer practiced at Barrack, Rodos & Bacine in Philadelphia,
where he had prominent roles in prosecuting several complex
class actions to successful conclusions, including *In re Sorbates
Direct Purchaser Antitrust Litigation,* No. C 98-4886 (N.D. Cal.
2001) ($92 million settlement) and also defended clients in
antitrust and commercial litigation.



### Darren J. Check

Darren J. Check, a partner of the
firm, concentrates his practice in the
area of securities litigation and insti-
tutional investor relations. He is a
graduate of Franklin & Marshall
College where he received a degree
in History, *with honors.* Mr. Check
received his law degree from
Temple University School of Law
and is licensed to practice law in
Pennsylvania and New Jersey, and
has been admitted to practice before
the United States District Court for the Eastern District of
Pennsylvania, the United States District Court for the District of
New Jersey, and the United States District Court for the District
of Colorado. Mr. Check began his career at Schiffrin Barroway
Topaz & Kessler by working extensively with partner David
Kessler on In re Initial Public Offering Securities Litigation, No.
21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002), widely considered the
largest securities class action in history.

Currently, Mr. Check concentrates his time as the firm's
Director of Institutional Relations. He consults with institutional
investors from around the world regarding their rights and
responsibilities with respect to their investments and taking an
active role in shareholder litigation. Mr. Check assists clients in
evaluating what systems they have in place to identify and moni-
tor shareholder litigation that has an affect on their investments,
and also assists them in evaluating the strength of such cases and
to what extent they may be affected by the conduct that has been
alleged. He currently works with clients in the U.S., Canada,
United Kingdom, France, Italy, Sweden, Denmark, Finland,
Norway, Germany, Austria, and the Netherlands. Mr. Check regu-
larly speaks on the subjects of shareholder litigation, corporate
governance, investor activism, and how Schiffrin Barroway Topaz
& Kessler's services can be of use to investors. Recently, Mr. Check
spoke at the MultiPensions 2005 Conference in Amsterdam,
Netherlands; the European Pension Symposium in Florence, Italy;
the Public Funds Summit in Phoenix, Arizona; the European
Investment Roundtable in Barcelona, Spain; The Rights &
Responsibilities Of Institutional Investors: European and U.S.
Approaches To Active Ownership in Amsterdam, Netherlands; the
Corporate Governance & Responsible Investment Summit,
Stockholm, Sweden; and Pension Fund Investment World –
Germany in Frankfurt, Germany.



## Tobias L. Millrood

Tobias L. Millrood, a partner of the firm, manages the mass tort department at Schiffrin Barroway Topaz & Kessler. Mr. Millrood has been actively involved in mass tort litigation involving Prempro (Hormone Therapy), Guidant Cardiac Devices, Medtronic Cardiac Devices, Vioxx, Fen-Phen, Baycol, Meridia, Thimerosal, Ephedra and Zyprexa.

Mr. Millrood has been distinguished with leadership roles in several national products liability actions. Mr. Millrood currently serves as Liaison Counsel in *In Re Hormone Therapy Litigation*, Philadelphia Court of Common Pleas. Mr. Millrood also serves on the Plaintiffs' Steering Committee in *MDL 1507 – In Re Prempro Products Liability* and is Chair of the Association of Trial Lawyers of America (ATLA) Hormone Therapy Litigation Group. Mr. Millrood served as a Co-Chair of the Expert Committee in *In Re Baycol Litigation*, Philadelphia Court of Common Pleas. In Meridia, Mr. Millrood is Co-Chair of the ATLA Meridia Litigation Group. He also served on the Executive Committee of *MDL 1481, In re Meridia Products Liability*. In Thimerosal, Mr. Millrood serves on the Executive Committee of the Omnibus Autism Proceedings before the National Vaccine Injury Compensation Program. In August 2003, Mr. Millrood's article on Hormone Therapy was published in *Trial* magazine. Mr. Millrood speaks frequently at various seminars, on the topics of Mass Tort Litigation, Hormone Therapy, Cardiac Device Litigation, Meridia, the Ethics of Settling Mass Tort Cases and Electronic Discovery. Mr. Millrood has helped his clients to achieve millions of dollars in settlement of their product liability claims.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Millrood practiced at Anapol Schwartz. While at Anapol Schwartz, Mr. Millrood garnered several notable achievements, including serving as co-counsel in a $22 million medical malpractice verdict in *Wallace v. Fraider* (Phila. CCP Mar. 2001), one of the highest in state history. He also wrote and argued cases resulting in significant changes to Pennsylvania law: *Cullen v. Pennsylvania Prop. & Cas. Ins. Guar. Ass'n*, 760 A.2d 1198 (Pa. Commw. 2000) (Pennsylvania workers' compensation carrier could not assert a subrogated claim for benefits that its insured's employee was precluded from recovering in settlement of a related medical malpractice claim); and *Estate of Magette v. Goodman*, 2001 WL 218981 (Pa. Super. 2001) (failure to retain evidence of EKG strip during orthopedic surgery that resulted in death of patient required new trial where court failed to give jury adverse inference instruction).

Mr. Millrood received his law degree from University of Tulsa College of Law. He is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District of New Jersey and the United States Court of Appeals for the Third Circuit. Mr. Millrood is a former member of the Pennsylvania Trial Lawyers Board of Governors and the Executive Committee of the Philadelphia Bar Association Young Lawyers' Division.



## Andrew L. Zivitz

Andrew L. Zivitz, a partner of the firm, received his law degree from Duke University School of Law, and received a Bachelor of Arts degree, with distinction, from the University of Michigan, Ann Arbor. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Zivitz practiced with the Philadelphia law firms of Klehr, Harrison, Harvey, Branzburg & Ellers, LLP and Drinker Biddle & Reath, where he litigated complex commercial and environmental matters.

Mr. Zivitz is admitted to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey. Mr. Zivitz concentrates his practice in the area of securities litigation, and is Lead or Co-Lead Counsel in several of the largest class action securities cases currently pending nationwide. In addition, Mr. Zivitz has been actively involved in a number of federal securities cases in which outstanding results were achieved, including the following:

*In re Tenet Healthcare Corp.*, 02-CV-8462 (C.D.Cal.):
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Tenet Healthcare and certain of its officers and directors defrauded Medicare out of hundreds of millions of dollars, materially overstated Tenet's revenues, and performed unnecessary cardiac surgeries to increase the Company's earnings. After three years of hard-fought litigation and complex mediation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement involving a $216.5 million payment from Tenet and the Company's former CEO and COO, and specific corporate governance improvements.

*In re Computer Associates*, No. 02-CV-1226 (E.D.N.Y.):
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that Computer Associates and certain of its officers misrepresented the health of the company's business, materially overstated the company's revenues, and engaged in illegal insider selling. After nearly two years of litigation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement of $150 million from the company.

*In re McLeod USA Inc.*, No. C02-0001-MWB (N.D. Iowa):
Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs, alleging that McLeod USA and certain of its officers misrepresented the health and prospects of the company's business. After more than three years of litigation, Schiffrin Barroway Topaz & Kessler helped obtain a settlement of $30 million from the defendants.

*In re Ligand Pharmaceuticals, Inc., 04-CV-1620-DMS (S.D. Cal.):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and was instrumental in obtaining a recovery of $8.0 million for class members against Ligand Pharmaceuticals and certain of its officers. Plaintiffs brought claims against the defendants on the grounds that they touted the financial condition of the company and their ability to predict and monitor inventory returns when, in fact, the Company's revenues and earnings were artificially inflated and defendants had no ability to meaningfully predict or gauge inventory returns.

*In re Aon Corp., No. 02-CV-5631 (N.D. Ill.):*

Schiffrin Barroway Topaz & Kessler served as Lead Counsel and was instrumental in obtaining a recovery of $7.25 million for class members against Aon Corp. and certain of its officers. Plaintiffs brought claims against the defendants on the grounds that they touted the prospects and successes of the company's multi-million dollar "Business Transformation Plan," when in fact they knew that the plan was damaging the company's business.

## Sean M. Handler



Sean M. Handler, a partner of the firm, received his Bachelor of Arts degree from Colby College, graduating *with distinction* in American Studies. Mr. Handler then earned his Juris Doctor, *cum laude*, from Temple University School of Law.

After law school, Mr. Handler practiced labor law at Reed Smith, LLP in Philadelphia. Since joining Schiffrin Barroway Topaz & Kessler, Mr. Handler has concentrated his practice in the area of securities litigation, with a particular emphasis on client development, litigation strategy and lead plaintiff litigation. In this role, Mr. Handler has been responsible for numerous reported decisions.

In addition to these responsibilities, Mr. Handler also spends considerable time litigating ongoing securities litigation matters on behalf of institutional clients, including:

*In re Delphi Corporation Securities Litigation, No. 06-10026 (GER) (E.D. MI.)*

*Smajlaj v. Brocade Communications Systems, Inc., et al., No. 05-cv-02042 (CRB) (N.D. Cal.)*

*State of New Jersey and Its Division of Investment v. Sprint Corporation, et al., No. 03-2071-JWL (D. Kan. 2003).*

## John A. Kehoe



John A. Kehoe, a partner of the firm, received his B.A. from DePaul University and an M.P.A., *with high honors,* from the University of Vermont. He earned his J.D., *magna cum laude,* from Syracuse University College of Law, where he was Associate Editor of the Syracuse Law Review, Associate Member of the Moot Court Board and Alternate Member of the National Appellate Team.

During his legal career, Mr. Kehoe has litigated high profile securities and antitrust actions in federal and state courts, including *Ohio Public Employees Retirement System et al. v. Freddie Mac et al.,* 03-CV-4261 (S.D.N.Y.) (resulting in a $410 million combined class and derivative settlement); *In re Bristol-Myers Squibb Sec. Litig.,* 02-CV-2251 (S.D.N.Y.) (resulting in a $300 million class settlement); *In re Adelphia Communications Corp. Sec. & Der. Litig.,* No. 03 MD 1529 (S.D.N.Y.) (resulting in a $460 million class settlement); and *In re Vitamins Antitrust Litig.,* MDL No. 1285 (D.D.C.) (resulting in more than $2 billion in federal and state class and direct action settlements).

Mr. Kehoe is currently among the lead trial attorneys representing individual and institutional investors in 309 separate class actions that have been consolidated for pretrial purposes in *In re Initial Public Offering Sec. Litig.,* No. 21 MC 92 (S.D.N.Y.) (resulting in over $1 billion in class settlements with additional claims pending against various underwriter defendants). He is also serving as lead or co-lead counsel in *Reynolds v. Repsol YPF S.A.,* 06-CV-00733 (S.D.N.Y.); *Mizzaro v. Home Depot Inc.,* 06-CV-1151 (N.D. Ga); and *In re AremisSoft Corp. Sec. Litig.,* 01-CV-2486 (D.N.J.).

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Kehoe spent six years as an associate at Clifford Chance LLP, where he represented Fortune 500 corporations and their officers and directors in complex commercial litigation and in actions brought by the Department of Justice, the Securities and Exchange Commission and the Federal Trade Commission.

Mr. Kehoe is a member of the Association of the Bar of the City of New York and the New York Bar Association and is admitted to practice before the courts of New York State (1999) and the U.S. District Court for the Southern District of New York (2000).



### Lee D. Rudy

Lee D. Rudy, a partner of the firm, received his law degree from Fordham University in 1996. In law school he was a senior editor of the Fordham Urban Law Journal and published *A Procedural Approach to Limited Public Forum Cases*, 22 Ford. Urb. L.J. 1255 (1995). He received his undergraduate degree, *cum laude*, from the University of Pennsylvania in 1992. Mr. Rudy is licensed to practice law in Pennsylvania and New York. From 1996 to 2002, Mr. Rudy was an Assistant District Attorney in the Manhattan District Attorney's Office, where he prosecuted dozens of felony jury trials to verdict. From 2003 to 2005, Mr. Rudy was an Assistant United States Attorney in the District of New Jersey, where he investigated and prosecuted numerous fraud and violent crime cases, and where he tried several major fraud cases to verdict in federal court. Mr. Rudy co-manages the firm's mergers and acquisition and shareholder derivative litigation department along with Marc Topaz and Eric Zagar.



### Kay E. Sickles

Kay E. Sickles, a partner of the firm, received her law degree from the University of Pennsylvania School of Law. She received her undergraduate degree from Colgate University, graduating, *with honors*, from the History department. Prior to joining the firm, Ms. Sickles was an associate with Sandals & Langer, LLP, where she litigated complex class actions arising out of violations of the ERISA and antitrust statutes. She is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the Ninth and Seventh Circuit Courts of Appeal, the United States District Court for the Eastern District of Pennsylvania, and the United States District Court for the District of New Jersey.

Ms. Sickles concentrates her practice in the area of securities litigation and specializes in settlement matters. She has played a lead role in effectuating some of the most significant settlements of securities class actions in recent years, including the partial settlement with Tenet Healthcare Corp. and certain officer of that corporation for $216.5 million in *In re Tenet Healthcare Corp. Sec. Litig.*, No. CV-02-8462-RSWL (Rzx) (C.D. Ca. 2006); the settlement for cash and common stock worth over $90 million in *In re Interpublic Sec. Litig.*, Civ. 6527 (DLC) (S.D.N.Y. 2004); and the settlements for securities worth over $133.5 million in *In re Computer Associates Class*

Action Securities Litigation, Master File No. 98 Civ. 4839 (TCP), and *In re Computer Associates 2002 Class Action Securities Litigation*, Master File No,.02-CV-1226 (TCP) (E.D.N.Y.).



### Eric L. Zagar

Eric L. Zagar, a partner of the firm, received his law degree from the University of Michigan Law School, *cum laude*, where he was an Associate Editor of the Michigan Law Review. He has practiced law in Pennsylvania since 1995, and previously served as a law clerk to Justice Sandra Schultz Newman of the Pennsylvania Supreme Court. He is admitted to practice in Pennsylvania.

Mr. Zagar concentrates his practice in the area of shareholder derivative litigation. Mr. Zagar has served as Lead or Co-Lead counsel in numerous derivative actions in courts throughout the nation, including *David v. Wolfen*, Case No. 01-CC-03930 (Orange County, CA) (Broadcom Corp. Derivative Action); *In re PolyMedica Corporation Shareholder Derivative Litigation*, Case No. 01-3446 (Middlesex County, MA); *In Re Dynacq Int'l. Shareholder Derivative Litigation*, Case No. 2002-07135 (Harris County, TX); and *Castillo v. Cavallaro, et al.*, Case No. A467663 (Clark County, NV) (Station Casinos, Inc. Class and Derivative Action). Mr. Zagar has successfully achieved significant monetary and corporate governance relief for the benefit of shareholders, and has extensive experience litigating matters involving Special Litigation Committees.

## Associates and Other Professionals



**JULES D. ALBERT,** an associate of the firm, received his J.D. in 2005 from the University of Pennsylvania Law School, where he was a Senior Editor of the University of Pennsylvania Journal of Labor and Employment Law and recipient of the James Wilson Fellowship. Mr. Albert also received a Certificate of Study in Business and Public Policy from The Wharton School at the University of Pennsylvania. Mr. Albert graduated *magna cum laude* with a Bachelor of Arts in Political Science from Emory University. Mr. Albert is licensed to practice law in Pennsylvania, and concentrates his practice in the mergers and acquisitions and shareholder derivative actions department.



**KATIE L. ANDERSON,** an associate of the firm, received her law degree from Widener University School of Law. She received her undergraduate degree from the University of Pittsburgh. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Anderson served as a Deputy Attorney General for the Pennsylvania Office of Attorney General, Bureau of Consumer Protection, where she was responsible for enforcing a wide range of consumer oriented laws.

Ms. Anderson is licensed to practice law in Pennsylvania and is admitted to practice in the United States District Court for the Eastern District of Pennsylvania. She concentrates her practice in the area of mass tort litigation.



**MICHELLE M. BACKES,** an associate of the firm, received her law degree from Villanova University School of Law. Ms. Backes received her undergraduate degrees in Finance and Art History from Loyola College in Maryland in 2002. Ms. Backes is licensed to practice law in Pennsylvania and New Jersey. She concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of securities litigation.



**IAN D. BERG,** an associate of the firm, received his J.D. and B.A. from Northwestern University. Mr. Berg concentrates his practice in the area of securities litigation and he plays a significant role in investigating and evaluating potential cases, including proprietary claims and direct actions on behalf of institutional clients. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Berg primarily practiced in the areas of commercial litigation and land use on behalf of corporations and real estate investment trusts. He is licensed to practice law in Pennsylvania and Illinois.



**ROBERT W. BIELA,** an associate of the firm, received his law degree from the Penn State Dickinson School of Law, where he served on the editorial board of the Environmental Law and Policy Journal. Mr. Biela received his undergraduate degree from West Chester University. Prior to joining the firm, Mr. Biela was an associate at Mager White and Goldstein, LLP. Mr. Biela is licensed to practice law in the Commonwealth of Pennsylvania and the United States District Court for the Eastern District of Pennsylvania. His practice focuses primarily in the area of securities litigation.



**KATHERINE B. BORNSTEIN,** an associate of the firm, received her law degree from Emory University School of Law. Ms. Bornstein received her undergraduate degree from the University of Maryland. She is licensed to practice law in Pennsylvania and Maryland. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Bornstein was an associate at Provost & Umphrey Law Firm, LLP, where she worked on a number of complex litigation issues. Ms. Bornstein concentrates her practice at Schiffrin Barroway Topaz & Kessler in the areas of ERISA, antitrust and consumer protection.



**TREVAN BORUM,** an associate of the firm, received his B.A. from Wake Forest University in 1987, and his J.D. from Widener University Law School in 1992. Mr. Borum was the valedictorian of his law school class, and served as a Wolcott fellow with the Delaware Supreme Court. He is licensed to practice law in Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Borum served as an Assistant District Attorney in Philadelphia for ten years. Mr. Borum also practiced criminal defense after leaving the District Attorney's office. At Schiffrin Barroway Topaz & Kessler, Mr. Borum concentrates his practice in the mergers and acquisitions and shareholder derivative actions department.



**JONATHAN R. CAGAN,** an associate of the firm, received his law degree from the Temple University School of Law. Mr. Cagan received his undergraduate degree, *cum laude,* from Temple University. Mr. Cagan is licensed to practice law in New Jersey, and is admitted to the Third Circuit Court of Appeals. Mr. Cagan concentrates his practice in the area of securities litigation and specializes in discovery matters.

28



**EDWARD W. CIOLKO,** an associate of the firm, received his law degree from Georgetown University Law Center, and an MBA from the Yale School of Management. Prior to joining the firm, he served as an Attorney Advisor to Commissioner Sheila F. Anthony at the Federal Trade Commission. He is licensed to practice law in the State of New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey. Mr. Ciolko concentrates his practice in the areas of antitrust, ERISA, and consumer protection.



**ALISON K. CLARK,** an associate of the firm, received her law degree, *cum laude,* from Boston University School of Law, and received her undergraduate degree in Political Science, with honors, from Lehigh University. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Clark was an attorney with a Fairfield County, Connecticut law firm, where she practiced in the areas of civil and commercial litigation, and real estate transactions.

Ms. Clark is licensed to practice law in Connecticut, and has been admitted to practice before the United States District Court for the District of Connecticut. Ms. Clark concentrates her practice in the mergers and acquisitions and shareholder derivative department.



**STEPHEN E. CONNOLLY,** an associate of the firm, received his law degree from Villanova University School of Law, and is a graduate of The Pennsylvania State University. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Connolly was an associate at a Philadelphia firm where he practiced in the areas of complex litigation, securities and antitrust litigation. Mr. Connolly is licensed to practice law in Pennsylvania, and concentrates his practice in the area of antitrust litigation.



Court of the United States of America. Mr. Danek concentrates his practice in the area of securities litigation.

**BRADLEY A. DIRKS,** an associate of the firm, received his J.D. from The University of Akron School of Law and a B.A. in Journalism and Political Science, *cum laude,* from the University of Wisconsin. He is a member of the State Bar of New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Dirks worked for an Atlantic City, New Jersey-based law firm where he focused on administrative law and regulatory issues in the casino gaming industry. Mr. Dirks concentrates his practice in the area of shareholder derivative litigation.



**JENNIFER L. ENCK,** an associate of the firm, received her law degree, *cum laude,* from Syracuse University College of Law in 2003 and her undergraduate degree in International Politics from The Pennsylvania State University in 1999. Ms. Enck also received a Masters degree in International Relations from Syracuse University's Maxwell School of Citizenship and Public Affairs. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Enck was an associate with Spector, Roseman & Kodroff, P.C. in Philadelphia, where she worked on a number of complex antitrust, securities and consumer protection cases.

Ms. Enck is licensed to practice law in Pennsylvania. She concentrates her practice in the areas of securities litigation and settlement matters.



**ROBERT J. GRAY,** an associate of the firm, received his law degree from the Temple University School of Law. Mr. Gray received Bachelor of Sciences degree from La Salle University with a dual major of Accounting and Finance. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Gray was an associate at Philadelphia boutique litigation firm practicing in the areas of complex commercial litigation and corporate transactions. Mr. Gray also worked as in-house counsel for a small, publicly-traded holding company.

Prior to beginning his law career, Mr. Gray worked as a forensic accountant for six years, conducting a variety of investigations for numerous governmental agencies and law firms. He received his C.P.A. license in 1997.

Mr. Gray is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. He concentrates his practice in the area consumer protection.

**MARK S. DANEK,** an associate of the firm, received his undergraduate degree in Architecture from Temple University in 1996 and his law degree from Duquesne University School of Law in 1999. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Danek was employed as in-house counsel of a real estate investment trust corporation that specialized in the collection of delinquent property tax receivables.

He is licensed to practice law in the Commonwealth of Pennsylvania and has been admitted to practice before the Courts of the Commonwealth of Pennsylvania, the United States District Court for the Western District of Pennsylvania and the Supreme

29



**JOHN GROSS,** an associate of the firm, received his law degree from Widener School of Law, and his undergraduate degree from Temple University. Mr. Gross is licensed to practice law in Pennsylvania, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Gross was an insurance defense litigation associate at a large, Philadelphia based firm. Mr. Gross now concentrates his practice in the area of antitrust litigation.



**MARK K. GYANDOH,** an associate of the firm, received his undergraduate degree from Haverford College and his law degree from Temple University School of Law. While attending law school Mr. Gyandoh served as the research editor for the Temple International and Comparative Law Journal. He also interned as a judicial clerk for the Honorable Dolores K. Sloviter of the U.S. Court of Appeals for the Third Circuit and the Honorable Jerome B. Simandle of the U.S. District Court for New Jersey. After law school Mr. Gyandoh was employed as a judicial clerk for the Honorable Dennis Braithwaite of the Superior Court of New Jersey Appellate Division.

Mr. Gyandoh is the author of "Foreign Evidence Gathering: What Obstacles Stand in the Way of Justice?," 15 Temp. Int'l & Comp. L.J. (2001) and "Incorporating the Principle of Co-Equal Branches into the European Constitution: Lessons to Be Learned from the United States" found in *Redefining Europe* (2005). Mr. Gyandoh is licensed to practice in New Jersey and Pennsylvania and concentrates his practice in the area of ERISA, antitrust and consumer protection.



**BENJAMIN J. HINERFELD,** an associate at the firm, and concentrates his work in securities litigation. In 1996, he graduated from the University of Pittsburgh School of Law, where he served as Lead Note and Comment Editor of the Journal of Law and Commerce. From 1996 to 1997, he clerked for the Hon. Sandra Schultz Newman of the Supreme Court of Pennsylvania. Prior to joining SBTK, Mr. Hinerfeld worked in a securities litigation firm in Wilmington, Delaware.

From 2000 to 2003, Mr. Hinerfeld was a writing consultant with the Undergraduate Writing Center at the University of Texas at Austin. During that time he also co-authored, with Dr. Sarah Jane Rehnborg and Catherine Fallon, "Investing in Volunteerism: The Impact of Service Initiatives in Selected Texas State Agencies" a report prepared by The RGK Center for Philanthropy and Community Service, LBJ School of Public Affairs. He received his bachelor's degree from Vassar College and a master's degree in American History from the University of Texas at Austin.

Mr. Hinerfeld is licensed to practice law in Pennsylvania.



**MICHAEL J. HYNES,** an associate of the firm, received his law degree from Temple University School of Law, and is a graduate of Franklin and Marshall College. Mr. Hynes is licensed to practice law in Pennsylvania, New Jersey and Montana, and has been admitted to practice in the United States Court of Appeals for the Ninth Circuit, and the United States District Courts for the Eastern and Middle Districts of Pennsylvania.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Hynes practiced law at Cozen O'Connor, where he concentrated on bankruptcy and commercial litigation. He was an attorney with the Defenders' Association of Philadelphia from 1991 to 1996, where he defended thousands of misdemeanor and felony cases. At Schiffrin Barroway Topaz & Kessler, Mr. Hynes concentrates his practice in the areas of securities litigation and shareholder derivative litigation.



**TARA P. KAO,** an associate of the firm, received her J.D. from Villanova University School of Law, where she was a Managing Editor of Student Works for the Villanova Law Review. Ms. Kao received her Bachelor of Science in Business/Finance, *with honors,* from Carnegie Mellon University. She is licensed to practice law in Pennsylvania and concentrates her practice in the areas of mergers and acquisitions and shareholder derivative actions.



**D. SEAMUS KASKELA,** an associate of the firm, received his law degree from Rutgers School of Law -- Camden, and received his undergraduate degree in Sociology from Saint Joseph's University. Prior to graduating from law school and joining Schiffrin Barroway Topaz & Kessler, Mr. Kaskela was a law clerk with a large Philadelphia law firm, where he worked in the complex civil litigation department. Mr. Kaskela is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania (pending) and the United States District Court for the District of New Jersey. Mr. Kaskela works in the firm's case development department.



**JENNIFER L. KEENEY,** an associate of the firm, received her law degree, *cum laude*, from Temple University Beasley School of Law, where she was the Special Projects Editor for the Temple International and Comparative Law Journal. Ms. Keeney earned her undergraduate degree in History, *with honors*, from Washington University in St. Louis in 2003. She is licensed to practice law in Pennsylvania and concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of securities litigation.



**HAL J. KLEINMAN,** an associate of the firm, received his law degree from The John Marshall Law School, and his undergraduate degree from Ithaca College. Mr. Kleinman is licensed in Illinois and Pennsylvania, and has been admitted to practice before the United States District Court for the Northern District of Illinois, the United States District Court for the Eastern District of Pennsylvania, the Court of Appeals for the Seventh Circuit, the Court of Appeals for the Third Circuit, and the United States Court of Claims. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Kleinman practiced law in Chicago, where his practice concentrated in the area of Complex Litigation, Mass Torts and Class Actions. Mr. Kleinman was a member of the law and briefing committee that successfully obtained class certification in *In re Hartmarx Securities Litigation*, Case No. 01 C 7832 (N.D. Ill.). In addition, he was appointed to the Class Counsel Management Committee in *Cress, et al. v. Sara Lee Corporation*, Case No. 98 L 15072 (Cir. Ct., Cook County, Ill.). For his work in this matter, Mr. Kleinman was asked to be a guest lecturer at the University of Chicago Law School's Class Action Controversies Seminar and to discuss the Sara Lee litigation. He also was responsible for representing hundreds of clients in various Mass Torts, including MDL-1431, *In re Baycol Products Liability Litigation*; MDL-1373, *In re Bridgestone/Firestone, Inc. ATX, ATX II and Wilderness Tires Products Liability Litigation*; MDL-1203, *In re Diet Drugs (Phentermine/ Fenfluramine/Dexfenfluramine) Products Liability Litigation*; and MDL-926, *In re Silicone Gel Breast Implants Product Liability Litigation*. Mr. Kleinman concentrates his practice in the area of Mass Torts.



**ERIC LECHTZIN,** an associate of the firm, received his law degree from the Temple University School of Law. Mr. Lechtzin received his undergraduate degree in Political Science and Economics, *magna cum laude*, from Temple University, where he received Phi Beta Kappa honors. Mr. Lechtzin is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania and the District of New Jersey.

Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Lechtzin was an associate with the firm of Grant & Eisenhofer, P.A., where his practice was concentrated in federal securities class actions and corporate governance litigation. Mr. Lechtzin spent the first ten years of his career at two large Philadelphia law firms where he represented corporate and public sector clients in a wide range of complex commercial litigation, including toxic torts, labor and employment, insurance, and environmental law. Mr. Lechtzin has extensive trial experience and has argued appeals before the Supreme Court of Pennsylvania and other appellate courts. Mr. Lechtzin concentrates his practice with Schiffrin Barroway Topaz & Kessler in the area of securities class action litigation and is Lead or Co-Lead Counsel in several class action securities cases currently pending nationwide. In addition, Mr. Lechtzin has been actively involved in a number of federal securities cases in which outstanding results were achieved, including the following: *In re Global Crossing Access Charge Litigation, No. 04-MD-1630 (S.D.N.Y.)*, in which Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs and helped obtain a settlement of $15 million from the company; *In re Van der Moolen Holding N.V. Securities Litigation, No. 1:03-CV-8284 (S.D.N.Y.)*, in which Schiffrin Barroway Topaz & Kessler served as Co-Lead Counsel on behalf of plaintiffs and helped obtain a settlement of $8 million from the company; and *Scott Tanne v. Autobytel, Inc., et al, No. CV 04-8987 (C.D. Cal.)*, in which Schiffrin Barroway Topaz & Kessler served as sole Lead Counsel on behalf of plaintiffs and obtained a settlement of $6.75 million from the company.



**JAMES A. MARO, JR.,** an associate of the firm, received his law degree from the Villanova University School of Law in 2000. He received a B.A. in Political Science from the Johns Hopkins University in 1997. Mr. Maro is licensed to practice law in Pennsylvania and New Jersey and is admitted to practice in the United States District Court for the Eastern District of Pennsylvania. He concentrates his practice in the area of mergers and acquisitions and shareholder derivative actions.



**RICHARD A. MANISKAS,** an associate of the firm, received his law degree from Widener University School of Law, and received his undergraduate degree from the University of Pittsburgh. While in law school, Mr. Maniskas served as Internal Editor of the *Widener Journal of Public Law*. He is licensed to practice law in Pennsylvania and the District of Columbia, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Mr. Maniskas works in the firm's case development department.

31



**JAMES H. MILLER**, an associate of the firm, received his J.D. in 2005 from Villanova University School of Law, where he was enrolled in Villanova University's J.D./M.B.A. program. Mr. Miller received his Master of Business Administration from Villanova University in 2005, and received his Bachelor of Chemical Engineering from Villanova University in 2002. Mr. Miller is licensed to practice law in Pennsylvania and concentrates his practice in the areas of mergers and acquisitions and shareholder derivative actions.



**CASANDRA A. MURPHY**, an associate of the firm, received her law degree from Widener University School of Law and her undergraduate degree from Gettysburg College. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Murphy was an associate at Post & Schell, P.C. where she practiced general casualty litigation. Ms. Murphy is licensed to practice in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. Ms. Murphy has lectured for the Pennsylvania Bar Institute and the Philadelphia Judicial Conference. She concentrates her practice at Schiffrin Barroway Topaz & Kessler in the area of consumer protection, ERISA, pharmaceutical pricing and antitrust.



**CHRISTOPHER L. NELSON**, an associate of the firm, received his law degree from Duke University School of Law, and his undergraduate degree in Business, Economics, and the Law from Washington University in St. Louis. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Nelson practiced with the Philadelphia law firm of Berger & Montague, P.C., where he was a securities litigator.

Mr. Nelson is admitted to practice law in the Commonwealth of Pennsylvania, the Supreme Court of the United States, the United States Court of Appeals for the Fourth, Fifth and Ninth Circuits, and the United States District Court for the Eastern District of Pennsylvania.

Mr. Nelson concentrates his practice in the area of securities litigation, and is Lead or Co-Lead Counsel in numerous pending nationwide class action securities cases.



**NICHOLAS S. PULLEN**, an associate of the firm, received his law degree, *cum laude*, from the Georgetown University Law Center in 2000. Upon graduation, Mr. Pullen worked at two prominent Philadelphia law firms. In 2003, he joined the administration of Governor Edward G. Rendell, where he served as Chief Counsel to the Pennsylvania Commission on Crime and Delinquency. Most recently, Mr. Pullen served as campaign manager for the Jim Eisenhower for Attorney General Campaign. He is licensed to practice law in Pennsylvania, and has been admitted to practice in the United States District Court for the District of Colorado. Mr. Pullen serves in the firm's Institutional Relations department.



**KAREN E. REILLY**, an associate of the firm, received her law degree from Pace University School of Law, where she was a member of the Moot Court Board and National Moot Court Team. Ms. Reilly received her undergraduate degree from the State University of New York College at Purchase. She is licensed to practice law in Pennsylvania, New Jersey, New York, Connecticut and Rhode Island, and has been admitted to practice before the United States District Courts for the Eastern District of Pennsylvania, District of New Jersey, Southern and Eastern Districts of New York, and the District of Connecticut.

Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Reilly practiced at Pelino & Lentz, P.C., in Philadelphia, where she litigated a broad range of complex commercial cases. Ms. Reilly concentrates her practice in the area of securities litigation.



**STEVEN D. RESNICK**, an associate of the firm, received his law degree from The Dickinson School of Law of The Pennsylvania State University, and his undergraduate degree, *cum laude*, from West Chester University. Mr. Resnick is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States Court of Appeals for the Third Circuit, the United States District Court for the District of New Jersey and the United States District Court for the District of Nebraska. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Resnick was an associate at the firm of German, Gallagher & Murtagh, where his practice concentrated in the defense of medical malpractice, products liability and premises liability. Mr. Resnick now concentrates his practice in the area of mass tort and product liability litigation.

32



**EMANUEL SHACHMUROVE,** an associate of the firm, received his law degree from The University of Michigan Law School, where he was an Associate Editor of the Michigan Journal of Law Reform. Mr. Shachmurove received his Bachelor of Science in Economics, *cum laude*, from The Wharton School at the University of Pennsylvania, where he was a Joseph Wharton Scholar. Mr. Shachmurove concentrates his practice in mergers and acquisitions and shareholder derivative litigation.



**BHARATI O. SHARMA,** an associate of the firm, received her law degree from the American University Washington College of Law, a Master of Public Administration from The George Washington University, and her undergraduate degree from the University of Pittsburgh. Ms. Sharma is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the District of New Jersey.

Ms. Sharma is a former judicial law clerk to the Honorable Stephen Skillman, Superior Court of New Jersey, Appellate Division, and a former member of American University's International Law Review. She is the founder and current President of the South Asian Bar Association of Philadelphia. Ms. Sharma also serves on the Executive Committees of the North American South Asian Bar Association and the Philadelphia Bar Association Young Lawyer's Division.

Prior to joining Schiffrin & Barroway, Ms. Sharma practiced complex civil litigation at a Philadelphia law firm. She now concentrates her practice in the areas of pharmaceutical and product liability litigation.



**BENJAMIN J. SWEET,** an associate of the firm, received his juris doctor from The Dickinson School of Law, and his BA, *cum laude*, from the University Scholars Program of The Pennsylvania State University. While in law school, Mr. Sweet served as Articles Editor of the Dickinson Law Review, and was also awarded Best Oral Advocate in the ATLA Junior Mock Trial Competition. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Sweet practiced in the Pittsburgh office of Reed Smith LLP, where he specialized in complex civil litigation. While at Reed Smith, Mr. Sweet co-authored "Assignability of Non-Compete Covenants," 74 Pa. Bar. Q. 64 (April 2003). Mr. Sweet is licensed to practice law in the Commonwealth of Pennsylvania, the United States District Court for the Western District of Pennsylvania and the United States Court of Appeals for the Ninth Circuit.

Mr. Sweet concentrates his practice in the area of securities litigation and has helped obtain several multi-million dollar settlements on behalf of class members in several nationwide federal securities class actions, including *In re CVS Pharmacy, Inc. Secs. Litig.,* No. 01-11464 (D.Mass. 2005) ($110 million recovery for Class members), *In re Zomax Inc. Secs. Litig.,* No. 04-cv-1155 (D.Minn. 2005) (multi-million dollar cash and stock recovery for Class members), *In re Flextronics Int'l Ltd. Secs. Litig.,* No. 03-cv-2102 (N.D. Cal. 2004) ($4.25 million recovery for Class members) and *In re Black Box Corp. Secs. Litig.,* No. 03-cv-412 (W.D. Pa. 2004) (multi-million dollar recovery for Class Members). Mr. Sweet is currently Lead or Co-Lead Counsel in several pending nationwide class action securities cases, including *In re Tyco Int'l Ltd. Secs. Litig.,* MDL Docket No. 02-1335-B (D.N.H.) and *In re PNC Financial Services Group, Inc. Secs. Litig.,* No. 02cv271 (W.D. Pa.).



**NICOLETTE TROPIANO,** an associate of the firm, received her law degree from Temple University School of Law. Ms. Tropiano received her undergraduate degree in Economics and Business Administration with a concentration in Accounting and Finance from Ursinus College in 2001.

Ms. Tropiano is licensed to practice law in Pennsylvania. She concentrates her practice in the area of securities litigation, and serves in the firm's lead plaintiff department which involves working with clients, litigation strategy and lead plaintiff issues.



**MICHAEL WAGNER,** an associate of the firm, received his undergraduate degree in Government from Franklin & Marshall College, and his law degree from the University of Pittsburgh School of Law in 1996. Mr. Wagner is licensed to practice law in Pennsylvania, and he has been admitted to practice in the United States Court of Appeals for the Third Circuit, and United States District Courts for the Eastern and Western Districts of Pennsylvania, for the Eastern District of Michigan, and for the District of Colorado.

Before joining Schiffrin Barroway Topaz & Kessler, Mr. Wagner worked at Rubin, Fortunato & Harbison, a boutique law firm in Paoli, PA, representing Fortune 100 corporations, as well as individuals and small businesses, in employment matters across the country. Mr. Wagner earlier worked for several years at Spector, Gadon & Rosen, in Philadelphia, concentrating his practice in complex commercial and corporate litigation. At Schiffrin Barroway Topaz & Kessler, Mr. Wagner focuses his practice in the areas of securities litigation and shareholder derivative litigation.

33



**JOSEPH A. WEEDEN,** an associate of the firm, received his law degree from the University of North Carolina School of Law, where he received the Gressman-Politt Award for outstanding oral advocacy. Mr. Weeden also received his undergraduate degree from the University of North Carolina at Chapel Hill, where he was a Joseph E. Pogue Scholar. Prior to joining the firm, Mr. Weeden was an associate at Kaufman & Canoles, P.C., where he practiced in the areas of commercial and business law. Mr. Weeden is licensed to practice law in Virginia, and concentrates his practice in the areas of complex ERISA and consumer litigation.



**ROBIN WINCHESTER,** an associate of the firm, received her law degree from Villanova University School of Law, and received her undergraduate degree in Finance from St. Joseph's University. Prior to joining Schiffrin Barroway Topaz & Kessler, Ms. Winchester served as a law clerk to the Honorable Robert F. Kelly in the United States District Court for the Eastern District of Pennsylvania. Ms. Winchester is licensed to practice law in Pennsylvania and New Jersey, and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania. She concentrates her practice in the area of shareholder derivative actions.



**GERALD D. WELLS, III,** an associate of the firm, received his law degree from Temple University School of Law, where he served on the editorial board of the Environment Law & Technology Journal. He is licensed to practice in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the District Court of New Jersey, and the United States District Court for the Eastern District of Michigan.

Mr. Wells concentrates his practice in the areas of antitrust, ERISA, consumer protection, and FLSA/overtime litigation and has helped obtain several multi-million dollar settlements on behalf of class members, including settlements in *In re Bristol-Myers Squibb ERISA Litigation*, No. 02-CV-10129 (LAP) ($41.22 million in cash plus structural remedies valued at up to $52 million); *Falk v. Amerada Hess Corp., et al.*, No. 03-CV-2491-FSH-PS ($2.25 million in cash plus structural remedies valued at up to $23.8 million); and *In re Westar Energy Inc. ERISA Litig.*, No. 03-4032-JAR (D. Kan.) ($9.25 million cash settlement). Mr. Wells currently serves as counsel in several pending nationwide class and collective actions.



**TERENCE S. ZIEGLER,** an associate of the firm, received his law degree from the Tulane University School of Law. Mr. Ziegler received a Bachelor of Business Administration degree with a concentration in Finance from Loyola University. Mr. Ziegler is licensed to practice law in the State of Louisiana, and has been admitted to practice before the United States Court of Appeals for the Fifth Circuit, the United States District Court for the Eastern District of Louisiana and the United States District Court for the Middle District of Louisiana. Mr. Ziegler concentrates his practice in the areas of consumer protection, ERISA, pharmaceutical pricing and antitrust.

# Of Counsel

CHRISTI A. CANNON, of counsel to the firm, received her law degree from Emory University School of Law and her undergraduate degree from Auburn University, *magna cum laude*. In law school Ms. Cannon was named to the Order of the Barristers, was one of twelve people from her class chosen to be on the Moot Court Special Teams, and served as the Director of Special Teams on the Moot Court Board of Directors. Ms. Cannon also served as one of three team members for the Georgia Intrastate Moot Court competition and as an alternate member for the National Moot Court Team.

Ms. Cannon has spent her legal career representing both plaintiffs and defendants in complex litigation around the United States and overseas, with a prominent emphasis on securities litigation under federal and state securities laws. Ms. Cannon is licensed to practice law in Georgia and has been admitted to practice before the Eleventh Circuit Court of Appeals, the United States District Court for the Northern District of Georgia, and all Georgia trial and appellate courts. In 2005, Ms. Cannon was voted by her peers and named by *Atlanta Magazine* and *Law and Politics Magazine* to be a Georgia Super Lawyer, placing her in the top five percent of attorneys and among the top 15 securities litigation attorneys in Georgia.

Ms. Cannon is working extensively with partner David Kessler on *In re Initial Public Offering Securities Litigation,* Master File No. 21 MC 92 (SAS) (S.D.N.Y. Dec. 12, 2002), currently pending in the Southern District of New York.

ROBERT M. BRAMSON, of counsel to the firm, has more than twenty-five years of experience in the litigation of antitrust and consumer cases, class actions and other complex litigation. Mr. Bramson received his undergraduate degree in economics, *summa cum laude*, from the University of California at Berkeley in 1977, and obtained his law degree from the Boalt Hall School of Law in 1981. Mr. Bramson is a member of the California Bar.

Mr. Bramson has represented both plaintiffs and defendants in numerous antitrust cases, and has acted as lead counsel in two such actions taken to trial — *Pacific West Cable Co. v. City of Sacramento, et al.* (E.D. Cal.) ($12 Million settlement on 24th day of trial, at close of plaintiff's case; Sherman Act §2 monopolization claims) and *Coleman et al. v. Sacramento Cable Television* (Sacramento Sup. Ct.) ($2.4 Million judgment after 17-day trial; class action/B & P §17200 case; B & P §17204 discriminatory pricing claims).

Mr. Bramson specializes in antitrust, business torts and communications litigation, as well as in class action cases. He served for many years on the Board of Directors of the National Association of Consumer Advocates and co-chaired its class action committee. He is a contributing author to the National Consumer Law Center's publication Consumer Class Actions. He acted as reporter for the National Association of Consumer Advocates in preparing its influential Standards and Guidelines for Consumer Class Actions, 176 F.R.D. 375 (1997).

Mr. Bramson's lecture topics have included "Strategic and Ethical Issues in Litigating 17200 Cases" (Bar Association of San Francisco, San Francisco 2001), "Equitable Remedies in Class Actions and Under California's Section 17200 Statute" (National Association of Consumer Advocates, Chicago 2000), "Ethical Issues Arising in Class Action Settlements" (National Consumer Law Center, Wash., DC and San Diego 1999 and 1998), "California's Business & Professions Code Section 17200" (California Bar Association, Lake Tahoe 1997), "Preparation of Competitive Business Practices Cases" (Continuing Education of the Bar, Sacramento 1997), and "The Cable Communications Policy Act of 1984" (California State University, Fullerton 1993).

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Bramson is a partner in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

ALAN R. PLUTZIK, of counsel to the firm, specializes in complex business litigation in state and federal courts throughout the United States. Areas of particular emphasis include class actions, securities fraud and corporate governance litigation, consumer law, antitrust, constitutional and communications law. Mr. Plutzik is admitted to practice in California and the District of Columbia (inactive member), and is a member of the bars of the United States Supreme Court, the Second, Eighth, Ninth, Tenth and District of Columbia Circuits and numerous federal district courts throughout the United States.

Mr. Plutzik received his law degree from the University of California at Berkeley's Boalt Hall School of Law in 1977. He received his undergraduate degree from St. John's College, Annapolis, Maryland, in 1971, and also holds an M. A. from Stanford University. Over the course of his twenty-nine year career, Mr. Plutzik has also handled a wide variety of class actions and derivative cases. He has represented, among other clients, corporate shareholders and limited partners challenging conduct by their general partners, officers or directors; consumers and businesses harmed by price-fixing and other anti-competitive conduct; consumers in actions against insurance companies, banks and other lenders; investors in securities fraud cases and derivative suits; employees in ERISA and wage/hour cases; purchasers of mislabeled and defective products; victims of toxic pollution; persons harmed by defective products; and cellular telephone and cable television subscribers.

Mr. Plutzik has also handled a substantial number of cases that raise First Amendment and other constitutional issues, and has represented broadcasters, cable television companies, communications common carriers and consumers in litigation and in administrative proceedings before the Federal Communications Commission and the California Public Utilities Commission.

Mr. Plutzik has written or lectured on topics that include class actions, California consumer law, substantive and procedural issues under the federal securities laws, First Amendment issues applicable to new media, cable television franchising and cable television companies' access to utility poles and real estate developments. He has appeared as a guest radio commentator on the Len Tillem Show on KGO-Radio in San Francisco, discussing class actions, consumer protection law and investor rights.

35

Mr. Plutzik has served as a judge pro tem on the Contra Costa County Superior Court. He is also President of the Warren W. Eukel Teacher Trust, a community-based charity that honors outstanding teachers in Contra Costa County, California.

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Plutzik is a partner in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

**L. TIMOTHY FISHER**, of counsel to the firm, specializes in consumer and securities class actions and complex business litigation. He has been actively involved in several cases in which multi-million dollar recoveries were achieved for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and fraud. Mr. Fisher is a member of the California Bar.

Mr. Fisher received his Juris Doctorate from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first year moot court competition.

In 1992, Mr. Fisher graduated *with highest honors* from the University of California at Berkeley and received a degree in political science. Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council." He is also a member of Phi Beta Kappa.

In addition to serving as Of Counsel to Schiffrin Barroway Topaz & Kessler, Mr. Fisher is an associate in the law firm of Bramson, Plutzik, Mahler & Birkhaeuser, LLP, of Walnut Creek, California.

# Consultants



**KEVIN P. CAULEY** serves in the firm's business development and institutional relations department. Mr. Cauley is a graduate of Temple University. Prior to joining the firm, Mr. Cauley was Director of Business Development for a multi-family office in New York City. Mr. Cauley also has prior experience in institutional fiduciary investment consulting, money manager selection, best trade executions, and asset allocation modeling. He has held the Series 7, 24, 63, and 65 licenses with the NASD. Mr. Cauley has also done political consulting in coordinating and directing various aspects of field operations for local, state, and national campaigns in Southeastern Pennsylvania. He is also an active member of The Pennsylvania Future Fund, A.O.H. Division 88 "Officer Danny Boyle Chapter," The Saint Andrews Society, The Friendly Sons of Saint Patrick, The Clover Club of Philadelphia, The Foreign Policy Research Institute, a Board Member of The Princeton Committee on Foreign Relations, and is an elected member to The Pennsylvania Society and The Union League of Philadelphia, where he serves on the Armed Services Committee.

**DAVID RABBINER** serves as Schiffrin Barroway Topaz & Kessler's Director of Investigative Services. As the firm's lead investigative fact finder, Mr. Rabbiner plans, oversees, and conducts investigations necessary to further and strengthen the firm's class-action litigation efforts. Although his investigative services are primarily devoted to securities matters, Mr. Rabbiner routinely provides litigation support, conducts due diligence, and lends general investigative expertise and assistance to the firm's other class-action practice areas. Mr. Rabbiner plays an integral role on the firm's legal team, providing critical investigative services to obtain evidence and information to help ensure a successful litigation outcome. Before joining Schiffrin Barroway Topaz & Kessler, Mr. Rabbiner enjoyed a broad-based, successful career as an FBI Special Agent, including service as an Assistant Special Agent in Charge, overseeing multiple criminal programs, in one of the Bureau's largest field offices. He holds an A.B. in English Language and Literature from the University of Michigan and a Juris Doctor from the University of Miami School of Law.

**SKIP HETTEL**, an investigator for the firm, received his undergraduate degree in Political Science from Syracuse University. Prior to joining Schiffrin Barroway Topaz & Kessler, Mr. Hettel was a paralegal for Miller, Alfano & Raspanti, P.C., where he worked on white-collar criminal defense and in the Special Master's office for Fen-Phen litigation. Previously, he served on the Jim Eisenhower for Attorney General Campaign.



280 King of Prussia Road, Radnor, Pennsylvania 19087
610-667-7706 · Fax: 610-667-7056

2125 Oak Grove Road, Suite 120, Walnut Creek, California 94598
925-945-0770 · Fax: 925-945-8792

www.sbtklaw.com

# EXHIBIT



# F

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                        \*
IN RE:                                  \*
                                        \*   No. C.02-MD-1335-B
TYCO INTERNATIONAL, LTD.                \*   November 2, 2007
                                        \*   10:40 a.m.
Multidistrict Securities                \*
Litigation                              \*
                                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF FAIRNESS HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For Securities            Richard S. Schiffrin, Esq.
Plaintiffs:               David Kessler, Esq.
                          Katharine M. Ryan, Esq.
                          Michael K. Yarnoff, Esq.
                          Darren J. Check, Esq.
                          Schiffrin, Barroway, Topaz &
                              Kessler, LLP

                          Jay W. Eisenhofer, Esq.
                          Sidney S. Liebesman, Esq.
                          Geoffrey C. Jarvis, Esq.
                          Grant & Eisenhofer, P.A.

                          Leigh Smith, Esq.
                          Sanford Dumain, Esq.
                          Milberg, Weiss, Bershad, Hynes &
                              Lerach, LLP

                          Bart M. Schwartz, Esq.

                          Louis P. Malone, Esq.
                          O'Donoghue & O'Donoghue

                          Cindy Rougeou, Esq.

                          William L. Chapman, Esq.
                          Orr & Reno, P.A.

COPY

2

| | |
|---|---|
| For Tyco: | Ann M. Galvani, Esq.<br>David Boies, Esq.<br>Marilyn C. Kunstler, Esq.<br>Jonathan W. Davenport, Esq.<br>Boies, Schiller & Flexner, LLP |
| | Frank P. Barron, Esq.<br>Cravath, Swain & Moore<br>(by telephone) |
| For PwC: | Michael P. Carroll, Esq.<br>Michael Flynn, Esq.<br>Davis, Polk & Wardwell |
| | Richard J. DeMarco, Jr., Esq.<br>PricewaterhouseCoopers, LLP |
| For Belnick: | Scott Mirelson, Esq.<br>Steptoe & Johnson, LLP |
| For Ashcroft: | Amanda Kosowsky, Esq.<br>Cadwalader, Wickersham & Taft, LLP |

Objectors:

| | |
|---|---|
| U.S. Trust Co.: | Robert E. Murphy, Jr., Esq.<br>Wadleigh, Starr & Peters, PLLC |
| State of PA: | Lenann T. Engler, Esq. |
| Court Reporter: | Diane M. Churas, CSR, CRR<br>Official Court Reporter<br>U.S. District Court<br>55 Pleasant Street<br>Concord, NH   03301<br>(603) 225-1442 |

3

BEFORE THE COURT

1

2      THE CLERK:  Court is now in session and has

3  for consideration today a fairness hearing in Case No.

4  02-MD-1335-PB, In Re:  Tyco Securities litigation.

5      THE COURT:  On Wednesday I held a telephone

6  conference with the parties to the proposed settlement

7  and those objectors who indicated a desire to speak

8  today.  It appears that two objectors wish to speak

9  challenging only the attorneys' fee issue.  So I propose

10  to proceed by first taking presentations from plaintiffs

11  and Tyco regarding the adequacy of the settlement, to

12  deal separately with the attorneys' fee question, give

13  the objectors an opportunity to make their presentations

14  and give the plaintiffs an opportunity to respond.

15  Anybody have any different idea about how we should

16  proceed?

17      All right.  Why don't we go ahead.  Before --

18  and I think Mr. Schiffrin should have an opportunity to

19  make his presentation, and then I understand someone

20  from Tyco would wish to speak as well.  I will hear

21  Tyco.

22      Before I do, Mr. Schiffrin, at the telephone

23  conference you informed me that there are certain minor

24  mistakes in your pleading that you wanted to correct,

25  and this is a good time to do that.  So why don't you do

1    the dollar, and I understand how individual shareholders

2    might feel that way, but it's simply not the reality in

3    something this complex.  So I don't think you need to

4    comment more than to say I am completely satisfied that

5    the amount of this settlement is an outstanding result

6    for this class.  I have no question about it, that it's

7    an outstanding amount for the class.  This is real

8    money, a significant percentage of what might be

9    recovered.  There were and are real risks to the class

10   in this case.  This is not a slam-dunk case for the

11   reasons I've identified, and do we have to come back to

12   the fact that your original effort to plead an

13   acquisition accounting fraud case, I threw out at the

14   12(b)(6) stage.  And the connection -- the problems of

15   connecting the corrective -- the looting claims with the

16   acquisition accounting fraud remain significant.  There

17   are a whole host of other risks.  So by any measure,

18   this is an outstanding result for the class.

19              MR. SCHIFFRIN:  I appreciate that, Judge,

20   obviously and share those sentiments.

21              What I was going to cover next, and you can

22   tell me if you'd like me to do this, is the objections

23   to the settlement.  There are a group of resolved and

24   then unresolved.  It's pretty short; so with the Court's

25   permission --

134

1   and I am uncomfortable being so complimentary.  That's
2   not like me.  It's out of character.  I'm usually
3   critical.  But I also want to say there's no doubt in my
4   mind about the quality of the legal work that the
5   plaintiffs have done here.  It has been of
6   extraordinarily high quality, equal to the high quality
7   work that Tyco has done.  The case -- and I'm sure
8   Maryanne shares this view.  That we want nothing to do
9   with this case is not because of the lawyers involved.
10  It's because we all have other things that we have to
11  do, and this is just a very big burden to take on.  It's
12  very hard in this world of ours to balance appropriately
13  the duty of zealous advocate and the duty of officer of
14  the Court.  When the stakes are as high as this, it
15  becomes even harder to do that, and one of the things I
16  know to be true is that the quality of the advocacy has
17  been very, very high and the civility of the lawyers has
18  been very, very high.  It hasn't been perfect.  We've
19  had a few minor problems, but it's a good thing for me
20  that in the most difficult case I've had, I've had some
21  of the best lawyering done in front of me, and I
22  appreciate that, and that extends to plaintiffs'
23  counsel, it extends to Tyco, it extends to PwC, and the
24  individual lawyers representing the individual
25  defendants in the case.  So I have no doubt about that.

# EXHIBIT

# G

6BFAACITC.txt

1

6BFAACITC                    Conference
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3
3    IN RE: CITIGROUP LITIGATION,
3
4
4                              03 CV 2932 (LTS)
5
5    ------------------------------x
6                                    New York, N.Y.
6                                    November 15, 2006
7                                    4:30 p.m.
7
8    Before:
8
9                  HON. LAURA TAYLOR SWAIN,
9
10                                     District Judge
10
11                      APPEARANCES
11
12   SCHIFFRIN & BARROWAY, LLP
12        Attorneys for Plaintiff
13   BY:  EDWARD W. CIOLKO BY:  MARK K. GYANDOH
13
14   LAW OFFICES OF CURTIS V. TRINKO, LLP
14        Attorney for Plaintiff
15   BY:  CURTIS V. TRINKO
15
16   PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
16        Attorneys for Defendant
17   BY:  JONATHAN H. HURWITZ BY:  LEWIS R. CLAYTON
18
19
20   ALSO PRESENT:  MICHAEL T. HEYRICH, ESQ. Citigroup Inc.
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

2

6BFAACITC                    Conference
1         (Case called)
2         THE COURT:  We're here in the matter of Citigroup
3    litigation.  For a conclusion of plaintiff's hearing on
4    approval of the settlement and related applications.  Counsel
5    would be good enough to introduce yourselves again to me.
6         MR. TRINKO:  Curtis Trinko for the plaintiff and with
7    me are Edward Ciolko, Mark Gyandoh, both from the Schiffrin &
8    Barroway firm in Philadelphia.
9         MR. CLAYTON:  Lew Clayton, your Honor, from Paul Weiss
10   for the defendants.  I am here with John Hurwitz of Paul Weiss
11   and also Michael Heyrich of the Citigroup.
12        THE COURT:  Good afternoon.
13        I have received your supplemental submission which
14   I've reviewed carefully and for which I thank you.
15        Do you wish to make statements at this point?
16        MR. TRINKO:  I believe that Mr. Ciolko will be
                        Page 1

6BFAACITC.txt
```
17  addressing the points for supplemental memorandum and any
18  questions that your Honor may have.
19          THE COURT:  Thank you.
20          MR. CIOLKO:  Good after, your Honor.
21      Thank you for giving us the opportunity for providing
22  the supplemental memorandum, the additional report by Professor
23  Ramaswamy.  I'll dispense with going over what was, I think,
24  laid out in maybe painstaking detail in our 140 pages of
25  briefing and maybe just concentrate on the supplemental filing
```

3

6BFAACITC                Conference
```
 1  and then, of course, I will be very brief and any questions
 2  your Honor might have.
 3          So I know, to be frank, Professor Ramaswamy in his
 4  analysis is complex, so it took me a bit of time to make sure I
 5  understand stood every nook and cranny.  I think our
 6  supplemental memorandum sets out both the supplemental filing
 7  done by Professor Ramaswamy as well as any potential impact of
 8  the pension -- on the settlement itself.
 9          If it please your Honor just as a quick review, the
10  settlement negotiated by the parties essentially or structural
11  changes to the plan and educational opportunities to be being
12  afforded to plan participants under the Citigroup 401 K plan,
13  formerly, there was two forms, for want of a better term, lot
14  Citigroup or company stock that was held by the plan.  One
15  originated from predecessor plan, The Travellers' had a 401 K
16  plan which came from a predecessor company that Citicorp became
17  Citigroup, and the plans merged to be become the Citigroup 401
18  K plan.  That lock stock under the terms of the plan generally
19  had to stay invested in company stock until a participant from
20  that 401 plan was aged 55.  A second source of locked
21  investment of company stock in the plan was from ongoing
22  Citigroup matching contributions under the plan which formerly
23  had to stay invested in Citigroup stock, generally, again, for
24  five years.
25          The parties engaged in a lengthy and detailed and
```

4

6BFAACITC                Conference
```
 1  spirited negotiations.  We tried to come to a meeting of the
 2  minds on the case that provided particular challenges on both
 3  sides, I believe, because of both the recovery of Citigroup
 4  stock during the relevant time period, the novel area of the
 5  case law, the large scale investment of the company stock in
 6  the plan.  I think the parties wanted to reach an amicable
 7  settlement that would both address some of the issues that
 8  plaintiffs had raised and protect the participants going
 9  forward.  I think that's what we did.
10          Essentially, under the original terms of the
11  settlement The Traveller's plan stock was immediately to be --
12  from the predecessor plan and the previous, the prior stock in
13  the plan that originated from Citigroup matching contributions
14  that had to be invested in company stock for five years would
15  only have to remain in investment in Citigroup for one year
16  after, essentially, for one year after grant.
17          In addition to that, Citigroup had agreed to provide
18  financial advice and financial investment educational services
19  to active participants in the plan and as well as provided
20  educational materials on the benefits of diversification,
21  retirement plan investments to class members who are no longer
```
Page 2

6BFAACITC.txt

22  participants in the plan or employees in the Citigroup. They
23  provided access to that material through their web site to the
24  people that wanted to gain insight on the advantages of
25  diversification of retirement assets which is at the heart of
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                            5

6BFAACITC                    Conference
1   what that settlement case is.
2           As parties brought to your attention at our last final
3   fairness hearing, in our view Congress had kind of caught up
4   with what was forward thinking on our part, I think, and
5   thought that it would be a good thing to eliminate any mandated
6   investment in company stock in these type of defined
7   contribution plans.
8           In general, the Pension Protection Act which was
9   signed into law after the final -- the relevant portions to a
10  settlement here are -- and I am sure my colleagues either next
11  door or behind me will correct me if I get it wrong but I am
12  trying to present it as simply as possible as I understand it.
13  Under the law any plan holdings that previously were locked in
14  the company stock that were generated from company matching
15  contributions before December 31, 2006, have to be allowed to
16  be unlocked or diversified on other plan investments on a
17  graduated scale. At least a third of these assets have to be
18  divested by the end of 2007, a third by 2008 and the remaining
19  third by 2009. And that for stock that had been in the plan
20  subject to restriction or lock employer's qualifying, employer
21  security such as the one at issue in this case.
22          So at your Honor's behest we went back to our
23  Professor Ramaswamy and asked him to take a look at the numbers
24  he had already created and if your Honor would remember I think
25  he initially had estimated the value of the unlocks negotiated
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                            6

6BFAACITC                    Conference
1   by the parties was somewhere between $23 and $43 million. He
2   took a look at those numbers again and ran those numbers under
3   a number of different scenarios. One of which I believe my
4   colleagues behind me at the defense table are better able to
5   discuss, but under three scenarios, one, under the original --
6   I know the terminology in the report is a little confusing, at
7   least was for me at first -- but under the proposed settlement
8   he reran numbers that he had run before trying to be even more
9   conservative than before and came out to essentially the same,
10  21 to 41 million dollar valuation.
11          Then he ran the numbers with the assumption that the
12  parties knew the act would be passed which it did with the
13  mandated divestment of company security -- He ran those numbers
14  and came to the conclusion that the negotiated settlement still
15  worked between, I believe, it's eight and $15 million -- eight
16  and $16 million.
17          Then after the independent fiduciary who had done an
18  11 month investigation into the original set of terms to the
19  original settlement said it would pass muster in their view
20  also took a look at Professor Ramaswamy's new numbers and had
21  asked that he also run additional calculations that -- I have
22  to back up a second. I apologize. Since our final fairness
23  hearing Citigroup has sua sponte, not as part of the
24  settlement, changed the 401 K plan where the Citigroup matching
25  contributions that were formally locked for five years and that
              SOUTHERN DISTRICT REPORTERS, P.C.
                      Page 3

6BFAACITC.txt
(212) 805-0300

7

6BFAACITC                Conference
1   unlocked was moved to one year under the settlement, now is
2   subject to immediate diversification.  That is so that the
3   independent fiduciary wanted Professor Ramaswamy to also run
4   some calculations to take into account that change in the plan
5   that's not part of the settlement.
6            And you know while I think informative, I'm not sure
7   it actually has any bearing one way or another on whether or
8   not the settlement was beneficial to the classes.  We believe
9   it is.  In Professor Ramaswamy's final conclusion, even in his
10  supplemental report, is that given that the parties had reached
11  this agreement I believe in the fall of 2004 the better view of
12  the value of the unlocking under the original settlement is
13  that it was worth conservatively $25 million given the amount
14  of lock stock that was then owned by the plan and that would
15  have been added to the plan, the five years come enhanced after
16  the settlement.
17           So the independent fiduciary has reviewed the new
18  numbers that Professor Ramaswamy has put forth and continues to
19  believe that the settlement is fair and the result and
20  beneficial to the class and the result in arms length
21  negotiation.
22           THE COURT:  The independent fiduciary is who?
23           MR. CIOLKO:  Great Bank Trust.
24           THE COURT:  OK.  Thank you.
25           MR. CLAYTON:  And their counsel, your Honor, is Hogan
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

8

6BFAACITC                Conference
1   and Hartsen --
2            MR. CIOLKO:  Yes.
3            THE COURT:  Now, the one sort of premise or structural
4   element of the Ramaswamy supplemental report that I'm not quite
5   sure I followed to my complete satisfaction was his pegging of
6   the valuations to a December 31, 2004 date.  It wasn't clear to
7   me whether in running the numbers on the diversification as
8   against risk value of unlocking stock he was making some sort
9   of, including some sort of assumption as to the opportunity for
10  additional, capturing of additional market value in some
11  retroactive period that isn't applying here.
12           MR. CIOLKO:  Do you mean -- and I actually had a
13  similar question, your Honor.  I think the assumptions that
14  Professor Ramaswamy made when starting in 2004 he was working
15  on the assumption, one, that the one year lock would be in
16  place going forward for five years, and, two, that he estimated
17  the amount of matching contributions that would be made in
18  those five years and took the value of the additional monies
19  that would be unlocked versus the five year unlock.  I don't
20  think he was taking any additional figures in a pretty
21  retroactive manner.  Maybe the easiest way to say this I thing
22  he utilized the same assumptions in his first calculations as
23  in his second.  If anything his numbers are conservative
24  because he would not take into account either the immediate
25  unlock that was negotiated after the settlement or the fact
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

9

6BFAACITC                Conference
1   that the -- I think the simply answer is that that was the
2   numbers that he has given, the latest numbers that we had for
                              Page 4

6BFAACITC.txt

3  the plan that he could define what future contributions would
4  be compared to what past contributions were.
5       THE COURT:  So as far as you know none of the numbers
6  that go into his new eight to 16 or 17 million dollar range
7  assume that a participant would have been able to reinvest at
8  some point between December 31, 2004 and today stock that
9  actually remained locked up during all or part of that period
10  that could not physically have been taken to the bank as it
11  were and actually diversified.
12       MR. CIOLKO:  I think that's right.  I think that's
13  exactly right under both.  I don't think he could.  I think in
14  his mind he did -- I think I understand your question and I
15  apologize, your Honor.  He wanted to, in order to do that he
16  would have made the calculations more complicated.  I think he
17  wanted a more conservative approach.  He assumed that the value
18  of the stock that was unlocked could be diversified, but that
19  was it.  There was no additional -- in his supplemental
20  analysis there was no additional stock he said would be able to
21  be unlocked even though effectively it couldn't have been cause
22  it wasn't unlocked.
23       THE COURT:  All right.  Just another question.  Where
24  does the implementation of the unlocking provisions stand as of
25  today when I haven't yet signed the final order approving?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

6BFAACITC          Conference

1  Have accounts actually been unlocked or accounts still unlocked
2  and awaiting the great release as it were?
3       MR. CIOLKO:  That might be a question better answered
4  by Mr. Clayton.
5       MR. CLAYTON:  Yes, your Honor.
6       We have not yet implemented that as the papers
7  indicate under the stipulation in part of the settlement in
8  part of the New Pension Act and some other factors Citi
9  decided, not as matter of compulsion under the settlement but
10  as a matter of administration, completely to unlock these
11  shares to go beyond even the one year restriction and that is,
12  we believe, scheduled to happen at the start of the new year
13  '07.
14       THE COURT:  1/1/07?
15       MR. CLAYTON:  Maybe a few days after 1/1/07 but it's
16  January '07.
17       THE COURT:  Thank you.  Now, that gives me the
18  predicate for asking one more time the question that I was
19  trying to formulate.
20       Does any of the numbers, to counsel's knowledge, in
21  the Ramaswamy report assume that participants could have at any
22  point prior to today invested stock that is in Citigroup stock
23  and locked under the current terms of the plan in some other
24  investment that would match their assumed risk and target
25  return profile?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

6BFAACITC          Conference

1       MR. CIOLKO:  No, your Honor.  What I think the
2  assumption was that once your Honor signed the settlement and
3  the -- were put into effect certain previously locked stock
4  would be available for divestment at that date, and that number
5  was included in Professor Ramaswamy's calculations because it
6  would be.  Formerly, there had been stock that say was, granted
7  in 2003, subject to a five year lock, that assuming that the

Page 5

6BFAACITC.txt

```
 8   defendants had not, Citigroup had not changed their locking
 9   provision it would be subject to one year locking and
10   effectively would have been immediately available for
11   investment.  So he took that into account, but immediately
12   available for investment upon the date of the change.
13         THE COURT:  Yes.  Prospectively.
14         MR. CIOLKO:  Prospectively.
15         THE COURT:  All right.  Thank you.  Is that it?  That
16   was my one question.
17         MR. CIOLKO:  That's it.  One other thing.
18         I know we had given your Honor a modified final
19   order --
20         THE COURT:  Yes.
21         MR. CIOLKO:  -- for your review.  And thank you for
22   the suggested revision.  Mr. Trinko also has a modified fee
23   award quarter which we have shown to defendants and they're
24   fine with the substance of it.  But we literally had just
25   finalized this today.
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              12
6BFAACITC                    Conference

```
 1         THE COURT:  It's been modified proposed fee order
 2   accompanied by an affidavit that lays out whatever additional
 3   work you want me to factor into the Loadstar calculation on the
 4   supplemental analysis?
 5         MR. CIOLKO:  To be honest with you, your Honor, we
 6   didn't actually include that.  Because the Loadstar number was
 7   so close to one effectively we're asking for our fees which in
 8   this type of case we think it's reasonable in this situation,
 9   in fact, the defendants had agreed to a fee request up to a
10   million dollars.  We thought that given the tally and the
11   circumstances that what we were asking for was essentially what
12   our fees would be with no multiplier.  So any additional work
13   that we put in would just be clarifying something that came
14   along out of the blue.  We could put the additional hours in
15   and it would actually be a fractional multiplier.
16         THE COURT:  Let me put it this way, if you are asking
17   me to award a greater amount of dollars then you asked me the
18   last time on account of what you had done have you documented
19   that if you are asking me the same number?
20         MR. CIOLKO:  Same number.
21         MR. TRINKO:  The only revision that was made to our
22   fee order, your Honor, was just to note that we're having the
23   supplemental hearing and just to indicate just as to why.
24         THE COURT:  Thank you.
25         MR. TRINKO:  If I could approach, your Honor, I'll
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              13
6BFAACITC                    Conference

```
 1   hand it up.
 2         THE COURT:  Yes.
 3         (Pause)
 4         THE COURT:  Mr. Clayton, did you or any of your
 5   colleagues wish to be heard?
 6         MR. CLAYTON:  Very little to say, your Honor.
 7         We appreciate the Court's time and the fact that we
 8   have been able to make some supplemental submissions so that
 9   the Court has a full record before it.  We think this is a
10   quite reasonable settlement.  We did make it sufficient, as
11   your Honor knows, concerning some recent changes to the Citi
12   plans.  We wanted that to be on the record here, but we do not
```

                              Page 6

6BFAACITC.txt
```
13   believe that those changes have any effect on this settlement.
14   Thank you, your Honor.
15            MR. CIOLKO:  Your Honor, one more thing.
16            You asked at the previous hearing that we also answer
17   a question whether any portion or provision of Pension
18   Protection Act was violated by term of settlement or was in
19   conflict with and we've reviewed it and it is not.
20            THE COURT:  Thank you.  And I think you also made that
21   representation in the written submission.
22            Well, I do thank you for your extensive original and
23   supplemental submissions in support of this proposed
24   settlement.  The proposed orders cover much, if not all, of the
25   technical ground that I need to cover in terms of approving the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14
6BFAACITC                    Conference
```
 1   settlement.  I will make a few further remarks on the record
 2   and these remarks and the orders that I will sign will
 3   constitute the Court's findings of fact and conclusions of law
 4   for purposes of Rule 52.
 5            I note that the Court has jurisdiction of these
 6   matters pursuant to Section 1132 of Title 29 of ARISSA as well
 7   as Section 1331 of Title 28 of the U.S.C.
 8            I find for the reasons documented at some length in
 9   the submissions that these were arms length negotiations.
10            I also find that the parties and their attorneys were
11   creative in approaching the legal issues presented and the
12   challenge of coming up with meaningful and constructive relief
13   for plan members in the context of a settlement and that it was
14   the product of arms length bargaining.
15            I have considered the requisite ^gran nel factors in
16   relation to the substantive terms of the settlement.  Just to
17   remark with respect to the reaction of the class as documented,
18   again, at some length in the original submissions there were
19   very few objections filed, a fraction of one percent of the
20   class and only eight of those, something like 11 objections
21   made specific comment on features of the settlement.
22            At least one of those letters requested that there be
23   no lock up at all, as I recall, and I note that the ultimate
24   result here including the voluntary plan changes eliminating
25   the lock up provisions address or would moot even that
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15
6BFAACITC                    Conference
```
 1   objection.
 2            The Court has taken seriously its obligation to
 3   consider the propriety and fairness of the settlement even as
 4   to non objecting class members and finds that the requisite
 5   factors are well and properly addressed here, that the risks of
 6   litigation are well responded to and balanced in this
 7   settlement.  It is a non monetary settlement.
 8            I find that it is reasonable under the circumstances,
 9   given the nature of the litigation and the legal risks and
10   novel issues presented here, I do find based on the analyses by
11   Professor Ramaswamy that there is real monetary value going to
12   class members in connection with the settlement by virtue of
13   the elimination of what we had been calling the lock up
14   provisions in the plan, that the settlement provisions for
15   elimination and or carve back of the lock up provisions are
16   more generous than those now mandated by law under the Pension
17   Protection Act of 2006.  And that the additionally voluntary
```
Page 7

6BFAACITC.txt
```
18    step taken by Citigroup improves that benefit to plan
19    participants even more.
20         I also find that the educational investment -- I'm
21    going to say advisory but not necessarily in the technical
22    sense of word -- provisions of the settlement are also
23    beneficial to and meaningful for class members.
24         I also find that final certification of the class in
25    connection with this settlement is appropriate and that the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    16

6BFAACITC                     Conference
```
 1    requisite factors are met pursuant to Rules 23(A) and 23 (B)
 2    (1) and (2) of the Federal Rules of Civil procedure.
 3         I further find having considered the Loadstar
 4    calculations with respect to the fee application and the
 5    Goldberger factors that the fees request is both reasonable and
 6    appropriate in relation to the work performed in risks faced by
 7    class counsel here, and, therefore, I find that it's
 8    appropriate to approve the proposed settlement, certify in
 9    connection with that settlement the class and award the
10    requested attorney's fees and expenses.
11         Is there anything further that counsel feel I should
12    address orally on the record in addition to the matters that
13    are covered in the proposed orders?
14         MR. CIOLKO:  Thank you very much, your Honor.
15         The matter of the case contribution award for the
16    individual plaintiffs.
17         THE COURT:  Yes.  I have considered carefully as well
18    the proposed case contribution award and I find that it is
19    reasonable and appropriate in structure and amount and so that
20    application is approved as well.
21         Now, that is not covered in these revised orders that
22    you gave me, is it?  I don't remember it being covered in the
23    revised orders, the final judgment order dismissal.
24         MR. CIOLKO:  It maybe in the separate proposed fee
25    order.  That's right.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    17

6BFAACITC                     Conference
```
 1         THE COURT:  It's in the --
 2         MR. TRINKO:  Paragraph five, your Honor.
 3         THE COURT:  Yes.  Thank you.
 4         All right, then, give me just one moment.
 5         Let's see.  And the request I have to confess that
 6    that was an aspect of it that I focused on at least one hearing
 7    ago.  So the specific request for the case contribution award
 8    the amount requested was what?
 9         MR. CIOLKO:  It was $2500 per plaintiff.
10         THE COURT:  Yes.  And I had considered that and had
11    concluded that it was an appropriate amount.  So I will fill
12    that in.  And the figure that you were seeking in attorney's
13    fees and expenses.
14         MR. CIOLKO:  The attorney's fees I believe were
15    $750,000.
16         THE COURT:  And the expenses number is what?
17         MR. CIOLKO:  31,921.
18         THE COURT:  31,921?
19         MR. CIOLKO:  That's right.
20         THE COURT:  And on the final judgment and order of
21    dismissal I've crossed out the word "corrected" in the title
22    since I've never entered one before, so this can be the final
```
                              Page 8

6BFAACITC.txt
23    judgment.  I'm also crossing out the reference to "correction"
24    in paragraph one and the reference to objectors having appeared
25    by counsel and having -- I'm just going to cross out "having
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                18
6BFAACITC         Conference
 1    appeared by counsel".  Just for the record, no one was here to
 2    speak at the August hearing but I have heard the objector by
 3    way of reviewing their objections.
 4            So with those changes I have also dated the final
 5    judgment and order of dismissal with today's date and signed
 6    that as well as the attorney fee and class representative case
 7    contribution award order and I wish to thank and congratulate
 8    all of you.
 9            I know it has been a very long road for you and it's
10    got to be fun to work on something that's precedent setting as
11    well as challenging and that reaches a result that is so
12    beneficial all around.  So congratulations to all of you.  I am
13    glad to have met you and I am sure that we will all live long
14    enough to see each other again.
15            Ms. Cypher will organize getting copies to you.  Will
16    it be acceptable to you if she faxed them out to your
17    respective firms rather than doing the Xeroxing tonight?
18            All right.  Again, thank you all.  Good night.
19                          o O o
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

# EXHIBIT

# H

Final Hearing Trans..txt

1

```
4AMUINTC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3
3  IN RE:
4                                    02 Civ. 6527(DLC)
4  INTERPUBLIC SECURITIES            03 Civ. 1194(DLC)
5
5  LITIGATION
6
6  ------------------------------x
7
7                                    New York, N.Y.
8                                    October 22, 2004
8
9  Before:
9
10                  HON. DENISE COTE
10
11                                   District Judge
11
12                  APPEARANCES
12
13  SCHIFFRIN & BARROWAY, LLP
13       Attorneys for Plaintiff in Class Action
14  BY:  RICHARD SCHIFFRIN
14       KAY SICKLES
15       KATIE RYAN
16  ROY L. JACOBS & ASSOCIATES
16       Attorneys for Plaintiffs in Derivative Action
17  BY:  ROY L. JACOBS
17       LAWRENCE PASKOWITZ
18
18  PAUL WEISS RIFKIN
19       Attorneys for IPG and Certain Directors in Class Action
19       and Inside Directors in Derivative Action
20  BY:  LEWIS CLAYTON
20       ANDREW GORDON
21
21  ARNOLD & PORTER, LLP
22       Attorneys for Nominal Defendant IPG
22  BY:  SUSAN SHIN
23
23
24
25
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```

2

```
4AMUINTC
1  WEIL GOTSHAL & MANGES, LLP
1       Attorneys for Director Defendants
2  BY:  STEPHEN A. RADIN
2
3  DEBEVOISE & PLIMPTON
3       Attorneys for Defendant in Derivative Action
4       Price WaterHouseCoopers
4  BY:  ROB CARROLL
5
5  INTERGROUP OF COMPANIES
                  Page 1
```

```
                          Final Hearing Trans..txt
      6          In-House Counsel
      6   BY:    NICHOLAS J. CAMERA
      7
      7
      8   ALSO PRESENT
      8          BRIAN M. FELGOISE
      9
      9
     10
     11
     12
     13
     14
     15
     16
     17
     18
     19
     20
     21
     22
     23
     24
     25
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

 ⃞                                                                              3

```
     4AMUINTC
      1          (Case called)
      2          THE COURT:  We are here for a fairness hearing in this
      3   class action and derivative action in the Interpublic Group
      4   matter, and I think what I would like to do is divide this into
      5   two sections, talk about the approval of the settlements first
      6   and then move to a discussion of the attorney's fees request
      7   second.  And in each case I think what I would like to do is
      8   start first with the class action and then move to the
      9   derivative action.
     10          I have read everybody's papers.  I have thought about
     11   these matters.  I have a draft opinion.  And because of the
     12   conferences that we had in the summer and the issues that were
     13   discussed at that time, I feel I had an opportunity to ask
     14   pertinent questions about the terms of the settlement and,
     15   therefore, I don't have a lot of questions about whether or not
     16   the settlement should be approved.  I have read the objections.
     17          I do have a few questions that I want to pin down with
     18   some facts.
     19          I would like the number of opt-outs as we understand
     20   it right now because I know that has been a shifting number.
     21          I would like to know the dollar amount or the
     22   equivalent dollar amount of what the settlement is worth today
     23   to the extent that we can know that, and how that number
     24   relates to the second part of what we will do today converts
     25   into an attorney's fee in class action.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

 ⃞                                                                              4

```
     4AMUINTC
      1          I may have missed it, but I don't believe I have a
      2   submission from the class representative for the True North
      3   class opining on the settlement -- at least I didn't see one
      4   in the papers most recently submitted, but I would like to read
      5   that if I have overlooked it.
      6          So, Mr. Schiffrin, why don't I turn to you.
                              Page 2
```

Final Hearing Trans..txt

```
 7        MR. SCHIFFRIN:  Judge, may I use the podium?
 8        THE COURT:  Sure.
 9        MR. SCHIFFRIN:  Thank you.
10        Judge, to answer the questions that you asked before I
11   begin my presentation, the closing price of the stock yesterday
12   was 11 dollars, I believe, and 73 cents.  That would translate
13   into a total value for the settlement of $96.8 million.  I am
14   not aware of the trading price of the stock today.
15        THE COURT:  So the stock equivalent is something like
16   76.8?
17        MR. SCHIFFRIN:  That's right.
18        The 10-day average upon which the $8.70 guaranteed
19   minimum is above $11, so that 8.70 guarantee does not come into
20   play.  I mean, it is well above it so, obviously, it does not
21   come into play.  The per-share recovery is $24.9 based upon
22   yesterday's closing price, and I can do the calculation, if you
23   want, for attorney's fees but it is just multiplying by
24   whatever percent, if the Court is inclined to do that.
25        THE COURT:  So at 17 percent --
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    5

4AMUINTC

```
 1        MR. SCHIFFRIN:  -- it would be 16.46 million.
 2        THE COURT:  Thank you.
 3        MR. SCHIFFRIN:  Judge, you did not miss a submission
 4   by Mr. McClain.  We spoke to Mr. McClain about the settlement,
 5   obviously, prior to reaching it.  We spoke to him about the
 6   settlement after we had reached it and about the submission of
 7   papers and attorney's fees and he was content.
 8        I did not tell him that there was a requirement that
 9   he file an affidavit or submission, and he asked simply that I
10   communicate his support of the settlement and the attorney fee
11   request.  I could go back and get a submission from him if the
12   Court required it, but I didn't think that you did, so I didn't
13   ask for that.
14        Judge, I think that I will skip the preliminaries.
15        THE COURT:  The number of opt-outs?
16        MR. SCHIFFRIN:  The number of opt-outs is 19.
17        THE COURT:  Is that a pretty firm number?
18        MR. SCHIFFRIN:  Well, the opt-out period ended on the
19   27th of September.  I am not sure if we are counting any
20   opt-outs received after the 27th.
21        MS. RYAN:  All the ones that we submitted to the Court
22   were timely.
23        MR. SCHIFFRIN:  So I think that is a firm number.
24        Judge, I think I will skip the preliminaries, the fact
25   that notice was sent pursuant to your order.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    6

4AMUINTC

```
 1        The Court will note that there were a couple of
 2   objections to the settlement and a couple of objections to the
 3   fee.  I think one individual objected to both.  Obviously, we
 4   laid out in our papers what we thought was pertinent for the
 5   Court and for the class.
 6        On the issue of the appropriateness of the settlement,
 7   I would like to simply highlight a few points and make a few
 8   observations.
 9        I think that the settlement is fair, reasonable and
10   adequate.  I think it is a very good settlement under the
11   circumstances.  We really had a couple of challenges in this
```
                                Page 3

Final Hearing Trans..txt

12  case.
13         THE COURT:  Do you believe that the litigation should
14  have been brought?
15         MR. SCHIFFRIN:  Yes, absolutely.
16         THE COURT:  Do you think a litigation like this should
17  be brought whenever there is a restatement?
18         MR. SCHIFFRIN:  I think it is possible to have a
19  restatement that, perhaps on its face, may seem to be
20  appropriate for a class action suit, but once you get behind
21  it, you determine that in fact it is not.  That is the argument
22  that the defendants advanced here.
23         I would say, a restatement does not necessarily equate
24  to securities fraud.
25         THE COURT:  So what distinguished this restatement
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              7

4AMUINTC
1   that made you believe that it was appropriate to sue?
2          MR. SCHIFFRIN:  Well, the restatement involved what I
3   believe to be a systemic problem.  This was not an isolated
4   problem that occurred in one office; it was a problem which the
5   evidence indicates was known to the company for a long period
6   of time.  There are documents --
7          THE COURT:  No.  Putting yourself at the point in
8   which you filed the suit.
9          MR. SCHIFFRIN:  At the point that we filed the suit,
10  we obviously had only the ability to do a minimal
11  investigation.  And what we believed then was that the company
12  had restated three times before they got the figure right,
13  which we thought itself was an indicia of some serious problem
14  and that the problem seemed to be a longstanding one.
15         We really could not get the kind of detailed
16  information that we subsequently received.
17         Obviously, that view was shared by others.  I think
18  there were 18 or so lawsuits filed.
19         I think, it is a legitimate question to be asked:  Are
20  we in a position to make the kind of evaluation necessary to
21  determine that a lawsuit is appropriate?
22         And I will tell you, Judge, that there are times when
23  it is a close question, that you really don't find out the
24  answer to that question until after the fact.
25         THE COURT:  How much did the existence of the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              8

4AMUINTC
1   informant about South American operations affect the decision
2   to file the lawsuit?
3          MR. SCHIFFRIN:  The information that we got from the
4   informant came at around the time we filed the lawsuit, so most
5   of the information we received from him was after the lawsuit
6   was filed.  But it was one of those situations where you are
7   told, There is a lot going on here.  There is a lot more.
8   There is a lot that is not yet known.
9          Actually, the situation with the informant was
10  somewhat interesting because this is an individual who
11  indicated that he could provide documents, witnesses and
12  information that both bolstered our case as well as supported
13  other claims against the company.  And it was a person who we
14  sat down with face to face who gave us information, gave us
15  witness names, dates, times, places -- someone who seemed quite
16  credible.  But through the course of the litigation as we
                           Page 4

Final Hearing Trans..txt
17  followed up on that information, ultimately, we were unable to
18  substantiate his claims.
19         I don't know if the Court remembers reading this, but
20  in our submission, in my declaration is a statement to the
21  effect that during one of the depositions that was taken, the
22  defendants claim, This is a guy who was committing improper --
23         THE COURT:  Right.  He was the wrongdoer.
24         MR. SCHIFFRIN:  He was not the wrongdoer for the
25  purposes of the case that we are settling.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

9

4AMUINTC
1          THE COURT:  Even from the motion to dismiss case, it
2   was clear that it was a real disconnect.
3          MR. SCHIFFRIN:  Right.  I am not willing, obviously,
4   to join in that view.  I saw no reason to think that what he
5   was telling us was untrue.
6          I have been around, Judge.  I have practiced in the
7   criminal field as a public defender for seven years.  I think I
8   have some reasonably good judge of people and their
9   credibility.  But at the same time he made a lot of promises
10  that he was not able to substantiate, and that did not advance
11  the course of this case.
12         So while on the one hand I think that when you have a
13  triple restatement, when you have a problem which the evidence
14  demonstrates was known for a long period of time, there are
15  documents indicating that there had been complaints about the
16  internal controls, that there was an inability for the company
17  to act in an appropriate manner in terms of reconciling these
18  accounts and they chose to ignore that problem, and when the
19  restatement was finally announced, there was a significant
20  stock drop.  I look at that, Judge, and as far as I am
21  concerned, I see a 10(b)(5) violation that is actionable, and I
22  think that it was appropriate to have brought this case and,
23  ultimately, to have resolved this case.
24         But I am not unmindful of the fact that, on the
25  liability side, we would have to prove intentional conduct or
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

10

4AMUINTC
1   recklessness, that negligence would not get us there and the
2   defendants would obviously take the position, Well, the
3   internal controls were a little weak and there was some sloppy
4   bookkeeping, but that doesn't equate to an intent to defraud.
5          You can read some of these documents and, depending
6   upon your point of view, you can take them one of two ways.  I
7   saw documents which said that I have been complaining about
8   this problem for years and nobody is doing anything about it.
9          Now, if I show a document like that to a jury, I would
10  hope that a jury would look at that document and say, OK, well,
11  what more do you want?
12         On the other hand, Mr. Clayton is going to say that
13  these were immaterial amounts of money, that this was a large
14  enterprise spread out over 140 offices, that their controls
15  were imperfect, but nobody was trying to defraud anyone; they
16  were simply trying to operate their business in an efficient
17  manner, and they did it imperfectly.  And now they are
18  improving it and individuals were not selling stock.  And this
19  is not an Enron or WorldCom, it is not in that league, and it
20  just doesn't pass the level of the kind of intentional reckless
21  conduct necessary for a 10(b)(5).  That would be a huge hurdle.
                         Page 5

Final Hearing Trans..txt
22    Another hurdle was created by your Honor's opinion in
23  dismissing the individuals in the 10(b)(5) counts.  It is
24  unusual to be proceeding in a case where you have no
25  individuals but, rather, just the corporation that you are
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

4AMUINTC
1   bringing a 10(b)(5) claim against.
2         Obviously, I do not think that is an insurmountable
3   hurdle, but I am not unmindful of the fact that it is an
4   atypical situation and gives rise to arguments on the other
5   side:  Wait a second.  Who are the people responsible?  Why
6   aren't they here?
7         So those are the challenges related to liability.
8         There were the challenges related to damages.  The
9   defendants took a position that, fundamentally, these amounts
10  were immaterial.  And that in fact not only were they
11  immaterial, but we would be unable to connect up the drop in
12  the price in stock to the announcement of this information
13  regarding the restatement.
14        And I admit that this was daunting because you had a
15  progression of events where the company announced there was a
16  delay and the stock took a huge drop.  Then they announced a
17  restatement and the stock increased.  That was the $68 million
18  restatement on August 13.
19        Then in October they said, No, it is 120 million, but
20  we have problems this quarter.  We have problems going forward.
21  And in the overall context of that announcement, it is not
22  clear what was really driving the market when the stock went
23  down 30 percent.
24        The final announcement raising the restatement from
25  120 to 180 caused no discernible move in the market.  The stock
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

4AMUINTC
1   dropped 40 cents, which our expert says is not statistically
2   significant.
3         We went around and around with the expert trying to
4   figure out, how can you parse out this 30 percent October 16
5   drop and figure out what portion was due to the restatement,
6   what portion was due to the current quarter negative
7   information and what portion was due to the future outlook, the
8   negative future outlook.
9         And they said that it would be difficult because this
10  is forensic economics, and we were dealing with a Ms. Preston
11  who was leading that team.  They did an analysis in which they
12  were trying to figure out whether the rise in the price of the
13  stock on August 13 was a measure of determining -- this is a
14  somewhat novel view -- how much the market was in fact reacting
15  to this restatement.
16        I imagine that Mr. Clayton, if this case had
17  progressed, would have had a myriad of arguments to make.  Our
18  damage analysis, I will tell you, at the time this case was
19  settled, was still a work in progress.  That is putting aside
20  the argument advanced by Mr. Clayton at the beginning of this
21  case and throughout, up until today -- and he and I just spoke
22  of it several minutes ago -- that $101 million, which was the
23  amount of the restatement attributable to the fraudulent
24  conduct, was the highest level of damages that plaintiffs could
25  possibly claim.
SOUTHERN DISTRICT REPORTERS, P.C.
Page 6

Final Hearing Trans..txt
(212) 805-0300

13

4AMUINTC

1    Now, I rejected that argument in the beginning. I
2 rejected it in the middle and I reject it today. I think that
3 he is wrong. If the Court were to call me up over the weekend,
4 I would reject it then. I don't buy that argument as a matter
5 of law. But I will say, without revealing what I think is a
6 confidential conversation that when we were in front of
7 Magistrate Judge Gorenstein and that issue came up, his
8 response to me was, Well, that is an intriguing argument.
9    Now, I couldn't tell whether Judge Gorenstein, being a
10 very effective mediator, was throwing that out to me because he
11 wanted me to have as many doubts as I could legitimately have
12 about my case and, obviously, I don't know what he was saying
13 to the defendants or whether he was suggesting that in fact
14 there could be a substantial legal basis for that. But if that
15 were the measure of damages in the case, then standing here
16 today, the settlement would represent 95 percent of the value
17 of the damages.
18    So I don't know if it is 95 percent. I don't think it
19 is. I think it is the range we gave, the 400 to 900 range.
20 Difficult as it would be, perhaps, to get a jury to accept
21 those numbers, I think that, ultimately, they would accept the
22 fact that some portion of this $5 drop on October 16 was
23 attributable to the restatement and that the defendants should
24 be compensated in a class for that.
25    THE COURT: The 465 figure and the 909 figure, I am
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

4AMUINTC

1 not sure I captured what the difference was. I thought that
2 the 909 figure was an aggressive damages estimate based on
3 stock price movement over the entire class period.
4    MR. SCHIFFRIN: Yes.
5    THE COURT: And the 465 is an aggressive figure based
6 on stock price movement, perhaps, on August 13 unadjusted for
7 any competing factor that may have affected stock price other
8 than general market movement, is that right?
9    MR. SCHIFFRIN: I guess that the answer is yes and no.
10 Yes, that is one of the ways that the experts looked at it, but
11 they tried to analyze it a number of different ways.
12    Another way that they tried to analyze it was simply
13 to look at the stock drop on October 16 and say, OK, you have a
14 $5 stock drop and you have the announcement of three pieces of
15 information.
16    THE COURT: Yes. You make an analysis of the fairness
17 of the settlement based on these two figures, and I just want
18 to make sure that I have a correct understanding of those two
19 figures.
20    MR. SCHIFFRIN: Yes, you do, Judge.
21    So those were the hurdles that we faced and,
22 ultimately, we ended up resolving this case in a way that I
23 think is creative and appropriate.
24    I will tell you, Judge, I do have a bias in this kind
25 of litigation in favor of a stock component to a securities
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

4AMUINTC

1 class settlement. And that bias is based upon the fact that if
2 one can be persuaded that the company's problems that gave rise
Page 7

Final Hearing Trans..txt
3  to the fraud are behind them and that the company is
4  fundamentally a sound organization with, if not a prosperous
5  future, with a good future, and that there's no inherent
6  weakness in the company then, I think, to the extent that you
7  can have a stock component to a settlement, you can put
8  adversaries on the same side of the table.  I think that you
9  can create a greater value because I think that you can reach a
10  higher number.  And I think that everyone then has an interest
11  in the company prospering.
12         Now, we had a problem here, Judge, because there was a
13  limited amount of insurance.  And, indeed, there were three $10
14  million insurance policies and one of those insurance policies
15  involved an entity which itself is having financial
16  difficulties.  So it was not clear whether they would have an
17  ability to pay.  Obviously, there was a resistance by the
18  carriers, as there typically is, towards paying anything.  As
19  we began these negotiations it was clear to me that the
20  company's position was, we are not paying any cash.  If you can
21  get it out of the carriers, that is fine.
22         Now, that would set 20 million, I suppose, as the
23  limit of a cash recovery if I were to accept the statement that
24  there's no cash beyond whatever you can get out of the
25  carriers.  So I don't accept that 20 million as an absolute
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              16
4AMUINTC
1  number.  But, nevertheless, it was clear to me that a 30-, 40-,
2  50-, 60-, 70-million-dollar settlement in cash was not
3  achievable and, in fact, once you reach a certain level in
4  terms of stock consideration, it is not even desirable.  So I
5  would rather have a $96 million settlement today with the
6  component of stock that we have than have, for example, a $30
7  million cash settlement or a $40 million cash settlement or a
8  $50 million cash settlement.
9         At somewhere along the way you have to make a
10  judgment.  We did spend a good deal of time with investment
11  bankers.  We looked at the reports of the company, the
12  investment banking coverage reports, and our client is very
13  sophisticated.  Mike Berlin, who is the general counsel and
14  holds a variety of titles at Private Asset Management, they
15  manage a billion dollars worth of securities.  He is the one,
16  Judge, I believe, that submitted an affidavit --
17         THE COURT:  I read it.
18         MR. SCHIFFRIN:  -- a very sophisticated man and was
19  quite bullish --
20         THE COURT:  I think it manages half a billion.
21         MR. SCHIFFRIN:  You could be right.  I am impressed,
22  Judge.  I think you are right.  I think it is a half a billion.
23         Nevertheless, he is someone that we have known for a
24  few years.  He is an impressive guy.  As we sat and talked
25  about this case on a number of occasions, he made it clear that
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              17
4AMUINTC
1  he believed there was a lot of long-term value in this stock
2  and that it would be appropriate and desirable, if we could do
3  it, to get a large stock component.
4         We then had the issue -- I don't know if this goes
5  more to fees than to the fairness of the settlement -- but
6  there was an issue of, at what point do you set the stock price
7  for determining the number of shares.  And that became the
                          Page 8

Final Hearing Trans..txt

8  subject of several months of negotiation, as well as the issue
9  of whether you provide a floor.
10     Now, Mr. Clayton made it clear to me that he did not
11  want a floor without a ceiling.  And that is kind of a standard
12  answer that I hear from defense counsel, and usually that's
13  what happens.  I am unable to achieve getting something without
14  giving something up.
15     My client, Mike Berlin, said that he would not accept
16  any ceiling in this case and so, therefore, I had to figure out
17  how I could get some kind of a floor without setting a ceiling.
18     There were some intense negotiations that went on, the
19  issue of what we set, what stock price we use.  I believe that
20  the stock was trading at 14.50 at one point.  Then it was up at
21  $16.  Mr. Clayton suggested that we set the stock price on the
22  day that we perhaps signed the settlement agreement or we pick
23  some day in the future.
24     I was concerned the stock price might be at 17 or 18
25  or 19 dollars at that point and we would be receiving a lesser
           SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                              18

4AMUINTC
1  number of shares.  Obviously, there is no guarantee.  The stock
2  is below 14.50.  That was the subject of negotiation.  We
3  compromised.  We chose, I think, a 45-day average that got us
4  back down to 14.50, and that is the price we agreed on.  All of
5  these things were a part of the process of negotiation.
6     I have been through a lot of these cases.  I have
7  negotiated a lot of cases with stock components and, having
8  done that, I felt that I was in a position, rather than
9  starting at the beginning, I could kind of jump more to the end
10  and cut through a lot and perhaps get a bit more for the class
11  than I might have been able to if I was litigating a case like
12  this five years ago.
13     I have not been able to get as large a downside floor
14  without giving up anything on the upside prior to this case.
15  So I was very pleased with that.  I don't mean in any way to
16  devalue what Mr. Clayton did.  He is a very, very fine lawyer.
17  I have grown fond of him through the course of this litigation,
18  but I am pleased with the results we achieved and believe that
19  this settlement is certainly fair, reasonable and adequate
20  under the appropriate legal standards.
21     THE COURT:  Thank you.
22     There was notice that one of the objectors wanted to
23  be heard at the fairness hearing.
24     Is there anyone in this courtroom who wants to address
25  the fairness or adequacy of the class action settlement?
           SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                              19

4AMUINTC
1     Do any of the defendants wish to address the fairness
2  or the adequacy of the class action settlement?
3     MR. CLAYTON:  As the Court noted, we had a lot of
4  briefs submitted on this issue.  We had a long discussion with
5  the Court, so I would say, from my perspective, I am available
6  if the Court has any questions but I don't see the need to
7  reiterate what was said before.
8     THE COURT:  Thank you.
9     I am going to approve the class action settlement.
10  There should not be any anxiety about it.  I did look at it
11  carefully at the time of the preliminary hearing.  I have
12  looked at it again carefully.  At this point I have read all of
                       Page 9

Final Hearing Trans..txt
13  your submissions.  I will be filing an opinion explaining my
14  reasons, but I am comfortable with approving the settlement.
15          Let's turn to the terms of the settlement in the
16  derivative action.
17          MR. PASKOWITZ:  May I approach the podium, your Honor?
18          THE COURT:  Certainly.
19          MR. PASKOWITZ:  May it please the Court, Lawrence
20  Paskowitz, from Paskowitz & Associates.
21          Your Honor has some familiarity with this derivative
22  settlement in connection with the motion for preliminary
23  approval of this settlement.
24          The derivative suit was filed not very long after the
25  class actions were filed and, generally, derivative suits of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    20

4AMUINTC
1   this nature focus upon the corporate governance issues at the
2   company that led to the company being sued and accused of
3   securities fraud, and this is a case where the company was
4   accused thereof.
5           The Court upheld the complaint against the company, at
6   least on the ground that fraud could be pled against them with
7   particularity.  Our allegations were not for fraud but, rather,
8   for gross mismanagement, except for the claim under the
9   Sarbanes-Oxley Act, which was a statutory forfeiture claim.
10          THE COURT:  Mr. Paskowitz, this may seem off the
11  point, but Mr. Jacobs has attended many of the conferences that
12  I have had.  I notice that you both have the same address and,
13  in fact, the same suite number.  What is your relationship with
14  Mr. Jacobs's firm.
15          MR. PASKOWITZ:  Mr. Jacobs and I started out at a firm
16  called Wolf Popper many, many years ago.  It is a well-known
17  securities firm.  And at that firm we worked together for many,
18  many years.  We both left the firm at about the same time.
19  Mr. Jacobs started his own firm.  I started my own firm.
20          We are small practitioners.  We each only have one or
21  two lawyers in our office, so in order to handle cases of some
22  size against defense lawyers that are large and deal with
23  matters that involve a lot of documents and issues, Mr. Jacobs
24  and I often affiliate as co-counsel in these cases and
25  represent the same plaintiff.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    21

4AMUINTC
1           THE COURT:  Thank you.
2           MR. PASKOWITZ:  Again, the allegations in this
3   derivative action, like many others, look at the corporate
4   governance, look at the longstanding problems of the company
5   that were alleged, the items or complaints that were ignored,
6   the accounting deficiencies that seemed to have gone on for a
7   long time without being corrected and then, when corrected,
8   seemed to have been corrected several times over a course of
9   months.  The company didn't have a handle on what was going on
10  during the period in which these restatements began, so we had
11  a series of three restatements.
12          So there were indications that the board, particularly
13  the audit committee of the board, were in dereliction of their
14  duties to oversee this company's affairs as carefully as they
15  should have.
16          We also brought claims against the accountants based
17  upon the prolonged knowledge of these issues and the inaction
                            Page 10

Final Hearing Trans..txt
18  regarding them until the company was in very serious trouble.
19  We brought claims against the accountant for breach of
20  contract, not performing their accounting duties properly.
21      Further, since this case did involve restatements, we
22  brought claims under the forfeiture provision, Section 304 of
23  the Sarbanes-Oxley Act of 2002 which provides specifically that
24  the CEO and the CFO are to forfeit any compensation received
25  during the period that is affected by the restatement of the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                        22
4AMUINTC
1   financial, and that is to prevent unjust enrichment.
2       Although the statute has not been interpreted by the
3   federal court, the standard there goes beyond, perhaps,
4   negligence and includes wrongdoing, although Congress has not
5   provided much guidance on what type of wrongdoing, whether that
6   is wrongdoing in the nature of gross negligence, wrongdoing in
7   the nature of intentional wrongdoing as would be affected by
8   scienter, and even whether it is the wrongdoing of the CEO or
9   the CFO which is the requisite wrongdoing.
10      Furthermore, Congress has not specifically provided
11  that a corporation may assert these claims.  Defendants on the
12  motion to dismiss said that that power is vested solely in the
13  SEC.  We said that that doesn't make any sense because it is
14  forfeiture of these compensation items back to the corporation.
15      And other sections of the Sarbanes-Oxley Act
16  prohibited private rights of action, yet Section 304 does not.
17  So we assert that there is certainly a private right of action
18  that could be asserted by the corporation.  And it follows that
19  if it could be asserted by the corporation, it could be
20  asserted derivatively as well on behalf of the corporation.
21      THE COURT:  Now, I notice that Mr. Karpus, your
22  client, was the plaintiff in the state court action.
23      MR. PASKOWITZ:  Yes, your Honor.
24      THE COURT:  And represented there by Mr. Felgoise.
25      MR. PASKOWITZ:  Mr. Felgoise represented a different
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                        23
4AMUINTC
1   plaintiff named Eduardo Braia.
2       THE COURT:  Also in the state court action?
3       MR. PASKOWITZ:  Also in the state court action.
4       THE COURT:  But you were in the state court action too
5   on behalf of Mr. Karpus?
6       MR. PASKOWITZ:  Yes.  Mr. Jacobs and I brought an
7   action on behalf of Mr. Karpus, affiliating as we usually do in
8   these cases.  Mr. Felgoise brought a separate action on behalf
9   of a plaintiff called Eduardo Braia.
10      THE COURT:  Also in state court?
11      MR. PASKOWITZ:  Also in state court.
12      THE COURT:  And you both chose to dismiss the state
13  court action?
14      MR. PASKOWITZ:  Yes, in favor of the federal court
15  action because the Sarbanes-Oxley Act, in Section 2, said that
16  any Sarbanes-Oxley Act is to be construed as if it is brought
17  under the Securities Exchange Act of 1934 which vests exclusive
18  jurisdiction in the federal courts.  So we did not want to
19  split causes of action.
20      And once we had officially investigated the various
21  statements made that constitute the legislative history of the
22  Sarbanes-Oxley Act and any cases that we could find, we
                            Page 11

Final Hearing Trans..txt
23  determined that there was a viable claim under the
24  Sarbanes-Oxley Act that should be asserted, could only be
25  asserted in the federal court.  So another complaint was filed
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

⬜                                                                          24

4AMUINTC
1   in the federal court asserting that claim, asserting the state
2   law claims under this Court's supplemental or pendent
3   jurisdiction.  And it proceeded in this court from that point
4   on.
5           Mr. Felgoise assisted in the litigation going forward
6   because he had gained familiarity with this entire case, with
7   the process, with the legal issues, so he continued in the
8   case.
9           The main hurdle for plaintiffs in the derivative
10  action is the demand requirement.  And since this corporation
11  was incorporated in Delaware, the demand requirement was
12  governed by Delaware law.
13          Ordinarily, a corporation which has a majority of
14  independent directors should proceed with the demand, but there
15  are exceptions.  We cited several.
16          One is when a corporation has taken a position on the
17  litigation.  And we cited several instances in which a
18  corporation in an answer denied the allegations in publicly
19  filed documents, said that the allegations are without merit
20  and that these are documents filed on behalf of the company .
21  and, presumably, on behalf of the board as well.
22          THE COURT:  Why do you think the Delaware action was
23  voluntarily dismissed after the motion to dismiss had been
24  filed?
25          MR. PASKOWITZ:  The Delaware action brought by other
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

⬜                                                                          25

4AMUINTC
1   firms?  I don't really know.  I know that the allegations were
2   very different in that action and that motions had been made on
3   demand requirements in that action.  And the plaintiffs in that
4   case decided just not to go ahead with the motion.  Obviously,
5   it is not a decision that I would have made because we did go
6   ahead with the motion, and it was fully briefed at the time
7   that this case was settled.
8           I thought that we had a fairly good argument,
9   particularly with the Sarbanes-Oxley Act claim because there,
10  if you are going by the Securities Exchange Act of 1934 as the
11  governing law of the Sarbanes-Oxley Act and if the standard is
12  gross negligence rather than scienter, and it is unclear, all
13  you have is one year to bring the claim.
14          During the years in which this action was pending, the
15  directors never brought the claim.  They would have allowed the
16  statute to lapse.  We were the only ones who were protecting
17  and preserving that claim.
18          We also felt that the directors, over time, in the
19  their answers and in documents had taken a position regarding
20  this litigation.  And anyone that takes a position that there
21  is no wrongdoing is then not the proper party to prosecute this
22  action or even to receive a demand to prosecute this action.
23          I would never want to make a demand on the judge who
24  had already decided the case.  That is what these directors
25  would be.  And even if they were to receive a demand and to say
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                           Page 12

Final Hearing Trans..txt

26

4AMUINTC

1   that they would pursue the case, I don't think anyone would say
2   that they were independent in their pursuit of the case because
3   it would be against themselves.  They had taken a position on
4   the case.  And certainly they would have had a conflict because
5   I don't see how they could have simultaneously maintained in
6   the action brought by Mr. Schiffrin that certain things didn't
7   happen.
8           It also maintained derivatively that those things did
9   happen and that the corporation deserves a recovery.
10          THE COURT:  Do you want to address the benefit to the
11  shareholders?
12          MR. PASKOWITZ:  Yes, your Honor.
13          In my view, derivative actions are most useful where
14  they achieve a corporate governance benefit.  And one of the
15  things that we have to look at here is what events led to this
16  lawsuit being brought against IPG.  Certainly nothing
17  beneficial came out of it for IPG who we represent
18  derivatively.
19          It seems that there were weak internal controls, but
20  it also seemed to us that complaints, whistleblowers,
21  informants were shunted aside, that their concerns were not
22  being heard, that there seemed to be a corporate culture where
23  these things were just not taken seriously, perhaps swept under
24  the carpet, perhaps ignored for too long.
25          And we heard not only what Mr. Schiffrin had to say on
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

27

4AMUINTC

1   that issue and from the informant in South America, we heard
2   from at least one other person who said, I complained and I was
3   even fired.  When I had my complaints heard, I was fired.  And
4   that person is represented by a lawyer in a separate
5   proceeding.
6           So the main issue was:  How do we prevent that from
7   happening again so that we don't have In Re IPG Litigation II?
8   How do we get those these concerns to filter up to the proper
9   parties to be heard?
10          At the time we negotiated the settlement,
11  Sarbanes-Oxley Act had been passed.  And it did have a
12  provision for confidential reporting of concerns to management,
13  but that had not been fleshed out.  There was no requirement of
14  any sort of independent ombudsman.  There was no prescription
15  as to how confidentiality was to be maintained.  There were
16  really no details.
17          What we did, we went to see how various companies,
18  including some very well known New York Stock Exchange
19  companies were responding to the Sarbanes-Oxley Act.  Well,
20  some of them, you can call up and get a recording, leave a
21  message.  Don't have to leave your name, leave a message.  That
22  was the concept of confidentiality there -- of course, your
23  voice may be recognized by your superior or somebody answering
24  the phone.  Others were not 24 hours, 7 days a week.
25          We looked at studies regarding confidential reporting
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

28

4AMUINTC

1   hotlines.  And we found that employees who have something
2   confidential to report or have a concern in their minds or
3   think they know of wrongdoing, often they are nervous about it.
                        Page 13

Final Hearing Trans..txt

4   Often they are at work during the day.  They call in the
5   morning.  They call after work.  They call in the middle of the
6   night.
7          So the best type of hotline, according to all of the
8   white papers and the studies that have been rendered on this
9   issue, said that you need a 24 hour a day, 7 day a week
10  hotline.
11         Many companies were not doing this, are not doing
12  this.  So what we insisted upon was 24 hours a day, 7 days a
13  week, confidentiality and, also, someone of a stature of what
14  we eventually selected, Pinkerton, which is an investigative
15  detective agency to handle these matters, in other words,
16  professional investigators.
17         Other companies we looked at, it wasn't clear who was
18  investigating these matters, whether the complaints were being
19  recorded by anyone, what type of standards were being
20  maintained to keep the confidentiality.
21         The plan that is in place with Pinkerton, which must
22  be in place for at least five years if this Court approves this
23  settlement, assures the confidentiality of the informant's
24  information.  Every call is answered by a professional
25  investigator.  It is open 24/7.  They have the ability to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                29

4AMUINTC
1   handle 120 different languages because IPG is an international
2   company.  Every call is logged.  There is a record.  No one can
3   call up, like we saw with some other companies, leave a message
4   and not know whether that message was heard, or erased or
5   ignored.  So we thought that was very, very important that be
6   done the right way so that we do not have a recurrence of this
7   problem.
8          THE COURT:  My recollection from the conferences this
9   summer is that IPG had already decided that it would meet its
10  requirements under Sarbanes-Oxley by retaining outside
11  investigative services to function as its ombudsman and that
12  there was very little sort of flesh on the bones until I raised
13  some inquiries at our initial conference and some more details
14  got fleshed out thereafter.
15         MR. PASKOWITZ:  Your Honor, it was my understanding
16  that -- we had very, very early discussions about this.  We had
17  meetings right at the beginning of the case about this issue,
18  about corporate governance.  And we expressed exactly what we
19  thought had to be done.
20         If later on, and I was not privy to their internal
21  discussions about this, they decided that Pinkerton's met what
22  we demanded, then that may be the way this evolved.
23         THE COURT:  Mr. Clayton, can you shed some light on
24  this because I don't want to get it wrong?
25         MR. CLAYTON:  Yes, your Honor, we did discuss this.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                30

4AMUINTC
1          THE COURT:  Who is "we"?
2          MR. CLAYTON:  We discussed this briefly with the Court
3   at the preliminary conference and, yes, there were some very
4   preliminary settlement discussions.  I think that we had one
5   meeting very early on with the derivative plaintiffs.
6          But in response to the Court's question -- I said then
7   and I will say it again now -- the ombudsman that IPG put in
8   was a decision of IPG.  I cannot say to the Court that that
                        Page 14

Final Hearing Trans..txt

9   decision was made or the details of the program chosen because
10  of this suit.
11          What we are doing here, which is different from what
12  otherwise would have happened, is that we have a five-year
13  commitment to maintain this program. I cannot represent to the
14  Court that anything that happened in settlement discussions or
15  anything in the progress of this derivative case had any
16  significant effect on IPG's choice of Pinkerton or choice of
17  the program.
18          We think it is beyond. It goes beyond Sarb-Ox, so our
19  commitment to do it for five years is not an empty commitment.
20  It is not that we are going to comply with the law for five
21  years. We have decided to go beyond the law because we think
22  it is a good thing to do for corporate governance. And because
23  of this case, if the Court approves the settlement, there will
24  be a written commitment that we don't change that decision for
25  five years.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

31

4AMUINTC

1           THE COURT: Thank you.
2           MR. PASKOWITZ: Should I resume?
3           THE COURT: Yes. Why don't you say anything more on
4   that topic that you want and move to any other benefit that you
5   can identify.
6           MR. PASKOWITZ: Obviously, I don't disagree with
7   Mr. Clayton. As I said I was not privy to what went on in IPG.
8   I know that we expressed, what we wanted to see. If somehow
9   someone at IPG came to that conclusion, I don't know. The
10  answer was, when it came back to us, and said, This is what we
11  are going to do, that seemed to address the issue.
12          Certainly, it does go beyond Sarbanes-Oxley, and they
13  cannot drop it, change it, take a different course, go to what
14  some other companies do which is certainly less expensive.
15  They are locked in for at least five years, and I would hope
16  that they would do it for many more years than that.
17          On the other issue, which was the repricing of the
18  options, as we said in the motion for preliminary approval, it
19  is no longer commonplace. It still happens.
20          THE COURT: It has never happened at IPG?
21          MR. PASKOWITZ: It has never happened at IPG.
22          THE COURT: And here at IPG, it would require
23  shareholder approval which is, of course, an undertaking.
24          MR. PASKOWITZ: But easy to obtain, surprisingly, even
25  though there is a lot of shareholder dissension. You will find

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

32

4AMUINTC

1   that very often in a shareholder vote, there is no public
2   viewpoint ever expressed, and it says, In order to incentivize
3   our management, which seems somewhat disincentivized by the
4   drop in the stock price, we must reprice our options. So it is
5   a Sword of Damocles over the heads of the shareholders.
6           Some savvy shareholders say, Wait a second. That is
7   not right. They directors and officers want to be paid a
8   second time for the same performance, and they want to be
9   rewarded for fixing the damage that they have caused.
10          But when you don't have the type of vote here, the
11  company presents its view and there is an opposing view and
12  then the shareholder votes; very often these things are just
13  approved because shareholders are in the habit of approving

                                Page 15

Final Hearing Trans..txt

14  them.
15      Just this week as we were preparing for this argument,
16  Tuesday of this week, there was another lawsuit on this issue,
17  a company called Ladis Semiconductor.  We saw the article in a
18  regional newspaper.  I can hand it up if the Court wishes.
19  There, the plaintiff says, among other things, that the board
20  granted lavish stock option packages to its executives and that
21  option grants and the pricing in 2002 and 2003, not that long
22  ago, would cause potential dilution to existing shareholders of
23  7 percent of the entire value of the company.  So when we were
24  preparing preliminary papers, we came up with several very
25  contentious issues this year.  And now last Tuesday there is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    33

4AMUINTC
1   yet another instance that makes the newspapers where
2   shareholders are complaining -- possibly rightly so, I don't
3   know that much about that case -- that these types of stock
4   options have hurt the company and hurt them.
5       IPG had not done it because, if you look at
6   Interpublic stock charts, it was a straight line up, for the
7   most part.  Interpublic has now gone from at one point over $40
8   a share, and they were mainly in the $30 range, down to, as Mr.
9   Schiffrin pointed out, less than $12 today.  That creates the
10  optimal conditions and incentive for repricing.  And we are
11  talking about 2 million option shares here.  If they were
12  repriced to 12 and the stock which arrives back up to where it
13  was and the directors were to exercise these options, they
14  would get tens of millions of dollars for bringing the company
15  right back to where it was before all of this happened, in
16  other words, being paid for the same performance twice or even
17  rewarded for actions taken that harm the company.
18      We felt that we could not live with that possibility,
19  even though we are told it is remote.  We don't know that it is
20  remote.  It is not so remote to companies that experience
21  cataclysmic stock drops.  It is a very tempting thing to do and
22  companies are doing it all the time -- not just small
23  companies, large companies -- and shareholders continue to
24  complain and it continues to be done.
25      Now, it can't be done, except if we had a trigger.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    34

4AMUINTC
1   And the trigger is, right now, to obtain a price that is two
2   and a half times today's stock price.  If this stock were to
3   hit 30, I think that the shareholders would be thrilled to see
4   the executive share in that good fortune.  So when we hit the
5   threshold number of $30, the stock options can be repriced.
6       I think that is a real benefit.  I have seen companies
7   do it again and again -- not as common as it was, but it does
8   happen.  And I don't think that we would have been doing our
9   job if we allowed it to happen and said nothing.  That would be
10  adding insult and injury to the shareholders.  Our client
11  didn't want to see it.  We didn't want to see it.  And we got a
12  promise that it would not happen.
13      So taking that together, in addition to what
14  Mr. Clayton said is more than the Sarbanes-Oxley Act would
15  require of the company, keeping this protection in place for
16  five years, no backsliding, no switching to less expensive and
17  less effective methods, we thought was a real benefit to the
18  corporation, and we thought that this settlement was fair,

Page 16

Final Hearing Trans..txt
19  reasonable, adequate and addressed the issues that bring us
20  here today.
21              THE COURT:  Thank you.
22              Anyone else wish to be heard on approval of the
23  derivative action settlement?
24              MR. CLAYTON:  May I for a moment, your Honor?
25              I think plaintiffs' counsel has adequately addressed
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    35
4AMUINTC
1   what the consideration of the class here is.  I would just like
2   to say, from our perspective here, I don't pretend that there
3   is a pot of gold for the derivative class.  I do think that
4   there are tangible considerations that they get but, on the
5   other hand, as we looked at this and as we negotiated it, we
6   really felt that, in this case, the claim on the merits was
7   perilously weak.
8               We had been looking forward to a decision of the
9   chancellor in Delaware on this claim.  The Sarb-Ox claim was
10  not before the chancellor, but everything else was, and it was
11  fully briefed.  In fact, it was scheduled for argument and it
12  was withdrawn precipitously two or three days before the
13  argument.
14              Delaware is very clear that you cannot bring a duty of
15  care case against these directors.  When you combine that fact
16  with your Honor's ruling about the nature of the involvement of
17  these individuals and the fact that they were buying stock, we
18  felt it was absolutely plain where it was going to go and
19  absolutely plain that the demand requirement was not there.
20              And it may have been possible to argue before all of
21  those cases in the 1970s that a statute that is silent conveys
22  a private right of action, but it is no longer a possibility
23  that this statute is silent.  So we think, in comparison to a
24  very, very weak claim, the stockholders do get something here,
25  and perhaps that explains the fact that there is no one that I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    36
4AMUINTC
1   know of who is here to argue against the settlement.
2               Thank you, your Honor.
3               THE COURT:  This is a much closer question, whether to
4   approve this.  The benefits to the shareholders are close to
5   window dressing.  But the claim here is, if not frivolous,
6   close to frivolous.  So in this context, weighing all that I
7   know about the issues in the derivative litigation, the fact
8   that there is so little benefit being conveyed on the company
9   or shareholders doesn't prevent me from approving the
10  settlement.
11              Let's go to the attorney's fees issue.  I will start
12  with the class action.  I want to start with sort of an
13  overview of some things as I see them.
14              I think there is some important policy issues at stake
15  here.  It would not be good to encourage litigation when a
16  corporation is fundamentally being a good corporate citizen
17  which is, when it discovers a problem, announcing it, doing a
18  restatement and moving on it fairly quickly.
19              On the other hand, it is hard to know all of that at
20  the beginning of a lawsuit, and so I have to make a judgment as
21  to whether or not, in a sense, I think, it was fair to file
22  this litigation in the first place.
23              Another policy issue for me is to look at any award of
                                Page 17

Final Hearing Trans..txt
24  attorney's fees here in light of the stage at which the
25  litigation was settled and the amount of work that had gone on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              37
4AMUINTC
1   by then and would have had to go on in the future if there had
2   not been a settlement.  And it seems to me that plaintiffs'
3   counsel fundamentally acted in a responsible way by engaging in
4   serious early settlement discussions, as I had asked it to do.
5   And that is to be encouraged.
6         And I have talked to Judge Gorenstein to ask his view
7   of how counsel conducted themselves in the settlement process
8   and to learn more from his point of view about what went on.
9   And he was very praising of lead plaintiffs' counsel, lead
10  counsel for the class, and that matters to me.
11        So I would not want to send a message that in any way
12  detracts from an incentive to settle a case early when it is
13  appropriate to do so.  I certainly don't want counsel to be
14  motivated to run up a lodestar figure and string out a
15  litigation in order to get a larger attorney's fee award when
16  the case should be over sooner.
17        I am looking at the amount of recovery for the class.
18  As of today, it is not what people expected when it was settled
19  because of the shift in the stock price.
20        Judge Gorenstein at the October 17 conference
21  recommended 20 million in cash and 95 million in stock, and
22  that is what the parties agreed to within a week thereafter.
23        While we have lost approximately $20 million in value
24  from the settlement because of the stock market movements and
25  stock price movement, I think that the settlement terms, when
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              38
4AMUINTC
1   they were agreed to, were fair and reasonable.  And there has
2   not been such a significant loss in value that it should
3   necessarily affect my analysis of the attorney's fee award
4   here.
5         There is part of the story that I don't understand,
6   though, and that is something that I raised with counsel in the
7   summer and something that continues to concern me, and that is
8   the six-month delay that is basically between reaching the
9   final settlement and getting me the papers in June.  I have
10  been given three explanations for that, and I don't think two
11  of them hold up.
12        One was the need to negotiate the downside protection,
13  but the December 5 press release by IPG included the
14  announcement of the downside protection, and so that was
15  certainly wrapped up and finalized in early December.
16        Another thing has been the document review.  But I
17  think, from looking at the time records, that that was
18  primarily between August and November.
19        And so we are left with the third thing, which is the
20  three depositions which occurred in the late spring and the
21  explanation that the defendants kept putting off the date
22  because the executives were busy and plaintiffs' counsel didn't
23  want to raise the issue with me because they were working in a
24  cooperative spirit with defense counsel.
25        When I look at the stock price movements and, of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                              39
                          Page 18

Final Hearing Trans..txt

4AMUINTC

1  course, one can never know these things in advance, one does
2  not know how the market as a whole is going to react or an
3  individual stock or an industry stock maybe, but IPG's stock
4  basically rose from December through some point in February.
5  And then between February and some point in June, it was sort
6  of erratic but moving down. And by June it had reached the
7  point that it was in December, roughly. And since that time it
8  has been a steady decline so that, if we didn't have that
9  six-month delay, we would be pricing this settlement at a
10  different figure. But, again, that was unknowable and I am not
11  suggesting that you were not moving promptly, understood what
12  the impact would be.
13          But that is another issue that I just raised. Should
14  I take that into account? Should I be looking at that? It is
15  a question.
16          I am a little unhappy with what I think are the
17  explanations with respect to the delay that don't hold up. I
18  don't think that counsel should ever be less than frank with
19  the Court or misrepresent the facts, to say the least.
20          Also, because of the delay, even if there had not been
21  a stock price movement as I have described, investors, the
22  class has just lost the use of the money. It has just delayed
23  the time in which the value gets into their hands. So should I
24  be concerned about that? Is that worth thinking about too?
25          And I think that the last thing that I just want to
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                40

4AMUINTC

1  throw out there is, I am a little concerned about class counsel
2  allowing derivative action counsel to get their fees and costs,
3  theoretically, out of the class recovery.
4          I am raising issues here to give counsel a chance to
5  address them. I don't want my questions to mislead you. I do
6  think that plaintiffs' counsel, fundamentally, deserves a fee
7  award here which would be seen to encourage early, prompt
8  settlement when fair and thorough review of the case shows that
9  that is appropriate.
10          So those are some of my thoughts that I want to give
11  counsel an opportunity to respond to.
12          MR. SCHIFFRIN: Judge, thank you for that guidance.
13          In no particular order in responding to some of the
14  things you brought up, the issue of paying the derivative
15  costs, fees and costs was simply part of the negotiation.
16          THE COURT: Negotiation with whom?
17          MR. SCHIFFRIN: Negotiation with Mr. Clayton, who
18  insisted that the derivative case be settled along with the
19  class case and not to be paying any additional money for that
20  settlement. So I suppose that I could have negotiated 18
21  million or 94 million in stock, 18 million in cash, 94 million
22  in stock, and then they would have paid for the derivative
23  settlement. But it was just part of the mix of negotiations,
24  and I agreed to it. I agreed to it up to what I considered to
25  be a relatively small level overall. It is not that I simply
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                41

4AMUINTC

1  said, I don't care what their fees are. And I believe that it
2  was agreed that there would be a fee below $300,000. And I
3  think 295 is what they ultimately agreed to. So I had my limit
4  for that, but that is the answer to that question.
                        Page 19

Final Hearing Trans..txt

5        As to the delay which seems to be your Honor's
6   greatest concern, I never claimed, Judge, that the downside
7   protection negotiations took place after December.  What I said
8   is that the downside protection negotiations took place between
9   the time we met with Judge Gorenstein and the time we agreed on
10  the settlement in December.  If I said it, Judge, I misspoke.
11  You may have some reference to it, but I never intended to say
12  that.  I was speaking of the time after the end of October.  I
13  don't remember if the Court had said, You met with Judge
14  Gorenstein the end of October, and I don't understand why it
15  took so long but, in any event, you are absolutely right.
16  There were no sessions after December.
17       THE COURT:  I am referring to paragraph 39 of your
18  declaration, when read in the context of paragraphs 37 and 38
19  and 39.  And in paragraph 37 you say, "Finally in December the
20  parties agreed to use a 45-day average closing price," etc.
21  And then in paragraph 39, "Soon thereafter defendants finally
22  agreed to provide downside protection."
23       MR. SCHIFFRIN:  Judge, that is a matter of days.  This
24  all took place in that December time frame.  We never went past
25  December, I don't think.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            42

4AMUINTC

1        Mr. Clayton can correct me if I am wrong.  I could be
2   wrong.  My memory is not perfect.
3        THE COURT:  Then at the June 17 conference at page 27
4   when I asked about the length of time to get us from an
5   agreement in December to settle, until a June settlement
6   agreement, you described the agreement to settle and the
7   discussions regarding the downside protection as something that
8   was worked out between December and the time of final approval
9   as one of the factors.
10       MR. SCHIFFRIN:  Judge, my memory is that we resolved
11  that issue in December.
12       THE COURT:  I know you did, before December 5 because
13  it is in the press release.
14       MR. SCHIFFRIN:  Then that is my recollection.
15       MR. CLAYTON:  I guess at this point, I could go back
16  and reconstruct.
17       THE COURT:  It is clear that it was decided before
18  December 5.  It was announced to the public.
19       MR. SCHIFFRIN:  I may have misspoken when you asked
20  that question.  It was certainly no intent to mislead the
21  Court.  That is not the issue that hung us up after December.
22  The issue that hung us up after December was the completion of
23  the document review which was, really, I think 30 or 45 days or
24  so and then there were the depositions.
25       THE COURT:  I have looked at the time records, and I
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            43

4AMUINTC

1   am not sure that that is supportable.
2        MR. SCHIFFRIN:  Judge, it was minimal.  It may have
3   been a small amount of work that was left.
4        The main problem was getting these depositions.  And I
5   was faced with a situation where I had counsel I had developed
6   a good relationship with who were telling me that it was
7   impossible to provide the depositions that we required in
8   January because they had some issues, in February, in March.
9        And Mr. Clayton will tell you that I had a lot of
                        Page 20

Final Hearing Trans..txt

10  exasperated conversations with him over this issue.  I was
11  concerned about the delay.
12       The Court brought up the issue of the stock price.
13  Obviously, the stock price could have gone the other way and
14  the delay could have operated to the benefit of the class, so
15  there was no way of knowing.
16       But my thought was, let's get this done.  And I was
17  exasperated and I suppose that I could have, in hindsight, have
18  come to your Honor and said, Order them to do this.  But I
19  really didn't think it was appropriate, since we were working
20  together, the majority of the consideration is in stock, and I
21  have representatives of the company telling me that you need to
22  talk to these people if you want this kind of information, and
23  we cannot get you those people for a variety of reasons.  And
24  those reasons continued over the course of several months.
25       I said, Lew, this must end.  We have to get this done.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    44

4AMUINTC
1       I think that the Court expressed some concern through
2  your clerk, Judge, where are these papers, and I was upset
3  about it.  I really was.
4       MS. RYAN:  If I may just add something here, because I
5  was the attorney that was responsible for taking the
6  depositions?
7       THE COURT:  Your name?
8       MS. RYAN:  Katherine Ryan.
9       And it was the more senior attorneys in the firm that
10  were concentrating on the more relevant documents after the
11  December time frame, getting ready for the depositions.  And I
12  personally was involved in scheduling the depositions with
13  Mr. Gordon, and we did have a lot of difficulty doing that.  I
14  had them scheduled two or three times and at the last minute
15  they were cancelled.  So I just wanted to add that.
16       THE COURT:  Thank you.
17       MR. SCHIFFRIN:  Judge, that is the explanation.
18       And perhaps, in retrospect, I could have approached
19  the Court and at least asked if you would intervene.  And I
20  suppose you would have told the defendants to speed up.  And I
21  think that you probably would have been more persuasive than
22  me, given our positions in this case.  But that is the
23  explanation and I really don't have anything to offer beyond
24  that.
25       THE COURT:  I guess the bigger issue is:  Should I
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    45

4AMUINTC
1  care about that in deciding in any way?  Should I weigh that in
2  in any way?  Is there any policy reason for or against me
3  considering that in assessing the size of the attorney's fee?
4       I don't have a firm view on this.  That's why I am
5  asking.
6       MR. SCHIFFRIN:  Judge, I think it is really not a
7  six-month issue, maybe it is a three-month issue.
8       THE COURT:  Sure.  I will give you that.
9       MR. SCHIFFRIN:  So three months in the context of this
10  overall litigation, I don't think should have an impact,
11  particularly when I am trying to simultaneously do what is in
12  the best interests of the company for purposes of having them
13  operate efficiently and have the stock be at as high a level as
14  it can be at, and at the same time I am trying to get done what
              Page 21

Final Hearing Trans..txt
15    I am bound to get done, which is to have this settlement
16    concluded in as rapid a period of time as possible.
17           So it is not even as if I am saying, I am sorry I
18    should have come to you.  I am simply reflecting that that
19    alternative did exist.  But I would ask that the Court not hold
20    that against me.  I really was trying to get this done, and I
21    was trying to get this done as quickly as I could.  That was my
22    goal.
23           THE COURT:  Mr. Clayton wants to weigh in on this.
24           MR. CLAYTON:  Just looking at it from the policy side,
25    this was not a situation where, from our side, there was an
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              46
      4AMUINTC
1     interest in delay.  It was not a situation where we are holding
2     somebody's money and we wanted to earn interest on it.  We
3     would have liked to have this resolved as quickly as possible.
4            What we were doing, we had selected three people we
5     thought were appropriate for this.  One of them turned out at
6     the time of the deposition to be one of our former employees,
7     which makes it more difficult.
8            At the same time, as the Court is aware, there is an
9     SEC investigation going on and there are timing issues where
10    that is concerned.
11           Some of these people also are involved in our
12    financial reporting, and we take that pretty seriously and we
13    don't want to have any future restatements.  So those people
14    were involved there.
15           It is probable that the parties could have moved
16    faster, but the policy perspective -- it is not a situation, as
17    the Court said, no one knows which way the stock was going to
18    go.  No one would be happier to have had the stock shoot up
19    through the ceiling than IPG.  So this was not a situation
20    where we were interested in delaying it.
21           THE COURT:  Remind me of the SEC investigation,
22    Mr. Clayton, and how that feeds in here.
23           MR. CLAYTON:  This was a formal SEC investigation, and
24    it is still ongoing, and there has been no result.  So I don't
25    know that it feeds into any other situation.
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              47
      4AMUINTC
1            THE COURT:  Thank you.
2            MR. SCHIFFRIN:  Judge, as far as you made a reference
3     to the lost value, the $95 million stock value which was
4     diminished to 75 million or so, of course, the 95 million was
5     never guaranteed as the particular date, so Mr. Clayton never
6     said to me:  Do you want 95 million at the fairness hearing for
7     the stock?  That was never on the table.
8            And Judge Gorenstein said, You guys are going to have
9     to figure out how to coordinate that.
10           I watched the decline in the price of the stock over
11    the last few months.  And the only thing that I can tell you,
12    on the more optimistic side, that the stock seems to have
13    bottomed out around 10.50 and is now working its way back up.
14           And I talked to our investment bankers and I have
15    asked them about this company, and they remain optimistic that
16    the stock in this company is undervalued.  And my client, Mike
17    Berlin, said the same thing.
18           So perhaps I was thinking that this might be a 20- to
19    25-dollar stock, and now it is maybe a 15- to 20-dollar stock
                       Page 22

Final Hearing Trans..txt

20  over the course of the next year or so.  But I think if you
21  look historically, there are reasons to believe that this stock
22  is a good buy.
23          And if the Court awards fees, a substantial portion
24  will be in stock.  And I can tell the Court -- I don't know if
25  this factors into your thought process or not -- but when I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                48

4AMUINTC
1  settle cases that have stock components and get an award of
2  attorney's fee in stock, I tend to hold on to that stock.
3          THE COURT:  You are getting it in the same proportion
4  as class members?
5          MR. SCHIFFRIN:  That's right.
6          Just for the record, I never agree to a settlement
7  with a company in a securities class action suit that involves
8  stock where my thought processes, when I get paid attorney's
9  fee in stock, I am going to flip it.  If that is my thought
10  process, then I am not sufficiently bullish on the stock to
11  enter into those negotiations.
12          I think that addresses the issues you raised.
13          You did raise this one issue, the first question that
14  you asked when we got together about whether the complaint
15  should be filed and the policy issue of the corporation acting
16  as a good corporate citizen and you don't want to discourage
17  that, it is an interesting, theoretical issue.  It has
18  practical implications.
19          Your Honor did sustain the complaint.  I suppose if
20  the complaint did not have enough meat on the bones, your Honor
21  would not have sustained it.  So I think that that vindicates
22  our position.
23          Despite all of my concerns about the great defenses
24  available to the corporation, I was prepared to more forward
25  with this case, nonetheless.  If Mr. Clayton had suggested that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                49

4AMUINTC
1  this case be settled for 15 or 20 million dollars, we would not
2  be here today because that was not going to happen.
3          So we did simultaneously litigate the case according
4  to the schedule that your Honor had set which was fairly
5  aggressive and negotiate the case according to your Honor's
6  express desires, and we did that aggressively too.  So we tried
7  to do both things simultaneously.
8          I don't have a lot to say about attorney's fees.  I
9  know that the Court is familiar with the case law.  I read a
10  transcript of a couple of cases previously before your Honor to
11  get a sense if there was an approach that your Honor favored,
12  and you have heard all of the arguments about the contingent
13  nature of this field and that sort of thing.
14          I guess that I have two or three things to add.
15          One is that there was no government investigation or
16  assistance that we received.  There is an SEC investigation.
17  No charges have been brought.  I have no idea where that is
18  going, but that didn't help us.
19          The fee that we agreed upon with Private Asset
20  Management was a fee negotiated with a sophisticated
21  institutional plaintiff.
22          Now, I understand that your Honor has a responsibility
23  to go beyond that, and I have heard you express that and I
24  don't disagree with that at all.  But I think that there is
                              Page 23

Final Hearing Trans..txt
25    some presumption, at least, that unlike a case, perhaps, where
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

4AMUINTC
1    you had an unsophisticated client who you told, 35 percent is
2    the fee we always get and they say, OK, I guess that I will
3    agree with that -- that wasn't the case here.  And we agreed
4    not to seek a fee above 20 percent.  That was in the notice,
5    and that was what people responded to.  And, ultimately,
6    Mr. Berlin thought that 17 would be more appropriate.
7        I think that there were only three objections to the
8    fee out of 300,000 notices.  Frankly, I don't find those sorts
9    of arguments to be particularly persuasive since most people
10   don't respond at all.  But I did note that one objector thought
11   10 percent was an appropriate level.  Another one, citing
12   Goldenberger, mentioned 11 to 19, and we fall within that
13   range.  He didn't seem to like 20.  And the third, I don't
14   believe, gave a range.
15       So apart from my previous arguments that we tried to
16   construct a settlement that was as large as possible, that gave
17   as much upside protection as we could get without giving away
18   the downside protection, and that we have a fee request that is
19   within a range of reasonableness, and that range may be pretty
20   broad, I would only add that the fee decision is within the
21   sound discretion of the Court, so it is a decision for you to
22   make.
23       If I could be allowed one personal observation at the
24   end, unless the Court has any questions of me.
25       You and I may not necessarily see eye to eye on every
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

4AMUINTC
1    issue, but I just wanted to say -- and I think that I speak for
2    Mr. Clayton and we have had this discussion -- I appreciate the
3    level of thoughtfulness and care that the Court gives to the
4    decisions that it makes, and this really has nothing to do with
5    the fee.
6        THE COURT:  Thank you.  I appreciate that.
7        MR. SCHIFFRIN:  I wanted to mention that.
8        THE COURT:  I know you know that I take this
9    responsibility seriously and try to think hard about these
10   issues.
11       And I do want to compliment class counsel.  I think
12   that you behaved responsively here and gave very good service
13   to the class.  They were well served by you.
14       I want to reflect over the weekend about where I end
15   up on these issues, but I do want any fee award here to reflect
16   appropriately the benefit that the class received here and to
17   encourage prompt and early settlement in cases where it is
18   appropriate.  I think that there shouldn't be a discount, so to
19   speak.  On the other hand, I do want to take all the factors
20   that I should into account in deciding exactly what the figure
21   is.
22       Let's turn to the fee for derivative class counsel.
23       MR. PASKOWITZ:  Yes.
24       THE COURT:  I have many problems with awarding any
25   money.  I have many problems with awarding Mr. Felgoise any
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

4AMUINTC

Page 24

Final Hearing Trans..txt

1  money.  It seems to me that this is as close to a frivolous
2  lawsuit -- it has given the shareholders very little of value.
3         The first settlement agreement that was signed, if it
4  were executed, would have substantially prejudiced the class.
5  And for that sole reason, with nothing else, I would be very
6  unlikely to give any fee award.  If I had not read that
7  settlement agreement carefully -- not every judicial officer
8  may have the time to read them carefully -- this settlement
9  would have barred all derivative actions for a far longer
10  period than it should have, and that is just reprehensible, in
11  my view.
12         Any payment to you will come out of a payment to the
13  class.  I should take that into consideration.  I don't want go
14  give their money away when I shouldn't.
15         And I have not seen any legal work of any significance
16  by counsel in the derivative action, nothing that would warrant
17  an award.
18         I think that there are significant policy issues at
19  stake here.  I don't think frivolous litigation should be
20  encouraged, and I don't believe that you had any reason to
21  believe that this litigation would survive a motion to dismiss.
22         I don't think there is any public policy served by
23  filing the litigation.  To the extent that the company needed
24  to be put on notice of a problem, it was put on notice of the
25  problem through other means.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

4AMUINTC

1         Therefore, this is your opportunity to be heard.
2         MR. PASKOWITZ:  Your Honor, I must respectfully
3  disagree.
4         Mr. Jacobs and I focus maybe half of our practice on
5  derivative litigation.
6         You asked before why did the other plaintiffs drop
7  their case in Delaware.  I don't know that they considered
8  themselves specialists in derivative litigation.
9         But when we briefed this motion, we thought that we
10  were going to win it.  In 2003 there were three cases before
11  the Delaware courts that stood to completely change the view of
12  when a plaintiff might get over a demand.  Those three cases
13  are very carefully discussed in our brief.  They all came out
14  in favor of demands not being excused.  One of them was Biondi
15  v. Scrushy.  Scrushy was the CEO of Health South Corporation.
16         Every practitioner in Delaware, every pundit said that
17  demand was not excused in that case.  What happened there,
18  there was a special litigation committee appointed.  And one of
19  its member, who happened to be the chairman, said Mr. Scrushy
20  had done nothing wrong.  Well, we might say he hasn't heard all
21  of the evidence.  He hasn't heard presentations from
22  plaintiffs' counsel.  He has not even heard from his own
23  independent counsel.  Who cares what he said then.  Let's see
24  what he says then.  Let's see what his final decision is.  He
25  is only one member of the committee.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

4AMUINTC

1         The vice chancellor said, When a company or even a
2  member of a special litigation committee comes out with an
3  opinion on the ultimate issue that he needs to decide, the man
4  is excused because what confidence can the public have in the
5  process that is being undertaken or in the decisionmakers when

Page 25

Final Hearing Trans..txt

6    the decision has already been publicly announced or prejudged.
7         In this case, very much like Judge Chin's case, Bank
8    of New York derivative litigation, this company came forward
9    with answers and in public documents saying that the litigation
10   was frivolous, without merit, going to be vigorously defended.
11   Under the Bank of New York derivative litigation, Judge Chin's
12   decision, under the Biondi v. Scrushy, demand is not excused.
13        The other cases were Disney and Oracle, also cases
14   where directors were seen not to be completely independent,
15   based upon prior case law, all pending 2003 and before and
16   awaiting decision.  We awaited those decisions.  They both came
17   out in favor of demand being excused and plaintiffs being
18   allowed to go ahead with those cases.  Disney involved
19   directors who were inattentive, not directors who were corrupt.
20   Those directors were not on the take.  They got nothing out of
21   Michael Eisner's extraordinary compensation package.  But the
22   allegations were, they did not pay enough attention.
23        And under those cases the vice chancellor said, You
24   know what, we are going to look at our case law and see if
25   there is a real possibility if these directors, looking at all
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              55

4AMUINTC
1    of these facts, are facing real liability because that is what
2    is going to go into a calculus of their independence.  If they
3    look at all of the facts and they say, for 18 months, two years
4    or in a particular transaction I should have done more, I was a
5    rubber stamper; I sort of half listened and I agreed anyway and
6    now the company is in a terrible, awful mess; boy, had I been
7    more attentive, had my colleagues been more attentive, asked
8    more questions, had we read more or had we put our foot down,
9    this wouldn't have happened.
10        In the Disney case, nobody would have ever predicted
11   that the Disney board would have been held to be not
12   independent enough to hear a demand.  The vice chancellor said,
13   It is not independent enough because, over a long period of
14   time, they were rubber stamps -- and we are talking about a
15   blue ribbon board that has the cream of the crop of corporate
16   directorship, and that was the Disney board.
17        And another case was Oracle, another major company --
18   directors, professors at Stanford University, well renowned
19   throughout the world thought the country.  What happened there,
20   they had interrelationships that involved donations to Stanford
21   University by Lawrence Ellison.  He liked Stanford University,
22   so he gave money.
23        Again, the court said, Let's take a human approach to
24   this.  What is going through a director's mind when the
25   director has to make a decision about suing the other men and
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              56

4AMUINTC
1    women around that board table?  He said, You have to look at
2    all of these factors, every factor.  If the factor is that
3    Mr. Ellison had been very generous to an institution with which
4    I as a director am associated, perhaps I don't want to sue
5    Mr. Ellison.  Perhaps if I sue Mr. Ellison, I will never get
6    another donation from a person of his stature because I am a
7    person who will be viewed as disloyal, viewed as somebody who
8    sues.
9         So the Delaware courts moved very significantly
10   during 2003 away from the previous presumptions that directors,
                          Page 26

Final Hearing Trans..txt
11  if they were not on the take, if they were not corrupt, did not
12  have personal gain from a transaction, that was taint.  That
13  was self-interest.  That was conflict.
14       They moved to a more practical evaluation of it --
15  having taken a position on the matter, are they too close to
16  the other directors?  Are they too embroiled in other
17  litigations?  Are they afraid, because of their own actions, if
18  they were to investigate this thoroughly, something bad would
19  come out about them?
20       Based upon that trio of Biondi, of Disney, of Oracle,
21  we thought that we would win.  I can't say that we would, but
22  we thought we had a great shot at it.
23       The other thing is Sarbanes-Oxley.  I cannot imagine
24  that Congress enacted Sarbanes-Oxley and said that in the case
25  of wrongdoing -- but they don't define "wrongdoing."
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                57
4AMUINTC
1   Wrongdoing can be anything.  Ordinarily, gross negligence is
2   sufficient for wrongdoing.  In a case of wrongdoing, the CEO
3   and CFO must forfeit their money back to the corporation
4   because they got that money based upon financials that were
5   just not true.  It is like crossing the finish line in a race
6   when you took the subway instead.  They didn't perform as they
7   were supposed to perform, and there was no reason for them to
8   pocket that money, and Congress decided, as a penalty, there
9   would be a forfeiture under Section 304.
10       Mr. Clayton talked about implication of causes of
11  action.  Implication of causes of action still occurs because
12  the statute is not silent.  In the many sections where Congress
13  said there should be no private right of action, it says, under
14  this section there will be no private right of action.  Under
15  Section 304(a) of the Sarbanes-Oxley Act, it doesn't say that.
16  It is silent as to it.
17       Who is the beneficiary of the Sarbanes-Oxley Act under
18  304?  Only the corporation.  The money doesn't go to the
19  government.  It doesn't go back to the shareholder.  It goes
20  back into the corporate till.
21       And to say that the corporation, in the many, many
22  restatement situations we have seen lately, many involving
23  wrongdoing, have to go to the SEC at the end and say, We know
24  you are a busy governmental agency, but can't you take a look
25  at this, spend all of your resources, divert what you are doing
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                58
4AMUINTC
1   now and get that money for Interpublic Group -- so we did not
2   think that that argument washed at all.  We thought that there
3   had to be an implication of the private right of action of
4   Sarbanes-Oxley.
5        The other thing is, these directors not only did not
6   have to hypothesize or speculate that they wouldn't bring it,
7   the one-year statute of limitations which most probably applies
8   to any claim that passed, and they didn't bring it.
9        If we had a chance to orally argue this motion to the
10  Court, which we never did because we settled instead, I think
11  that we had a great argument.  I don't think this was frivolous
12  at all.  I think that we would have gotten past a demand.
13       And after we got past demand, I don't know why it was
14  not the case that these directors were not grossly negligent.
15  We don't have to prove fraud under Delaware law.  And it is not
                         Page 27

Final Hearing Trans..txt

```
16  even clear that you have to prove fraud under Sarbanes-Oxley.
17       Why is it fair that when you have directors who are
18  not applying appropriate stewardship and attention to what they
19  are doing -- and in so many cases we see that -- that the
20  shareholders pay to settle?  That's what derivative suits are
21  about.  Should the shareholders get their stock price dropped,
22  and the second, the third time around, the directors say, You
23  know, we have B&O policies?  We don't have to pay a penny.  And
24  maybe this company issues some more stock and says, We can
25  dilute everyone, and maybe we don't have to pay for that
```

59

4AMUINTC
```
 1  either.
 2       So these derivative suits are saying to directors,
 3  Wait a second.  Not so quick.  You have personal liability
 4  here.  We know we have to get over the demand motion.  We think
 5  we can do it.  We think that we have enough arguments, and we
 6  can hold you personally liable.
 7       We also have a secondary obligation to the companies,
 8  the derivatives.  I don't think it would be proper, if we felt
 9  we got a sufficient benefit here, which I think we did, to say,
10  We are going to hold up this whole shebang.  The company cannot
11  put this litigation behind it.  It has to keep litigating.  The
12  shareholders cannot get their money because, even though we
13  think that we have sufficient benefits, we want a little more.
14  I thought that we had enough.
15       And nobody said to me, Here is something we plan to do
16  anyhow, and we will give it to you for consideration for the
17  settlement, because past consideration is no consideration.  We
18  wouldn't have tolerated that.  Maybe someone at IPG was
19  percolating the idea somewhere, but it wasn't communicated to
20  us.  So as far as we knew, this company was locking itself into
21  something that was better than the Sarbanes-Oxley Act of 2002,
22  bestowed upon the shareholders of Interpublic Group.
23       And I was worried about the repricing of the options
24  because I was aware that other companies had done it and this
25  might have been a very good instance where it could have
```

60

4AMUINTC
```
 1  occurred although, yes, it would have been a much rarer thing.
 2       As far as the allocation, we have asked for, I think,
 3  also, less than what was negotiated.  We were looking at
 4  compensation for hours, and we made an estimate.  And the
 5  amount that I think nobody would have objected to coming out of
 6  the whole pot was $295,000 in fees and $20,000 out-of-pocket.
 7  We just didn't have it, and we applied for $240,000 which was a
 8  little bit of multiple given the time value of money and, I
 9  think, 3,000-odd dollars in expenses, because that's what we
10  had.
11       I think Mr. Schiffrin is quite correct, when you look
12  at it backwards, sideways, frontwards, however the defendants
13  decide to pay derivative compensation, it is going to come out
14  of the class compensation.  They are looking at one number.  So
15  if the number is 120 million this way and $200,000 that way or
16  120,200,000 and you guys divide it up, you wind up in the same
17  place.  So is it coming out of the shareholder consideration?
18       Well, that's a technicality because it always has to
19  be divided somehow.  I think the question is:  Do we have a
20  benefit and did we work hard to achieve it?  We hung in there.
```
Page 28

Final Hearing Trans..txt
21    We did it and I think that we got a pretty good result.
22          THE COURT:  Do you want to address the other issues I
23    raised or not?
24          MR. PASKOWITZ:  The release?
25          I think that the release was a result of negotiation.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    61
      4AMUINTC
1     Defendants won't settle these claims unless they have peace.
2     We knew of no other possible derivative claims.  If we did,
3     someone would be here objecting that they have some possible
4     claim against this company for something to be brought in the
5     corporate name.
6           THE COURT:  No, no.  I raise the issue of the
7     overbreadth of the relief at the conference and it was
8     renegotiated.
9           MR. PASKOWITZ:  It was.
10          THE COURT:  Right.  So as it was described in the
11    notice, it was described on the basis of the re-negotiated
12    release.
13          MR. PASKOWITZ:  Yes.  The original release was a
14    standard release.  Some people say it was overbroad.  This was
15    renegotiated.  This was an improvement.
16          There is no doubt that the Court helped the class and
17    shareholder.  It is no doubt that the Court's intervention in
18    this matter improved what we had.  But we did have something
19    that we brought to the Court that we thought was beneficial.  I
20    thank the Court for having done that.  I am sure that the
21    shareholders are grateful for it.  I got a letter from a
22    shareholder very grateful for the ombudsman position being
23    created and being in place for five years.  I can submit that
24    to the Court, if the Court wishes.
25          The Court definitely helped improve what we had, but I
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    62
      4AMUINTC
1     would say that we had something substantial.  Many judges do
2     get involved, and sometimes a settlement is better after judges
3     get involved.  I would say most cases it is.  Your Honor in
4     particular is involved in these matters and in particular
5     improved this settlement.  We are grateful for that and it does
6     happen, but we thought what we brought was something
7     substantial to begin with and now it is better.
8           Regardless of the Court's decision on the fee, I have
9     to thank the Court for improving the settlement.
10          THE COURT:  Thank you, sir.  You are gracious.
11          MR. FELGOISE:  First of all, I would like the
12    opportunity to introduce myself.  I am Brian Felgoise.  I am
13    one of the co-counsel on the derivative case.
14          And I think that Mr. Paskowitz accidentally forgot to
15    address it, the lodestar by my firm in the derivative lawsuit
16    was $39,000.  My firm was involved with Mr. Paskowitz in the
17    litigation of the case.  We personally, handled from a
18    confirmatory standpoint, the three depositions with regard to
19    the derivative case because you did address that to derivative
20    counsel.
21          I wanted to get a chance to introduce myself to the
22    Court.  It wasn't as though I was just of counsel in the case
23    and did nothing relative to Mr. Jacobs and Mr. Paskowitz; my
24    time was, again, the $39,000.
25          THE COURT:  So you attended the three depositions?
                            Page 29

Final Hearing Trans..txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

63

4AMUINTC

1   MR. FELGOISE: Of counsel in my office, James Wilson
2   attended the three depositions from a confirmatory standpoint
3   in the derivative case.  That is correct, and that was
4   submitted in our paperwork.
5   THE COURT:  Was he an active participant at the
6   deposition?
7   MR. FELGOISE:  Yes.
8   THE COURT:  Did he ask questions?
9   MR. FELGOISE:  I am not sure that he asked questions,
10  because the depositions were handled by Schiffrin & Barroway.
11  He was there at the depositions, yes.
12  THE COURT:  Because I did not see any evidence of
13  document review or preparation that would have put him in a
14  position to be an active participant in the deposition.
15  MR. SCHIFFRIN:  Your Honor, that is included in my
16  time submission.  I am sure Ms. Ryan can speak to the fact that
17  Mr. Wilson was there.  She is aware of why he was there.  I had
18  conversations with her as far as from a derivative counsel
19  standpoint that we want to be there and partake from a
20  derivative standpoint, confirmatory.
21  THE COURT:  Thank you.
22  MS. RYAN:  Your Honor, Mr. Wilson did attend the
23  deposition and I did send the documents to let him know what I
24  was going to use, but he did not ask questions.
25  THE COURT:  Thank you.
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

64

4AMUINTC

1   Does anybody else want to be heard on any of these
2   issues?
3   MS. RYAN:  If I may hand up to the Court, you had
4   asked yesterday for our time records.
5   THE COURT:  Good.  Thank you.
6   And counsel were kind enough last night to provide us
7   with the by attorney and support staff monthly time records
8   which we reviewed and were helpful to us in analyzing what went
9   on here.
10  I want to congratulate the company and the class on
11  this settlement.  Again, I believe that it does give a benefit
12  to the class.  I want to thank counsel for the defendants and
13  class counsel for being of assistance to me at a variety of
14  points in this process.
15  I disagree that you were on an aggressive schedule.  I
16  think that you were on an appropriate schedule that we set
17  together.  But I know that Judge Gorenstein was impressed with
18  the cooperation on both sides and I am glad that you were able
19  to reach, with relatively little cost, given what could have
20  happened here, a settlement that is appropriate for one and
21  all.
22  Thank you.

24                    o   O   o

25
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

# EXHIBIT



Woods Fairness Hearing.txt

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JIMMY R. WOODS              ) DOCKET NO. 1:04-CV-1912-RWS
                           )
    PLAINTIFF               ) ATLANTA, GEORGIA
                           ) AUGUST 14, 2007
        V.                 )
                           )
SOUTHERN COMPANY, ET AL.    )
                           )
        DEFENDANT.         )

TRANSCRIPT OF FAIRNESS HEARING
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:              DEREK W. LOESER, ESQ.
                               JOSEPH H. MELTZER, ESQ.

FOR THE DEFENDANTS:            DAVID M. MONDE, ESQ.
                               ROBIN A. SCHMAHL, ESQ.

COURT REPORTER:               SHARON D. UPCHURCH
                              2114 U. S. COURTHOUSE
                              ATLANTA, GEORGIA 30303-3361
                              (404) 215-1354

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

Page 1

Woods Fairness Hearing.txt

2

1                P R O C E E D I N G S
2            (AUGUST 14, 2007; IN OPEN COURT)
3        THE DEPUTY CLERK:  THE COURT CALLS THE CASE OF
4    JIMMY R. WOODS VERSUS SOUTHERN COMPANY AND OTHERS, CIVIL ACTION
5    NUMBER 1:04-CV-1912.
6        THE COURT:  GOOD MORNING.  WE ARE HERE FOR A HEARING
7    ON THE APPROVAL OR THE MOTION FOR APPROVAL OF THE SETTLEMENT
8    THAT HAS BEEN REACHED IN THIS CASE.  WE PREVIOUSLY HAD A
9    HEARING FOR THE PRELIMINARY APPROVAL THAT THE COURT GRANTED,
10   AND NOTICE HAS NOW BEEN SENT TO MEMBERS OF THE CLASS.  IT'S MY
11   UNDERSTANDING THAT ONLY ONE OBJECTION WAS FILED; AND THE COURT
12   IS NOT AWARE OF ANY NOTICE HAVING BEEN FILED ON BEHALF OF THAT
13   OBJECTOR TO APPEAR AT THIS HEARING AND BE PRESENT, AND I ASSUME
14   HE IS NOT PRESENT HERE TODAY.
15       SO THE COURT HAS TAKEN THAT OBJECTION, HOWEVER, INTO
16   CONSIDERATION AND CONSIDERED THE RESPONSE THAT HAS BEEN FILED
17   TO IT BY COUNSEL, AND I AGREE WITH COUNSEL THAT THE OBJECTION
18   IS NO CAUSE FOR NOT APPROVING THE SETTLEMENT.  I'M SURE EVERY
19   MEMBER OF THE CLASS WOULD LIKE TO GET MORE MONEY, WHICH IS
20   ESSENTIALLY THE NATURE OF THE OBJECTION; AND I APPRECIATE AND
21   UNDERSTAND THAT DESIRE BUT STILL FEEL AS I HAVE STATED
22   PREVIOUSLY THAT ARMS-LENGTH NEGOTIATIONS HAVE OCCURRED HERE,
23   THAT COUNSEL FOR PLAINTIFFS HAVE OBTAINED A GOOD SETTLEMENT ON
24   BEHALF OF THE MEMBERS OF THE CLASS, AND IT'S A SETTLEMENT THAT
25   SHOULD BE APPROVED.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

3

Page 2

Woods Fairness Hearing.txt

1    I HAVE REVIEWED ALL THE DOCUMENTS THAT YOU HAVE
2    SUBMITTED IN CONNECTION WITH YOUR MOTION, INCLUDING THE MOTION
3    FOR ATTORNEY FEES AND FOR COSTS.  I FIND THAT THOSE ARE
4    APPROPRIATE AND ARE IN ORDER, AS WELL.  I FIND THAT THERE HAS
5    BEEN APPROPRIATE NOTICE GIVEN TO MEMBERS OF THE CLASS SO THAT
6    THEY MAY HAVE AN OPPORTUNITY TO FILE OBJECTIONS, IF ANY, TO THE
7    SETTLEMENT.  AND SO IT IS MY INCLINATION TO APPROVE THE
8    SETTLEMENT AND TO AWARD THE ATTORNEY'S FEES AS REQUESTED AT A
9    LEVEL OF 27.5 PERCENT, TO AWARD THE COSTS OF $69,155.08, AND TO
10   APPROVE THE CASE CONTRIBUTION AWARD FOR THE NAMED PLAINTIFF OF
11   $5,000.
12       HAVING SAID THAT, I WILL ALSO, IF THERE'S ANYTHING
13   FURTHER COUNSEL WISH TO MAKE AS A PART OF THE RECORD, LET ME
14   GIVE YOU THAT OPPORTUNITY.  FIRST FOR THE PLAINTIFF,
15   MR. MELTZER, ANYTHING FURTHER YOU WANT TO PUT ON THE RECORD.
16       MR. MELTZER:  YOUR HONOR, I CERTAINLY WON'T GO
17   THROUGH THE LENGTHY PRESENTATION THAT I HAD PREPARED FOR TODAY.
18   MAYBE INSTEAD I'LL TAKE TWO MINUTES OF THE COURT'S TIME AND
19   EXPLAIN WHERE WE'LL GO FROM HERE.
20       THE COURT:  OKAY.
21       MR. MELTZER:  I THINK WHAT WILL HAPPEN IS THE ORDER
22   WILL BE ENTERED.  THERE WILL BE A 30-DAY PERIOD UNTIL IT
23   BECOMES EFFECTIVE TO ALLOW FOR ANY POSSIBILITY OF AN APPEAL.  I
24   THINK THAT'S PROBABLY REMOTE AND LIKELY WON'T HAPPEN.
25       ASSUMING THAT IT BECOMES EFFECTIVE 30 DAYS AFTER IT'S


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


4


1    ENTERED, WE'LL THEN START THE DISTRIBUTION PROCESS.  THE PLAN
2    OF ALLOCATION WHICH YOUR HONOR WILL APPROVE AS PART OF THE

Woods Fairness Hearing.txt

3   SETTLEMENT AND AS PART OF THE FINAL ORDER WILL DICTATE HOW THE

4   MONEY IS DISTRIBUTED AMONGST THE PLAINTIFF PARTICIPANTS AND THE

5   CLASS MEMBERS.

6           IT IS A WELL-REFINED PROCESS.  AT THIS POINT

7   MR. LOESER AND I HAVE DONE A NUMBER OF THESE CASES.  WE'VE USED

8   BASICALLY THIS EXACT FORMULA BEFORE.  WE USED ALMOST PRECISELY

9   THE SAME FORMULA IN MIRANT.  THIS IS A RARE OPPORTUNITY WHERE

10  WE SORT OF GET A POSTSCRIPT AND AN OPPORTUNITY TO SORT OF GIVE

11  THE COURT SOME INSIGHT ON HOW THAT HAPPENED AND HOW EVERYTHING

12  WAS EFFECTUATED IN MIRANT.

13          AND I'M PLEASED TO REPORT THAT WE'RE VERY PROUD OF

14  HOW EVERYTHING TRANSPIRED WITH RESPECT TO ALLOCATION IN MIRANT,

15  AND I BELIEVE THAT SETTLEMENT BECAME EFFECTIVE LATE DECEMBER, I

16  BELIEVE DECEMBER 18TH OF 2006.  THE ENTIRE SETTLEMENT WAS

17  DISTRIBUTED BY JANUARY 4TH OF 2007.  THERE WAS A RANGE OF

18  RECOVERIES WITHIN THE MIRANT PLAN PARTICIPANT BASE FROM A FEW

19  HUNDRED DOLLARS TO MANY SEVERAL TENS OF THOUSANDS OF DOLLARS.

20  SO SOME PEOPLE ARE GOING TO GET BACK A REAL RECOVERY.

21          THE SAME IS GOING TO BE TRUE IN THIS CASE.  I CAN'T

22  GUARANTEE THAT IT'S GOING TO WORK QUITE AS SEAMLESSLY BECAUSE,

23  FRANKLY, I'VE NEVER SEEN ONE THAT'S WORKED QUITE THAT WELL.

24  WHEN YOU FACTOR IN THE INTERVENING HOLIDAYS, I'M REALLY

25  SURPRISED.  BUT HOPEFULLY, IT WILL SORT OF BE AKIN TO THAT AND


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

0

5

1   WE'LL GET A SIMILAR EFFICIENCY AND WE'LL HAVE EVERYTHING

2   DISTRIBUTED AND WRAPPED UP IN THE NEXT FEW MONTHS.

3           THE COURT:  WELL, I THINK THAT THE ALLOCATION PLAN IS

Page 4

Woods Fairness Hearing.txt

4   A GOOD ONE, AND I THINK IT'S EXTREMELY FAIR AND HELPS TO ASSURE

5   EQUAL AND FAIR TREATMENT TO ALL MEMBERS OF THE CLASS AND ALSO

6   AVOIDS, I THINK, SOME NEEDLESS AND EXPENSIVE ACTIVITY BY THE

7   DESIGNATION OF CERTAIN DE MINIMIS CLASS MEMBERS SO THAT YOU

8   DON'T SPEND A LOT OF RESOURCES WITH REGARD TO CLAIMS THAT

9   ESSENTIALLY HAVE NO SUBSTANTIAL VALUE TO THEM SO THAT THERE CAN

10  BE REAL, MORE REAL RELIEF FOR OTHER MEMBERS OF THE CLASS.

11          SO I THINK THAT THE ALLOCATION FORMULA AND PLAN ARE

12  THOUGHTFUL AND ARE -- WILL ACHIEVE THE INTENDED RESULT OF

13  GETTING THE BEST POSSIBLE RELIEF TO THE GREATEST NUMBER OF

14  MEMBERS OF THE CLASS.

15          SO I WAS NOT FAMILIAR WITH HOW IT HAD GONE IN MIRANT,

16  BUT JUST IN TERMS OF REVIEWING IT FELT THAT IT WOULD ACHIEVE

17  THOSE GOALS; AND THAT'S ANOTHER REASON THAT I'M HAPPY TO

18  APPROVE THE SETTLEMENT AS PROPOSED.

19          MR. MELTZER:  THANK YOU, YOUR HONOR.

20          THE COURT:  ANYTHING FROM THE DEFENDANT?

21          MR. MONDE:  JUDGE, DAVID MONDE FROM JONES DAY ON

22  BEHALF OF THE DEFENDANTS.  THE ONLY EVENT THAT I WOULD POINT

23  OUT THAT OCCURRED BETWEEN THE COURT'S PRELIMINARY APPROVAL AND

24  THE FINAL APPROVAL WAS THE ENGAGEMENT BY THE PLAN OF AN

25  INDEPENDENT FIDUCIARY AS REQUIRED UNDER SECTION 3.5 OF THE


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

6

1   SETTLEMENT AGREEMENT.

2           I WILL TELL YOU THAT THE PLAN TOOK THE OBLIGATION OF

3   RETAINING A TRULY INDEPENDENT FIDUCIARY VERY SERIOUSLY.  THEY

4   INTERVIEWED, I BELIEVE, AT LEAST THREE CANDIDATES FOR THAT.

5   THEY CHOSE INDEPENDENT FIDUCIARY SERVICES.  THAT COMPANY AND

Page 5

Woods Fairness Hearing.txt

6   ORGANIZATION HAD NO PRIOR RELATIONSHIP WITH THIS LAWSUIT, WITH

7   THE MIRANT LAWSUIT, WITH THE SOUTHERN COMPANY OR WITH THE PLAN.

8   AND I CAN TELL YOU HAVING BEEN ON THE RECEIVING END OF THEIR

9   REQUESTS FOR DOCUMENTS AND INTERVIEWS, THAT THEY DID MORE THAN

10  KICK THE TIRES.  THEY PUT US THROUGH OUR PACES.

11          WE PRODUCED OVER TWO BANKERS' BOXES OF MATERIALS TO

12  THEM, SPENT TIME ON THE TELEPHONE WITH THEM; AND THEY REVIEWED

13  THIS PROPOSED SETTLEMENT SOLELY FROM THE VIEWPOINT OF THE PLAN

14  AND THE PARTICIPANTS BEFORE THEY AGREED TO AUTHORIZE THE

15  RELEASE BY THE PLAN AS SET FORTH IN THE SETTLEMENT AGREEMENT.

16          AND, OF COURSE, WE DID FILE WITH THE COURT THE NOTICE

17  OF THAT INDEPENDENT FIDUCIARY'S DETERMINATION THAT THE

18  SETTLEMENT IS FAIR AND REASONABLE TO THE PLAN AND THAT THEY

19  APPROVE IT ON BEHALF OF THE PLAN.

20          THE COURT:  AND I WAS REMISS IN NOT MENTIONING THAT I

21  HAD REVIEWED THAT CERTIFICATE IN REVIEWING THE FILE IN

22  PREPARATION FOR TODAY'S HEARING, AS WELL.  THANK YOU.

23          WITH APOLOGIES FOR NOT REQUIRING OR ALLOWING YOU TO

24  GO THROUGH YOUR PACES AS I KNOW YOU ARE PREPARED TO DO TODAY,

25  BUT IN ALL HONESTY, I JUST THINK THAT'S A NEEDLESS TASK TO PUT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

0

7

1   YOU THROUGH BECAUSE I LOOKED AT THIS VERY CLOSELY WHEN YOU CAME

2   HERE BEFORE AND I WOULD NOT HAVE GIVEN YOU PRELIMINARY APPROVAL

3   IF I DIDN'T FEEL PRETTY GOOD ABOUT IT THEN.  THE LAST THING I

4   WANT TO DO IS HAVE THOUSANDS OF CLASS MEMBERS OUT THERE GETTING

5   A NOTICE ABOUT SOMETHING THAT I DON'T THINK IS GOING TO PASS

6   MUSTER.  I WOULD HAVE ALERTED YOU BACK THEN SO THAT WE COULD

Woods Fairness Hearing.txt

7    HAVE CORRECTED ANY PROBLEMS WE HAD BEFORE WE CREATED THAT KIND
8    OF MONSTER.
9         AND SO WHEN I GAVE PRELIMINARY APPROVAL, I WAS
10   PRETTY, PRETTY SURE THAT THIS WAS GOING TO BE FINE.  THE MAIN
11   THING WAS TO GET NOTICE OUT THERE AND SEE HOW THE PLAN
12   PARTICIPANTS FELT ABOUT IT.  AND AS YOU APTLY POINTED OUT IN
13   YOUR MOTION, THE FACT THAT YOU HAD THIS MANY PEOPLE RECEIVING
14   NOTICE AND HAD ONLY ONE OBJECTION AND THAT OBJECTION WAS OF THE
15   NATURE THAT IT WAS, AND I REALIZE IT WAS MORE THAN JUST WOULD
16   LIKE TO HAVE HAD MORE MONEY BUT FEELING THERE WERE SOME FOLKS
17   THAT SHOULD HAVE TAKEN RESPONSIBILITY AND SOME FEELINGS ABOUT
18   THAT, AGAIN, I APPRECIATE AND UNDERSTAND HOW MEMBERS OF THE
19   CLASS FEEL.
20        BUT IT DOES NOT TAKE AWAY FROM MY FEELING THAT THIS
21   IS AN EXCELLENT SETTLEMENT FOR THE MEMBERS OF THE CLASS AND ONE
22   THAT GETS SOME MONEY TO THEM IN A MUCH QUICKER FASHION THAN
23   LITIGATING THIS CASE IS GOING TO DO AND WITH MUCH LESS COST TO
24   BOTH SIDES THAN WOULD OTHERWISE OCCUR.  AND THAT'S ANOTHER
25   REASON THAT I'M WILLING TO APPROVE THE ATTORNEY'S FEES.


             SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


                                                        8


1         THE PERCENTAGE IS NOT INAPPROPRIATE.  IT IS WITHIN
2    THE RANGE THAT ONE WOULD EXPECT.  TYPICALLY THE COMPARISON
3    BETWEEN THE FEES AND THE LODESTAR IS THERE'S A LITTLE HIGHER
4    FEE THAN WHAT I MIGHT WOULD NORMALLY SEE, BUT I ALSO KNOW THAT
5    YOU STILL HAVE A TRIAL AHEAD OF YOU IF YOU DIDN'T GET THIS
6    SETTLEMENT APPROVED.  YOU HAD TO STILL WIN THE APPEAL AND YOU
7    HAD TO COME BACK AND TRY THE CASE, AND THERE WAS A LOT OF
8    ATTORNEY COMMITMENT THAT WAS STILL AHEAD IN THIS CASE.
                        Page 7

Woods Fairness Hearing.txt

9      AND SO IN TERMS OF APPROVING THIS, THIS REQUEST FOR

10    ATTORNEY'S FEES, THOSE ARE SOME OF THE FACTORS THAT WENT INTO

11    THE COURT'S DECISION THAT THIS IS AN APPROPRIATE ATTORNEY FEE

12    AMOUNT.  AND AS I SAID, WE'RE WITHIN THE 20- TO 30-PERCENT

13    ANYWAY THAT ONE WOULD EXPECT TO FIND FOR A CONTINGENT-FEE-TYPE

14    CASE OF THIS NATURE; SO I HAVE NO PROBLEM WITH THAT.

15          I HAD HAD A PROPOSED ORDER SUBMITTED FROM COUNSEL,

16    AND I DIDN'T KNOW IF YOU HAD AN ORIGINAL THAT YOU WANTED ME TO

17    SIGN, OR IF YOU WANTED ME TO SIGN THE ONE YOU SUBMITTED, I'LL

18    BE HAPPY TO SIGN IT.

19          MR. MELTZER:  YOUR HONOR, I HAVE A VERSION THAT HAS

20    BLANKS AND I HAVE A VERSION THAT HAS NUMBERS FILLED IN.

21          THE COURT:  IF YOU HAVE ONE THAT HAS THE NUMBERS THAT

22    YOU HAD REQUESTED FILLED IN, YOU MAY SUBMIT IT AND LET ME SIGN

23    IT BECAUSE THEN IT WILL BE A CLEANER COPY FOR THE CLERK'S

24    OFFICE.  I HAD TAKEN THE ONE YOU GAVE ME AND I WROTE IN, BUT MY

25    PENMANSHIP IS PROBABLY SUCH THAT THE CLERK WOULD PREFER TO HAVE


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

9

1     ONE THAT YOU'VE TYPED.

2           ALL RIGHT.  I HAVE SIGNED THE ORDER AND FINAL

3     JUDGMENT APPROVING THE SETTLEMENT.  GOOD LUCK TO YOU AS YOU GO

4     THROUGH THE ALLOCATION AND DISTRIBUTION PROCESS OF THIS.  I

5     KNOW THE MEMBERS OF THE CLASS WILL BE ANXIOUSLY WAITING TO HEAR

6     FROM YOU.

7           AND AGAIN, I THINK I EXPRESSED THIS TO YOU BEFORE,

8     BUT IF I DIDN'T, I WANT TO EXPRESS TO YOU AGAIN MY APPRECIATION

9     FOR COUNSEL WORKING TOGETHER SO WELL IN GETTING THE MATTER

Page 8

Woods Fairness Hearing.txt

10    RESOLVED.  I KNOW ALL OF YOU HAVE PUT A GREAT DEAL OF TIME INTO

11    THIS CASE AND CERTAINLY INTO THE NEGOTIATIONS FOR A SETTLEMENT

12    IN THE CASE.  I THINK THAT BOTH SIDES HAVE ABLY REPRESENTED

13    YOUR CLIENTS AND HAVE REACHED A VERY FAIR AND REASONABLE

14    COMPROMISE OF THE CLAIMS INVOLVED, AND I APPRECIATE YOUR

15    PROFESSIONALISM AND YOUR HARD WORK IN MAKING THAT HAPPEN.

16    THANK YOU FOR DOING THAT.  THAT MAKES MY JOB NOT ONLY EASIER,

17    BUT IT MAKES ME FEEL BETTER ABOUT IT BECAUSE I FEEL LIKE WE'VE

18    REACHED A RESULT THAT'S IN THE BEST INTEREST OF EVERYONE; AND I

19    APPRECIATE YOUR WORK IN MAKING THAT HAPPEN.

20              HAVE A GOOD DAY.  WE'RE ADJOURNED.

21              (PROCEEDINGS CONCLUDED.)

22

23

24

25


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


* * *

REPORTER'S CERTIFICATION

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


_____
SHARON D. UPCHURCH, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA


DATE: _____

Page 9

Woods Fairness Hearing.txt

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

# EXHIBIT



# J

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF KANSAS
 2                     TOPEKA, KANSAS        ORIGINAL

 3         _____
                                          )
 4         In Re:  WESTAR ENERGY, INC.    )   Case No.
           ERISA LITIGATION               )   03-4032-JAR
 5         _____ )

 6

               TRANSCRIPT OF FAIRNESS HEARING
 7

 8             PROCEEDINGS had before the Honorable
           Julie A. Robinson, United States District
 9         Court Judge, for the District of Kansas,
           Topeka, Kansas, on the 27th day of July,
10         2006.

11         APPEARANCES:

12         For the              Joseph H. Meltzer, Esq.
           Plaintiffs:          SCHIFFRIN & BARROWAY, LLP
                                 280 King of Prussia Road
13                               Radnor, PA  19087

14                               Ronald P. Pope, Esq.
                                 Ralston, Pope & Diehl, LLC
15                               2913 S.W. Maupin Lane
                                 Topeka, KS  66614
16
           For Defendant        Sharon Katz, Esq.
17         Westar Energy:       Antoinette Ellison, Esq.
                                 DAVIS POLK & WARDWELL
18                               450 Lexington Avenue
                                 New York, NY  10017
19
                                 Jason M. Hans, Esq.
20                               ROUSE HENDRICKS
                                   GERMAN MAY PC
21                               One Petticoat Lane Building
                                 1010 Walnut Street
22                               Suite 400
                                 Kansas City, MO  64106
23
           For Defendant        Stanley M. Burgess, Esq.
24         Koupal:              ARMSTRONG TEASDALE LLP - KC
                                 2345 Grand Boulevard
25                               Suite 2000
                                 Kansas City, MO  64108-2617
```

2

```
1
       For Defendant        Kathryn A. Lewis, Esq.
2      Terrill:             WARDEN TRIPLETT GRIER PA
                            9401 Indian Creek Parkway
3                           Suite 1100
                            Overland Park, KS  66210
4
       Court Reporter:      Sherry A. Berner, C.S.R.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SHERRY A. BERNER
Official Court Reporter

3

```
 1                      PROCEEDINGS
 2              THE COURT:  All right.  We will call
 3     In Re:  Westar Energy, Inc. ERISA Litigation,
 4     case number 03-4032.  Your appearances.
 5              We'll begin with you, Ms. Lewis,
 6     you're on the phone.
 7              MS. LEWIS:  Yes.  It's Kathryn Lewis
 8     for Defendant Richard Terrill.
 9              THE COURT:  All right.  And other
10     appearances, please.
11              MR. MELTZER:  Good afternoon, Your
12     Honor.  Joseph Meltzer of Schiffrin &
13     Barroway on behalf of the plaintiffs.  Joined
14     with me is cocounsel, Ron Pope.
15              MS. KATZ:  And Sharon Katz of Davis
16     Polk & Wardwell, and my colleague, Antoinette
17     Ellison, from Davis Polk & Wardwell, for
18     Westar Energy.  And Mr. Hans on--
19              MR. HANS:  Jason Hans on behalf of
20     Westar Energy.
21              THE COURT:  All right.
22              MR. BURGESS:  I'm Matthew Burgess
23     from Armstrong Teasdale on behalf of Carl
24     Koupal.
25              THE COURT:  All right.  And we're
```

4

```
1      here for the fairness hearing on the

2      settlement of the class action in this case.

3              On May 15th of this year I held a

4      preliminary settlement hearing and

5      preliminarily approved the settlement,

6      ordered that notice be given, as set forth in

7      the order preliminarily approving settlement.

8      And in preliminarily approving the settlement

9      I conditionally certified the class,

10     preliminarily approved the terms of the

11     settlement, and set this date for today's

12     hearing, and, of course, approved the class

13     notice of proposed settlement.

14              You all have now submitted a

15     proposed order and final judgment.  And in

16     addition we've received the motion of the

17     plaintiffs for final approval; a memorandum

18     in support of class counsel's motion for

19     award of attorneys' fees, expenses, and case

20     contribution compensation as well; a

21     declaration of Mr. Meltzer in support of the

22     motions for settlement and awarded fees,

23     compensation, and reimbursement of expenses;

24     a declaration of Mr. Pope concerning that as

25     well.
```

SHERRY A. BERNER
Official Court Reporter

5

1                All right.  Mr. Meltzer or Ms. Katz,

2       who is going to proceed?

3                MR. MELTZER:  I will, Your Honor.

4                THE COURT:  All right, go ahead.

5                MR. MELTZER:  Thank you.  Your

6       Honor, we are pleased to be here today.  And

7       as you stated, we're here to present a

8       settlement of all claims in the Westar ERISA

9       litigation.  As Your Honor has alluded to, a

10      lot of papers have been filed in our

11      presentation so I won't cover everything in

12      those papers or it would drag on far too

13      long; but I think I'll hit the relevant

14      points.

15               As I stated, we have a settlement of

16      all claims in the Westar ERISA case.  It

17      was-- the settlement was the product of some

18      rather strenuous and extensive negotiations

19      between the parties.  We're proud to present

20      the settlement.  We think in light of the

21      litigation risk and the damage analogies in

22      this case that it's an excellent result for

23      the ERISA class.

24               The settlement calls for a payment

25      of 9.25 million that will be paid by the

6

```
1     defendants into the Westar Energy 401(k)
2     savings plan.  That money will then be
3     distributed to class members and plan
4     participants in accordance with the plan of
5     obligation that we've submitted in
6     conjunction with the settlement.
7               Two points I would want to make
8     quickly.  First, the settlement has been
9     reviewed by an independent fiduciary.  The
10    independent fiduciary was retained by Westar
11    in its corporate capacity and as a fiduciary
12    of the plan.  The independent fiduciary in
13    this case is Independent Fiduciary Services,
14    Incorporated.  Essentially what they do is
15    they come in to look and see that the
16    settlement meets the DOL class exemption, and
17    also that it's not a prohibited transaction
18    under Section 406 of ERISA.  Essentially,
19    they need to make a determination that the
20    release given in consideration for the value
21    of the settlement is fair and that the
22    fiduciaries were not engaged in self-dealing.
23               They have authorized the settlement.
24    Your Honor has, obviously, the ultimate
25    discretion to approve.  But in a case such as
```

7

```
1         this it's usually a good sign when the

2         independent fiduciary gives its blessing to

3         the settlement.

4              The other point I would make is that

5         there have been no objections to either the

6         motion for approval or for the application of

7         fees.  That's especially telling in this case

8         because we have a -- as Mr. Pope would tell

9         you -- a very active, interested class.  They

10        were very involved, very engaged in this

11        entire process.  And they have unanimously

12        endorsed the settlement, and no one has

13        lodged any objections to any of the motions

14        pending today.

15             The two motions that are on calendar

16        for today, as Your Honor stated, are a motion

17        for final approval of settlement,

18        certification of the settlement class and

19        approval of the plan of allocation; and a

20        second motion for an award of attorneys'

21        fees, reimbursement of expenses and case

22        contribution compensation.  And, Your Honor,

23        with your permission, I can address the

24        settlement first.

25             THE COURT:  Go ahead.
```

8

```
1              MR. MELTZER:  The-- Your Honor,
2      would it be helpful if I gave a background of
3      the claims and the history of the litigation?
4      That's set forth at length in the papers, but
5      I would be happy to do it for the record.
6              THE COURT:  No.  I think you can
7      summarize that.
8              MR. MELTZER:  Okay.  Your Honor,
9      just briefly, the first case in the Westar
10     ERISA litigation was filed in March of 2003.
11     The central claim is that the plan
12     fiduciaries breached their duties under ERISA
13     by allowing investments in the company stock
14     at a time when they knew or should have known
15     that those investments were imprudent.
16              There were many cases that were
17     filed after the Toledo case, the first case
18     filed in March.  There were several cases
19     filed afterwards.
20              Your Honor consolidated those cases
21     in September of 2003.  We filed a
22     consolidated pleading -- which is the
23     operative complaint for today -- in October
24     of 2003, and that touched off a flurry of
25     briefings, several motions to dismiss,
```

9

1    consolidated response, numerous replies.

2         Your Honor, we started informal

3    settlement negotiations in the summer of

4    2004.  We continued those through the fall to

5    essentially pick a mediator.  Our first

6    mediation -- there wound up being four total

7    -- was in December of 2004 with Gary McGowan,

8    who presided over each and every mediation in

9    this case.

10         Unable to resolve the case, we went

11    back into litigation posture in 2005.  We

12    essentially engaged in a formal

13    discovery protocol at that point that was

14    presided over by Magistrate Judge O'Hara.

15    The defendants produced a large volume of

16    documents.  We prepared, we analyzed, and

17    coded some of those documents.  We set up an

18    electronic database for further analysis.

19         We also continued on a settlement

20    track, fortunately, as we were going through

21    formal discovery.  We had another mediation

22    -- excuse me -- in the spring of 2005 that

23    was, obviously, unsuccessful.  We pressed

24    forward with a lot of discovery in the case.

25         We had yet another mediation in

10

```
1    October of 2005.  And while we weren't able

2    to resolve the case at that time, it did

3    break some of the log jam, frankly.  There

4    was a fair amount of progress in October of

5    2005.  That may partly be the result of Your

6    Honor's ruling in September of 2005 on the

7    motions to dismiss.  Gave people a better

8    sense of what the claims were going to be in

9    this litigation.

10        We scheduled a final mediation for

11    January 31st of this year.  We were able to

12    reach an agreement at that time.  We signed

13    the term sheet on that day and began the

14    settlement process which leads us to today's

15    hearing.

16        In terms of the approval process,

17    the Tenth Circuit has established a

18    four-factor test to determine whether the

19    settlement is fair, reasonable, and adequate.

20    The test is set forth in the Tenth Circuit

21    case Jones v. Nuclear Pharmacy.

22        I'll go through them briefly.  The

23    first factor is whether the proposed

24    settlement was fairly and honestly

25    negotiated.  Your Honor, as I just explained,
```

```
 1        there were multiple mediations.  There were

 2        formal negotiations with an experienced

 3        mediator.  There were informal negotiations.

 4        The negotiation process in this case was

 5        arms-length, to say the least, and was

 6        strenuous and was fair and honest.

 7             The second factor is whether serious

 8        questions of law and facts exist, placing the

 9        ultimate outcome of the litigation in doubt.

10        Your Honor, as a lot of courts have noted,

11        these are difficult cases.  ERISA itself is a

12        very difficult statute.  There are complex

13        questions.  And when you factor in the class

14        certification aspects of this case, you find

15        a way to make an ERISA case even more

16        complicated.  So I think that factor also

17        militates in favor of approval.

18             The third factor is whether the

19        value of an immediate recovery outweighs the

20        mere possibility of future relief after

21        protracted and expensive litigation.  Your

22        Honor, in this particular case, given what

23        our prospects were for success, even if we

24        overcame every legal hurdle by very capable

25        opposing counsel, I'm not sure that we would
```

12

```
 1      have done any better; and we may have wound

 2      up getting a little bit less for the class

 3      settlement.  This factor is particularly in

 4      favor of approval here because we were able

 5      to get a recovery which may well exceed what

 6      we would have gotten even if we would have

 7      won through judgment.

 8              The fourth factor is the judgement

 9      of the parties that the settlement is fair

10      and reasonable.  I think everyone here today

11      will essentially endorse the settlement as

12      fair and reasonable.  I know I do.  I'm

13      fairly confident that my colleagues on the

14      defense side will as well.  And I think those

15      four factors are what the Tenth Circuit views

16      in terms of assessing whether a settlement

17      should be approved.  I think they're all met

18      here.

19              The only other point that I would

20      make with respect to the settlement, Your

21      Honor, again, is that there have been no

22      objections.  So the reaction of the class has

23      been overwhelmingly and unanimously, frankly,

24      in support of approval.

25              The other aspect of the settlement
```

13

```
 1        approval is for certification of the

 2        settlement class.  We think that Your Honor

 3        mentioned that you preliminarily certified

 4        the settlement class.  We think that the

 5        class certification in this case is very

 6        appropriate.  A 23(b)(1) class should be

 7        certified.  The class that we're seeking to

 8        certify for settlement purposes is a

 9        participant or beneficiary in the Westar

10        Energy employees' 401(k) savings plan from

11        July 1st, '98, through January 1st, 2003,

12        whose account included investments in Westar

13        stock.

14               Your Honor, as our papers explain in

15        some length, I think all the factors of 23(a)

16        are met, as well as the factors of 23(b)(1)

17        have also been satisfied.  There have been a

18        number of these cases both in a settlement

19        context and in a litigation context, this

20        ERISA employer stock type of case.  I believe

21        they have all been certified under 23(b)(1)

22        as a non opt-out class.  And we think that's

23        appropriate here.

24               Your Honor, I don't-- I don't have

25        anything more on the settlement itself unless
```

14

```
 1          Your Honor has any questions.
 2                    THE COURT:  I don't believe so.
 3                    Would anyone else like to weigh in
 4          on this matter?
 5                    MS. KATZ:  If I might just for a
 6          second, Your Honor, just to say on behalf of
 7          Westar that we are very pleased to be here at
 8          what we hope is now the conclusion of the
 9          trilogy of civil cases that had originally
10          been presented to Your Honor, and we are very
11          pleased with the settlement.  We do believe
12          that it is fair, reasonable, and adequate.
13                    The settlement negotiations were
14          very, very hard-fought.  This was a very,
15          very difficult case for us to resolve.  But
16          we are very pleased with the results, and we
17          think that they will be of great benefit to
18          the members of the class, and we just urge
19          that Your Honor approve the settlement as
20          described by Mr. Meltzer and the
21          certification of the class.  Thank you.
22                    THE COURT:  All right.  Thank you.
23                    Anyone else?
24                    All right.  I'll begin with the
25          matter of the certification of the class.
```

15

```
1        And, yes, there have been no objections by
2        any single class member to the certification
3        of the class, to the settlement, or to the
4        related matters concerning allowance of fees
5        and expenses and compensation.  I did
6        conditionally certify the class at the
7        preliminary hearing.  I'll now reiterate my
8        findings that class certification is proper
9        for the class, as defined in the preliminary
10       order.
11              The requirements of Rule 23(a) are
12       met.  The numerosity requirement is met.
13       This class consists of several thousand
14       potential class members.  Joinder is not
15       practicable.
16              The requirement of commonality is
17       met.  There are common issues of fact and
18       law, including whether the defendants
19       breached fiduciary duties owed to the plan
20       and their participants in allowing the
21       maintenance of existing, and the addition of
22       new, investments in the company stock during
23       the proposed class period; issues concerning
24       whether the defendants knew or should have
25       known of problems besieging the company that
```

16

```
 1        negatively affected the prudence of Westar

 2        stock as an investment of the plan during the

 3        class period.

 4              Other common issues:  Whether

 5        defendants were fiduciaries of the plan

 6        and/or the participants; whether defendants

 7        breached their fiduciary duties, if they were

 8        fiduciaries; whether the plans and the

 9        participants were injured by such breaches;

10        and whether the class is entitled to damages

11        and injunctive relief.

12              The requirement of typicality is met

13        in that the claims of the class

14        representatives are typical of the claims of

15        the class as a whole.  The plaintiffs in this

16        case and the proposed class are all employees

17        of Westar, a participant of the plan during

18        the class period, and each had part of his or

19        her individual plan investment portfolio

20        invested in Westar stock during the class

21        period.

22              All of them-- all of the plaintiffs

23        sustained injury during the class period; and

24        all of the plaintiffs bring their claims

25        pursuant to ERISA Sections 409 and 502(a)(2)
```

17

1    for plan-wide relief, so any relief obtained

2    would inure to the plan as a whole and,

3    derivatively, to its participants during the

4    class period.

5         And the requirement for adequacy of

6    representation is also met.  The named

7    plaintiffs and their counsel are adequate

8    representatives of the interests of the class

9    as a whole.  I find that plaintiffs have no

10   interest antagonistic to the interests of the

11   absent class members.

12        Plaintiffs have retained attorneys

13   that are highly qualified and experienced in

14   this type of litigation, ERISA breach of

15   fiduciary class actions, specifically.  And

16   based on all of the pleadings in the entire

17   record, I find that they have diligently

18   represented the class before the Court as

19   well as in negotiations with defendants'

20   counsel that resulted in this settlement.  So

21   all of the requirements of 23(a) are met.

22        Also, the requirements of 23(b)(1)

23   are met in that the only remedy available to

24   the plan participants is in fact plan-wide

25   relief, including the restoration of losses

18

```
 1          to the plan.  Actions such as this are by law
 2          representative actions which, if successful,
 3          will cause defendants to be obligated to
 4          provide relief applicable to all participants
 5          in the plan.
 6                   And given the unique group based
 7          relief offered under ERISA for violations of
 8          the fiduciary duties owed to participants in
 9          covered benefit plans, these actions are
10          appropriate for class treatment under
11          Rule 23(b)(1) to avoid the risk of
12          inconsistent outcomes and inconsistent
13          standards of conduct for defendants; as well
14          as, the prosecution of separate individual
15          actions would, as a practical matter, be
16          dispositive of the interests of other class
17          members who were not parties to the action.
18                   Thus, I will certify the proposed
19          class pursuant to Rule 23 for settlement
20          purposes.  The class being defined as set out
21          in the pleadings.  In short:  Any person who
22          was a participant in or beneficiary of the
23          Westar 401(k) employees' savings plan from
24          July 1, 1998, through January 1, 2003, and
25          whose account in the plan included
```

19

```
 1    investments in the Westar Energy, Inc.

 2    company stock fund.

 3          Excluded from the settlement class

 4    are all defendants named in the action, their

 5    subsidiaries and affiliates, members of their

 6    immediate family, the legal representatives,

 7    heirs, successors or assigns of any excluded

 8    person, as well as any entity in which the

 9    company has or has had a controlling

10    interest.

11          All right.  And then turning to the

12    proposed settlement itself, first of all,

13    I'll find that notice to prospective class

14    members was adequate.  I approved the

15    proposed class notice of proposed settlement

16    at the last hearing.

17          The administrator filed an affidavit

18    on July 17, 2006, establishing that notice

19    was mailed to the class, as ordered, and it

20    was also published in accordance with the

21    terms of the preliminary order.  Notice was

22    sent to 3,871 current and former participants

23    of the plan on May 26, 2006, and the approved

24    publication notice was published nationally

25    in USA Today and locally in The Kansas City
```

20

1    *Star*, *The Wichita Eagle*, and *The Topeka*

2    *Capital-Journal*.  Also, plaintiffs created a

3    dedicated settlement website, which is

4    identified in the pleadings.

5            The form and method of notice was

6    agreed to by the parties; it was approved by

7    the Court; it was effectuated by the

8    plaintiffs, consistent with the order; and it

9    satisfies all due process considerations and

10   meets the requirements of 23(e)(1)(B).

11           All right.  Turning to final

12   approval of the settlement, as Mr. Meltzer

13   has indicated, under the Tenth Circuit

14   prevailing case law there are four factors

15   the Court must address and consider when

16   determining whether the proposed settlement

17   is fair, reasonable, and adequate.

18           The first such factor is that the

19   settlement was fairly and honestly

20   negotiated.  As the pleadings set out in

21   detail, and as Mr. Meltzer summarized, this

22   settlement is the product of lengthy

23   litigation as well as mediation and

24   negotiation:  18 months or more of formal and

25   informal negotiations; multiple mediation

21

1    sessions with an experienced mediator, who

2    was also the mediator in the Westar

3    securities litigation; voluminous discovery;

4    as well as intense advocacy and litigation

5    through this stage of motions to dismiss and

6    responses to that.

7         In addition, the Court finds that

8    class counsel had an in-depth understanding

9    of the merits of plaintiffs' claims and the

10   defenses available to defendants.  Plaintiffs

11   counsel had the same.  The Court-- in

12   addition, of course, there was this oversight

13   or independent evaluation by a third party

14   experienced in this type of litigation.  So

15   based on all of these things, the Court

16   concludes that the settlement was fairly and

17   honestly negotiated.

18        The second factor is that there be

19   existence of serious questions of law and

20   fact.  This is obviously evident to the Court

21   based on having reviewed and considered and

22   ruling on a number of issues that arose in

23   the context of the motions to dismiss.

24        In addition, more generally, as

25   plaintiffs point out, ERISA is a developing

22

1    and esoteric area of the law.  It does

2    present many difficult issues of law and fact

3    made more complex, of course, in the context

4    of a class action such as this one.  Although

5    plaintiffs survived defendants' motions to

6    dismiss, by and large, defendants would

7    likely have raised serious defenses at the

8    summary judgment phase as well as at trial,

9    if the case proceeded that far.  Many of

10   these issues were legally and factually

11   complex issues that militate in favor of

12   settlement.

13          Also, of course, this case had yet

14   to be certified as a class action, and

15   plaintiffs and defendants, obviously,

16   recognize that courts have not

17   uniformly certified a proposed class to all

18   claims in ERISA cases of this nature.

19          Also, the risks of establishing

20   damages are always complex and generally

21   recognized in the context of these types of

22   actions.  Very complex and require the

23   completion of full discovery and evaluation

24   of the relevant time period by the Court.

25          And there were questions as to

SHERRY A. BERNER
Official Court Reporter

23

```
 1        whether the losses alleged by plaintiffs

 2        could be compensated under ERISA.  There were

 3        questions as to the proper measure of

 4        damages.  All of which, again, militated in

 5        favor of settlement.

 6             Had this case gone to trial, likely

 7        there would have been a battle of experts.

 8        Would be difficult for the parties to

 9        anticipate the outcome or the decision that

10        would be made after hearing expert testimony

11        from both sides.

12             A third factor is the value of

13        immediate recovery.  The Tenth Circuit has

14        held that the value of immediate recovery is

15        simply the monetary worth of the settlement.

16        This settlement is for $9.25 million.  And

17        the Court agrees that this amount may well

18        have been in excess of what the class may

19        have obtained even through trial.  This

20        recovery is in addition to the payment the

21        plan will receive from the recovery garnered

22        in the securities litigation and

23        substantially increases the recovery for the

24        individual class members.

25             It is-- it is clear that continued
```

24

1    litigation would have been protracted,

2    complex, and expensive; requiring more

3    discovery; requiring the battle over class

4    certification; requiring hiring and vetting

5    and discovery of experts; and ultimately, of

6    course, the expenses and time associated if

7    this case went all the way to trial.

8            And then the final factor the Court

9    must look at is the judgment of the parties

10    that the settlement is fair and reasonable.

11    And I've heard from both parties that after

12    -- as Ms. Katz said -- protracted mediation

13    and negotiation and intense negotiation

14    advocacy, they are satisfied that the

15    settlement is fair and reasonable to all.

16            Both parties are represented by

17    nationally-known counsel with extensive

18    experience in ERISA class actions.  This has

19    been vetted by a third party.  It's been

20    mediated.  The Court is convinced that the

21    settlement is fair and reasonable.  Thus, the

22    settlement will be approved at this hearing

23    on final approval of settlement.

24            And now we'll turn to the motion for

25    award of fees, expenses, and contribution of

25

```
 1        compensation to class members.
 2               MR. MELTZER:  Thank you, Your Honor.
 3        Your Honor, we put in an application
 4        for award of attorneys' fees, reimbursement
 5        of expenses and case contribution
 6        compensation.  Our request is for 30 percent
 7        of the settlement fund.  That amounts to
 8        2.775 million, plus reimbursement of expenses
 9        of $76,715.59, and a $1,000 award for each
10        named plaintiff for their contribution to
11        this case.
12               With respect to the request for
13        fees, there is a-- again, there's a test that
14        the Tenth Circuit employs to determine
15        whether-- whether the request is reasonable.
16        That-- that test is set out, among others, in
17        Brown v. Phillips Petroleum.  This test is
18        quite a bit longer than the test relating to
19        approval of the settlement so I'll try and
20        run through the factors as quickly as I can.
21        There are, I believe, 10 or so that apply
22        here.
23               First is the time and labor
24        required.  As the application states, Your
25        Honor, the class counsel has spent over 4,000
```

26

1    hours in prosecuting this case.  It was a

2    case that was heavily litigated both on the

3    litigation side as well as on the mediation

4    settlement front.

5            The lodestar in the case is a little

6    bit over $1.4 million.  That translates into

7    a multiplier, a lodestar multiplier, of 1.88.

8    I would submit that that is a very modest

9    multiplier.  In comparison, Your Honor, I

10   believe in the Westar securities case the

11   30 percent awarded by Your Honor, I believe

12   that amounted to something like a 3.9

13   multiplier.  So here it is far, far less.

14           The second factor is the novelty and

15   difficulty of the questions presented by the

16   case.  As we've stated in this hearing

17   before, ERISA is a difficult case-- ERISA is

18   a difficult statute to prosecute a case.

19   There are a lot of trapdoors in ERISA.  The

20   legal questions that get presented in a case

21   like this are complex.  They are novel and

22   they are developing.  And unless you practice

23   in it, it is a very difficult area of the law

24   to navigate correctly.

25           The third factor is somewhat related

27

1    to that -- the skill requisite to perform the

2    legal service properly.  Again, ERISA cases

3    are not easy.  When you build in a class

4    action component to them, they go from

5    complicated to extremely complicated.

6              It is difficult to present the case

7    properly both in pleadings as well as in what

8    were essentially summary trials during all of

9    these mediations.  Getting a damage analysis

10   that's credible and gives you a, you know,

11   hope for recovery is not easy.  Navigating

12   the statute and the legal issues that are

13   compounded by difficult issues of fact,

14   again, is not an easy proposition.

15             The fourth factor, the preclusion of

16   other employment by the attorneys due to

17   acceptance of the case.  As I stated

18   previously, we dedicated 4,000-- over 4,000

19   hours.  That obviously has an opportunity

20   cost that prevents us or precludes us from

21   working on other matters during the two-plus

22   years or almost three years of litigation

23   that we dedicated here.  I retract that.

24   Three-plus years of litigation here.

25             The-- whether the fee is fixed or

28

1     contingent is another factor.  Here, there

2     was no guarantee that we would receive

3     payment for anything.  I believe that is

4     particularly telling here because with Your

5     Honor's ruling on the motion to dismiss and

6     in a developing area of the law, there's no

7     certainty that you're going to overcome the

8     initial Rule 12 challenge.  Did not come

9     until September of 2005, several years into

10    the litigation, after we had expended a lot

11    of time and a lot of money in prosecuting

12    these claims.  So there was a great deal of

13    uncertainty, and there was certainly a fairly

14    large risk that we were going to get no

15    payment whatsoever.

16              The next factor is the amount

17    involved and the results obtained.  Your

18    Honor, it's a settlement for $9.25 million.

19    I believe it does substantially increase

20    recovery to the class members.  It is in

21    addition to the recovery that the plan will

22    make as part of the Westar securities case.

23    I believe it is an excellent result.  And I

24    believe that factor also supports the

25    requested fee.

29

```
 1              The next factor is the experience,
 2       reputation, and ability of the attorneys.  My
 3       firm and-- my firm is an experienced--
 4       Schiffrin & Barroway is an experienced class
 5       action firm.  Mr. Pope and his firm, Ralston,
 6       Pope & Diehl, are very experienced
 7       litigators, especially in this particular
 8       court.  We-- I'll leave the rest of it to the
 9       papers so that I don't stand up and sort of
10       trumpet my success and abilities.
11              The next factor is the
12       undesirability of the case.  Your Honor, it's
13       not a difficult leap to say that an ERISA
14       class action to many practitioners would be
15       viewed as undesirable.  Sometimes my wife
16       feels the same way.  The desirability is--
17       frankly, when cases are easy and not so
18       complex, they become a lot easier to jump
19       into and dedicate your time and resources to.
20       But where they are difficult and complex, as
21       here, it becomes a little more of a-- a
22       little more of a challenge.  And, frankly, I
23       think that factor supports the requested fee
24       as well.
25              Awards in similar cases.  When you
```

30

1    look at what the multiplier is in this case,

2    I think it compares extremely favorably to

3    both awards in the Tenth Circuit in class

4    action cases -- I think that's a very modest

5    multiplier, the 1.88 -- as well as cases

6    across the country.  I think you'll see

7    multipliers that are closer to three, four,

8    and five for this type of case.  So I think

9    the requested fee compares very favorably.

10           The final point, Your Honor, is we

11   have no objections to the award of the fees

12   to the class, as unanimously endorsed in our

13   application.

14           The second component is for

15   expenses.  We have expended $76,715.59.  We

16   submitted an application to detail the

17   categories of expense.  A lot of that is

18   discovery related.  Much of-- some of that is

19   travel.  It's travel related.  There are also

20   copying expenses and the like.  I think the

21   expenses, given the length of the case and

22   the complexity of the case, were minimal,

23   fortunately, because we were able to resolve

24   the case before we got further into expert

25   discovery.  So resolving the case before we

31

1    went into really a deposition protocol and

2    before we started submitting summary judgment

3    papers helped keep expenses to a relative

4    minimum.

5           The final component of the

6    application is for case contribution awards.

7    We've asked for $1,000 apiece.  That is a low

8    amount relative to what awards have been in

9    other cases.  But essentially it recognizes

10   that there are quite a few named plaintiffs.

11   In fact, more in this case than in almost any

12   other that I've seen.  But the one thing I

13   will say for the named plaintiffs is they

14   were very active.  They played a big role.

15   They were a large part of us being able to

16   hold the line in settlement negotiations.  I

17   think they did a really excellent job and

18   served the rest of the class very well.

19           THE COURT:  All right.  Thank you.

20           MR. MELTZER:  If you have any

21   questions, I'll be happy to address them.

22           THE COURT:  I don't.

23           Anyone else?

24           All right.  The so-called Johnson

25   factors that have been-- come from a Fifth

32

```
1          Circuit case but have been adopted in the

2          Tenth Circuit are those as outlined by

3          Mr. Meltzer.  In the Tenth Circuit the

4          percentage-of-recovery method has been

5          endorsed as an appropriate method for

6          determining an award of attorneys' fees in

7          these types of cases and in other types of

8          cases as well.

9               Based on the entire record, and

10         particularly the parties' pleadings

11         concerning these fees and expenses, I find

12         that the fees requested are reasonable.  The

13         expenses are also reasonable and customary.

14         And the compensation requested for the

15         members, the named plaintiffs, is also

16         reasonable.

17              Many of these factors have already

18         been addressed in summarizing the propriety

19         of the settlement that was approved.  But

20         I'll note further that there was extensive

21         time and labor involved in this case.  Over

22         4,000 combined hours in prosecuting the case

23         that culminated in the settlement.

24              As already addressed, the questions

25         legally and factually were novel and
```

33

```
1        difficult and complex.

2               Class counsel is experienced,

3        nationally recognized in this field, and had

4        the requisite skill necessary to perform the

5        legal services required in cases as complex

6        as this.

7               Based on the number of hours spent

8        over the last three-plus years, it's clear

9        that other employment was precluded to a

10       large degree by the attorneys that

11       represented the class.

12              The 30 percent request is in keeping

13       with the range of reasonable fee awards or

14       fee awards that have been found reasonable in

15       the Tenth Circuit.  And the multiplication

16       factor as well.

17              The-- as I've already addressed, the

18       $9.25 million settlement is very favorable to

19       the class.  Given the complexity of the legal

20       and factual issues, the need for protracted

21       and intense advocacy, it's fair to say that

22       this case would have been viewed as

23       undesirable, perhaps, to many.  And that

24       factor needs to be taken into account.

25              The nature and length of the
```

34

```
1        professional relationship with the client is
2        evident, given the length of time that has
3        been spent to date on this case taking it
4        through settlement.
5                Again, the 33 percent-- or, rather,
6        the 30 percent requested is in line with the
7        range of awards in similar cases in this
8        circuit, including the range of awards given
9        by this particular Court.
10               As far as the expenses, we've
11       reviewed those.  They appear to be reasonable
12       and customary expenses associated with
13       discovery and litigation and mediation.
14               And finally, with respect to the
15       request for $1,000 each as a case
16       contribution award to each of the 27 named
17       plaintiffs, I'll find that that is also
18       reasonable and appropriate, given the
19       litigation support that they provided over
20       the last three-plus years to class counsel to
21       the benefit of all other members of the
22       class.
23               So the motion for award of
24       attorneys' fees, reimbursement of expenses
25       and case contribution compensation is
```

35

1    granted.

2              You all had, I think, presented a

3      proposed order.  I think my law clerk talked

4      to you about some language that needed to be

5      changed.  And as soon as you can get that-- I

6      suppose we could change that, if need be, and

7      we can get this order out right away.

8              I do commend all of you.  I know

9      that you-- I know this was a difficult case

10      for everyone involved.  And I had some sense

11      of that deciding the motion to dismiss, how

12      difficult many of these-- all of these issues

13      really were.  So I do appreciate the obvious,

14      you know, commitment you all made to securing

15      a fair and reasonable settlement that, you

16      know, benefitted the members of the class and

17      benefitted the company.  And I know it took a

18      lot of work and a lot of intense lawyering.

19      And you all, obviously, did a very excellent

20      job in all respects.  So I commend you.  And

21      it's nice to have lawyers such as yourselves

22      appear in this court.  I look forward to

23      seeing you again someday in another complex

24      class action, no doubt.

25              MR. MELTZER:  Thank you, Your Honor.

36

1          THE COURT:  All right.  We'll be in

2     recess.

3                    (THEREUPON, the hearing

4     concluded).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHERRY A. BERNER
Official Court Reporter

37

```
 1      UNITED STATES OF AMERICA   )
                                   )      ss:
 2      DISTRICT OF KANSAS         )

 3

 4              C E R T I F I C A T E

 5

 6          I, Sherry A. Berner, Certified Shorthand

 7      Reporter in and for the State of Kansas, do

 8      hereby certify that I was present at and

 9      reported in machine shorthand the proceedings

10      had the 27th day of July, 2006, in the

11      above-mentioned court; that the foregoing

12      transcript is a true, correct, and complete

13      transcript of the requested proceedings.

14          I further certify that I am not attorney

15      for, nor employed by, nor related to any of

16      the parties or attorneys in this action, nor

17      financially interested in the action.

18          IN WITNESS WHEREOF, I have hereunto set

19      my hand and official seal at Topeka, Kansas,

20      this  2ND  day of  AUGUST        , 2006.

21

22                      Sherry C. Berner

23                      Sherry A. Berner
                        Certified Shorthand Reporter

24

25
```

SHERRY A. BERNER
Official Court Reporter

# EXHIBIT

# K

Mirant Final Approval.txt

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


IN RE:  MIRANT CORP.          ) DOCKET NO. 1:03-CV-1027-RWS
ERISA, ET AL.                 )
      PLAINTIFFS              ) ATLANTA, GEORGIA
                              )
        V.                    ) NOVEMBER 16, 2006
                              )
MIRANT CORPORATION, ET AL     )
      DEFENDANTS.             )
                              )
                              )
                              )
                              )


TRANSCRIPT OF FINAL APPROVAL HEARING
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:              GERALD WELLS, ESQ.
                                DEREK W. LOESER, ESQ.
                                GARY GOTTO, ESQ.
                                JOSEPH H. MELTZER, ESQ.
                                JOSHUA A. MILLICAN, ESQ.


FOR THE DEFENDANTS:             HOWARD DOUGLAS HINSON, ESQ.
                                MICHAEL G. MONNOLLY, ESQ.



COURT REPORTER:                 SHARON D. UPCHURCH
                                2114 U. S. COURTHOUSE
                                ATLANTA, GEORGIA 30303-3361
                                (404) 215-1354


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

Mirant Final Approval.txt

2

```
 1                    P R O C E E D I N G S
 2              (NOVEMBER 16, 2006; IN OPEN COURT)
 3         THE COURT:  GOOD MORNING.  WE ARE HERE FOR PURPOSES
 4    OF A FINAL HEARING ON THE SETTLEMENT IN THIS MATTER.  AND I
 5    HAVE, OF COURSE, RECEIVED A MOTION AND OTHER DOCUMENTATION
 6    SUBMITTED BY COUNSEL; BUT I WILL HEAR FROM PLAINTIFF AT THIS
 7    TIME.  MR. WELLS, IF YOU WANT TO PROCEED ON BEHALF OF THE
 8    PLAINTIFF.
 9              MR. WELLS:  GOOD MORNING, YOUR HONOR.  WE ARE VERY
10    PLEASED TO BE HERE.  WE ARE HAPPY TO PRESENT TO THE COURT FOR
11    FINAL APPROVAL THIS SETTLEMENT WHICH RESOLVES ALL CLAIMS IN THE
12    MIRANT ERISA LITIGATION.  THE SETTLEMENT IS A PRODUCT OF
13    INTENSE NEGOTIATIONS BETWEEN THE PARTIES THAT INVOLVED AN
14    EXPERIENCED NEGOTIATOR AND WAS DONE OVER THE COURSE OF SEVERAL
15    MEDIATION SESSIONS AS WELL AS SUBSEQUENT TELEPHONE
16    CONVERSATIONS AND THE LIKE.
17              PLAINTIFFS BELIEVE THAT THIS SETTLEMENT IS EXCELLENT
18    BECAUSE IT RECOVERS A SUBSTANTIAL AMOUNT OF DAMAGES AND
19    PROVIDES A CASH SETTLEMENT IN THE AMOUNT OF $9.7 MILLION THAT
20    WILL BE DISTRIBUTED ON A PRO RATA SHARE TO THE PLAN
21    PARTICIPANTS; THAT IS, EACH PARTICIPANT WILL RECEIVE A PORTION
22    OF THE SETTLEMENT IN PROPORTION TO THE TOTAL LOSSES THAT THEY
23    SUSTAINED DUE TO THEIR HOLDINGS IN MIRANT STOCK AND THE MIRANT
24    401K PLANS.  THE SETTLEMENT ITSELF WAS REVIEWED EXTENSIVELY BY
25    AN INDEPENDENT FIDUCIARY, FIDUCIARY COUNSELORS, INC.  THAT
```

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

3

Mirant Final Approval.txt

1    REPORT WAS FINALIZED, AND WE SENT THAT TO YOUR HONOR FOR REVIEW

2    YESTERDAY.

3           BEFORE THE COURT IS APPROVAL OF THE SETTLEMENT ITSELF

4    AS WELL AS APPROVAL OF ATTORNEY'S FEES AND REIMBURSEMENT OF

5    EXPENSES AS WELL AS CASE CONTRIBUTION AWARDS TO THE NAMED

6    PLAINTIFFS.  IF I MAY PROCEED, YOUR HONOR, WE WOULD LIKE TO GO

7    DIRECTLY TO THE FAIRNESS OF THE SETTLEMENT.

8           THE COURT:  YES, SIR.

9           MR. WELLS:  THANK YOU.  WOULD YOUR HONOR LIKE A BRIEF

10   HISTORY OF THE LITIGATION ITSELF OR SHALL WE PROCEED?

11          THE COURT:  YOU MAY PROCEED TO THE FAIRNESS.

12          MR. WELLS:  UNDERSTOOD, YOUR HONOR.

13          THE SETTLEMENT FACTORS THAT ARE CONSIDERED, YOUR

14   HONOR, ARE THE BENNETT FACTORS THAT WERE ENUMERATED BY THE

15   ELEVENTH CIRCUIT.  AND THOSE SIX FACTORS IN ORDER ARE AN

16   ASSESSMENT OF THE LIKELIHOOD THAT PLAINTIFFS WOULD PREVAIL AT

17   TRIAL.  I SUBMITTED IN OUR PAPERS, YOUR HONOR, ALTHOUGH

18   PLAINTIFFS BELIEVE VERY STRONGLY IN THIS CASE AND IN THE MERITS

19   OF THIS CASE, PLAINTIFFS UNDERSTAND THAT NO PLAINTIFF HAS

20   RECOVERED WHEN A CASE HAS BEEN TAKEN THROUGH TRIAL.  THAT BEING

21   SAID, PLAINTIFFS DO BELIEVE STRONGLY IN THEIR CLAIMS AND THAT

22   THEY WOULD, IN FACT, BE ABLE TO PREVAIL.  HOWEVER, GIVEN THE

23   CASE LAW OUT THERE AS WELL AS THE SETTLEMENT AMOUNT ITSELF, WE

24   BELIEVE THAT THIS FACTOR MILITATES IN APPROVING THE SETTLEMENT.

25          THE SECOND FACTOR IS THE RANGE OF POSSIBLE RECOVERY.

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

0

4

1    HERE, YOUR HONOR, I SUBMITTED IN OUR PAPERS DAMAGES RANGE FROM

2    THE MAXIMUM POSSIBLE RECOVERY OF APPROXIMATELY $30 MILLION

Page 3

Mirant Final Approval.txt

3   TO -- AND THAT IS A BREACH DATE AT THE INCEPTION OF THE CLASS
4   PERIOD -- TO A DAMAGE PERIOD OF ABOUT $11 MILLION IF YOUR HONOR
5   WOULD FIND THAT THE BREACH DATE, THAT IS, WHEN MIRANT STOCK WAS
6   IMPRUDENT, WAS NOT UNTIL SEPTEMBER OF 2002; AND DAMAGES THEN
7   RANGE IN THE NEIGHBORHOOD OF $11 MILLION.  HOWEVER, IF THE
8   BREACH DATE WAS TAKEN EVEN FURTHER OUT, FOR INSTANCE, INTO MAY
9   OF '03 WHEN THE GOING CONCERN ISSUE REGARDING MIRANT WAS
10  ISSUED, DAMAGES WOULD BE SUBSTANTIALLY LOWER.
11       THAT BEING SAID, YOUR HONOR, PLAINTIFFS HAVE
12  RECOVERED ANYWHERE FROM THE MAXIMUM OF 30 PERCENT OF THE
13  RECOVERY TO UPWARDS OF 88 PERCENT OF THE RECOVERY.  THAT IN
14  ITSELF, WE THINK, SPEAKS HIGHLY OF THE SETTLEMENT AND, AGAIN,
15  FACTORS STRONGLY IN APPROVING THE SETTLEMENT.
16       THE THIRD FACTOR, YOUR HONOR, IS CONSIDERATION
17  PROVIDED TO CLASS MEMBERS PURSUANT TO THE SETTLEMENT AS
18  COMPARED TO THE RANGE OF POSSIBLE RECOVERY.  AGAIN, YOUR HONOR,
19  THE CONSIDERATION HERE IS BETWEEN 30 PERCENT AND 88 PERCENT OF
20  THE TOTAL DAMAGES.  WE, AGAIN, BELIEVE THAT THIS FACTORS
21  STRONGLY IN APPROVING THE SETTLEMENT.
22       THE FOURTH IS THE COMPLEXITY, EXPENSE AND POSSIBLE
23  DURATION OF THE LITIGATION HAD IT PROCEEDED.  AS YOUR HONOR IS
24  WELL AWARE, THE CASE WAS ADMINISTRATIVELY CLOSED AFTER BRIEFING
25  ON DEFENDANT'S MOTIONS TO DISMISS AS WELL AS MOTION ON JUDGMENT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

5

1   OF THE PLEADINGS WAS COMPLETED.  THAT BEING SAID, IF THIS
2   LITIGATION WERE TO CONTINUE, THOSE MOTIONS WOULD HAVE TO BE
3   DECIDED; DISCOVERY, WHICH WOULD BE INTENSE BECAUSE THE

Mirant Final Approval.txt

4   DISCOVERY WOULD FACTOR IN TWO SUCH THINGS AS WHETHER OR NOT

5   MIRANT WAS A PRUDENT INVESTMENT FOR PLANS FROM THE INCEPTION,

6   WHETHER OR NOT THE DEFENDANTS THAT WE ALLEGED IN OUR COMPLAINT

7   WERE, IN FACT, FIDUCIARIES OF THE PLAN AND EXERCISED CONTROL

8   AND WERE ABLE TO, IN FACT, DIVEST THE PLANS OF MIRANT STOCK;

9   THROUGH SUMMARY JUDGMENT WHICH, AGAIN, WOULD BE VERY FACT

10  INTENSIVE, AND AS WE HAVE NOTED, THERE ARE A NUMBER OF

11  DECISIONS THAT GO BOTH IN FAVOR OF PLAINTIFFS AS WELL AS

12  AGAINST PLAINTIFFS IN THIS CASE; AND THROUGH TRIAL.

13          CONSERVATIVELY, YOUR HONOR, WE WOULD ESTIMATE THAT

14  TRIAL THROUGH LITIGATION WOULD ESTIMATE BETWEEN THREE OR FOUR

15  YEARS.  AGAIN, THIS EARLY SETTLEMENT IN THIS STAGE OF

16  LITIGATION FACTORS IN FAVOR OF APPROVING THE SETTLEMENT.

17          THEN THE FIFTH FACTOR, YOUR HONOR, IS THE NATURE AND

18  EXTENT OF ANY OBJECTIONS TO THE SETTLEMENT.  AS WE SUBMITTED,

19  THERE IS ONLY ONE OBJECTION SUBMITTED BY ARTHUR LANKFORD TO THE

20  SETTLEMENT ITSELF.  NOTABLY, YOUR HONOR, THE CLASS MEMBER DOES

21  NOT OPPOSE APPROVAL OF THE ATTORNEY'S FEES WHICH THE ORIGINAL

22  REQUESTED WERE 30 PERCENT, NOR DOES HE OPPOSE REIMBURSEMENT OF

23  EXPENSES OR THE CASE CONTRIBUTION AWARDS TO NAMED PLAINTIFFS.

24  RATHER, IN HIS LETTER HE SAID THAT THE SETTLEMENT SHOULD BE

25  HIGHER BECAUSE CERTAIN DEFENDANTS RECEIVED GOLDEN PARACHUTES.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER



6


1           RESPECTFULLY, YOUR HONOR, ALL PLAINTIFFS' COUNSEL

2   AGREE THAT THE SETTLEMENT SHOULD BE HIGHER.  HOWEVER, GIVEN THE

3   OTHER FACTORS HERE AS WELL AS THE CASE LAW AS IT CURRENTLY

4   STANDS, THIS IS A SETTLEMENT THAT WE SIMPLY COULD NOT TURN OUR

5   BACK ON.  MOREOVER, OVER 3500 NOTICES WERE SENT OUT TO CLASS

Mirant Final Approval.txt

6    MEMBERS, AND ONLY ONE PERSON FOUND OBJECTION.  WE THINK THIS

7    COUNSELS IN FAVOR OF APPROVING THE SETTLEMENT.

8         FINALLY, YOUR HONOR, THE STATE OF PROCEEDINGS IN

9    WHICH THE SETTLEMENT WAS REACHED.  AS I STATED EARLIER,

10   BRIEFING ON THE MOTION TO DISMISS WAS COMPLETED.  HOWEVER, THIS

11   WOULD STILL BE A VERY LONG ROW TO HOE, AS WELL AS THE FACT THAT

12   WE CLEARLY UNDERSTOOD THE POSITIONS OF THE RESPECTIVE PARTIES

13   THROUGH THE MEDIATION EFFORTS.  MEDIATION SUBMISSIONS WERE

14   SUBMITTED TO THE MEDIATOR, AND MEDIATION SESSIONS TOOK OVER

15   THREE DAYS IN TWO SEPARATE SESSIONS.

16        COMBINED, YOUR HONOR, WE THINK EACH OF THE SIX

17   FACTORS ENUMERATED IN BENNETT SEPARATELY, AS WELL AS COMBINED,

18   FACTOR IN APPROVING THIS SETTLEMENT; AND WE SUBMIT THIS

19   SETTLEMENT FOR APPROVAL.

20        THE COURT:  I WILL HEAR FROM YOU, AS WELL, ON THE

21   REQUEST FOR ATTORNEY'S FEES AND EXPENSES.

22        MR. WELLS:  BEFORE WE TURN TO THAT, YOUR HONOR, THERE

23   IS THE ISSUE OF CERTIFICATION OF CLASS; AND WE WOULD SUBMIT TO

24   THE COURT AS WE SUBMITTED IN THE PAPERS THAT SETTLEMENT HERE IN

25   CERTIFICATION OF A (B)(1) CLASS IS APPROPRIATE GIVEN THE NATURE

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

7

1    OF THE PLAN-WIDE BREACH AND THE HARM SUBMITTED.

2         WITH RESPECT TO THE REQUEST FOR ATTORNEY'S FEES, WE

3    WOULD PUT FORTH THAT EACH OF THE 12 FACTORS, JOHNSON FACTORS,

4    FAVOR IN APPROVING THIS SETTLEMENT.  THE FIRST FACTOR IS THE

5    TIME AND LABOR REQUIRED.  AS PUT FORTH IN OUR PAPERS, OVER 2700

6    HOURS OF BOTH ATTORNEY AND PROFESSIONAL TIME WAS COMMITTED TO

Mirant Final Approval.txt

 7   THIS CASE.  THOSE ARE SUBSTANTIAL RESOURCES WITH A LODESTAR

 8   THAT AT THIS POINT IS JUST OVER 1.17 MILLION.

 9          THE SECOND FACTOR, YOUR HONOR, IS THE NOVELTY AND

10   DIFFICULTY OF THE QUESTIONS PRESENTED.  AS STATED BY MANY

11   COURTS, ERISA CASES IN PARTICULAR AND CLASS ACTIONS IN GENERAL

12   ARE COMPLEX CASES THAT REQUIRE SPECIALIZED EXPERTISE AS WELL AS

13   A GREAT DEAL OF, FOR LACK OF A BETTER TERM, HEAVY LIFTING ON

14   BEHALF OF PLAINTIFF'S COUNSEL.  WE SUBMIT THAT WE'VE DONE THAT

15   HERE AND THAT THE SETTLEMENT EXEMPLIFIES THAT.

16          THIRD IS THE SKILL REQUISITE TO PERFORM THE LEGAL

17   SERVICES.  HERE, YOUR HONOR, CLASS COUNSEL, AS STATED BY

18   INDEPENDENT FIDUCIARY, ARE SOME OF THE -- ARE TWO OF THE FIRMS

19   THAT ARE AT THE FOREFRONT OF THIS TYPE OF LITIGATION AND HAVE

20   PUT FORTH TREMENDOUS EFFORT; AND IT IS THROUGH OUR EFFORT THAT

21   THE SETTLEMENT WAS ABLE TO BE ACHIEVED.

22          FOURTH, YOUR HONOR, IS THE PRECLUSION OF OTHER

23   EMPLOYMENT.  RESPECTFULLY, OVER 2700 HOURS WERE EXPENDED SOLELY

24   ON THIS CASE.  THOSE 2700 HOURS COULD HAVE BEEN PUT FORTH ON

25   OTHER MATTERS THAT HAD A GREATER LIKELIHOOD OF RECOVERY.


          SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

0

                                                    8


 1          WHAT IS UNIQUE TO THIS CASE IS, UNLIKE ANY OTHER, TO

 2   MY KNOWLEDGE, FIDUCIARY BREACH CASE OUT THERE, WE HAVE ASSERTED

 3   THAT THE COMPANY STOCK WAS IMPRUDENT FROM THE INCEPTION.  THAT

 4   IS A UNIQUE FACTOR TO THIS CASE THAT WE THINK, WHILE WE COULD

 5   HAVE PROVED AT TRIAL, WOULD RAISE OTHER SUBSTANTIAL HURDLES

 6   UNLIKE ANY OTHER CASE AND BECAUSE OF THESE UNIQUE FACTORS,

 7   AGAIN, COUNSELS IN FAVOR OF APPROVING THE SETTLEMENT.

 8          THE FIFTH FACTOR, YOUR HONOR, IS THE CUSTOMARY FEE.

                          Page 7

Mirant Final Approval.txt

9  AS THE ELEVENTH CIRCUIT PUT FORTH IN CAMDEN I, THE CUSTOMARY

10  FEE IN COMMON FUND CASES IS BETWEEN 20 AND 30 PERCENT OF THE

11  TOTAL SETTLEMENT RECOVERED.  HERE PLAINTIFFS ARE REQUESTING

12  27-AND-A-HALF PERCENT OF THE COMMON FUND.

13       THE SIXTH FACTOR IS WHETHER THE FEE IS FIXED OR

14  CONTINGENT.  PLAINTIFF'S COUNSEL TOOK THIS FEE -- TOOK THIS

15  CASE, RATHER, COMPLETELY ON A CONTINGENT-FEE BASIS; THAT IS,

16  HAD THERE BEEN NO RECOVERY OBTAINED, WE WOULD HAVE BEEN WITHOUT

17  RECOURSE.  WE HAVE FURTHER PUT FORTH OVER $52,000 WORTH OF

18  EXPENSES WITH NO GUARANTEE THAT THOSE EXPENSES WOULD BE

19  REIMBURSED.  AGAIN, OVER 2700 HOURS WITH A LOADSTAR OF 1.17

20  MILLION AS WELL AS OUT-OF-POCKET EXPENSES THAT COULD HAVE BEEN

21  PUT FORTH TO CASES WITH A SUBSTANTIALLY HIGHER LIKELIHOOD OF

22  RECOVERY COUNSELS IN FAVOR OF APPROVING THIS SETTLEMENT.

23       THE SEVENTH FACTOR, YOUR HONOR, IS THE TIME

24  LIMITATIONS IMPOSED BY THE CLIENT UNDER THE CIRCUMSTANCES.

25  RESPECTFULLY, YOUR HONOR, CLASS COUNSEL READILY ADMITS THAT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

9

1  THIS IS A CLASS CASE; AND, THEREFORE, THE CLIENT EXPECTATIONS

2  WERE THAT THEY WOULD LIKELY RECOVER, AND THERE WAS NO FIX DATE.

3       MOVING ON, YOUR HONOR, TO THE EIGHTH FACTOR, THE

4  AMOUNT INVOLVED AND THE RESULTS OBTAINED.  AS I STATED EARLIER,

5  THE TOTAL OUTWARD RECOVERY IS BETWEEN A MAXIMUM OF 30 MILLION

6  TO A MORE REALISTIC NUMBER OF 11 MILLION.  HERE THE $9.7

7  MILLION RESULTS IN A SUBSTANTIAL AMOUNT OF THE RECOVERY.

8       THE NINTH FACTOR, YOUR HONOR, IS THE EXPERIENCE,

9  REPUTATION AND THE ABILITY OF THE ATTORNEYS.  AS PUT FORTH AND

Page 8

Mirant Final Approval.txt

10   SEEN IN OUR PAPERS, AS WELL AS THE COMMENTS MADE BY THE

11   INDEPENDENT FIDUCIARY, THESE FIRMS HERE BEFORE YOUR HONOR ARE

12   AT THE FOREFRONT OF THIS TYPE OF PRACTICE AND HAVE USED THEIR

13   KNOWLEDGE HERE TO PUT FORTH AND GO AGAINST SOME OF THE MOST

14   EMINENT DEFENSE ATTORNEYS WITH RESPECT TO THIS FIELD AND WERE

15   ABLE TO PUSH FOR AND ACHIEVE THIS MAGNIFICENT SETTLEMENT.

16          THE TENTH FACTOR, YOUR HONOR, IS THE UNDESIRABILITY

17   OF THIS CASE.  YOUR HONOR, HERE CLEARLY THIS WAS A BANKRUPTCY

18   CASE; SO YOU HAD THE ISSUES INHERENT IN BANKRUPTCY WHICH

19   PLAINTIFF'S COUNSEL WENT THROUGH AND SPENT SUBSTANTIAL TIME IN

20   DEALINGS IN THE BANKRUPTCY COURT ENSURING THAT THE SETTLEMENT

21   HERE WAS PRESERVED AND THESE CLAIMS WERE PRESERVED.

22          FURTHER, YOUR HONOR, BECAUSE OF THE NATURE OF THE

23   CASE, ASSERTING THAT IMPRUDENCE WAS FROM THE INCEPTION, THIS,

24   TOO, COUNSELS IN FAVOR THAT THIS CASE WAS, IN FACT, UNDESIRABLE

25   IN THAT IT WAS NOT THE EASIEST CASE, IT WAS NOT THE EASIEST


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

10

1   ERISA CASE, AND IT HAD UNIQUE FACTORS.

2          THE ELEVENTH FACTOR, YOUR HONOR, IS THE NATURE AND

3   LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENT.

4   AGAIN, RESPECTFULLY, YOUR HONOR, THIS IS A CLASS CASE; AND WE

5   SUBMIT THAT WHILE OUR CLIENTS HAVE BEEN FULLY INFORMED AND

6   ADVISED OF THE CASE THROUGHOUT THE COURSE OF THE LITIGATION,

7   THIS IS NOT AN ONGOING RELATIONSHIP.

8          MOVING, YOUR HONOR, TO THE FINAL AND TWELFTH FACTOR,

9   THE AWARDS IN SIMILAR CASES.  AS PUT FORTH IN OUR PAPERS, THERE

10   ARE NUMEROUS CASES OUT THERE IN WHICH SIGNIFICANTLY HIGHER

11   PERCENTAGES WERE OBTAINED AND ACHIEVED IN SIMILAR ERISA CASES;

Mirant Final Approval.txt

12    NOTABLY, ADC AND WESTSTAR IN WHICH 30 PERCENT RECOVERY WAS

13    APPROVED.  HOWEVER, YOUR HONOR, AGAIN, AS NOTED BEFORE, THE

14    ELEVENTH CIRCUIT HAS SAID BETWEEN 20 AND 30 PERCENT IS

15    APPROPRIATE.  HERE WE SUBMIT THAT OUR REQUEST FOR 27-AND-A-HALF

16    PERCENT, IT FALLS WITHIN THAT NORM; AND AS DEMONSTRATED BY THE

17    AMOUNT OF WORK PUT INTO THE CASE AND THE END RESULT ACHIEVED,

18    THAT THIS FACTORS IN FAVOR OF APPROVING THE SETTLEMENT.

19          YOUR HONOR, THE ELEVENTH CIRCUIT HAS NOTED IN CAMDEN

20    THAT THERE ARE SEVERAL OTHER FACTORS THAT MAY BE UTILIZED IN

21    DETERMINING WHETHER OR NOT A SETTLEMENT IS APPROPRIATE; AND IF

22    YOUR HONOR WOULD LIKE, I CAN GO THROUGH THOSE FIVE ADDITIONAL

23    FACTORS.

24          YOUR HONOR, THE FIRST ONE IS THE TIME REQUIRED TO

25    REACH SETTLEMENT.  AS I STATED EARLIER, THIS INVOLVED TWO


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

0

11

1    FORMAL MEDIATION SESSIONS, THE FIRST MEDIATION SESSION

2    OCCURRING IN APRIL OF '05.  THAT WAS A TWO-DAY ALL-DAY

3    MEDIATION SESSION.  PRIOR TO THAT SESSION, THERE WERE NUMEROUS

4    PHONE CALLS AND TELEPHONIC CONFERENCES WITH BOTH THE MEDIATOR

5    AS WELL AS DEFENSE COUNSEL TRYING TO SEE IF SETTLEMENT MAY BE

6    AN APPROPRIATE AVENUE.  SUBSEQUENT TO THE APRIL MEDIATION,

7    THERE WAS ANOTHER ALL-DAY MEDIATION IN NOVEMBER OF 2005; AND

8    THAT WAS ABLE TO PUSH THE CASE FURTHER ALONG.  HOWEVER,

9    SETTLEMENT WAS NOT OBTAINED UNTIL EARLY OF 2006.  THAT

10    DEMONSTRATES THAT THERE WAS SUBSTANTIAL TIME PUT FORTH IN

11    OBTAINING THE SETTLEMENT.

12          THE SECOND ONE IS WHETHER OR NOT THERE ARE ANY

Page 10

Mirant Final Approval.txt

13    SUBSTANTIAL OBJECTORS BY THE CLASS.  AGAIN, THERE'S ONLY ONE

14    OBJECTOR FROM THE CLASS OF OVER 3500.

15         THE THIRD IS WHETHER OR NOT THERE'S ANY NONMONETARY

16    BENEFITS CONFERRED UPON THE SETTLEMENT CLASS.  HERE, YOUR

17    HONOR, AS PUT FORTH IN THE STIPULATION OF SETTLEMENT, THERE IS

18    A SPECIFIC CARVE-OUT SAYING THAT THE RECOVERY HERE WILL IN NO

19    WAY AFFECT THE SECURITIES-RELATED -- SECURITIES LITIGATION, NOR

20    WILL IT ADVERSELY AFFECT THE RELATED SOUTHERN ERISA LITIGATION.

21         THE FOURTH FACTOR, YOUR HONOR, IS THE ECONOMICS

22    INVOLVED IN PROSECUTING THIS CASE.  SIMPLY PUT, YOUR HONOR,

23    CLASS CASES SUCH AS THIS WILL REQUIRE THE EXPENDITURE OF TENS

24    OF THOUSANDS, IF NOT HUNDREDS OF THOUSANDS OF DOLLARS.  BECAUSE

25    WE WERE ABLE TO ACHIEVE THE SETTLEMENT RELATIVELY EARLY IN THAT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

12


1    PROCESS, WE WERE ABLE TO KEEP EXPENSES TO A MINIMUM; BUT WE DID

2    PUT FORTH EXTREME AMOUNTS OF MONEY.

3         THE FIFTH IS ARE THERE ANY OTHER FACTORS UNIQUE TO

4    THIS CASE.  AS I SAID EARLIER, THIS INVOLVES A BANKRUPTCY CASE

5    AS WELL AS IMPRUDENCE FROM THE INCEPTION.  BOTH OF THOSE

6    FACTORS ARE UNIQUE TO THIS ERISA CASE AND STRONGLY SUPPORT THIS

7    SETTLEMENT.

8         THE COURT:  THANK YOU.

9         MR. WELLS:  YOUR HONOR, IN ADDITION, THERE IS ALSO

10    THE MATTER OF THE REIMBURSEMENT OF EXPENSES, IF YOU'D LIKE ME

11    TO ADDRESS THAT.

12         AS PUT FORTH IN OUR PAPERS, WE HAVE EXPENDED OVER

13    $52,000 WORTH OF EXPENSES THAT INCLUDE THE LIKES OF TRAVEL,

14    LODGING, FILINGS AND THE LIKE.  WE THINK THEY ARE REASONABLE

Page 11

Mirant Final Approval.txt

15    AND APPROPRIATE, AND WE NOTE FOR YOUR HONOR THAT THERE'S BEEN

16    NO OBJECTION TO THE REIMBURSEMENT OF EXPENSES.

17         THE OTHER MATTER BEFORE YOUR HONOR IS THE ISSUE OF

18    THE CASE CONTRIBUTION AWARD.  AS PUT FORTH IN OUR PAPERS, CASE

19    CONTRIBUTION AWARDS IN THIS CASE, ON THESE TYPE OF CASES, ARE

20    EMINENTLY REASONABLE BECAUSE THESE PLAINTIFFS -- BUT FOR THESE

21    PLAINTIFFS, THIS CASE WOULD NOT BE BROUGHT.  THESE PLAINTIFFS

22    WERE ABLE TO STEP FORWARD, PROVIDE PLAN DOCUMENTS TO CLASS

23    COUNSEL, PROVIDE INFORMATION TO CLASS COUNSEL AS TO THE INNER

24    WORKINGS OF BOTH THE COMPANY IN GENERAL AS WELL AS THE PLANS IN

25    PARTICULAR.


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

13

1         AND WITH THESE CASES, THEY HAVE HELPED FOSTER AND

2    ACHIEVE A $9.7 MILLION SETTLEMENT THAT WOULD BENEFIT OVER 3500

3    CLASS MEMBERS; AND WE THINK THEIR EFFORTS SHOULD BE RECOGNIZED

4    AND AWARDED BY THIS COURT.  RESPECTFULLY, YOUR HONOR, WE ASK

5    THAT A CASE CONTRIBUTION AWARD OF $2,000 FOR EACH OF THE TWO

6    NAMED PLAINTIFFS BE APPROVED.

7         AND WITH THAT, YOUR HONOR, IF THE COURT HAS ANY

8    QUESTIONS, I WOULD BE HAPPY TO ADDRESS THOSE.

9         THE COURT:  I DO NOT.  THANK YOU.

10    MR. HINSON, ANYTHING FROM THE DEFENDANT?

11    MR. HINSON:  YOUR HONOR, AS WE SAID IN OUR WRITTEN

12    SUBMISSION, WE ONLY WOULD ADD THAT WE BELIEVE WE WOULD PREVAIL

13    HAD THE LITIGATION MOVED FORWARD; AND WE BELIEVE THAT IN THAT

14    LIGHT, THIS DEFENSE -- I MEAN THIS SETTLEMENT IS, IN FACT, A

15    FAIR AND REASONABLE SETTLEMENT.  WE TAKE NO POSITION ON THE

Mirant Final Approval.txt

16   ATTORNEY'S FEES ISSUES.  AND, THEREFORE, WE HAVE VERY LITTLE TO

17   ADD.

18          THE COURT:  THANK YOU.  I WOULD NOTE FOR THE RECORD

19   AND AS HAS BEEN ALLUDED TO BY MR. WELLS, THERE WAS ONE

20   OBJECTION FILED TO THE SETTLEMENT BY MR. LANKFORD.  AND THE

21   COURT HAS REVIEWED THAT OBJECTION; AND LIKE MR. WELLS, I

22   UNDERSTAND MR. LANKFORD'S DISSATISFACTION WITH THE TOTAL AMOUNT

23   THAT WILL BE COMING TO HIM AS A MEMBER OF THIS CLASS.  I CAN

24   UNDERSTAND AND APPRECIATE HIS CONCERN, HAVING LOST A

25   SUBSTANTIAL AMOUNT OF HIS LIFE SAVINGS.  HOWEVER, WHILE I


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


14


1    APPRECIATE HIS POSITION, I DO NOT THINK IT JUSTIFIES REJECTION

2    OF THE SETTLEMENT.

3          FOR THE REASONS THAT HAVE BEEN STATED, I DO FIND THAT

4    THE SETTLEMENT IS FAIR AND IS A GOOD SETTLEMENT FOR THE MEMBERS

5    OF THE CLASS.  CERTAINLY THE QUESTION OF LIABILITY, THE RANGE

6    OF POTENTIAL RECOVERIES, PARTICULARLY THE DETERMINATION OF WHEN

7    WE WOULD FIND THEY HAD BREACHED THEIR DUTIES REALLY COULD HAVE

8    HAD A SUBSTANTIAL EFFECT.  AND I KNOW PROBABLY FROM THE

9    PERSPECTIVE OF NEGOTIATION, THAT HAD TO BE A DIFFICULT MATTER

10   TO GRAPPLE WITH, AS WELL.  BUT IT CERTAINLY MILITATES IN FAVOR

11   OF THE SETTLEMENT THAT HAS BEEN REACHED.

12          I WILL APPROVE THE SETTLEMENT.  I WILL CERTIFY THE

13   CLASS AS A (B)(1) CLASS.  I FIND THAT THE ATTORNEY'S FEES ARE

14   ALSO REASONABLE.  COUNSEL, CLASS COUNSEL, ARE OBVIOUSLY

15   EMINENTLY QUALIFIED TO BRING AND PURSUE THIS LITIGATION.  I

16   THINK THAT WHEN ONE VIEWS THE LODESTAR INVOLVED IN THE CASE AS

17   COMPARED TO THE AMOUNT OF RECOVERY, THIS IS A FAIR

Page 13

Mirant Final Approval.txt

18    COMPENSATION, PARTICULARLY WHEN ONE CONSIDERS, AS WE DISCUSSED

19    EARLIER, THE LIKELIHOOD OF SUCCESS, THE RISK THAT WAS ACCEPTED

20    BY COUNSEL IN TAKING ON THIS LITIGATION AND TAKING IT ON

21    TOTALLY ON A CONTINGENT-FEE BASIS; SO THEY BORE THE ENTIRE

22    RISK.  AND I THINK THERE IS A PUBLIC POLICY ISSUE AT STAKE HERE

23    IN THAT COUNSEL NEED TO BE ENCOURAGED TO TAKE THESE CASES WHEN

24    THEY'RE MERITORIOUS; AND IF THERE'S NOT FULL, COMPLETE AND

25    APPROPRIATE COMPENSATION, THERE WILL NOT BE THAT INCENTIVE TO


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

15

1    TAKE THESE CASES.

2         I DO APPRECIATE THE FACT THAT COUNSEL HAS ADJUSTED

3    ITS REQUEST TO 27.5 PERCENT OF THE COMMON FUND, AND I WILL

4    AWARD FEES OF 27.5 PERCENT OF THE COMMON FUND.  I WILL ALSO

5    AWARD TO COUNSEL THE FULL AMOUNT OF EXPENSES AS REQUESTED IN

6    THE PAPERS FILED WITH THE COURT AND WILL ALSO MAKE THE CASE

7    CONTRIBUTION AWARDS TO THE NAMED PLAINTIFFS OF $2,000 EACH AS

8    REQUESTED.  I THINK THAT'S EMINENTLY FAIR FOR THE PEOPLE WHO

9    CHOOSE TO ALLOW THEMSELVES TO BE PUT OUT THERE AS

10   REPRESENTATIVES OF THE CLASS.  AND WHILE I REALIZE IN A CASE OF

11   THIS TYPE, THEY ARE NOT INTIMATELY INVOLVED IN THE PROCEEDINGS,

12   THEY ARE THERE TO REPRESENT THEIR COLLEAGUES AND TO BE IN TOUCH

13   WITH COUNSEL AND DO HAVE SOME RESPONSIBILITIES AND ROLES IN

14   THAT REGARD.  SO I THINK THAT'S A VERY FAIR AMOUNT TO PROVIDE

15   TO THOSE TWO.

16        YOU HAD SUBMITTED PROPOSED ORDERS ON THESE MATTERS,

17   AND I FIND THEM TO BE APPROPRIATE AND AM INCLINED TO EXECUTE

18   THOSE AS SUBMITTED.  THE QUESTION I WOULD HAVE IS THERE ARE

Page 14

Mirant Final Approval.txt

19  BLANKS TO BE FILLED IN.  I DID NOT KNOW IF YOU HAVE COMPLETED

20  ONE THAT FILLS IN THE BLANKS OR IF YOU WANTED TO GET IT TO US

21  BY E-MAIL AND WE WOULD DO IT.

22          MR. WELLS:  YOUR HONOR, NOT TO BE PRESUMPTUOUS, BUT

23  WE DID HAVE ONE THAT HAS THE BLANKS FILLED IN.  I WOULD BE

24  HAPPY TO SUBMIT IT TO YOUR HONOR.

25          THE COURT:  I AM NOT OFFENDED BY YOUR PRESUMPTION AT


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER


16


1  ALL.  I APPRECIATE IT, AS DOES MY STAFF.

2          MR. WELLS:  THANK YOU, YOUR HONOR.

3          (PAUSE IN THE PROCEEDINGS.)

4          THE COURT:  I HAVE SIGNED THE ORDER OF FINAL

5  JUDGMENT, AND THIS WILL BE -- I'LL LET COUNSEL FILE IT WITH THE

6  CLERK SINCE MY CLERK IS NOT HERE TODAY.  HE'S OUT SICK.  I'LL

7  LET YOU FILE IT WITH THE CLERK.

8          LET ME, HOWEVER, CONCLUDE BY EXPRESSING TO COUNSEL

9  FOR BOTH THE PLAINTIFFS AND THE DEFENDANT MY SINCERE

10  APPRECIATION FOR YOUR LABORS IN THIS CASE.  YOU POINTED OUT,

11  MR. WELLS, THE LAYERS OF THIS LITIGATION AND THE FACT THAT YOU

12  HAD THE BANKRUPTCY ASPECT OF THIS TO DEAL WITH AS WELL AS THE

13  OTHER ISSUES THAT ARE INVOLVED IN THIS CASE.  THIS WAS NOT A

14  SIMPLE CASE.  IT HAD THE EXTRA LAYERS THAT MADE IT MORE

15  DIFFICULT.

16          BUT IT'S VERY CLEAR TO ME THAT ALL OF YOU WORKED VERY

17  HARD AT THIS.  NUMBER ONE, YOU HAD WORKED VERY HARD BEFORE I

18  STAYED THE CASE IN THE MOTION PRACTICE THAT HAD ALREADY BEGUN.

19  I AM CONFIDENT THAT YOU WOULD HAVE WORKED EQUALLY AS HARD HAD

20  THE CASE BEEN REOPENED AND WE HAD GONE THROUGH THE DECIDING OF

Page 15

Mirant Final Approval.txt

21    THOSE MOTIONS AND IF THE CASE SURVIVED, THE ENTIRE ROUTE THAT

22    YOU'VE DESCRIBED, MR. WELLS, THROUGH SUMMARY JUDGMENT, TRIAL,

23    ET CETERA.  AND FROM A JUDGE'S PERSPECTIVE, IT'S JUST REALLY

24    NICE TO HAVE LAWYERS WHO ARE CAPABLE, WHO ARE PROFESSIONAL, WHO

25    WORK TOGETHER, WHO SEEK TO FIND A GOOD RESOLUTION TO A


SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

17

1    DIFFICULT CONFLICT; AND I FEEL THAT YOU HAVE IN THIS CASE.

2            I FEEL VERY GOOD ABOUT THIS SETTLEMENT IN EVERY

3    RESPECT.  I THINK THE AMOUNT OF MONEY THAT'S GOING INTO THE

4    POCKETS OF THE MEMBERS OF THE CLASS, WHILE, AGAIN, I WOULD LOVE

5    TO SEE, AS I KNOW YOU WOULD, MORE MONEY GOING INTO THEIR

6    POCKETS, THIS IS COMING OUT A LOT BETTER THAN WHAT COULD HAVE

7    BEEN; AND I THINK YOU FOLKS HAVE DONE A GREAT JOB.

8            AND I KNOW THAT THERE ARE OBSERVERS WHO WOULD

9    CRITICIZE THE AMOUNT OF ATTORNEY'S FEES AND THEY WOULD SAY THIS

10   IS ALL ABOUT LAWYERS MAKING MONEY.  BUT THE REALITY IS IF YOU

11   HAD REPRESENTED EVERY ONE OF THESE FOLKS INDIVIDUALLY, A 27.5

12   CONTINGENT FEE WOULD HAVE BEEN A STEAL ON THEIR PARTS.  THEY

13   COULD NOT HAVE RETAINED COUNSEL TO REPRESENT THEM INDIVIDUALLY

14   ON THAT KIND OF CONTINGENT FEE.  NUMBER ONE, MOST OF THEIR

15   CLAIMS WOULD NOT HAVE BEEN SUFFICIENT TO JUSTIFY THAT.  THEY

16   WOULD HAVE HAD TO PAY AN HOURLY FEE; AND LOOKING AT YOUR

17   LODESTAR, THE TIME THAT WOULD HAVE HAD TO GO INTO IT, THEY

18   WOULDN'T HAVE GOTTEN ANYTHING OUT OF IT.  THEY WOULD HAVE HAD

19   TO PAY A HIGHER CONTINGENCY.

20           SO WHILE I RECOGNIZE MANY FOLKS OUT THERE DON'T

21   APPRECIATE THE ROLE THAT YOU HAVE PLAYED IN THIS AND THEY SEE

Mirant Final Approval.txt

22    THIS AS LAWYERS JUST GETTING RICH AT THE EXPENSE OF THE VICTIMS

23    OF WHAT HAS OCCURRED HERE, I HONESTLY SEE BEYOND THAT AND THINK

24    THAT YOU HAVE DONE A REAL SERVICE BY REPRESENTING THESE FOLKS,

25    AND I THINK THEY HAVE GOTTEN A DEAL IN IT.  AND SO THANK YOU

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

18

1    FOR YOUR WORK ON THE FILE.

2         AND I APPRECIATE THE DEFENDANTS, AS WELL, BEING

3    WILLING TO COME TO THE TABLE AND GET A RESOLUTION OF THIS.

4         I'VE SIGNED THE ORDER.  I WILL LET YOU FILE IT, AND

5    THAT WILL CLOSE THE MATTER.  THANK YOU, AND HAVE A GOOD DAY.

6    WE'RE ADJOURNED.

7         (PROCEEDINGS CONCLUDED.)

8                        *  *  *

9              REPORTER'S CERTIFICATION

10    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

11

12

13                        _____
                          SHARON D. UPCHURCH, RPR
14                        OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
15                        NORTHERN DISTRICT OF GEORGIA

16

17    DATE: _____

18

19

20

21

22

23

Page 17

Mirant Final Approval.txt

24

25

SHARON D. UPCHURCH, OFFICIAL COURT REPORTER

# EXHIBIT

# L

1

1          IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
2            CIVIL ACTION  2:03-cv-01214-DRD-SDW

3

    IN RE: HONEYWELL ERISA      : TRANSCRIPT OF PROCEEDINGS
4   LITIGATION                  :
                                :        M O T I O N
5   - - - - - - - - - - - - - -

                                    Pages 1 - 45
6

                              Date:  July 19, 2005
7                             Newark, New Jersey

8

B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
9                  SENIOR UNITED STATES DISTRICT JUDGE

10

A P P E A R A N C E S:
11

    DRINKER BIDDLE & SHANLEY
12  BY:  JOHN J. FRANCIS, ESQ., and
    ROBERT ECCLES, ESQ.,
13  Attorney for Honeywell Corporation

14

    TRUJIILLO RODRIQUEZ & RICHARDS
15  BY:  LISA RODRIGUEZ, ESQ. and
    SCHIFFRIN & BARROWAY
16  BY:  JOSEPH MELTZER, ESQ.,
    Attorney for the Plaintiffs

17

18

19  Pursuant to Section 753 Title 28 United States Code, the
    following transcript is certified to be an accurate record as
20  taken stenographically in the above entitled proceedings.

21  Mollie Ann Giordano
    MOLLIE ANN GIORDANO
22  Official Court Reporter

23

24

25

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

```
                        Colloquy                    2
```

1       THE COURT:  Good morning.  I gather you've given your

2    appearances to Miss Giordano, so we're ready to proceed.

3       Let me ask before we start in, the gentlemen back

4    here, are you here to make any comments about the settlement?

5       VOICE:  No, sir.

6       THE COURT:  All right.  So we have nobody appearing at

7    this point anyway to address the approval of the settlement?

8    Any other applications?  All right, well, Miss Rodriguez, are

9    you presenting this?

10      MS. RODRIGUEZ:  Actually, your Honor, Mr. Meltzer will

11   be presenting on behalf of the plaintiffs today.

12      THE COURT:  All right.  Mr. Meltzer, go ahead.

13      MR. MELTZER:  Good morning, your Honor.  We are very

14   pleased to be here today.  We are here to present the

15   settlement in all the claims in the Honeywell ERISA litigation.

16   The settlement is a product of a rather lengthy, sometimes

17   rather intense negotiations between the parties.  Your Honor,

18   to summarize what the settlement provides for, monetary and

19   structural relief.  On the monetary side, it calls for 14

20   million dollars to pay into the Honeywell plans.  It will be

21   distributed to the participants and further pro rata share, and

22   in accordance with how much they may have lost due to their

23   investments in Honeywell stock.  Your Honor, if I could, one

24   bit of housekeeping.  We had submitted a plan.

25      THE COURT:  And I gather you propose not to pursue

Colloquy

3

1    that this morning?

2        MR. MELTZER:  That's right.

3        THE COURT:  We will address that question later.

4        MR. MELTAER:  It's largely worked out, and I think

5    there's some details that I think we need to finalize, and the

6    parties will get together and submit something in due course.

7        With respect to the structural part of the settlement,

8    previously the Honeywell plan provided that participants cannot

9    invest their honey in anything but Honeywell stock until they

10   were 55, and had accumulated 10 years of service in the plan.

11   Those restrictions have been lifted or unlocked, so to speak,

12   so now participants can move their money about in any of the

13   plans in investment alternatives.

14       The other motion before your Honor today is counsel's

15   motion for fees, expenses, and payment of case contribution

16   orders; namely, plaintiffs.

17       With respect to the motion for approval of settlement,

18   we seek the Court's finding that the settlement is fair,

19   adequate, and reasonable under Rule 23 and the Third Circuit

20   standards.  We also seek final certification of settlement

21   class, and I can give you a brief background of the litigation

22   to this point.

23       THE COURT:  All right.

24       MR. MELTZER:  Okay.  The cases were initially filed in

25   March, 2003.  They allege breaches of fiduciary duty under

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

1    ERISA, specifically Section 409 and 502 of ERISA.  There were

2    two cases filed.  They were ultimately consolidated in May of

3    2003.  There was a consoldation and organizational order

4    entered by the Court.  At that time, my firm and Ms. Rodriguez

5    leads with the liaison counsel, and we secured certain

6    documents, ERISA-related documents that relate to the governing

7    of the plan.  They are essentially the trust agreement and all

8    the governing instruments under which the plans are operated.

9         We then continue by our investigation of the claims,

10   and essentially to prepare the filing of the consolidated

11   complaint.  The consolidated pleading was filed on July 28,

12   2003.  It is fairly long, it's fairly detailed, it essentially

13   groups three sets of defendants, Honeywell International,

14   members of the retirement plan's committee, members of the

15   company's investment committee, and it sets out a variety of

16   allegations relating to why Honeywell stock, at least

17   plaintiffs allege, was imprudent during that period.  Problems

18   that the company was having related to certain mergers, Allied

19   Signal mergers.  Also a contemplated merger with General

20   Electric.  Claims for relief based on breach of fiduciary

21   duties under ERISA; to monitor fiduciaries under ERISA; and

22   also prohibit transactions.

23        Following the filing of that consolidated pleading,

24   that touched off some motion practice.  Defendants moved to

25   dismiss the complaint, and we of course opposed it.

Colloquy                                     5

1          THE COURT:  You're familiar with what took place here

2     in court?

3          MR. MELTZER:  That ultimately resulted in oral

4     argument before your Honor, and ultimately an order granted in

5     part, denied in part, defendant's motion.

6          At that time the parties were also engaged in class

7     certification discoveries as a result of the magistrate waiting

8     to enter an order bifurcating discovery in the matter.  We were

9     engaged in propounded discovery, compounded discovery.  We had

10    several meet and confer sessions, some rather lengthy, some

11    rather contentious, but we ultimately framed a couple of issues

12    for the Court.  We had a couple of motions to compel pending

13    the time the settlement was reached.

14         The other aspect of the litigation that I would point

15    out is that the ERISA plaintiffs and counsel here today appear

16    before your Honor in the securities case because there was some

17    questions if they were reached in their case.

18         THE COURT:  What was the settlement figure in that

19    case?

20         MR. MELTZER:  In the securities litigation?

21         THE COURT:  Yeah.

22         MR. MELTZER:  I believe it was a hundred million

23    dollars.

24         Yeah, we appeared at the fairness hearing in the

25    securities litigation to make sure the relief was not -- could

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

```
                            Colloquy                        6
1     not be read to the certain defense in this litigation.

2     Settlement discussions began sometime in the spring of '04, and

3     frankly, your Honor, I believe they were touched off by an

4     inquiry you made during the contest of a securities hearing as

5     to whether class counsel in the ERISA case has begun a

6     settlement dialogue.  And we're appreciative of that fact,

7     because sometimes that's just the kind of push the parties need

8     to talk about settlement in a fruitful way.  We had rather

9     protracted settlement discussions.

10            There is essentially two grounds, if you will, in

11    negotiation.  We had asked your Honor to refrain from issuing

12    his opinion on the motion to dismiss, sort of insuring the

13    maximum amount of uncertainty while settlement talks were

14    proceeding.  We reached an impasse at some point.  We then

15    contacted your Honor and asked that you issue your opinion.

16    And after it's received, we sort of picked up on settlement

17    negotiations at that time.

18            Beyond the settlement, we went over the terms of the

19    actual agreement.  We proceeded with some confirmatory

20    discovery that involved largely the production of.  Corporate

21    minutes, there are two committees I mentioned before,

22    Retirement Plan Committee that deal with operations an

23    administration of the plans.  We reviewed some of those

24    minutes.  We talked to a large --

25            THE COURT:  How far will discovery proceed in the
```

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

```
                              Colloquy                          7
 1    securities class action?  Have they gotten into merits

 2    discovery.

 3            MR. MELTZER:  My involvement was limited, your Honor.

 4    But as I understand it, I think they were well into merits --

 5            THE COURT:  Well, the point of my question is, were

 6    you able to draw on the information and discovery in that case

 7    to assist you in this case?

 8            MR. FRANCIS:  Judge, if I may, I was the only one who

 9    was in both cases.  There were a limited number of depositions

10    in the securities litigation, fair amount of document

11    discovery, and very little depositions.

12            THE COURT:  And the document discovery?

13            MR. FRANCIS:  Yes, yes, a fair amount of that.

14            MR. MELTZER:  The only thing I can say, your Honor, in

15    direct response, I didn't have access to anything that went on

16    in the securities litigation, with the exception of pleadings

17    that were filed.

18            THE COURT:  And there were motions filed --

19            MR. MELTZER:  Right.

20            THE COURT:  -- in that case.  And I assume you've

21    followed whatever was going on in the court?

22            MR. MELTZER:  Yes, especially with respect to

23    settlement.  You do what you have to do.

24            THE COURT:  All right.

25            MR. MELTZER:  Beyond that, that's sort of where our
```

Colloquy                                8

1    involvement ended.

2                THE COURT:  All right.

3                Well then, what was the data on which you relied in

4    determining the merits of your case?

5                MR. MELTZER:  Your Honor, we got both the

6    ERISA-related documents, we did a lot of precomplaint sort of

7    informal discovery.  Anything that we were able to obtain from

8    probable available sources, SEC filings, the DOL, anything that

9    we got from the defendants, both before the complaint was filed

10   and in the context of discussing settlement.  That's the kind

11   of information we relied upon.  There included information with

12   regard to the insurance that the company had taken out for

13   fiduciary claims, it included information regarding the plans,

14   purchases, and sales of Honeywell stock during the time period.

15   Again, the minutes of the committees that were assessing the

16   propriety in investing in Honeywell stock were produced the day

17   after the agreement was reached in a confirmatory capacity.

18   There was, in addition to whatever we got in the context of

19   class certification, the discovery, in the way of discovery

20   responses.  Frankly speaking, I'm not sure how much that

21   dovetails to the merits of the claim.  It did somewhat, but

22   that's not entire overlapping.

23                THE COURT:  All right.

24                MR. MELTZER:  There was a fairly substantial amount of

25   information that we were -- that we had access to, both in the

Colloquy                                    9

1    context of preparing for our complaint and the motion practice,

2    and in proceeding with settlement negotiations that I think

3    span settlement -- six or seven months.

4            THE COURT:  Good.  Okay.

5            MR. MELTZER:  Your Honor, I would just like to touch

6    real briefly on the structural relief part of the settlement.

7    We are particularly pleased with that.  There is a -- there is

8    a report that we would draw your Honor's attention to that

9    we've submitted with our approval papers.  It's from a

10   Professor Ramaswamy.  He is a professor -- he sort of is a

11   specialist in trying to quantify what value it brings.  He puts

12   a broad range in terms of value, less concerned about what the

13   actual value is, and more concerned that people are going to be

14   able to kind of spread our investments out over a variety of

15   investments, especially if they see some kind of down turn in

16   any particular sector of the market.  It helps to mitigate

17   against these kinds of claims going forward, otherwise I can

18   rely on the submission, and we're not seeking a fee on the

19   value that he quantifies, fairly large.

20           THE COURT:  And it's pretty speculative --

21           MR. MELTZER:  Yeah, it is.

22           THE COURT:  -- value?

23           MR. MELTZER:  Well, it's speculative in one sense

24   because obviously you're not dealing with people and their

25   investment decisions in the future.  And on the other hand,

Colloquy                                    10

1    it's fairly empirical, and it's at least well reasoned, and

2    it's actually based on actual data.

3         With respect to settlement as a whole, both the

4    monetary and structural components of it, we would ask that the

5    Court enter a finding that it's fair, reasonable, and adequate,

6    under Rule 23E, within the Third Circuit.  There is a nine

7    factor test.  Frankly, preliminarily, your Honor, the

8    settlement is presumptively fair under Third Circuit case law.

9    It was negotiated at arm's length.  There was sufficient

10   discovery so counsel could assess the merits, and counsel has

11   experienced a similar action, and only a small portion of the

12   class objected.  And those are inadequate notice to the class

13   participants, and I'll touch on that in a second.  Those are

14   the elements for sort of a presumptive finding of fairness.

15        With respect to notice, the notice in this case, and

16   it's a non-class, those standards are lower or somewhat

17   relaxed.  Frankly, the notices in this case were outstanding.

18   There were individual notices mailed out to over a hundred

19   thousand participants.  There was publication in the USA Today,

20   the Minneapolis Star Union.  There was a web site that we made

21   available through the claims administrator which gave everybody

22   information regarding the settlement, including court

23   documents, that had twenty-thousand, two hundred hits in the

24   small amount of time since notice was effectuated.

25        Despite the notice efforts, there were roughly 18

Colloquy                                    11

1   objections, as I counted them.  Given the size of the class,

2   that's a rather small number.

3           With respect to the Dirsh factors, I can run through

4   those fairly quickly.  The first factor, and this is the

5   nine-factor test that the Third Circuit has enunciated, I think

6   it's a 1975 case, but it's been reiterated and reiterated.  The

7   first factor is complexity and likely duration of the

8   litigation.  Your Honor, these are fairly novel claims, and

9   these are fairly new lines of cases.  The case law, as your

10  Honor probably knows from issuing the opinion, is very

11  unsettled.  There is a lot of inherent complexities.  Courts in

12  this district alone have noted the difficulties in trying to

13  prove one of these cases and advance it all the way to trial.

14  The expense and likely duration of the litigation, had we not

15  settled at this point, the litigation probably would have gone

16  on for at least another year.  And a factor of that, the

17  expense would have been very considerable.  Experts in this

18  kind of case alone are in the hundreds of thousand of dollars.

19  Document production would have cost some factor of that.  So

20  that factor militates in favor of approval of the settlement.

21          The second Dirsh factor is the reaction of the class

22  to the settlement.  As I say, your Honor, there were roughly 18

23  objectors.  Given the size, winds up to be .01 percent of the

24  class.  The other thing to note about the reaction of the

25  class, some say too little in terms of settlement, some say

Colloquy                                              12

1    it's far too much.  We seem to obstruct that.

2         THE COURT:  Well, I guess you had a few people who

3    just don't like class action or class action lawyers.

4         MR. MELTZER:  Unfortunately, your Honor, the person in

5    my position is always the case.  There are always people who

6    are dissatisfied with the way Rule 23 operates.  By and large

7    the class is -- by not objecting is sort of affirming the

8    reasonableness of the settlement, and I think that factor also

9    militates in favor of the finding fair and reasonable.  The

10   proceedings and the amount of discovery, as we discussed

11   previously, the case was settled after your Honor issued the

12   motion to dismiss.  Class certification, the discovery was

13   ongoing at the time.  The class, as I addressed briefly,

14   earlier, class certification and discovery was proceeding

15   because it hadn't bifurcated at that point.  Merits discovery

16   has been stayed, despite our objection.  We lost on that one.

17   Class certification discovery was determined first, and then

18   subsequent to a finding on class certification, we were to move

19   into merits discovery.  We had discovery that was produced

20   informally] before the complaint was filed.  We had a lot of

21   publicly available information.  We had dozens and dozens of

22   participants who had contacted my firm, who gave us

23   information.  We also ad information that was produced in the

24   context of negotiating the settlement.  All of those factors

25   essentially amounts to us having clearly a considerable amount

Colloquy                                    13

1    of information and enough information that we can assess the

2    propriety of moving forward with this settlement today.

3          The fourth and fifth test of the Dirsh test is showing

4    liability.  These are difficult cases, as I touched on briefly.

5    There is a dirth of case law with respect to whether the cases

6    are meritorious and can go forward on any number of fronts,

7    whether it's in the face of a presumption or in terms of

8    standing to bring the claims.  There is a District Court

9    opinion, your Honor, in this district shortly before you issued

10   your opinion on the motion to dismiss, which dismissed all the

11   claims in analogous actions based on standing and the inability

12   to proceed in this type of action.  There is a limited number

13   of circuit court decisions that guide us.  And frankly, I have

14   felt we had strong claims with respect to liability, as the

15   defendants I'm sure think they have very strong offenses with

16   respect to liability.

17         In terms of damages, this particular case is not a

18   sort of fraud of the century, if you will.  It's not an Enron

19   or Worldcom.  It's not a case where the company spiraled into

20   bankruptcy.  I think the close, the trade was somewhere up to

21   forty dollars a share.  It's obviously a viable company.

22   Factor that with the sort of performance of the stock, visa-vis

23   the market during the time period, and whether it

24   underperformed or out performed certain indexes, damages would

25   be a very difficult proposition for us to prove.  There was a

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                                    14

1    drop in the stock obviously between the beginning and end of

2    our class period.  Whether we could tie that to the specific

3    fiduciary action or inaction, obviously is something that we

4    would only ote if we proceed through an entire trial.  But

5    based upon our experience in other cases, this was a difficult

6    case in terms of trying to prove up the actual damages.  And

7    frankly, your Honor, if you look at the memorandum that the

8    defendants filed yesterday, we would have been lucky to prove

9    any damages at all, based on the statements made in that

10   memorandum.

11        The sixth Dirsh factor is the risk of maintaining a

12   class action through trial.  Frankly, your Honor, I think the

13   class would have been certified.  I think these cases make for

14   perfect class actions under 23D-1.  I think they said all the

15   elements of 23A pretty clearly, and the cutting against that of

16   course is that the defendants had already undertaken a very

17   aggressive class certification.  And in light of that, they

18   would have attacked the accuracy of our named plaintiffs.  We

19   were preparing for depositions at the time we settled.  There

20   was certainly a risk that we wouldn't be able to maintain a

21   class at trial, albeit I think a small one.

22        The seventh Dirsh factor is the ability of the

23   defendants to withstand a greater judgment.  Your Honor, we

24   don't challenge whether Honeywell could sustain a greater

25   judgment than what we would have secured here.  This factor

Colloquy                                    15

1   standing alone doesn't preclude the entry of a settlement.  I

2   think the waiver and anti-trust case in the Third Circuit, just

3   because the company could pay more, doesn't mean that the

4   settlement shouldn't be approved.  You have to look at all the

5   other compliments and all the other factors.

6        The eighth and ninth factors within the Dirsh test are

7   the range of reasonableness of the settlement in light of the

8   best possible recovery and the range of reasonableness of the

9   settlement fund to possible recovery in light of the attendant

10  risks of litigation.  Frequently they are analyzed together.

11  The Third Circuit has pointed out that this settlement, these

12  factors should be interpreted essentially as to whether the

13  settlement represents a good value for a relatively weak case.

14  In light of some of the problems, not only in terms of the law,

15  but as they apply to the facts of this particular case, clearly

16  a solvent company and very viable company.  I think this is an

17  excellent result, both in terms of securing almost all the

18  fiduciary liability policies, despite the fact that there was a

19  denial of coverage and very -- essentially, when you -- base it

20  again on the risk that we wouldn't be able to get anything at

21  all, it's an excellent recovery.  And when you base it against

22  the best possible recovery, and the problem we would have, I

23  think again the factor is clearly supportive of approving the

24  settlement.

25        Finally, the motion for approval seeks final

1   certification of the settlement classes.  Obviously it's not

2   opposed by the defendant's settlement classes.  Any person who

3   is a participant in the --

4            THE COURT:  I don't think you have to read the

5   definition over.

6            MR. MELTZER:  That's set forth in the papers.  We

7   think it clearly meets all the Rule 23 requirements, and we

8   would seek certification of the settlement class under 23A, and

9   then 23B(1) and B(2).

10           THE COURT:  All right.

11           MR. MELTZER:  There's all I have with respect to

12  approval, your Honor.

13           THE COURT:  Then we get to the application for fees

14  and expenses.

15           MR. MELTZER:  Okay.

16           Your Honor, we submitted a motion for attorney's fees,

17  reimbursement for expenses and case contribution.  We requested

18  25 percent of the settlement fund that nets out to 3.5 million

19  dollars, as well as reimbursement of forty-three thousand,

20  eight hundred and eighty-seven dollars in expenses as well as

21  an award of twenty-five hundred dollars for each of the named

22  plaintiffs.

23           THE COURT:  In the securities class action I awarded

24  20 percent.

25           MR. MELTZER:  Yes.

Colloquy                        17

1          THE COURT:  Is there some reason why there should be a

2     higher percent in this case than in that case?

3          MR. MELTZER:  Your Honor, the answer I guess is, given

4     the higher number, sometimes when you have higher awards,

5     courts will take the percentages down and the Third Circuit

6     called it frankly the range of settlement.  The fee awards in

7     these types of cases have been between 20 and 30.  I think 25

8     is reasonable.  I think it is, in light of the multiplier, it

9     is certainly reasonable.  I think these are a little more novel

10    in terms of whether we'd ever be able to to recover anything,

11    including our times, as opposed to security litigation --

12         THE COURT:  You see a greater risk.

13         MR. MELTZER:  There's somewhat of a greater risk in

14    this action.  Beyond that, I think -- you know, if you look at

15    the factors, the Third Circuit sets out, I think, given the

16    complexity, and I think your Honor said the risk of not payment

17    all at all, and there was a fairly substantial risk of

18    nonpayment, particularly after that District Court opinion in

19    New Jersey that dismissed the claims, which came down before --

20    before we settled.  I think that militates in favor of a

21    slightly higher percentage, especially when you couple that

22    with the fact that it's a smaller aggregate amount, which

23    doesn't require sort of a slide back.  They call it a slide

24    back on a mega settlement fund.  And there's also fairly --

25    again, I believe very substantial and valuable structural

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                            18

1    relief that is attendant to the settlement, for which we're not

2    seeking any fee at all.

3            THE COURT:  All right.  And I guess that's to the --

4    to the case contribution payment to the named plaintiffs.  I

5    don't see that as much of a problem.  How many named plaintiffs

6    do you have?

7            MR. MELTZER:  Six.

8            THE COURT:  All right.  I guess that's all the

9    applications you've got.

10           MR. MELTZER:  I believe so.

11           THE COURT:  Mr. Francis.

12           MR. FRANCIS:  Your Honor, Mr. Eccles has a few brief

13   remarks to make.

14           MR. ECCLES:  Thank you, your Honor.  And I will be

15   brief.

16           Let me exercise the main points why we think this

17   settlement should be approved.  First, it's clearly an arm's

18   length settlement.  This was an adversarial process the way

19   it's supposed to be.  I say not at all uncivil, but contentious

20   is not a bad word to use.  We were litigating this hard and the

21   settlement stopped there.  It's also that both Mr. Meltzer's

22   firm and my firm have many other cases that look a little like

23   this, and we've been through this, and have the able to assess

24   what cases are worth, and what cases should go forward.  And

25   from a procedural viewpoint, I don't think that's any question

Colloquy                                    19

1   that all the class proceedings and notice were more than

2   adequate to provide notice to the class.

3           From our point of view, and we put this in submission,

4   so I'll be very brief, from the defendant's point of view, we

5   thought we had terrific defenses.  And the court defense in a

6   nutshell was the stock market went down, and the Honeywell

7   stock went down with it, and there's nothing extraordinary

8   about that.  No fraud, no nothing else.  And we cited that one

9   of the other funds, a gross equity fund within these plans the

10  participants could have put their money in, actually it went

11  down more than the Honeywell stock over each of the three big

12  years involved here.

13          And so we thought we had an excellent set of defenses,

14  your Honor.  But like most cases, nothing certain, except that

15  they'll be a lot of expenses, I think an additional year of

16  litigation would have been an extremely optimistic viewpoint.

17  There would have been a lot of depositions and a lot more

18  document discovery.  And so from our viewpoint, it made sense

19  for both sides to get together and talk, and that's exactly

20  what we did.  And reached a settlement, which I think is

21  definitely an arm's length settlement, definitely a fair

22  settlement to the class.

23          The one other point we make, your Honor, is although

24  some of the objectors did focus on the fees, which is not our

25  issue, it's a separate issue from the fairness of the rest of

```
                          Colloquy                        20
```

1    the settlement, and I think will effectively get taken care of

2    when the Court approves whatever fee is fair.  And unless the

3    Court has questions with that, we ask the settlement be

4    approved.

5              THE COURT:  All right.  Thank you.

6              Anyone else at the counsel table want to speak.

7              MR. MELTZER:  Only to point out for the record, and I

8    think Mr. Eccles knows this, to the point where I was

9    contentious, to the extent I say contentious, and it was not

10   well taken on the other side, it was not my intent.  It was a

11   hard fight, I should have said.

12             THE COURT:  I didn't take it in any invidious sense.

13   Is there a Mr. Smith in the courtroom?  I think he filed a

14   notice and wanted to be heard.  All right.  And there's nobody

15   else who has appeared either in favor of, or in opposition to

16   the settlement.

17             I think it's important or useful at least to resolve

18   the matter at this point, so I'm going to impose upon you to

19   read a rather lengthy opinion into the record.  I'll reserve

20   the opportunity to correct any transcript which results from

21   that before it's officially made a part of the record.

22             This action was commenced on March 17th, 2003, when

23   Plaintiff Richard Ramseyer, a participant in the Honeywell

24   Savings and Ownership Plan I, filed a class action complaint

25   asserting claims under the Employee Retirement Income Security

1    Act of 1974 (ERISA).  The Ramseyer action sought relief for

2    losses to the Honeywell Savings and Ownership Plans I and II,

3    (collectively the "Plan").  On May 8th, 2003, the Ramseyer

4    action was consolidated with Freund v. Honeywell International,

5    Inc., et al., 03-cv-1626 (District of New Jersey), a related

6    action involving similar allegations and claims.  The order of

7    consolidation also appointed Shiffren & Borroway, LLP and

8    Trujillo Rodriguez & Richards, LLC as lead and liaison counsel

9    for plaintiffs, respectively.  Plaintiffs filed a consolidated

10   complaint for breach of fiduciary duty on July 28th 2003.

11          After extensive investigation, and a motion to dismiss

12   the complaint, a hearing on the motion, class discovery and

13   settlement discussions, the parties arrived at a settlement.

14   Upon motion of the plaintiffs, the Court preliminarily approved

15   the settlement, conditionally certified a settlement class

16   pursuant to Federal Rule of Civil Procedure 23, approved a

17   notice plan and scheduled a final fairness hearing.  The case

18   is now before the Court for certification of a settlement

19   class, a ruling upon the fairness, reasonableness and adequacy

20   of the settlement, approval of the cash contribution awards for

21   named plaintiffs, and award of attorneys' fees and expenses.

22   Originally plaintiffs moved for final approval of a plan of

23   allocation, but both plaintiffs and defendants have requested

24   this motion be a adjourned for a brief period to permit

25   refinement to be made in the plan.

Colloquy                                    22

1          First, proceedings.  The consolidated complaint names

2    the defendants Honeywell, members of the Company's Retirement

3    Plans Committee, members of the Company's Pension Investment

4    Committee, and Michael R. Bonsignore, Chairman and CEO of

5    Honeywell from April 2000, through June, 2001.  The

6    consolidated complaint alleges, inter alia,, that defendants

7    breached their fiduciary duties by allowing the Plan to

8    purchase and hold Honeywell common stock at a time when

9    Honeywell stock was an imprudent investment.  In particular,

10   plaintiffs allege that the Plan was allowed to accumulate and

11   maintain, through company-encouraged participant investments

12   and company-matching contributions, a large position in

13   Honeywell common stock.

14          According to plaintiffs, such a heavy single-equity

15   investment, in addition to being inherently risky, was

16   particularly imprudent, given the persuasive problems that

17   beset the company stemming from the consummated Allied Signal

18   transaction, and the failed General Electra merger, the

19   ramifications of which defendants were fully aware.  Further,

20   plaintiffs allege that Honeywell and certain individual

21   defendants made material misrepresentations through Securities

22   and Exchange Commission filings and other public

23   pronouncements, and withheld pertinent information, that

24   compromised participants' ability to make informed investment

25   decisions.  When the company finally disclosed that the Allied

1   Signal transaction resulted in expensive operational problems

2   and substantial customer losses, and that the General Electric

3   merger would not be effectuated, the Plan's assets were

4   depleted as the value of the Honeywell stock declined.

5           The consolidated complaint further alleges that

6   defendants are liable under ERISA as a result of their:  One,

7   engaging in prohibited transactions involving the Plan's assets

8   with parties-in-interest; two, failing to properly monitor and

9   provide material information to the Pension Investment

10  Committee; three, allowing or abetting fiduciary breaches of

11  their cofiduciaries; and four, failing to avoid or remedy

12  inherent conflicts of interest between their corporate

13  interests and their fiduciary responsibilities to the Plan

14  under ERISA.  The consolidated complaints seeks plan-wide

15  relief under Section 409 and 502 of ERISA.

16          Plaintiffs' counsel conducted a thorough investigation

17  into these allegations.  They reviewed documents produced by

18  defendants and publicly-available materials related to the

19  company and the Plan.  They analyzed specific corporate

20  transactions and interviewed Plan participants.  In addition,

21  counsel derived certain information from a securities class

22  action initiated in 2000 in this court and which involved many

23  factual allegations relevant to the claims in this action.  In

24  re Honeywell Securities Litigation, No. 00-3605.

25          Defendants vigorously contested the litigation.  On

1    September 29th, 2003, they filed a motion to dismiss.  After

2    extensive briefing, oral argument was heard on January 26,

3    2004, after which there was further briefing.

4         During this period the parties engaged in a extensive

5    litigation concerning class action discovery issues.  On

6    January 14th, 2004, Magistrate Judge Wigenton, over plaintiffs'

7    objections, bifurcated class and merits discovery, staying

8    merits discovery pending resolution of plaintiffs' motion for

9    class certification.

10        Also during this period the parties to the parallel

11   Securities Class Action settled.  It was necessary for

12   plaintiffs' counsel in the instant case to ensure that the

13   settlement in that action and its release of claims did not

14   affect plaintiffs' ability to pursue relief in this case.

15        Beginning in the spring in 2004, the parties commenced

16   settlement negotiations and exchanged information relevant to

17   that subject, such as performance of Plan investments during

18   the relevant period, insurance available to satisfy any

19   possible judgment, including documents evidencing denial of

20   coverage under the fiduciary insurance policy, settlement in

21   analogous cases, the precise number of Honeywell shares held by

22   the Plan, and demographic information for participants as a

23   means of measuring the impact of proposed structural changes to

24   the Plan.

25        The parties requested the Court to refrain from

1   issuing its ruling on defendants motion to dismiss while

2   settlement negotiations were ongoing.  In early September 2004,

3   the parties reached an impasse.  Notified of this development,

4   the Court on September 16, 2004, issued its opinion and order

5   granting the motion to dismiss with respect to plaintiffs'

6   prohibited transaction claims and claims for monetary relief

7   under ERISA, Section 502(a)(3) and denying the motion in all

8   other respects.  In re Honeywell International ERISA

9   litigation, 2004, U.S. District, LEXIS 21585, (District of New

10  Jersey, 2004).

11       Upon issuance of the court's opinion, the parties

12  resumed class certification discovery and resumed settlement

13  negotiations.  Ultimately agreement was reached, resulting in

14  the agreement now before the Court for approval.  Two, the

15  proposed settlement.

16       The settlement agreement provides the defendants shall

17  pay $14 million into an interest-bearing escrow account, (the

18  "Settlement Fund").  The principal (less amounts expended for

19  certain approved costs) will accrue interest between

20  preliminary approval and distribution.  The net amount of the

21  settlement funds, including interest, and after payment of, and

22  establishment of reserves for, any taxes and Court-approved

23  costs, fees and expenses (including and Court-approved

24  compensation to be paid the named plaintiffs), will be paid to

25  the Plan.  After payment of implementation expenses, the

Colloquy                                    26

1    remaining amount will be allocated to the Plan accounts of

2    members of the settlement class according to a Plan of

3    allocation to be approved by the Court.

4          In addition, the settlement agreement provides for

5    certain structural changes in the Plan.  The operative

6    documents of each Plan will be amended to state that each Plan

7    participant who is or has become one hundred percent vested in

8    his or her Company Matching Contribution Account shall have the

9    right to direct the investment of his or her Company Matching

10   Contribution Account balance in the same manner and among the

11   same investment alternatives as are available for the

12   investment of employee contributions to the respective plans.

13   This provides participants with the ability to diversify rather

14   than being required to remain invested in Honeywell stock.

15   Plaintiffs retained Professor Krishna Ramaswamy of the Wharton

16   School at the University of Pennsylvania to analyze the

17   structural term of the settlement and estimate the value to the

18   Plan and its participants of the unlocking of Company matching

19   contributions, past and future.  The expert provided a detailed

20   report of his analysis and estimated that allowing the Plan's

21   participants to diversify company-matching contributions

22   previously "locked" into Honeywell stock would provide a

23   benefit of between $34.1 million to $211.4 million, depending

24   primarily on the percentage of the Plan's Honeywell equity

25   investments originating from company-matching contributions.

1        The notice to Plan participants advised that class

2   counsel would file a motion for payment of attorneys' fees of

3   up to 30 percent of the settlement fund, plus expenses of

4   litigation, notice and settlement administration, and case

5   contribution awards for the named plaintiffs.

6        Three, class certification.  Plaintiffs urge

7   certification of the following class for settlement purpose.

8   "Any person who was a participant in the Honeywell Savings and

9   Ownership Plan I and II and/or the predecessor Plan named the

10  Data Instruments, Inc. Employee Stock Ownership Plan, the

11  Honeywell DMC Savings Plan, and the Honeywell Savings and Stock

12  Ownership Plan (collectively the "Plan" or "Plan,") at any time

13  between December 20, 1999 and February 28, 2005 (the "class

14  period") and whose Plan accounts included investments in the

15  Honeywell Common Stock Fund, or a beneficiary, alternate payee

16  representative, or successor-in-interest of any such person

17  (the "settlement class")."

18        Rule 23(a) sets forth four prerequisites to class

19  certification:  One, numerosity; two, commonality; three,

20  typicality; and four, adequacy of representation.  Each of

21  these requirements is met.

22        The class is sufficiently numerous because the number

23  and diverse location of putative class members is such that it

24  is impractical to join all of the class members in one action.

25  There are more than 100,000 potential class members, which

Colloquy                                          28

1    clearly satisfies the numerosity requirement.

2         There is commonality when the proposed class

3    representatives share at least one question of law or fact with

4    the claims of the prospective class.  In the present case, the

5    principal question of law and fact applicable to all

6    participants is whether the defendant breached fiduciary duties

7    owed to the Plan and its participants in allowing the

8    maintenance of existing, and addition of new, heavy investments

9    in Honeywell common stock when defendants knew or should have

10   known of its operational problems and accounting irregularities

11   which negatively affected the prudence of Honeywell stock as an

12   investment of the Plan during the class period.  It is

13   unnecessary to catologue the several other commons question of

14   law and fact that exist as to all members of the class and

15   predominant over any questions affecting solely individual

16   class members.

17        The proposed class representatives' claims arise from

18   the same event or course of conduct that gives rise to the

19   claims of the other class members and are based on the same

20   legal theories.  Class plaintiffs share the incentives of the

21   absent class members to pursue this action to its conclusion.

22   Typicality can be met in class actions brought for breaches of

23   fiduciary duty under ERISA and is met here.  In re Ikon Office

24   Solutions, Inc., 191 Federal Rule of Decisions, 457, 465

25   Eastern District of Pennsylvania, 2002).  Each class member was

Colloquy                                            29

1    an employee of Honeywell, a participant in the Plan during the

2    class period, and had part of his or her individual Plan

3    investment portfolio invested in Honeywell stock during that

4    time.  All Plan participants sustained injury arising out of

5    defendants' alleged wrongful conduct and plaintiffs bring their

6    claims pursuant to ERISA Sections 409 and 502(a)(2) for

7    Plan-wide relief; so any relief obtained for such claims would

8    enure to the Plan as a whole and, derivatively, its

9    participants during the class period.

10           The class representatives meet the adequacy

11    requirement of Rule 24(a)(4).  They have represented and will

12    represent the members of the class so as to fairly and

13    adequately protect the interest of the class.  The named

14    plaintiffs have no interest antagonistic to the class and are

15    in the same position as all all other members.  Class counsel,

16    Schiffren & Barroway, LLP has had extensive experience in

17    litigating complex ERISA breach of fiduciary duty class

18    actions.

19           While it is necessary for class certification to

20    qualify under only one of the requirements of Rule 23(b),

21    plaintiffs in the instant case qualify under all three.

22           They qualify under Rule 23(b)(1)(a) and (B).  The

23    relief to be accorded is Plan-wide.  Failure to certify could

24    expose defendants to multiple lawsuits and risk inconsistent

25    decisions.  Failure to certify would create the risk that

Colloquy                                    30

1    future plaintiffs would be without relief.  Rankin v. Rots, 220

2    Federal Rule of Decisions 511, 523 (Eastern District of

3    Michigan, );, Ikon 191 F.R.D. at 466.

4         Although the proposed class meets the requirements of

5    Rule 23(b)(2), and Rule 23(b)(3), no further discussion is

6    warranted, as the Court will rely on Rule 23(b)(1) alone.

7         In sum, the action will be certified as a class action

8    under Rule 23(a) and (b) on behalf of the plaintiffs' proposed

9    class.

10        Four, Objections to Settlement.  Eighteen persons have

11   lodged specific objections to the settlement terms and/or to

12   plaintiffs' request for attorneys' fees and expenses, and case

13   contribution awards for the named plaintiffs.  One person, Mr.

14   Steven K. Smith, wished to be heard at the hearing to express

15   his objections.  He did not appear at the hearing.  These 18

16   objectors represent .016 percent of the more than one hundred

17   and fifteen thousand settlement class members to whom

18   individual notice of the settlement was sent.  The Court has

19   read and considered each objection with care.

20        A few are from persons who object to this class action

21   proceedings per se, either because they do not believe in class

22   actions as a matter of principle, or because the concept of

23   awarding substantial attorneys' fees to attorneys who take on

24   class action cases offends them, or because they believe

25   Honeywell voluntarily turned over shares of its stock to the

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                                 31

1    Plan, and employees who benefited from these contributions

2    should not sue their benefactor Honeywell.  While these views

3    are entitled to respectful consideration, they have in effect

4    been rejected when the Court did not grant defendants' motion

5    to dismiss and proceeded with the case.  They cannot be

6    advanced again at this time.

7           There are objections either to the settlement or to

8    the payment of attorneys fees.  The objections must be treated

9    with utmost sympathy, because they are submitted by persons who

10   believe that they have been grievously injured by the conduct

11   of the defendants as charged in the complaint.  Some are by

12   employees who had worked loyally for the company for many years

13   and had counted on their interests in the Plan to provide

14   comfortable old age, an expectation that in some cases has not

15   been fulfilled.  A few others assert that they had been close

16   to the management of the Plan and had expressed doubts about

17   the way they were being handled during the class period,

18   warnings that had been ignored.

19          The objections generally address three aspects of the

20   settlement.  A number of them attack the adequacy of the

21   settlement award, others challenge the 30 percent potential

22   attorneys' fee request; a few challenge payment of a cash

23   contribution award to the named plaintiffs.  In their

24   submissions, plaintiffs have discussed each objector's

25   contentions, explaining why they believe they are not a basis

Colloquy                                             32

1    for rejection of the proposed settlement.  Each of these

2    objections will be addressed generally in the context of the

3    discussions of these subjects in the sections of the opinion

4    that follow.

5            Five, Fairness, Reasonableness and Adequacy.  The

6    fairness reasonableness and the adequacy of the settlement

7    agreement is supported by the prevailing circumstances.

8    Settlement of disputed claims, especially those advanced in

9    complex class action litigation, are favored by the courts.

10   The Court of Appeals affords an initial procedural presumption

11   of fairness of a settlement if adequate notice was given to

12   affected members of the proposed settlement class and "if the

13   Court finds that (1) the negotiations occurred at arm's length;

14   (2) there was sufficient discovery; (3) the proponents of the

15   settlement are experienced in similar litigation; and (4) only

16   a small fraction of the class objected."

17           In re Cendant Corporation Litigation, 264 F. 3d 201,

18   223, Note 18 (3rd Circuit 2001).  As described above, each of

19   these four factors was fully met in this case.

20           Beyond these procedural criteria, courts in this

21   Circuit apply the nine-factor test enumerated in Girsh v.

22   Jepson, 521 F. 2d 153, 157 (3rd Circuit 1975).  Applying these

23   factors, the Court concludes that the settlement for $14

24   million in cash, plus significant structural changes in the

25   Plan, is fair, reasonable and adequate.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

1       A.   Complexity, expense and likely duration.  All

2   defendants have denied wrongdoing and liability.  They

3   vigorously through able counsel, defended the action up to the

4   point of settlement and would no doubt continue to do so,

5   absent a settlement, defending through continued class action

6   and merits discovery, class certification, objections, trial,

7   and, if unsuccessful at trial, on appeal.  This action is

8   complex and raises novel issues in the ERISA context, issues

9   that have not been decided definitively by the Supreme Court

10  and Courts of Appeals.  If successful, plaintiffs' ultimate

11  recovery would be delayed for years during which enormous

12  attorneys' fees and expenses would be incurred.  Settlement

13  ensures prompt payment and enjoyment of the restructured

14  provisions of the Plan.

15      B.   Reaction of the Class to the Settlement.  As noted

16  above, only .016 percent of the more than one hundred fifteen

17  thousand class members submitted objections to the settlement

18  agreement, which reinforces the fairness and adequacy of its

19  provisions.

20      C.   Stage of Proceedings and Discovery.  The extensive

21  investigation of the circumstances of this case was described

22  above.  It is apparent the plaintiffs' counsel had full

23  information relating to the merits of the case and were in a

24  position to negotiate and evaluate the terms of the settlement.

25      D.   Risk of Establishing Liability and Damages.

Colloquy                                    34

1    Plaintiffs' counsel who have thoroughly familiarized themselves

2    with the facts of this case and the applicable law have

3    concluded that the terms of the settlement represent an

4    appropriate balance of the amount that might ultimately be

5    recovered if successful and the risks of not recovering at all.

6    There are novel and complex issues, some of which the Court

7    recognized when it addressed defendants' motion to dismiss.

8    ERISA law is in the process of development.  In re Xcel Energy,

9    Inc. Securities, Derivative & ERISA Litigation, 364 F. Supp.

10   2d, 980, (District of Minnesota, 2005).  In re Global Crossing

11   Securities and ERISA litigation, 225 F.R.D., 436, 459 Note 13

12   (Southern District of New York 2004).  Computing damages raises

13   distinct problems.  Unlike securities law claims, ERISA

14   provides relief for the imprudent purchase and holding of stock

15   by a Plan during the class period.  In re Ikon Office

16   Solutions, Inc., 191 F.R.D. 457, 464 (Eastern District of

17   Pennsylvania, 2000), but there is little law explaining the

18   basic principle's application to the type of defined

19   contribution Plan at issue here.  Damages calculations in ERISA

20   cases such as this one require a sophisticated computer model

21   of the Plan involved and require consideration of a number of

22   complex interrelated factors.  The legal and factual

23   complexities and uncertainties of calculating and proving ERISA

24   damages point strongly towards approving the settlement.

25          E.  Risk of Maintaining Class Action Through Trial.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

1    There is always a risk that class action status might not be

2    maintained through trial.  If it could not be maintained, the

3    value of the action would decline precipitously.  The Court

4    does not consider this to be a very serious risk and by itself

5    it would not be a compelling reason to approve a settlement.

6          F.  Ability of Defendants to Withstand a Greater

7    Judgment.  Undoubtedly Honeywell could withstand a greater

8    judgment, but the other factors weigh sufficiently in favor of

9    approving the settlement.  The risks entailed in seeking a

10   larger recovery through trial militate against rejecting the

11   opportunity to receive prompt payment of a lesser sum.

12         G.  Reasonableness of the Settlement Fund.  One of the

13   principal grounds of those who filed objections is that the

14   case is being settled for an inadequate amount, specifically

15   that plaintiffs should hold out for more than $14 million in

16   cash and the changes in the Plan that will allow for greater

17   diversification among the participant accounts.  This is "in

18   plaintiffs' counsel's estimation, an outstanding result."

19   Considering the skill and extensive experience of counsel and

20   the vigor with which this case has been pursued, this

21   estimation is entitled to considerable deference.

22         The persons who object to the settlement are well

23   aware of the losses incurred and the hurt that the losses have

24   caused to Plan participants.  They cannot be expected to be

25   aware of the legal uncertainties in computing damages for

Colloquy                                    36

1   recovery purposes and of the legal hurdles to be faced to

2   secure any recovery at all.  One objector urged that plaintiffs

3   should have calculated how many additional shares of Honeywell

4   stock the Plan should have been able to purchase if the

5   company's equity was not inflated in the settlement class

6   period and compare that to what the Plan held at the end of

7   that period as an approach to estimating damages.  It is

8   relevant to note that the decline in value of the Honeywell

9   Common Stock Fund was less in each of the three years of the

10  2000 through 2002 bear market than the decline in value of a

11  diversified stock fund that was also an investment option under

12  the Plan.

13          One objector noted that the Plan held about 10 percent

14  of Honeywell's outstanding shares.  Of significance, $14

15  million represents 14 percent of the monetary settlement

16  reached in the related securities case which this Court

17  approved some months ago.  Further, the $14 million represents

18  93 percent of the company's fiduciary liability policy, an

19  obligation which the insurance company originally disclaimed.

20  Although no precise value could be placed upon the negotiated

21  structural relief, the opinion of Professor Ramaswamy

22  establishes that it is substantial, far more than the $14

23  million cash payment.

24          Weighing the various factors, the Court concludes that

25  the settlement is fair, reasonable and adequate.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

1     Six, attorneys' Fees and Expenses.  Plaintiffs'

2     attorneys seek fees in the amount of 25 percent of the total

3     recovery and out-of-pocket expenses of $43,887.09 incurred

4     since this lawsuit began.  Several of the objectors filed

5     objections to the maximum amount of 30 percent that the class

6     Notice advised might be requested, but the Court will assume

7     that the objections would be advanced to the 25 percent

8     request.  One objector contended simply that the case does not

9     require extensive legal work or a complicated determination.

10    Another would limit fees to what real estate brokers typically

11    earn, namely 6 percent.  Others objected on principle to fees

12    being paid to attorneys who appear in class actions.  Some

13    simply objected to 30 percent as being too high a percentage.

14    It is understandable that lay persons cannot

15    appreciate both the amount of work and the risk of receiving no

16    fee that enter into representation in a class action case.  In

17    the present case, the work which the attorneys performed is

18    described above.  In accomplishing this work, the three law

19    firms representing plaintiffs devoted 2223.6 hours of attorney

20    and paralegal time (Schiffrin & Barroway LLP - 2212.6 hours;

21    Brodsky & Smith, LLC - 28.3 hours; Trujillo Rodriguez &

22    Richards, LLC - 82.70 hours).

23    It is universally recognized in the courts that

24    attorneys who generate a fund of recovery for the benefit of a

25    class should be fairly compensated.  Boeing Co. v. Van Gemert

Colloquy                                    38

1    444 U.S. 472, 478 (1980).   Application of a portion of the

2    collected funds to the payment of attorneys' fees spreads the

3    payment proportionately among those who benefited from the

4    suit.   It encourages attorneys to undertake these kinds of

5    difficult cases.

6            The Court of Appeals for the Third Circuit as well as

7    the courts of many other circuits have expressed a preference

8    for awarding attorneys' fees from a common fund pursuant to the

9    percentage of the fund method of calculation.   In re Prudential

10   Insurance Company Am. Sales Practices Litigation Agent Actions,

11   148 F. 3d 288, 333, (3rd Circuit 1998).   This method is an

12   alternative to the lodestar method in which a fee is computed

13   by multiplying the reasonable number of hours the attorneys

14   expended on the case by the rates charged by comparable

15   attorneys in the area in which the services were rendered.   To

16   arrive at the ultimate fee, this lodestar figure is usually

17   multiplied by a factor to reflect the degree of success, the

18   risk of nonpayment the attorneys faced and perhaps the delay in

19   payment that they encountered.   But, as noted, the preference

20   is for computing the award on the basis of a percentage of

21   recovery, perhaps checking the result against a lodestar

22   computation to ensure that it is not grievously out of line.

23           The amount of the percentage varies case to case, 15

24   percent, 20 percent, 25 percent, 30 percent, 33 1/3 percent, 38

25   percent having been awarded.   Thiry percent or 33 1/3 percent

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

Colloquy                                    39

1    is quite common.  The Court has reviewed the various factors

2    that govern the determination of an appropriate percentage and

3    concludes that the requested 25 percent of the class recovery

4    is reasonable, particularly in light of the fact that the value

5    of the structural changes in the Plan is not included in the

6    amount to which the percentage is applied.  Gunter v. Ridgewood

7    Energy Corporation, 223 F. 3d 195 (3rd Circuit 2000).

8          The proposed settlement appears to be favorable to the

9    class, conferring the immediate benefit of $14 million plus

10   accrued interest less attorneys' fees and expenses and the

11   named plaintiffs case contributions.  In addition, in the

12   future each Plan participant who is or has become 100 percent

13   vested in his or her Company Matching Contribution Account

14   shall have the right to direct the investment of his or her

15   Company Matching Contribution Account balance in the same

16   manner and among the same investment alternatives as are

17   available for the investment of employee contributions.

18          As described above, very few members of the class

19   voiced objections to attorneys' fees with an upper limit of 30

20   percent.  Eighteen out of the 115,000 to whom notices were sent

21   filed objections, and not all of the objections were to

22   attorney's fees.  Understandably these few objectors were

23   unaware of the principles that the courts have developed over

24   the years for awarding attorneys' fees.  The Court recognizes

25   that very few class members are likely to analyze the notices

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

1   which are sent to them.  Despite every effort to make them

2   readily understandable to lay people, they cannot help but be

3   technical in nature, lengthy and complex.  The vast majority of

4   class members rely upon the good faith of the class

5   representatives and their attorneys and upon the oversight role

6   of the Court.  Thus in the case where the class members do not

7   include institutional investors an absence of a large number of

8   objections to the Plan itself and to the requested attorney's

9   fees is of limited significance.  However, in the present case

10  where the few objections filed did not raise substantial

11  grounds to reject the requested attorney's fees, the absence of

12  a significant number of objections and the lack of merit of the

13  few objections that were filed are factors pointing towards

14  approving the fee application.

15          Plaintiffs' counsel undoubtedly possess great skill

16  and experience in this kind of case and have exhibited that

17  experience during the course of these proceedings.

18          Unlike the typical securities fraud case, a field in

19  which the law has well developed during the prior decades,

20  ERISA class actions are a relatively new phenomenon, presenting

21  complex issues as the courts deal with the complicated ERISA

22  statute.  Faced with this statute, counsel had to engage in

23  extensive factual explorations and address legal problems both

24  in the context of seeking class certification and during the

25  course of the motion to dismiss.  In this context both the

Colloquy                                    41

1  merits and class litigation, and the settlement negotiations

2  were conducted with experienced lawyers and powerful law firms

3  on the opposing side.  The Ramseyer lawsuit was commenced on

4  March 17, 2003, and was consolidated on May 8, 2003.  The

5  consolidated complaint was filed on July 28, 2003.  Intense

6  investigative and litigation activity, described above,

7  proceeded thereafter and continued until October, 2004 when a

8  settlement was agreed upon.  Had the case proceeded to

9  additional class action and merits discovery its duration would

10 have been greater, but one of the objections of the percentage

11 of recovery method of computing attorneys' fees is to encourage

12 early resolution of cases and to bring to an end continued

13 litigation that would generate extensive efforts and increasing

14 attorneys' fees.

15      The risk of not succeeding on the merits (which would

16 result in no recovery by the class members and, of course, no

17 attorneys' fees) was far greater in this case than in a typical

18 securities fraud case.  Apart from the usual difficulties in

19 developing the factual predicates underlying the legal theory

20 on the basis of which recovery is sought, in this, an ERISA

21 case, the legal theories themselves are still subject to

22 challenge.  In particular, the application of long-standing

23 fiduciary principles in the ERISA context has yet to be

24 authoritatively developed.  As the Court stated in In re Global

25 Securities and ERISA Litigation 225 F.R.D 436, 456 (Southern

Colloquy                                    42

1    District of New York, 2004).

2            "The ERISA cases would pose additional factual and

3    legal issues.  Fiduciary status, the scope of fiduciary

4    responsibility, the appropriate fiduciary response to the

5    Plan's concentration in company stock and defendant's business

6    practicse sould be issues for proof, and numerous legal issues

7    concerning fiduciary liability in connection with company stock

8    in 401(k) Plan remained unresolved.  These uncertainties would

9    substantially increase the ERISA cases' complexity, duration,

10   and expense - and thus militate in favor of settlement

11   approval."

12           The legal and factual contentions of the class members

13   would be challenged vigorously by defendants' able counsel.

14   The risks inherent in this case support approval of the

15   settlement and approval of the attorneys' fees application.

16           Class counsel have described the work they have

17   performed and the hours expended performing that work -

18   specifically 2223.6 hours - see the foregoing sections of this

19   opinion.  They will have to continue expending time finalizing

20   the settlement, overseeing claims administration and dealing

21   with any appellate issues, should they arise.  Without

22   consideration of the additional legal work that will have to be

23   performed the lodestar in this case is $937,160, and the

24   requested fee represents a multiplier of 3.8.  In fund in court

25   cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

Colloquy                                              43

1    even higher.  Prompt resolution of a case is often reflected in

2    a higher multiplier, rewarding prompt recovery for the members

3    of the class and discouraging unnecessary protracted

4    litigation.  If I were to compute the lodestar in this case for

5    the purpose of actually computing the fee, I might have arrived

6    at a somewhat lesser figure, finding that the rates the

7    attorneys project to be somewhat high.  However, I might well

8    apply a somewhat higher multiplier, and the end result would be

9    substantially the same.

10              Considering all these factors, I find that the

11   attorneys' fees being requested are reasonable and they well be

12   allowed.  No objection has been raised to reimbursement of the

13   attorneys' expenses totaling at least $43,887.09 as of the date

14   of this application.  They appear to have been reasonably

15   incurred and will be allowed.

16              Seven, Named Plaintiffs' Case Contribution Awards.

17   Class counsel seek approval of case contribution awards to the

18   named plaintiffs in the amount of $2500 each.  A few class

19   members objected to the payment of these sums.  However, the

20   persons who agreed to be named as class plaintiffs undertook

21   responsibilities in connection with the litigation.  They had

22   to provide information and subjected themselves to depositions

23   to a greater degree than the other members of the class.

24   Courts frequently allow modest compensation for the role on the

25   occasion of the settlement of a class action.  The modest

1    cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

2    even higher.  Prompt resolution of a case is often reflected in

3    a higher multiplier, rewarding prompt recovery for the members

4    of the class and discouraging unnecessary protracted

5    litigation.  If I were to compute the lodestar in this case for

6    the purpose of actually computing the fee, I might have arrived

7    at a somewhat lesser figure, finding that the rates the

8    attorneys project to be somewhat high.  However, I might well

9    apply a somewhat higher multiplier, and the end result would be

10   substantially the same.

11        Considering all these factors, I find that the

12   attorneys' fees being requested are reasonable and they well be

13   allowed.  No objection has been raised to reimbursement of the

14   attorneys' expenses totaling at least $43,887.09 as of the date

15   of this application.  They appear to have been reasonably

16   occurred and will be allowed.

17        Seven, Named Plaintiffs' Case Contribution Awards.

18   Class counsel seek approval of case contribution awards to the

19   name plaintiffs in the amount of $2500 each.  A few class

20   members objected to the payment of these sums.  However, the

21   persons who agreed to be named as class plaintiffs undertook

22   responsibilities in connection with the litigation.  They had

23   to provide information and subjected themselves to depositions

24   to a greater degree than the other members of the class.

25   Courts frequently allow modest compensation for the role on the

Colloquy                                        44

1    occasion of the settlement of a class action.  The modest

2    amounts suggested for this purpose are reasonable and will be

3    allowed.

4            Eight, Plan of Allocation.  A ruling on a plan of

5    allocation will be deferred for a brief period.

6            Nine, Conclusion.  For the reasons set forth above, an

7    order will be entered:  One, certifying the class; two,

8    approving the settlement as fair, reasonable and adequate;

9    three, approving class plaintiffs' attorneys' petition for

10   payment of attorneys' fees and reimbursement of expenses; and

11   four, approving the requested payment of a case contribution

12   award for the the named plaintiffs.

13           Now, I have one problem here, what is the amount of

14   the expenses which are being requested for reimbursement?  I

15   have two figures, one would seem rather enormous, four hundred

16   thousand dollars, which I don't think is correct.

17           MR. MELTZER:  No, your Honor.  Forty-three thousand,

18   eight hundred and eighty-seven dollars and nine cents.

19           THE COURT:  All right.  I must have had a typo here.

20   That will be contradicted, and the figure which I now have will

21   be inserted.  Forty-three thousand, eight hundred and

22   eighty-seven dollars and nine cents.

23           MR. MELTZER:  Correct.

24           THE COURT:  All right.  That figure will be

25   substituted for the four hundred odd thousand, which I stated

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    45

1    previously.

2         THE COURT:  We have orders and what not to be signed.

3         MR. ECCLES:  Your Honor, assuming that the parties

4    reach agreement on the allocation, is it agreeable to file

5    consent orders rather than file a formal motion for approval?

6         THE COURT:  I went over the plan of allocation as

7    submitted, I saw nothing wrong with it.  Does anyone have any

8    comments on the plan, which I assume is a subject of what will

9    be coming next?

10        MR. ECCLES:  I think there are some expenses that were

11   not considered at our end that need to be plugged in there.

12   That's the only --

13        THE COURT:  They seem to be fairly trivial.  Well,

14   maybe not to you.

15        MR. ECCLES:  Well --

16        THE COURT:  Maybe not to you.

17        MR. ECCLES:  It's not going to change drastically.

18        THE COURT:  Do we need a separate hearing?

19        MR. ECCLES:  I don't think we need a separate hearing.

20        THE COURT:  Could we just submit a consent order?

21        MR. ECCLES:  Yes, your Honor.

22        THE COURT:  I'll look at it and see if there's any

23   other changes in my mind.  I doubt that they would, what you

24   hve given me.

25        MS. RODRIGUEZ:  They're the proposed orders, both with

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    46

1    regard to the settlement and the attorneys' fees.

2            THE COURT:  All right.  WeLL, let me see what you have

3    here.

4            In the first paragraph, I'm going to add:  For the

5    reasons stated in the bench opinion.  I'm going to add that

6    after duly reached.

7                    (Matter concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT

# M

William J. Dealy, Esq. is the founding partner of Dealy & Silberstein, LLP, formerly, Dealy & Trachtman, LLP.

Dealy & Silberstein, LLP is a boutique law firm that handles labor relations, employment law and legal issues concerning multi-employer benefit funds and ERISA. The firm has been involved in complex litigations in state and federal court concerning labor relations and employee benefit fund issues. William J. Dealy, Esq. was previously a partner in the firm of Manning, Raab, Dealy & Sturm, which was a union side labor relations firm in New York City that, at one point, represented numerous unions in New York City, including Local 32BJ, Local 74, Local 2, Local 54, SEIU International, Local 531, the District Council of Carpenters, Local 608 and a wide variety of other union side clients. Also that firm represented a number of health & welfare, pension and annuity funds.

Some of the relevant litigations that Mr. Dealy and Mr. Silberstein have been directly involved in are as follows:

1) Equal Employment Opportunity Commission v. Bloomberg, LP - Case No. 07 CV 08383 - this is a major Title VII case, which has been brought by the EEOC and is currently pending in the Southern District of New York before Judge Loretta Preska. The case involves claims by our firm's clients that they were subjected to pregnancy discrimination at Bloomberg. The EEOC found probable cause that our clients were discriminated against, and filed this case on behalf of our clients and on behalf of a class similarly situated female executives against Bloomberg in September 2007. Our firm's motion to intervene into the case was granted by Judge Preska in October 2007.

2) Oak Beverages, Inc. v. Tomra, et al. - Case No. 99 Civ. 3102 - this was a RICO case before Judge Colleen McMahon in the Southern District of New York. Mr. Dealy represented three members of the Empire State Beer Distributors Association, which is also a client of the firm. The case was dismissed based upon our firm's motion to dismiss brought together with a large number of other defendants.

3) Ericson, et al. v. Syracuse University, et al. - Case No. 98 CV. - 03435 - this was a major Title IX case before Judge Jed Rakoff in the Southern District of New York that was settled with a Confidential Settlement Agreement on the eve of trial.

4) Amsterdam Tobacco, et al. v. Philip Morris - Case No. 98 CV 03934 - this was a case against Philip Morris concerning the sale of cigarettes in southern states that were being illegally transported to the state of New York without the proper tax stamps which was causing competitive problems for the cigarette tax dealers in New York State.

5) Selas Enterprises, Ltd. v. Local 813, International Brotherhood, et al. - Case No. 97 CV 07448 - this was a Boys' Markets Injunction case in the Eastern District of New York which Judge Platt issued the injunction on behalf of the firm's client, Selas Enterprises, Ltd.

6) <u>Sage Realty Corporation v. ISS Cleaning Services Group, Inc., et al.</u> - Case No. 96 CV 0581 - this was a major anti-trust case brought against companies in the real estate business in New York City by a realty company and Local 32B-32J concerning alleged anti-competitive practices by the real estate companies during a strike by the service employees against the commercial building owners in New York City.  Mr. Dealy represented Local 32B-32J, SEIU, AFL-CIO in that case.

7) <u>Associated Brick Mason Contractors, et al. v. Local Union No. 1</u> - Case No. 96 CV 03275 - this is a Boys' Market Injunction case brought in the Eastern District of New York before Judge Platt and Magistrate Boyle in which Mr. Dealy represented the Associated Brick Mason Contractors of Greater New York, Inc.  The Boys' Markets Injunction was granted by Judge Platt after a fact finding hearing and recommendation by Magistrate Boyle.

8) <u>Biofeedtrac, Inc. v. Kolinor Optical, et al.</u> - Case No. 90-CV-01169 - this was a RICO case against a foreign corporation before Judge Nickerson in the Eastern District of New York in which Mr. Dealy represented the Plaintiff and the case was settled after Plaintiff prevailed on very significant jurisdictional issues.

9) <u>Galbreath Ruffin v. Local 32BJ Pension Fund</u> - This was one of the earliest cases involving an interpretation of MPPAA by Judge John Sprizzo.

Mr. Dealy has also advised a number of clients on substantial assets purchase agreements and the issues concerning multi-employer withdrawal liability related to those transactions. Additionally, Mr. Dealy has handled mergers of multi-employer Taft Hartley Pension, Health & Welfare Funds.

**WILLIAM J. DEALY, ESQ.**
225 Broadway, Suite 1405
New York, New York 10007
Telephone No. (212) 385-0066

**WORK EXPERIENCE:**

**November 1, 2002 through present - Dealy & Silberstein, LLP**

Partner in law firm specializing in ERISA and labor relations matters including employment law, representation of Taft Hartley Multi-Employer Health & Welfare Funds and Pension Funds including attending meetings of the Board of Trustees, interfacing with investment advisors and actuarial firms, third party payors and service providers, reviewing contracts with service providers, reviewing employment contracts and dealing with a wide variety of issues concerning the administration of the Funds; pursuing the collection of delinquent contributions and pursuing issues concerning audits and the discovery of individuals working in covered employment who have not been properly reported to the Funds; pursuing claims against Employers and, where appropriate, against individuals and guarantors; pursuing such claims in the bankruptcy courts to protect the rights of the Funds and of the covered beneficiaries of the Funds; dealing with D.O.L. investigations and audits and protecting the rights of the Trustees of the Funds; arbitrations, lawsuits in Federal District Courts and lawsuits in State Courts to enforce the rights of the Funds to collect delinquent contributions; every aspect of labor relations law including, employment contract disputes, sex, age and race discrimination matters and litigations and, additionally, corporate, commercial and business matters including arbitrations, administrative hearings, litigations and appeals

**July 1, 1997 through October 31, 2002 - Dealy & Trachtman, LLP**

Partner in law firm performing same functions as listed above under Dealy & Silberstein, LLP (Essentially the firm is the same; Alan C. Trachtman, Esq. left the firm to become "Of Counsel" to a larger firm).

**1978 through June 30, 1997 - Manning, Raab, Dealy & Sturm**

Partner in law firm specializing in labor relations matters, employment law, employment contract disputes, sex, age and race discrimination matters and litigations, representation of health and welfare funds and pension funds, including attending Trustees meetings and defending Trustees and fiduciaries in major federal lawsuits and governmental investigations, including D.O.L. investigations and government and privately brought ERISA and RICO Actions, corporate, commercial and business matters including arbitrations, administrative hearings and litigations

**1976 through 1978 - General Counsel - American Standards Testing Bureau and related companies**

General Counsel to a group of privately held corporations with common ownership - handled labor relations, commercial, business and corporate matters

**1972 through 1976 - Associate - Booth, Lipton & Lipton**

Handled corporate, commercial and labor relations matters including litigations, labor arbitrations, NLRB trials, negotiations of labor relations contracts and related matters

**MEMBER:**

The American Bar Association
The Association of Trial Lawyers of America
New York County Lawyers Association

**ADMISSIONS:**

Supreme Court of the United States, 1988
Second Circuit Court of Appeals, 1985
Eastern District of New York, 1973
Southern District of New York, 1973
State of New York, 1972

**EDUCATION:**

Fordham University, School of Law, J.D. 1971
Fordham College, B.A. 1968
Brooklyn Prepatory School, 1964
President, Gamma Eta Gamma, Legal Fraternity, 1970-1971

**OUTSIDE INTERESTS AND ACCOMPLISHMENTS:**

Past President and one of the Founders - Crestwood Civic Association
Board of Directors - Cooley's Anemia Foundation (Honored as Man of the Year 1992)
C.Y.O. High School Basketball Coach - Annunciation, Crestwood
 (With another gentlemen founded C.Y.O. High School Basketball League
 in Westchester County and Northern Bronx)
Hillcrest Lakers Baseball Coach and Basketball Coach - a member of the Board of
   Directors
Crestwood Basketball Coach - Monroe College Summer League
Eastchester Soccer League Coach - a member of the Board of Directors

# MILO SILBERSTEIN
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-0066

## EXPERIENCE

**Dealy & Silberstein, LLP**, New York, NY
Partner, November 1, 2002 to Present

Partner in law firm specializing in ERISA and labor relations matters
including employment law and representation of multi-employer benefit
funds and various employer associations; handle all aspects of litigation in
State and Federal courts, and in arbitrations, including case management
from commencement through disposition and appeal; extensive
experience in preparation of pleadings, pre-trial disclosure and discovery,
including the taking and defense of depositions of party, non-party and
expert witnesses; preparation of comprehensive document requests and
interrogatories and responses thereto; preparation of briefs and records on
appeal; drafting of routine and complex motion papers and argument of
motions, including motions for dismissal, summary judgment, pre-trial
disclosure, protective order, transfer, removal, remand and enforcement of
judgment; trial preparation, including drafting pre-trial briefs and
preparation of witnesses and documents; experience in expedited and
emergency applications, including orders to show cause, and motions for
temporary restraining order and preliminary injunction; prepare
submissions and appear before Federal, State and local administrative
agencies including OSHA, EEOC, NYSDHR, NYCCHR, Campaign
Finance Board and the Workmen's Compensation Board; negotiation and
preparation of settlement agreements, collective bargaining agreements,
employment contracts, separation agreements, stipulations, confidentiality
agreements and restrictive covenants.

**Dealy & Trachtman, LLP**, New York, NY
Associate, September, 1997 to October, 2002

Associate in law firm performing essentially the same functions as listed
above under Dealy & Silberstein, LLP.

**Klein, O'Brien & Trachtman**, New York, NY
Associate, August 1996 to August 1997

Drafted and negotiated real estate contracts, leases, purchases and
refinances.  Routinely handled closings on behalf of national mortgage
bank.  Worked on real estate and zoning litigation.  Drafted mechanics'
liens.

## EDUCATION

**BENJAMIN N. CARDOZO SCHOOL OF LAW**, New York, NY
Juris Doctor, June 1996
Journal:  Cardozo Studies in Law and Literature, Editorial Staff

**SYRACUSE UNIVERSITY**, Syracuse, NY
Bachelors of Arts in Political Science, May 1993
Honor:       Dean's List
Activities:    Syracuse University Men's Basketball, Team Manager

## PROFESSIONAL

Bar Admissions:  New York State, Appellate Division, First Department - 1997
                 United States District Courts for the Southern and Eastern Districts of
                 New York - 1997