UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE BEAR STEARNS COMPANIES
ERISA LITIGATION,

This Document Relates To:
ERISA Action, No. 08 Civ. 2804 (RWS)

Master File No.: 08 MDL No. 1963 (RWS)

ECF Case

**CLASS ACTION**

---

**AMENDED CONSOLIDATED COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME SECURITY ACT**



**Table of Contents**

I.     INTRODUCTION ................................................................................................ 1

II.    NATURE AND SUMMARY OF THE ACTION ............................................... 1

III.   JURISDICTION AND VENUE ........................................................................ 7

IV.    PARTIES ............................................................................................................ 8

       A.    Plaintiffs. .................................................................................................. 8

       B.    Defendants. .............................................................................................. 8

             1.    Bear Stearns. .................................................................................. 8

             2.    Director Defendants. ...................................................................... 9

             3.    Executive Committee Defendants. ................................................ 14

             4.    The Employee Stock Ownership Plan Committee
                   Defendants. .................................................................................... 15

             5.    Additional Defendants. ................................................................. 16

V.     THE PLAN ......................................................................................................... 16

       A.    Background. ............................................................................................. 16

       B.    Participation, Eligibility and Vesting of Benefits. ................................. 17

       C.    Right To Divest Plan Account. ............................................................... 19

       D.    ESOP Fiduciaries Are Bound by Core ERISA Fiduciary Duties. ......... 20

       E.    The Plan Incurred Significant Losses During the Class Period. ............ 21

VI.    DEFENDANTS' FIDUCIARY STATUS .......................................................... 22

       A.    The Nature of Fiduciary Status. ............................................................. 22

       B.    Bear Stearns's Fiduciary Status. ............................................................ 23

       C.    Director Defendants' Fiduciary Status. .................................................. 24

       D.    The Executive Committee Defendants' Fiduciary Status. ..................... 25

E. ESOP Committee Defendants' Fiduciary Status. ............................................. 26

VII. FACTS BEARING ON FIDUCIARY BREACH .......................................................... 27

A. Bear Stearns Stock Was an Imprudent Investment for the Plan During the Class Period Because of, *inter alia*, Bear Stearns's Reckless Business Practices, Undisclosed Failure of Risk Management, and Mis-Handling of Its Subprime and Alt-A Mortgage Assets ......................................................................... 27

1. Summary. ........................................................................... 27

2. Bear Stearns's Once-Functional Business Model Became Unsustainable. ................................................................. 31

a. The Beginning. ........................................................ 31

b. Bear Stearns Increasingly Depended On Risky Subprime, Alt-A, MBS and Structured Financial Product Exposure. ....................................... 33

c. Bear Stearns Took Advantage of Scant Regulation and Low Capital Requirements To Increase Leverage and Grow Its Debt-Security Business. ....................... 36

3. The Rise and Fall of the Subprime and Alt-A Lending Industry, Debt Securitization, and the U.S. Housing Market. ............................................................................ 39

a. The Boom in Subprime and Alt-A Loan Origination. ............................................................. 40

b. The Warnings About Foreclosures. ........................... 43

c. High Volumes of Mortgage-Backed Securities Compounded the Effects of Foreclosures. .................. 49

4. Bear Stearns Sought Full Vertical Integration into the Subprime and Alt-A Lending and Securitization Industry as the Housing and MBS Markets Collapsed. ............................. 57

5. The Volume of Bear Stearns's Securitizations and Holdings Backed by Risky Mortgages Made the Company Vulnerable to Collapse. ......................................................... 63

a. Securitization. ......................................................... 63

b. Off-Balance Sheet MBS Exposure. ........................... 65

c.      Variable Interest Entities ("VIEs"). ............................................. 70

d.      MBS Were a Significant Portion of Bear Stearns's Total Assets................................................................... 72

e.      Bear Stearns Relied on Credit Derivatives to Hedge Against its MBS Vulnerabilities. ................................. 73

6.      Bear Stearns Relied on Inadequate Risk Management Practices. ............................................................................ 74

a.      Presentation of Risk and Risk Management in Financial Statements. ................................................ 75

b.      Risk Modeling. ........................................................... 76

(i)      Asset Valuation Modeling. ............................. 77

(ii)      Value-at-Risk Modeling. ................................ 79

c.      The Securities Exchange Commission Office of Inspector General Has Documented Severe Flaws in Bear Stearns's Risk Management and Use of VaR. .................. 86

7.      Bear Stearns Was Extremely Leveraged and Had Insufficient Capital and Liquidity ........................................... 89

a.      Leverage. .................................................................. 89

b.      Bear Stearns Lacked Sufficient Capital and Liquidity. ................................................................... 96

(i)      Capital. .......................................................... 96

(ii)      Liquidity. ....................................................... 98

8.      Bear Stearns's Reliance on Overnight Repo Loans Was a Liquidity Crisis Waiting to Happen. .................................... 101

9.      Bear Stearns Accelerated Its Dependence on the Mortgage Industry During the Housing Bubble Bust, Yet the Company Persistently Denied the Resulting Deterioration of Its Financial Condition and Made Misleading Statements. ............................................................................ 104

a.      Third Quarter 2006. .................................................. 104

b.      Fourth Quarter 2006. ................................................ 105

|  |  | c. | First Quarter 2007. | 107 |

c.    First Quarter 2007. .................................................................. 107

d.    Second Quarter 2007................................................................ 110

e.    Third Quarter 2007. ................................................................ 112

      (i)    Bear Stearns Increased Its Exposure to the Subprime and Alt-A Mortgage Market by Backing Its Hedge Funds. ............................................. 113

      (ii)    Bear Stearns's Hedge Funds Collapsed and the Company Scrambled to Revamp Senior Leadership.................................................................. 116

      (iii)    Bear Stearns Maintained Its Opportunistic Focus on MBS and Insisted "The Worst Is Largely Behind Us." ...................................... 121

f.    Fourth Quarter 2007................................................................ 124

10.    Bear Stearns's Housing-Bubble-Related "Risk Factors" Were Disclosed Too Late.................................................... 131

11.    Bear Stearns Crumbled, But Kept Reassuring the Flock..................... 134

12.    Bear Stearns's Recklessness and Foreseeable Collapse Made the Company a Catalyst in the Global Liquidity Crisis, Not a Victim. .................................................... 144

13.    Bear Stearns's Practices Violated Accounting Standards..................... 150

14.    Bear Stearns's Internal Controls Were Materially Deficient................ 153

15.    Bear Stearns's Practices Violated Banking Regulations. .................... 155

16.    Post-Collapse Events. ......................................................... 156

17.    Bear Stearns's Stock Price Was Artificially Inflated............................ 159

B.    Defendants Knew or Should Have Known that Bear Stearns Company Stock Was an Imprudent Investment................................ 161

C.    Defendants Failed To Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Bear Stearns Stock in the Plan...................................................... 172

D.    Defendants Suffered from Conflicts of Interest............................... 174

VIII.    THE RELEVANT LAW.................................................................. 176

IX.     DEFENDANTS' INVESTMENT IN BEAR STEARNS STOCK IS NOT
        ENTITLED TO A PRESUMPTION OF PRUDENCE ................................................ 178

X.      CAUSES OF ACTION ............................................................................................ 182

        A.      Count I:  Failure To Prudently and Loyally Manage the Plan and
                Assets of the Plan (Breaches of Fiduciary Duties in Violation of
                ERISA Section 404 by Defendants Bear Stearns and the ESOP
                Committee). ................................................................................................. 182

        B.      Count II: Breach of Duty To Avoid Conflicts of Interest (Breaches
                of Fiduciary Duties in Violation of ERISA Section 404 by All
                Defendants). ................................................................................................. 186

        C.      Count III: Failure To Adequately Monitor Other Fiduciaries
                (Breaches of Fiduciary Duties in Violation of ERISA Sections 404
                and 405 by Bear Stearns, the Director Defendants and the
                Executive Committee Defendants). .............................................................. 187

XI.     CAUSATION ........................................................................................................... 190

XII.    REMEDY FOR BREACHES OF FIDUCIARY DUTY ............................................ 190

XIII.   CLASS ACTION ALLEGATIONS ........................................................................ 192

XIV.    PRAYER FOR RELIEF .......................................................................................... 194

## I.   INTRODUCTION

1.      Court-appointed Interim Co-Lead Plaintiffs Shelden Greenberg and Aaron Howard ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included: review of U.S. Securities and Exchange Commission ("SEC") filings by The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), including Bear Stearns's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), and current reports (Form 8-K); a review of Forms 5500 filed by The Bear Stearns Companies Inc. Employee Stock Ownership Plan (the "Plan") with the U.S. Department of Labor ("DOL"); interviews with Participants in the Plan; review of publicly available articles, books, reports, government testimony, and interviews regarding Bear Stearns; and review of the Plan and other Plan-related materials provided by Bear Stearns.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.   NATURE AND SUMMARY OF THE ACTION

2.      This is a class action brought on behalf of the Plan pursuant to section 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2), against the fiduciaries of the Plan for violations of ERISA.

3.      The Plan is a retirement plan sponsored by Bear Stearns.  *See* Bear Stearns, IRS Annual Report, Form 5500 for 2006 (BSC-ERISA 117-127) [hereinafter 2006 Form 5500], a true and correct copy of which is attached as Exhibit A.

4.      Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan ("Participants"), and to exercise the required skill, care, prudence, and diligence in

1

5.      Plaintiffs allege that Defendants imprudently permitted the aggressive investment of the Participants' assets in Bear Stearns common stock throughout the Class Period, despite the fact that they clearly knew, or should have known, that such investment was unduly risky and imprudent due to Company's serious mismanagement and improper business practices.

6.      Bear Stearns was founded in 1923, and grew from a partnership of three to a publicly held full-service investment bank of over 14,000 employees.  It was the smallest of the "big five" investment banks in the United States when it collapsed.  Bear Stearns survived decades of financial ups and downs mainly due to its once-balanced and diversified business model, its management controls, and its discipline.

7.      Bear Stearns had always taken risks, but previously the risks it took were measured and calculated in order to generate considerable wealth.  This tried-and-true approach to profit making changed when Bear Stearns underwent a radical shift beginning at the turn of this century, revamping its business model to rely almost exclusively on an emerging mortgage-dependent industry that was rife with high risks, and which was accompanied by a massive deterioration in Bear Stearns's risk management practices.  Bear Stearns's new business plan involved originating, purchasing, and securitizing primarily residential real estate mortgage loans.  These loans, driven by the housing bubble, were a new breed of risky gambles that defied traditional lending standards and controls.

---

[1] Plaintiffs reserve the right to amend the Class Period, including but not limited to extension beyond March 24, 2008 if, through the course of discovery, it becomes clear that an alternate date is more appropriate.

8.      To take full advantage of the booming mortgage industry earlier in this decade, Bear Stearns engaged in a sobering array of risky business practices that ultimately caused the collapse of the Company including:

- continuing to concentrate its business on high-risk mortgage origination and asset-backed securities ("ABS"), including mortgage-backed securities ("MBS"), as well as collateralized debt obligations ("CDO") and collateralized mortgage obligations ("CMO"), despite clear indicators of an unstable, illiquid market for these investment products;

- failing to adequately manage the Company's liquidity and capital position despite increased risks and exposures;

- maintaining an overly leveraged position that prevented the Company from securing cash infusions on credit;

- developing and relying on faulty asset-valuation models and risk assessment models that overvalued ABS, MBS, CDO, and CMO positions and underestimated the risk to which the Company was exposed;

- relying on tenuous financing and becoming wholly dependent on overnight repo loans to continue daily operations;

- projecting the appearance of using sound risk management practices, while making false and misleading statements about the Company's risks, exposures, and risk management practices; and

- through the use of the above practices, overstating earnings and artificially inflating the stock price.

9.      Not long after the peak of the housing bubble in 2005 and 2006, foreclosures skyrocketed, subprime and Alt-A lenders went out of business, indexes tracking mortgage-backed securities dropped, analysts and federal regulators sounded warning alarms, and the credit market began to seize up.

10.      Yet, as the subprime and Alt-A mortgage industry into which Bear Stearns had immersed itself began to collapse, Bear Stearns intensified its involvement instead of getting out—or moving to protect Plan assets.  Bear Stearns stood out in its resistance to responding to

ever-mounting red flags throughout the Class Period.  Indeed, Bear Stearns was one of the most aggressive and reckless speculators in the risky mortgage industry.

11.    In mid-2007, two highly-leveraged hedge funds that were backed and supervised by Bear Stearns collapsed.  Bear Stearns attempted to bail out the funds, which failed, resulting in an addition of almost $2 billion in worthless MBS to Bear Stearns's books, which were already bulging with toxic assets.

12.    Even as the Company hemorrhaged billions of dollars in securities write-downs and restructured top management in the aftermath of the hedge funds' implosion—ousting Defendant Warren Spector, who had overseen the funds—Bear Stearns insisted that these events were not harbingers of further turmoil or systemic flaws at Bear Stearns and, instead maintained that the viability of the Company was not in jeopardy.

13.    Nonetheless, in January of 2008, Bear Stearns ousted its CEO, Defendant James Cayne—a further sign of the ongoing decline in confidence that Bear Stearns remained viable.

14.    By March 2008, Bear Stearns's practices caught up with it, and the Company collapsed.  On Wednesday, March 10, the first of Bear Stearns's creditors refused to renew financing.  On March 10 and 11, clients withdrew cash and overnight repo ("repurchase agreement") financing—on which Bear Stearns relied to continue operations—dried up.  The rest of the week and into the next saw a chaotic dash to put together a rescue by the government and/or another financial institution, peppered with assurances by Bear Stearns executives that everything was fine.

15.    Bear Stearns's spectacular implosion ultimately resulted in government intervention, including an unprecedented extension of credit and debt guarantees, and the

ultimate acquisition by J.P. Morgan Chase & Co. ("JPMorgan"), the final terms of which were announced on March 24, 2008.

16.     Bear Stearns was not a hapless victim of a "run on the bank." Instead, it was the engineer of its own demise. Bear Stearns's downward spiral into mortgage dependency, failures in leadership, and abandonment of sound risk management practices led to the artificial inflation of Bear Stearns stock and the collapse of the Company. Bear Stearns's business model made it vulnerable to this collapse at any time during the Class Period.

17.     Moreover, as it was smaller than its competitor investment banks, Bear Stearns's lack of diversification and dependence on structured financial products, combined with its over-leveraged position and lack of sufficient capital, made it even more vulnerable to collapse, and indeed this is why Bear Stearns fell first.

18.     Not only did Bear Stearns create its own vulnerability, its practices destabilized the broader economy. Bear Stearns's hedge funds' collapse has been pegged as the trigger for a cascade of liquidity problems in the larger economy. In addition, because Bear Stearns was the first over-leveraged, undercapitalized firm to crumble, Bear Stearns contributed to the global liquidity crisis rather than being a mere casualty of it. Driven by concern for the systemic instability that Bear Stearns's reckless business practices had unleashed, the federal government intervened to facilitate the Company's sale to JPMorgan.

19.     Bear Stearns's business practices rendered Bear Stearns stock an unduly risky and inappropriate investment option for Participants' retirement savings. As such, Defendants' conduct in making and maintaining investment in Bear Stearns stock in the Plan during the Class Period breached the Defendants' fiduciary duties under ERISA.

20.     Specifically, Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the Plan's assets breached their fiduciary duties to the Plan's Participants in violation of ERISA by failing to prudently and loyally manage the Plan's assets and investment in Bear Stearns stock.  In Count II, Plaintiffs allege that Defendants failed to avoid or ameliorate inherent conflicts of interest which crippled their ability to function as independent, "single-minded" fiduciaries with only the Participants' best interests in mind.  In Count III, Plaintiffs allege that those Defendants who were responsible for selecting, monitoring, and removing the Plan's other fiduciaries failed properly to monitor the performance of the fiduciary appointees, failed to remove and replace those whose performance was inadequate, and failed to remedy breaches of their co-fiduciaries.

21.     As explained more fully below, during the Class Period, Defendants imprudently permitted the Plan to hold hundreds of millions of dollars in Bear Stearns stock despite the fundamental problems the Company faced.  Based on publicly available information for the Plan, it appears that Defendants' breaches have caused the Plan to lose approximately *300 million dollars* of retirement savings.

22.     This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA sections 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).

23.     ERISA sections 409(a) and 502(a)(2) authorize Participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty.  Pursuant to that authority, Plaintiffs bring this action derivatively on behalf of the Plan and as a class action under Federal Rule of Civil Procedure 23 on behalf of all

participants and beneficiaries of the Plan whose Plan accounts were invested in Bear Stearns common stock during the Class Period.

24.     Because the information and documents supporting Plaintiffs' claims are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity upon information and belief.  Once Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint—or if required, seek leave to amend—to add such other additional facts as are discovered that further support Plaintiffs' claims.

### III.   JURISDICTION AND VENUE

25.     Subject Matter Jurisdiction.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA section 502(e)(1), 29 U.S.C. § 1132(e)(1).

26.     Personal Jurisdiction.  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over all Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

27.     Venue.  Venue is proper in this district pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Bear Stearns has its principal place of business in this district.

# IV.   PARTIES

**A.**     Plaintiffs.

28.     Plaintiff Shelden Greenberg is a resident of Staten Island, New York.  He worked for Bear Stearns beginning in 1981 and left the Company in 2003.  He is a participant in the Plan within the meaning of ERISA section 3(7), 29 U.S.C. § 1002(7), and held Bear Stearns shares in the Plan during the Class Period.

29.     Plaintiff Aaron Howard is a resident of Los Angeles, California.  Mr. Howard began working for Bear Stearns in 1995 and ended his employment on October 29, 2007.  He is a participant in the Plan within the meaning of ERISA section 3(7), 29 U.S.C. § 1102(7), and held Bear Stearns stock in the Plan during the Class Period.

30.     Pursuant to this Court's Order dated January 5, 2009 (Dkt. 24), Plaintiffs Shelden Greenberg and Aaron Howard were appointed Interim Co-Lead Plaintiffs in this consolidated ERISA class action.

**B.**     Defendants.

**1.**     Bear Stearns.

31.     Through May 30, 2008, Defendant Bear Stearns was a Delaware corporation with its principal place of business located at 383 Madison Avenue, New York, NY 10179.  On May 31, 2008, JPMorgan announced that it had completed an acquisition of Bear Stearns, effective 11:59 p.m. EDT on May 30, 2008.  Prior to its acquisition, Bear Stearns was a leading investment banking, securities and derivatives trading, clearance and brokerage firm serving corporations, governments, institutional and individual investors worldwide.  It provided these services through broker-dealer and international bank subsidiaries, including Bear Stearns & Co. Inc., Bear Stearns Securities Corp., Bear Stearns International Limited and Bear Stearns Bank PLC.  *See* Bear Stearns, Annual Report (Form 10-K), at 3 (Feb. 13, 2007) (for the period

ending Nov. 30, 2006) [hereinafter 2006 Form 10-K]. The Company conducted additional activities through several wholly owned subsidiaries, including, *inter alia*, EMC Mortgage Corporation, Bear Stearns Residential Mortgage Corporation, Bear Stearns Asset Management, and Bear Stearns Commercial Mortgage, Inc. The Company had approximately 14,000 employees worldwide.

32.    Bear Stearns was the named sponsor of the Plan. *See* 2006 Form 5500, BSC-ERISA 117.

33.    Moreover, at all applicable times, Bear Stearns had effective control over the activities of its officers and employees, including over their Plan related activities. Bear Stearns had the authority and discretion to hire and terminate all officers and employees. In addition, upon information and belief, the Company had the authority and discretion to appoint, monitor, and remove individual officers and employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, the officer and employee fiduciaries breached duties they owed to the Plan and its Participants and the Company is liable for these imputed actions under the doctrine of *respondeat superior*.

34.    Bear Stearns was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

   **2.**    Director Defendants.

35.    Bear Stearns, as a corporate entity, could not act on its own without any human counterpart. In this regard, during the Class Period, the Company relied upon the Board of Directors, among other entities and individuals, to carry out its fiduciary responsibilities under the Plan and ERISA.

36.     The Board of Directors was responsible for the overall administration of the Plan, for determining the amount of discretionary Company contributions to the Plan, and for appointing and monitoring the performance of members of various committees charged with management and operation of the Plan.  For instance, the Board had the authority to appoint members of the Employee Stock Ownership Plan Committee and, upon information and belief, members of the Executive Committee.

37.     Henry S. Bienen ("Bienen") served as a director of the Company beginning in 2004 and continuing through the Class Period.  Bienen was a member of the Audit and Qualified Legal Compliance Committees.  Bienen was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

38.     James Cayne ("Cayne") served as the Chief Executive Officer ("CEO") and Chairman of the Board ("Chairman") during the Class Period.  Cayne became CEO on June 25, 2001.  On January 8, 2008, Cayne announced his retirement from the Company as CEO but remained as Chairman during the Class Period.  Cayne was also a member of the Executive Committee during the Class Period.  Cayne was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

39.     Carl D. Glickman ("Glickman") served as a director of the Company beginning in 1985 and continuing through the Class Period.  Glickman was a member of the Audit and Qualified Legal Compliance Committees and the Chairman of the Compensation Committee.

Glickman was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

40.     Michael Goldstein ("Goldstein") was appointed to the Board on January 10, 2007 and continued to serve in that capacity throughout the remainder of the Class Period. Goldstein was a member of the Audit Committee. Goldstein was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

41.     Alan C. Greenberg ("Greenberg") served as a director of the Company beginning in 1985 and continuing through the Class Period. Greenberg served as Chairman of the Executive Committee of the Company throughout the Class Period. Greenberg was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

42.     Donald J. Harrington ("Harrington") served as a director of the Company beginning in 1993 and continuing through the Class Period. Harrington was a member of the Compensation Committee during the Class Period. Harrington was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

43.     Frank T. Nickell ("Nickell") served as a director of the Company beginning in 1993 and continuing though the Class Period. Nickell was a member of the Compensation,

Corporate Governance and Nominating, and Finance and Risk Committees during the Class Period.  Nickell was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

44.     Paul A. Novelly ("Novelly") served as a director of the Company beginning in 2002 and continuing through the Class Period.  Novelly was a member of the Audit, Corporate Governance and Nominating, and Qualified Legal Compliance Committees.  Novelly also served as Chairman of the Finance and Risk Committee during the Class Period.  Novelly was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

45.     Frederic V. Salerno ("Salerno") served as a director of the Company beginning in 1992 and continuing through the Class Period.  Salerno was a member of the Audit, Finance and Risk, and Qualified Legal Compliance Committees.  Salerno also served as Chairman of the Corporate Governance and Nominating Committee during the Class Period.  Salerno was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

46.     Alan D. Schwartz ("Schwartz") served as a director of the Company from 1987 until 1996 and again in 1999 through the Class Period.  Schwartz was Co-President until January 2008, when Schwartz replaced Cayne as CEO of the Company.  Schwartz was also a member of the Executive Committee during the Class Period.  Schwartz was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he

47.     Warren J. Spector ("Spector") served as Co-President and Co-Chief Operating Officer from June 2001 until his resignation in August 2007.  Spector also served as a director of the Company from 1987 until 1996 and again from 1999 until his resignation.  Prior to his resignation, Spector was responsible for the Company's Fixed Income division.  Spector served as a member of the Executive Committee during the Class Period, and was replaced after his resignation by Defendant Mayer.  Spector was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

48.     Vincent Tese ("Tese") served as a director of the Company beginning in 1994 and continuing through the Class Period.  Tese was a member of the Compensation, Corporate Governance and Nominating, and Finance and Risk Committees.  Tese also served as Chairman of the Audit Committee and the Qualified Legal Compliance Committee during the Class Period.  Tese was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

49.     Wesley S. Williams Jr. ("Williams") served as a director of the Company beginning in 2004 and continuing through the Class Period.  Williams was a member of the Audit and Qualified Legal Compliance Committees during the Class Period.  Williams was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A),

because he exercised discretionary authority or control over Plan management and/or authority
or control over management or disposition of Plan assets.

50.    Defendants Bienen, Cayne, Glickman, Goldstein, Greenberg, Harrington,
Nickell, Novelly, Salerno, Schwartz, Spector, Tese and Williams are collectively referred to
herein as the "Director Defendants."

**3.**    Executive Committee Defendants.

51.    The Executive Committee of the Company ("Executive Committee") consisted
of "both Board and non-Board members, but . . . [could] function in a manner comparable to
that of a Board committee."  *See* Bear Stearns DEF 14A Notice of Proxy Statement, filed with
the SEC on March 3, 2007.  The Executive Committee had "the authority to take action with
respect to matters delegated to it by the Board."  *Id.*

52.    Upon information and belief, the Board charged the Executive Committee with
certain responsibilities for the Plan.  By way of example, Plan audit documents for Fiscal Year
2005/2006 were directed to the "Executive Committee of The Bear Stearns Companies Inc."
*See* 2006 Form 5500/ESOP Auditor's Report.

53.    Jeffrey Mayer ("Mayer") served as a senior managing director and Co-Head of
the Fixed Income Division of the Company beginning in March 2002.  In August 2007, Mayer
became the Company's Executive Vice President, and was appointed to the Executive
Committee upon the resignation of Defendant Spector.  Mayer was a fiduciary of the Plan
within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised
discretionary authority or control over Plan management and/or authority or control over
management or disposition of Plan assets.

54.    Samuel L. Molinaro, Jr. ("Molinaro") served as the Company's Executive Vice
President and Chief Financial Officer during the Class Period.  On August 5, 2007, Molinaro

was also appointed Chief Operating Officer.  Molinaro was a member of the Executive

Committee during the Class Period.  Molinaro was a fiduciary of the Plan within the meaning

of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary

authority or control over Plan management and/or authority or control over management or

disposition of Plan assets.

55.     Defendants Cayne, Greenberg, Mayer, Molinaro, Schwartz and Spector are

hereinafter collectively referred to as the "Executive Committee Defendants."

**4.**     The Employee Stock Ownership Plan Committee Defendants.

56.     The Employee Stock Ownership Plan Committee ("ESOP Committee"), the

members of which were appointed by the Board or the Executive Committee, was the Plan

administrator.  *See* The Bear Stearns Companies, Inc. Employee Stock Ownership Plan

Summary Plan Description ("SPD") at 14, BSC-ERISA 78.  A true and correct copy of the

SPD is attached as Exhibit B.

57.     Kathleen Cavallo ("Cavallo") served as a member of the ESOP Committee

during the Class Period.  Cavallo was a fiduciary of the Plan within the meaning of ERISA

section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or

control over Plan management and/or authority or control over management or disposition of

Plan assets.

58.     Stephen Lacoff ("Lacoff") was employed as a senior managing director in the

Company's human resources department and served as a member of the ESOP Committee

during the Class Period.  Lacoff was a fiduciary of the Plan within the meaning of ERISA

section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or

control over Plan management and/or authority or control over management or disposition of

Plan assets.

59.     Robert Steinberg ("Steinberg") was employed as a senior managing director, member of the Management & Compensation Committee (Risk Management and New Products) and served as a member of the ESOP Committee during the Class Period.  Steinberg was a fiduciary of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

60.     Defendants Cavallo, Lacoff and Steinberg are hereinafter collectively referred to as the "ESOP Committee Defendants."

**5.**     Additional Defendants.

61.     Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including members of the Plan fiduciary committees, as well as other Company officers, directors, employees, or other appointees or designees who were fiduciaries of the Plan within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.  The identities of these John Doe Defendants are currently unknown to Plaintiffs. Once their identities are ascertained through discovery, Plaintiffs will seek leave to join them to the instant action under their true names.

**V.     THE PLAN**

**A.**     Background.

62.     The Plan is an "employee pension benefit plan" within the meaning of ERISA section 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" within the meaning of ERISA section 3(34), 29 U.S.C. § 1002(34).  *See* SPD at 14, BSC-ERISA 78.

63.     The Plan is designed to invest primarily but not exclusively in employer stock. *See* The Bear Stearns Companies, Inc. Employee Stock Ownership Plan (As Amended and Restated Effective as of January 1, 2007) ("2007 Plan Document") at 53, BSC-ERISA 54.

64.     The Plan is a legal entity that can sue and be sued.  *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff; rather, pursuant to ERISA section 409, 29 U.S.C. § 1109, and interpretative case law, the relief requested in this action is for the benefit of the Plan.

65.     According to the SPD, Bear Stearns designed the Plan "to provide [Participants] with benefits to meet [their] future financial needs."  *See* SPD at 5, BSC-ERISA 69.

66.     The Plan was adopted and became effective on October 29, 1985.  *See* The Bear Stearns Companies, Inc. Employee Stock Ownership Plan (As Amended and Restated Effective as of May 1, 2002) ("2002 Plan Document") at 1, BSC-ERISA 137; 2007 Plan Document at 1, BSC-ERISA 2.  True and correct copies of the 2002 Plan Document and 2007 Plan Document are attached as Exhibits C and D, respectively.

67.     ERISA section 403(a), 29 U.S.C. § 1103(a), requires the assets of an employee benefit plan to be "held in trust by one or more trustees."  During the Class Period, Custodial Trust Company acted as Plan trustee pursuant to a written trust agreement.  *See* The Bear Stearns Companies Inc. Employee Stock Ownership Trust ("Trust Agreement"), BSC-ERISA 83-116.

**B.**     Participation, Eligibility and Vesting of Benefits.

68.     Prior to January 1, 2005, eligible employees became Plan participants on the first day of the Plan Year immediately on or after their first day of active employment.  *See* 2002 Plan Document at 12, BSC-ERISA 148; SPD at 4, BSC-ERISA 68.  As of January 1, 2005, however, no new employees of the Company were permitted to become participants in the Plan.  *See* 2007 Plan Document at 12, BSC-ERISA 13 ("No Employee shall become a Participant in the Plan after December 31, 2004."); SPD at 4, BSC-ERISA 68 ("Effective January 1, 2005, no new employees will enter the Plan.").  Accordingly, during the Class

Period, no employees of the Company became newly eligible under, or were admitted as new

Participants to, the Plan.

69.      Under the Plan, the Company borrowed money to acquire Bear Stearns common

stock.  As the loans were repaid, shares of Bear Stearns common stock were released to the

Plan and allocated to the accounts of eligible Participants on an annual basis.  *See* SPD at 6,

BSC-ERISA 70.

70.      Bear Stearns had discretion to make additional contributions to the Plan either

in cash or in its common or preferred stock, as determined by the Company.  *See* 2002 Plan

Document at 13, BSC-ERISA 149; 2007 Plan Document at 13, BSC-ERISA 14 (same); SPD at

6, BSC-ERISA 70.

71.      A Participant was eligible to receive an allocation to his or her account in the

Plan for any Plan Year that the participant had (a) completed 1,000 hours of service and was

actively employed by the Company on the last day of the Plan Year, (b) become totally and

permanently disabled, or (c) died while actively employed by the Company.  *See* 2002 Plan

Document at 23, BSC-ERISA 159; 2007 Plan Document at 23, BSC-ERISA 24; SPD at 6,

BSC-ERISA 70.

72.      A Participant's share of the annual allocation was generally based on ratio of the

participant's compensation to the total compensation of all eligible Plan Participants for that

given year.  *See* SPD at 6, BSC-ERISA 70.

73.      Plan Participants who received dividends on Bear Stearns stock allocated to

their accounts in the Plan could choose to reinvest those funds and purchase additional shares

of Bear Stearns stock through the Plan.  *See* 2002 Plan Document at 15-17, BSC-ERISA 151-

53; 2007 Plan Document at 15-17, BSC-ERISA 16-18; SPD at 7, BSC-ERISA 71.

74.      Prior to January 1, 2005, a Plan Participant's account would not become fully vested and non-forfeitable until the Participant had (a) completed five years of service, (b) become totally and permanently disabled, or (c) died while actively employed by the Company.  *See* 2002 Plan Document at 17-18, BSC-ERISA 153; 2007 Plan Document at 17-18, BSC-ERISA 18-19; SPD at 6, BSC-ERISA 70.  However, as of January 1, 2005, all Plan Participants actively employed by the Company became fully vested in their Plan accounts. *See* 2007 Plan Document at 17-18, BSC-ERISA 18-19 ("[T]he Accounts of all Participants who are employed by an Employing Company or an Affiliate on December 31, 2004 shall be 100% vested on that date."); SPD at 6, BSC-ERISA 70 ("Effective December 31, 2004, all Plan Participants are fully vested.").  Accordingly, during the Class Period, all Plan Participants had a fully vested interest in the Plan.

**C.**      Right To Divest Plan Account.

75.      The 2002 Plan Document authorized the Committee to establish a date by which any Plan Participant could sell up to 100% of his or her account in the Plan once each calendar quarter and transfer the proceeds of such sale to his or her account in the 401(k) Plan.  *See* 2002 Plan Document at 20, BSC-ERISA 156; Amendment No. 1 to 2002 Plan Document at 3, BSC-ERISA 199.

76.      Upon information and belief, the Committee established such a date and, prior to the start of the Class Period, allowed Plan Participants to sell up to 100% of their accounts in the Plan and transfer the proceeds of such sale to their accounts in the 401(k) Plan.

77.      By at least January 1, 2007 (if not before), the Plan authorized a Participant to sell the entirety of his or her account in the Plan and transfer the proceeds of such sale to his or her interest in the 401(k) Plan, where it would be invested in the options selected by the Participant.  *See* 2007 Plan at 20, BSC-ERISA at 21; SPD at 8, BSC-72.

78.     Effective March 24, 2008, the Plan mandated that the Committee establish uniform rules allowing Participants to sell up to 100% of their accounts in the Plan once each calendar week.  *See* Amendment No. 2(2)[2]  to the 2007 Plan Document, BSC-ERISA 63.

79.     Accordingly, throughout the entirety of the Class Period or, at least by no later than January 1, 2007, the Plan expressly allowed any Plan Participant to sell up to 100% of his or her interest in the Plan and transfer the proceeds of the sale to his or her account in the 401(k) Plan.  However, as alleged herein, Participants were not provided with information necessary to make fully informed decisions regarding such sale and transfer.

80.     During the Class Period, the 401(k) Plan did not offer any investment in Bear Stearns stock.

**D.**     ESOP Fiduciaries Are Bound by Core ERISA Fiduciary Duties.

81.     Fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

82.     Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

83.     Nothing in the Plan document limited Bear Stearns or the ESOP Committee from liquidating all or a portion of the Plan's investment in Bear Stearns stock as prudence dictates.

---

[2] There are two separate amendments to the 2007 Plan Document that are each identified as "Amendment No. 2 to The Bear Stearns Companies Inc. Employee Stock Ownership Plan (As Amended and Restated Effective as of January 1, 2007)."  *See* BSC-ERISA 62-63.  Plaintiffs refer to the second of these amendments, upon information and belief made effective March 24, 2008, as "Amendment No. 2(2)."

84.     Here, this course of action was all the more appropriate because the Plan did not require exclusive investment in Company stock.

**E.     The Plan Incurred Significant Losses During the Class Period.**

85.     During the Class Period, Bear Stearns stock represented a significant portion of the Plan's assets.

86.     As of December 31, 2006, the market value of assets in the Plan was approximately $370.2 million.  2006 Form 5500, at BSC-ERISA 124.  Accordingly, the Plan held approximately 2.27 million shares of Bear Stearns stock.

87.     The Plan has incurred substantial losses as a result of the Plan's investment in Bear Stearns stock.  Following revelations of the Company's serious mismanagement and improper business practices—including, among other practices: (a) continuing to concentrate its business on high-risk mortgage origination and ABS, MBS, CDOs, and CMOs, despite clear indicators of an unstable, illiquid market for these investment products; (b) failing to adequately manage the Company's liquidity and capital position despite increased risks and exposures; (c) maintaining an overly leveraged position that prevented the Company from securing cash infusions on credit; (d) developing and relying on faulty asset-valuation models and risk assessment models that overvalued ABS, MBS, CDO, and CMO positions and underestimated the risk to which the Company was exposed; (e) relying on tenuous financing and becoming wholly dependent on overnight repo loans to continue daily operations; and (f) projecting the appearance of using sound risk management practices, while making false and misleading statements about the Company's risks, exposures, and risk management practices—Bear Stearns stock declined approximately *93 percent* between the beginning of the Class Period and the acquisition by JPMorgan.  Consequently, the value of the Plan was decimated as a result of Defendants' fiduciary breaches.

88.     Defendants knew or should have known by December 14, 2006 *at the very latest* that the foregoing risks, which are described more fully *infra*, made the Company vulnerable to collapse and the Plan vulnerable to significant losses.  By December 14, 2006, Bear Stearns stock had become an imprudent investment for the Plan.

## VI.   DEFENDANTS' FIDUCIARY STATUS

**A.**     The Nature of Fiduciary Status.

89.     Named Fiduciaries.  ERISA requires every employee benefit plan to have one or more "named fiduciaries" who jointly or severally have authority to control and manage the operation and administration of the plan.  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

90.     De Facto Fiduciaries.  In addition to "named fiduciaries," ERISA recognizes functional, or de facto, fiduciaries—individuals who are deemed fiduciaries by virtue of their conduct rather than by being named in the plan document itself.  ERISA section 3(21)(A) provides that "a person is a fiduciary with respect to a plan to the extent that (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).

91.     ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that any fiduciary must discharge his or her duties with respect to a plan: (a) solely in the interest of the participants and beneficiaries; (b) for the exclusive purpose of providing benefits and defraying reasonable expenses; (c) with the care, skill, prudence and diligence under the circumstance then prevailing that a prudent person acting in a like capacity and familiar with such matters

would use in the conduct of an enterprise of a like character and with like aims; (d) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (e) in accordance with the documents and instruments governing the plan insofar as they are consistent with ERISA.

92.     Although fiduciaries of eligible individual account plans—like the Plan here— do not violate the diversification requirements by investing in employer securities, *see* ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2), such fiduciaries must nonetheless comply with each of the remaining fiduciary obligations of Section 404(a)(1), including the duty of prudence (except to the extent it requires diversification). *Id.*

93.     Each Defendant was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan Participants; however, Plaintiffs do not allege that each Defendant was a fiduciary with respect to any and all aspects of the Plan's management and administration. Rather, as set forth in detail below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each Defendant are based on such specific discretion and authority.

**B.**     Bear Stearns's Fiduciary Status.

94.     Bear Stearns was the sponsor of the Plan within the meaning of ERISA section 3(16)(B), 29 U.S.C. § 1002(16)(B).  SPD at 14, BCS-ERISA 78.

95.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Bear Stearns chose to assign the appointment and removal of fiduciaries to itself and other Defendants named herein.   These persons and entities, in turn, selected Bear Stearns's employees, officers and agents to perform most fiduciary functions.

96.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C.

§ 1108(c)(3). However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the plan sponsor.

97.     At all applicable times, Bear Stearns had effective control over the activities of its officers and employees over their Plan related activities—including, without limitation, the members of the Executive Committee and the ESOP Committee. As such, the Company is responsible for the activities of these individuals under traditional principles of agency and the doctrine of *respondeat superior*.

98.     Further, on information and belief, the Company exercised *de facto* authority and control with respect to the *de jure* responsibilities of the other Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing Plan documents to the those Defendants, without relieving them of any such responsibility.

99.     Finally, under basic tenets of corporate law, the Company is imputed with the knowledge that its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to the Company.

100.    Consequently, Bear Stearns was a fiduciary of the Plan within the meaning of ERISA section 3(21), 29 U.S.C. § 1002(21), during the Class Period.

**C.**    Director Defendants' Fiduciary Status.

101.    The Board of Directors was responsible for the overall administration of the Plan, for determining the amount of discretionary Company contributions to the Plan, and for appointing and monitoring the performance of members of various committees charged with management and operation of the Plan. For instance, the Board had the authority to appoint members of the Employee Stock Ownership Plan Committee, who served at the pleasure of the Board. 2002 Plan Document at 38, BSC-ERISA 174; 2007 Plan Document at 35, BSC-ERISA

36 (same).  Additionally, on information and belief, the Board had the authority to appoint members to the Executive Committee.

102.    Furthermore, the Plan Documents provide that the Director Defendants could "allocate their fiduciary responsibilities under the Plan among themselves, and the Board and any member thereof may designate other persons to carry out its (or his) fiduciary responsibilities under the Plan."  *See* 2002 Plan Document at 43, BSC-ERISA 179; 2007 Plan Document at 40, BSC-ERISA 41.

103.    Upon information and belief, the Director Defendants allocated some or all of their fiduciary responsibilities to the Executive Committee.

104.    The power to appoint individuals to fiduciary committees or to delegate fiduciary responsibilities to a delegate—and the concomitant responsibility to monitor the performance of such individuals and, when necessary, replace them—is a fiduciary function. *See, e.g.*, 29 C.F.R. § 2509.75-8 (D-4; FR-14).

105.    Consequently, in light of the foregoing duties, responsibilities and actions, the Director Defendants were fiduciaries of the Plan within the meaning of ERISA section 3(21), 29 U.S.C. § 1002(21).

**D.**     The Executive Committee Defendants' Fiduciary Status.

106.    Upon information and belief, the Director Defendants delegated fiduciary responsibilities to the Executive Committee.  Upon information and belief, the Executive Committee's responsibilities included appointing members to the ESOP Committee.

107.    The power to appoint individuals to perform fiduciary functions—and the concomitant responsibility to monitor the performance of such individuals and, when necessary, replace them—is a fiduciary function.  *See, e.g.*, 29 C.F.R. § 2509.75-8 (D-4).

108.   Consequently, in light of the foregoing duties, responsibilities and actions, the Executive Committee Defendants were fiduciaries of the Plan within the meaning of ERISA section 3(21), 29 U.S.C. § 1002(21).

**E.**   ESOP Committee Defendants' Fiduciary Status.

109.   The ESOP Committee was the administrator of the Plan during the Class Period. *See* 2002 Plan Document at 38, BSC-ERISA 174 ("The Plan shall be administered by Committee, consisting of three members to be appointed by the Board."); 2007 Plan Document at 35, BSC-ERISA 36 (same); SPD at 14, BSC-ERISA 78 ("The Plan administrator is: The Bear Stearns Stock Ownership Plan Committee.").

110.   Thus, during the Class Period, the ESOP Committee was the "named fiduciary" of the Plan for purposes of ERISA section 402(a)(2), 29 U.S.C. § 1102(a)(2).

111.   The ESOP Committee consisted of at least three members who were appointed by, and served at the pleasure of, the Board (or the Executive Committee, if such fiduciary responsibility was so delegated by the Board).  *See* 2002 Plan Document at 38, BSC-ERISA 174; 2007 Plan Document at 35, BSC-ERISA 36.

112.   The ESOP Committee had "all powers and discretion necessary or helpful for the carrying out of its responsibilities, including the discretion and exclusive right to determine any question arising in connection with the interpretation, application or administration of the Plan."  *See* 2002 Plan Document at 39, BSC-ERISA 175; 2007 Plan Document at 36, BSC-ERISA 37.

113.   Upon information and belief, the ESOP Committee monitored the Plan's investment policy and the overall performance of Plan's assets.

114.   Consequently, in light of the foregoing duties, responsibilities, and actions, the ESOP Committee was both a named fiduciary of the Plan pursuant to ERISA section 402(a)(1),

29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary within the meaning of ERISA section 3(21), 29 U.S.C. § 1002(21), during the Class Period.

## VII.   FACTS BEARING ON FIDUCIARY BREACH

**A.**   **Bear Stearns Stock Was an Imprudent Investment for the Plan During the Class Period Because of, *inter alia*, Bear Stearns's Reckless Business Practices, Undisclosed Failure of Risk Management, and Mis-Handling of Its Subprime and Alt-A Mortgage Assets.**

   **1.**   Summary.

   115.   During the Class Period, Bear Stearns was plagued by severe structural problems—including overexposure to subprime and Alt-A mortgages, overexposure to mortgage-backed and collateralized debt securities, insufficient capitalization and liquidity, overleveraging, dependence on overnight repurchase financing, use of flawed and misleading models to value assets and estimate risk, colossal failures in risk management, and a lack of sound leadership.  These problems made it imprudent for the Plan's fiduciaries—who were also key leaders of the Company—to maintain the Plan's massive investment in Bear Stearns stock.  Bear Stearns stock posed an unduly large risk of significant loss and this risk is not one that could be prudently borne by an employee retirement plan.

   116.   These risks, which Plan fiduciaries knew or should have known existed, were exacerbated by false and misleading statements issued by Bear Stearns.

   117.   Bear Stearns's faulty business model and failures in risk management, coupled with misleading statements by Bear Stearns executives, caused the price of Bear Stearns stock to be artificially inflated.

   118.   As stated by the DOL, the agency charged with enforcing ERISA, it is never prudent for a retirement plan fiduciary to invest Plan assets in artificially inflated stock.  Brief of the Secretary of Labor as Amicus Curie Supporting Appellants and Requesting Reversal at 15-16, *Phelps v. Calpine Corp.*, *et al.*, No. 06-15013 (9th Cir. 2006).

119.    While a fiduciary's duty of prudence does not include a general duty to diversify with respect to company stock in an ERISA-governed retirement plan, a fiduciary has a duty of prudence that includes a duty not to ignore circumstances, such as those alleged here, which increase the Plan's risk of loss and the overall magnitude of that potential loss to an imprudent and unacceptable level.

120.    Several circumstances contributed to the unacceptable level of risk borne by Plan Participants as a result of the Plan's massive investment in Bear Stearns stock, including, but not limited to:

- Bear Stearns's dramatic increase in exposure to subprime and Alt-A mortgage origination, purchasing, securitization and sales in related ABS and CDO markets such as MBS and CMOs throughout the Class Period, despite recognizable signs of distress in the housing market, including rapidly rising delinquency rates on subprime and Alt-A loans as well as illiquidity in the market for securities backed by such loans;

- The ongoing inflation of asset values on MBS and CDOs and the underestimation of firm-wide risk, due to the Company's calculating its worth based on faulty and outdated VaR assumptions, which disregarded the actual housing market, credit market, and liquidity conditions affecting the value of MBS and CDOs heavily composed of subprime and Alt-A mortgages;

- Bear Stearns's increasingly reckless business practices, which over-leveraged and under-capitalized the Company, and placed too much emphasis on escalating risky business development in debt securities dependent on the housing market, resulting in the Company's ultimate reliance on nightly $100 billion repo loans to continue operations;

- Bear Stearns's void in sound management at the top, resulting in the Company's failure to adequately and accurately re-measure the Company's risks during the housing market bubble correction;

- The Company's failure to detect and adequately respond to the sector-wide pressure on Wall Street banks with businesses that heavily relied on debt securities backed by poorly performing subprime and Alt-A mortgages that led to tightened credit conditions and increased illiquidity in mortgage securitization markets;

28

- Bear Stearns's business model and lack of adequate supervision, which precipitated the collapse of two hedge funds managed by Bear Stearns Asset Management;

- Bear Stearns's failure to effectively restructure senior management in the wake of the hedge funds' collapse, especially with regard to macro risk management controls;

- The Company's repeated false and misleading statements regarding the dire circumstances it faced as a result of its mortgage-dependent business model throughout the Class Period which caused the price of Bear Stearns stock to be artificially inflated; and

- The sheer magnitude of Bear Stearns's subprime and Alt-A loss exposure and over-leveraged condition, which made the Company particularly vulnerable to a liquidity crisis at any moment during the Class Period.

121.    The risk of significant loss to the Plan was exacerbated by the fact that Bear Stearns stock constituted the lion's share of the Plan's total assets.  Astonishingly, given the profound risk the Company faced due its exposure to MBS and similar financial instruments, the Plan's fiduciaries did not undertake any meaningful action to protect the Plan from the massive losses that have been caused by the Plan's holding hundreds of millions of dollars of Bear Stearns stock while exigent circumstances beset Bear Stearns during the Class Period. For example, the Plan's fiduciaries continued to allow the Plan's investment in Bear Stearns stock even during the time that the stock was plunging in value as a result of the hot air being released from the housing bubble and as the financial world began to figure out that Bear Stearns's business model was unsustainable.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan's assets were decimated.

122.    The remainder of this Part (VII) provides details on various aspects of Bear Stearns's broken business model, starting with the Company's history and entry into the subprime and Alt-A mortgage and securities industry, as well as its regulatory environment (subsection VII.A.2).  Subsection VII.A.3 describes the contours of the Subprime and Alt-A

mortgage industry, the foreclosure crisis, and the impact of high levels of securitizations of these mortgages by firms such as Bear Stearns, and subsection VII.A.4 provides an overview of Bear Stearns's involvement in the industry.  Subsection VII.A.5 provides detail regarding Bear Stearns's securitization volumes, holdings, off-balance sheet exposure, and hedging. Subsection VII.A.6 describes the defective risk management practices that Bear Stearns employed, including its asset-valuation models, Value-at-Risk (VaR) modeling, and analysis by the Securities and Exchange Commission Office of Inspector General of the flaws in these systems.  Subsection VII.A.7 describes how Bear Stearns's business model was built on extreme leverage and insufficient capital and liquidity.  Subsection VII.A.8 provides an overview of Bear Stearns's dependence on overnight repo loans, the denial of which toppled the Company in a few days and dried up liquidity.

123.    Subsection VII.A.9 provides a quarter-by-quarter snapshot of the company's business model, in particular describing how it hinged on acceleration of Bear Stearns's vertical integration into the subprime and Alt-A mortgage industry precisely when the Company should have been backing away from this business during the housing bust and the revelation of increasingly distressed prices for subprime and Alt-A MBS and CDOs.  This subsection also describes Bear Stearns's backing of its overleveraged and MBS/CDO-dependent hedge funds and its ineffective recovery efforts after their collapse.  Subsection VII.A.10 recounts Bear Stearns's too-little-too-late disclosure of risk exposure to the housing bubble.  Subsection VII.A.11 outlines Bear Stearns's final days, along with the incessant assurances its executives made that the Company was viable.  Subsection VII.A.12 recaps the foreseeable nature of Bear Stearns's spectacular collapse and discusses the role that Bear Stearns played in the global liquidity crisis—as a catalyst rather than a victim.

124.     Subsection VII.A.13 summarizes Bear Stearns's violations of Generally Accepted Accounting Practices ("GAAP"); subsection VII.A.14 summarizes how Bear Stearns's Internal Controls were defective; and subsection VII.A.15 summarizes how Bear Stearns's business practices violated the banking regulations to which it was subject.

125.     Subsection VII.A.16 describes several pertinent post-collapse events. Subsection VII.A.17 explains how inflated Bear Stearns's stock price was.  In short, section VII.A provides a plethora of allegations regarding many of the reasons Bear Stearns's stock was an imprudent investment for the Plan because Bear Stearns's business model was fatally flawed during the entirety of the Class Period.  Building on these alleged facts, section VII.B provides details on allegations that Defendants knew or should have known that the risks and unsound business practices that the Company was engaging in made Bear Stearns Stock an imprudent investment for the Plan; section VII.C alleges that Participants were not given complete and accurate information about the true risks of investing in the Plan; and section VII.D provides a summary of the Defendants' conflicts of interest.

**2.**     Bear Stearns's Once-Functional Business Model Became Unsustainable.

**a.**     The Beginning.

126.     Founded in 1923, Bear Stearns was known for its measured risk-taking culture even before it became a public company in 1985.  *See* Leslie Wayne, *A Daring Dealmaker Piles Up Profits*, N.Y. Times, June 12, 1983, § 3, at 1; Sarah Bartlett, *Where the Ace Is King*, N.Y. Times, June 11, 1989.  But, according to one mid-1980s observer, "Bear Stearns is seen as a firm of bright, sharp entrepreneurs who are more self motivated or motivated for the individual gain of people within the firm rather than building a corporate entity for the long term."  Wayne, *supra*.

127.     Bear Stearns started as a private partnership of three, survived the Great Depression without any layoffs, and managed to make a record profit in the fiscal year encompassing the market crash of October 1987 (again, without layoffs).  *See* WILLIAM D. COHAN, HOUSE OF CARDS 153 (Doubleday 2009) (2009); Mark Singer, *The Optimist*, The New Yorker, Apr. 1999, at 146.  By 2008, Bear Stearns employed over 14,000 people.  *See* Bear Stearns, Annual Report (Form 10-K), at 12 (Jan. 29, 2008) (for the period ending Nov. 30, 2007) [hereinafter 2007 Form 10-K].  Nevertheless, Bear Stearns remained the smallest of the big five investment banks.

128.     Defendant Alan "Ace" Greenberg, longtime CEO of Bear Stearns (from 1978 to 1993), had deliberately done two things to build the firm through the 1970s and 1980s: he generated a "dependably profitable enterprise" in "clearing" the trades of small brokerages and he diversified the company with "careful" expansion in various areas.  Singer, *supra* at 143. Bear Stearns added "[i]nvestment banking, merchant banking, high-yield debt underwriting, mortgage-backed securities"—profitable areas in the 1980s and 1990s.  *Id.*  Yet Greenberg's "risk-calculation instincts" kept limitations on such risks as well as on his personal funds— "maintaining a diversified portfolio is an indispensable tenet of [Greenberg's] investing philosophy."  *Id.*

129.     In the mid-1990s, Bear Stearns was known for strong and effective "risk controls" and good management to keep earnings steady.  Michael Sinconolfi, *Talented Outcasts: Bear Stearns Prospers Hiring Daring Traders That Rival Firms Shun—It Lets Them Make Big Bets, But Sharp-Eyed 'Ferrets' Watch Their Every Move—Grilled at the 'Cold-Sweat'*, Wall. St. J., Nov. 11, 1993, at A1.

130.    In 1993, Defendant James "Jimmy" Cayne took over as CEO, but Defendant Greenberg stayed on as chairman.  Allen R. Myerson, *Careful Player Moves Closer To the Top at Bear Stearns*, N.Y. Times, July 14, 1993.  Cayne was described at the time as being a careful decision maker as well, "always on the watch for new, more reliable ways to get ahead."  *Id.*  Cayne was dedicated to Bear Stearns and expected the same from others; Cayne's view was that "Loyal partners would never sell a share of stock."  COHAN, *supra* at 226.

      **b.**     Bear Stearns Increasingly Depended On Risky Subprime, Alt-A, MBS and Structured Financial Product Exposure.

131.    The solid risk-management foundation that Bear Stearns once enjoyed eventually gave way to its thirst for the profit potential in an unprecedented housing boom. According to the *Wall Street Journal*, "Bear took particular pride in its risk management but it let its standards slide in the hunt for higher returns during the mortgage mania earlier this decade."  Editorial, *Bear Naked Lenders*, Wall St. J., Mar. 18, 2008, at A22.

132.    By 2000, as its high-risk trading and lower-risk clearing operations netted income that lagged in comparison to rival investment banks Goldman Sachs, Morgan Stanley, and Merrill Lynch, Bear Stearns needed to make a change in its "business mix" to bolster its slipping status on Wall Street.  Erin E. Arvedlund, *Who Will Buy Bear Stearns?—Dull Businesses and Scandal Taint this Odd Wall Street Firm*, Barron's, Aug. 7, 2000, at 23.  As it turned out, that change ultimately was throwing the weight of the business behind a booming housing market—accompanied by subprime and Alt-A loan origination, servicing, and securitization, trading and sales in MBS and similar financial instruments, such as CDOs known as collateralized mortgage obligations ("CMOs") when backed by mortgages.  This shift created a vertically integrated mortgage securitization platform, resembling the profitable

models of Countrywide Financial and Lehman Brothers.  Many of Bear Stearns's ultimate

problems can be traced back through its changing business model to this point.

133.    The securitization market has evolved rapidly since its beginnings several

decades ago, and its metamorphosis in the early years of the current decade is inextricably

linked to the risky mortgage loans that accompanied the United States housing boom and bust.

When this new market emerged, its combination with Bear Stearns's critical failures in

management, described in more detail *infra*, turned out to be disastrous.

134.    Bear Stearns entered the MBS business in earnest in 1988.  Bartlett, *supra*.

Bear Stearns's 1985 IPO prospectus indicated that Fixed Income—the home of mortgage and

MBS activity, *see infra* subsections VII.A.4, VII.A.5, and VII.A.9—had become a major part

of the firm's business, but it focused on *agency* MBS (*i.e.*, securities backed by mortgages of

the government-sponsored Ginnie Mae, Fannie Mae, and Freddie Mac), a far more stable type

of mortgage that conformed to standards used by the Federal Home Loan Mortgage

Corporation (Freddie Mac) and Federal National Mortgage Association (Fannie Mae).  COHAN,

*supra* at 204 (citing Bear Stearns, Initial Public Offering (Form S-1) (Sept. 12, 1985)).

135.    In 1986, Bear Stearns was a "negligible force" in the MBS market; by 1988, it

was seventh in underwriting; and by the first half of 1989, Bear Stearns surged to first place,

underwriting $7.1 billion in MBS, "$2 billion more than its nearest competitor, perennial

power Salomon Brothers."  Andrew Bary, *Bear Stearns Thrives During Tough Times In

Mortgage Market*, Dow Jones, July 7, 1989.  Most of the MBS that Bear Stearns underwrote

during the first half of 1989 were real estate mortgage investment conduits ("REMICs").  *Id.*

By 1989, MBS underwriting leadership had become very important on Wall Street, as

derivative packaging of mortgage products began to take off.  *Id.*

136.    Bear Stearns's appetite for risk and MBS exposure took on a new and extremely dangerous character as it dug deeper into the subprime and Alt-A markets that accompanied the housing boom and eventual bust in the early and middle part of this decade.  While Bear Stearns's MBS involvement was previously only one of many of its business operations, the mortgage industry increasingly became Bear Stearns's bread and butter as the housing bubble inflated.  David A. Vise, *Bear Stearns's Old Hand at Bridge, Brokerage; Jimmy Cayne's Prowess at Table Part and Parcel of Rise at Firm*, Washington Post, Oct. 29, 1989, at H1.  Bear Stearns was the number-one ranked underwriter of U.S. mortgage-backed securities by the middle of this decade.  Chris Sanders, *Bear Stearns Profit Rises 36 Pct, Tops Estimates*, Reuters, Mar. 16, 2006 [hereinafter Sanders, *Rises 36 Pct*].  Bear Stearns also became active in subprime and Alt-A mortgage origination, servicing, and purchasing.  *See infra* subsection VII.A.4.

137.    The crux of the new business plan was full vertical integration into the mortgage industry: involvement from start to finish in originating, servicing, purchasing, and securitizing subprime and Alt-A mortgages, as well as packaging, repackaging, selling, holding, and trading MBS and other similar financial instruments built on these loans.  As Defendant Molinaro frequently put it, this industry was seen as an enormous and enticing "opportunity."  *See infra* subsection VII.A.9.  It would turn out to be an opportunity that Bear Stearns relentlessly pursued through its final days, like an addicted gambler hoping that just one more hand would make up for the mounting losses.

138.    In pursuing vertical integration in the subprime and Alt-A mortgage industry, Bear Stearns squelched its former relative diversification as the Company concentrated risk in the most volatile segment of the economy.  Payouts flowed for a time.  Net revenue in Bear

Stearns's Fixed Income Division "jumped 78 percent in third quarter 2001 from the same quarter in 2000."  Prince, C J, *In Search of Bear's Market*, Chief Executive Magazine, Jan. 2002.  Largely due to the Fixed Income enterprise, earnings at the Company doubled between 1999 and 2004.  Andrew Bary, *How Sweet It Is: Once Wall Street's Rodney Dangerfield, Bear Stearns Now Gets Respect*, Barron's, Aug. 2, 2004 [hereinafter Bary, *How Sweet*].  By 2002, the Company had grown substantially in size and wealth as well.  *Bear Stearns Introduces New Beacon On Manhattan's Skyline*, Business Wire, Apr. 4, 2002 [hereinafter *New Beacon*].

139.    Bear Stearns's pursuit of vertical integration meant a failure to diversify its business model when it had "numerous chances." COHAN, *supra* at 277.  Defendant Cayne "now admits" that the "blame for the firm's failure to diversity" rests "squarely on his shoulders."  *Id.*

140.    According to an article describing Bear Stearns's new office building, "New York could experience simultaneous water, phone and power outages, yet Bear Stearns would be impervious thanks to four emergency generators . . . a water tank big enough for a Sea World show and an independent phone service." *New Beacon*, *supra.*  As it turned out, such tangible disasters never sunk Bear Stearns, but a far more obscure one did: its foray into the tangled web of "toxic assets," excessive leverage, and astronomical risk-taking.

       **c.**      Bear Stearns Took Advantage of Scant Regulation and Low Capital Requirements To Increase Leverage and Grow Its Debt-Security Business.

141.    Bear Stearns's regulatory environment fueled its new business model.

142.    As a broker-dealer, Bear Stearns was subject to Section 17(h) of the Securities and Exchange Act of 1934, as amended effective September 1992, which requires "broker-dealers that are part of a holding company structure with at least $20 million in capital to file with the [SEC] disaggregated, non-public information on the broker-dealer, the holding

company, and other entities within the holding company" and to maintain and preserve certain records.  Bear Stearns was one of 146 firms that filed the *Risk Assessment Report for Brokers and Dealers* (Form 17-H or 17(h) documents) with the SEC as part of the Broker-Dealer Risk Assessment ("BDRA") Program.  OFFICE OF AUDITS, OFFICE OF INSPECTOR GEN., SEC. EXCH. COMM'N, REPORT NO. 446-B, SEC'S OVERSIGHT OF BEAR STEARNS AND RELATED ENTITIES: BROKER-DEALER RISK ASSESSMENT PROGRAM iii (Sept. 25, 2008).  Staff in the SEC's Division of Trading and Markets ("TM") tracked these filings, and TM was tasked with assessing risks associated with the broker-dealers or their activities.  *Id.*  However Bear Stearns was one of only six major firms that were subject to detailed scrutiny, due to their "significant number of customer accounts."  *Id.*

143.    To fully immerse itself into the world of debt securities, Bear Stearns needed a way to grow its potential for massive returns and risk-taking in a regulatory environment decidedly different than that governing traditional deposit banks.  That structure was membership in the Consolidated Supervised Entity program.

144.    The Consolidated Supervised Entity ("CSE") program was established by the SEC in 2004 as a voluntary regulatory framework for broker-dealers without a principal federal regulator.  Seven firms were part of the CSE program: Bear Stearns, Goldman Sachs, Morgan Stanley, Merrill Lynch, Lehman Brothers, Citigroup, and JPMorgan, but the SEC only supervised the first five, since Citigroup and JPMorgan are regulated by the Federal Reserve. OFFICE OF AUDITS, OFFICE OF INSPECTOR GEN., SEC. EXCH. COMM'N, REPORT NO. 446-A, SEC'S OVERSIGHT OF BEAR STEARNS AND RELATED ENTITIES: THE CONSOLIDATED SUPERVISED ENTITY PROGRAM iv-v (Sept. 25, 2008), *available at* http://www.sec-oig.gov/Reports/AuditsInspections/2008/446-b.pdf (redacted version, with

Appx.); http://finance.senate.gov/press/Gpress/2008/prg092608i.pdf (unredacted version)

[hereinafter OIG CSE REPORT].  Bear Stearns was approved as a CSE in November 2005.  *Id.*

at 1.

145.    The primary incentive for investment banks such as Bear Stearns in CSE

participation was the opportunity to obtain an exemption from the standard net capital rule.

Instead of being subject to this rule, CSE firms were permitted to compute net capital using an

alternative method, resulting in much higher leverage ratios.  OIG CSE REPORT, *supra* at iv-v.

Under the "standard net capital rule," firms must maintain specific leverage ratios, along with

"minimum net capital levels based on the type of securities activities they conduct.  *Id.* at 2; 17

C.F.R. 240.15c3-1(a)(7).  In contrast, the "alternative capital method is based on mathematical

models and scenario testing."  OIG CSE REPORT, *supra* at 2.  Bear Stearns took full advantage

of the subjectivity in value and risk modeling that the alternative capital method allowed by

increasing leverage and concentrating its assets in MBS and similar financial instruments,

which mainly ended up off Bear Stearns's financial statements through the use of legal

engineered securitization conduits that side-stepped net capital rules altogether.

146.    Compared to other CSE firms, Bear Stearns still had "less capital and was less

diversified."  OIG CSE REPORT, *supra* at v.  When this condition was combined with its status

as the smallest CSE firm, Bear Stearns was the first to collapse under the weight of its risk-

taking.

147.    Shortly after Bear Stearns collapsed, United States Senator Charles E. Grassley,

Ranking Member of the Senate Committee On Finance requested that the Office of Inspector

General ("OIG") of the Securities and Exchange Commission conduct an investigation into—

and an audit of—the SEC's oversight—or lack thereof—of CSE entities, and in particular Bear

Stearns.  OIG CSE REPORT, at *supra* 54-55 (Appx. II, April 2, 2008 letter).  The OIG issued its

report on September 25, 2008, finding significant failures by TM to address Bear Stearns's

readily apparent systemic flaws, and raising serious questions about the viability of the CSE

program altogether, particularly given that none of the big five investment banks now exist in

their former contours: Bear Stearns was absorbed by deposit bank JPMorgan, Lehman Brothers

failed, Goldman Sachs and Morgan Stanley became bank holding companies regulated by the

Federal Reserve, and Merrill Lynch was acquired by Bank of America.

**3.**      The Rise and Fall of the Subprime and Alt-A Lending Industry, Debt
              Securitization, and the U.S. Housing Market.

148.    Industry experts have attributed the proliferation of subprime loans to a

confluence of factors that occurred in 2004 and 2005, including rising home prices, declining

affordability, historically low interest rates, intense lender competition, innovations in the

structure and marketing of mortgages, and an abundance of capital from lenders and mortgage

securities investors.  *See Federal Deposit Insurance Corporation on Mortgage Market*

*Turmoil: Causes and Consequences: Hearing Before the S. Comm. on Banking, Housing and*

*Urban Affairs*, 110th Cong. (Mar. 22, 2007), (prepared statement of Sandra L. Thompson, Dir.,

Div. of Supervision and Consumer Prot.) [hereinafter Testimony of Sandra L. Thompson]

*available at* http://www.fdic.gov/news/news/speeches/archives/2007/chairman/

spmar22071.html.

149.    In 2004, as interest rates began to climb, the pool of potential prime or

traditional borrowers looking to refinance began to dry up and lenders began extending loans

to subprime borrowers with troubled credit histories or no documentation of income in an

effort to maintain or grow market share in a declining origination environment, as well as to

entice prime borrowers to take out ever-larger mortgage loans.  Lenders did this in order to

profit from the heavy demand for mortgage loans that could be securitized and sold by Wall

Street to institutional investors.

> **a.**     The Boom in Subprime and Alt-A Loan Origination.

150.    In order to take advantage of this new market, lenders began weakening their

underwriting standards, including:

- reducing the minimum credit score borrowers need to qualify for certain loans;

- allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load;

- introducing new products designed to lower borrowers' monthly payments for an initial period; and

- letting borrowers to take out loans with little, if any, documentation of income and assets.

See Ruth Simon, *Mortgage Lenders Loosen Standards—Despite Growing Concerns, Banks*

*Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1

[hereinafter Simon, *Concerns*].

151.    While subprime loans are issued to borrowers who have poor credit histories or

a history of delinquency in mortgage payments, Alt-A mortgages generally fall loosely in

between these subprime loans and the traditional prime mortgage loans, typically being offered

to borrowers with good credit scores but other negatives.  As described by securities industry

analysts, Alt-A loans overlap somewhat with the subprime category, and can be distinguished

from prime and subprime loans by several features centered on documentation, occupancy

type, and loan-to-value ratios.  MARK ADELSON, NOMURA FIXED INCOME RESEARCH, A

JOURNEY TO THE ALT-A ZONE: A BRIEF PRIMER ON ALT-A MORTGAGE LOANS (June 3, 2003).

Features of Alt-A mortgages include:

- "Reduced Documentation" requirements:  Either income or assets are not fully documented.  This feature may result in only "stated income" with verification of

borrower assets.  A risk with reduced documentation loans is that borrowers may have something to hide.  *Id.* at 6-7.

- "No Ratio" loans:  The "borrower's assets are fully disclosed and verified" but "neither the amount nor the source of the borrower's income is disclosed."  Thus, the approval of the loan does not rely on any analysis of debt-to-income ratios. The borrower is therefore often "stretched."  *Id.* at 7.

- "No Doc" Loans:  Neither assets nor income are disclosed, much less verified. Documentation is "entirely *eliminated*" in these loans.  Underwriting is based solely on the borrower's credit report and the value of the property to be mortgaged.  *Id.* at 7-8.

- Investment or Vacation "Occupancy Type":  Alt-A loans are often used to finance second homes or investment properties.  *Id.* at 8.  In 2005, 40% of all home sales were second homes used for investment or vacation.  Nat'l Ass'n of Realtors, 2006 National Association of Realtors Profile of Second-Home Owners, *available at* http://www.realtor.org/Research.nsf/files/2ndHOHilites06WebFile. pdf/$FILE/2ndHOHilites06WebFile.pdf.

- Higher "Loan-to-Value" Ratios:  Borrowers of Alt-A loans typically put less money down and finance a greater percentage of the purchase.  ADELSON, *supra* at 8-9.

152.   No-documentation ("no doc") and reduced documentation loans are known in the industry as "liar loans," and the practice of requiring little or no documentation from borrowers constituted as much as 40 percent of subprime mortgages issued in 2006, up from 25 percent in 2001.  *See* Gretchen Morgenson, *Crisis Looms In Mortgages*, N.Y. Times, Mar. 11, 2007 [hereinafter Morgenson, *Crisis Looms*].  Overstatement of income in "liar loans" was staggering.  *Id.*

153.   Alt-A mortgage origination volumes surged in the housing boom period, growing from $36 billion in 2001 to $390 billion in 2005—accounting for 12.5 percent of all residential mortgages that year.  Brenda B. White, *The Emergence of Alt-A*, Mortgage Banking, Apr. 2006, *available at* http://findarticles.com/p/articles/mi_hb5246/is_7_66/ai_n29277268/ ?tag=content;col1.  Alt-A loans were the loans of choice for real estate speculators, particularly in California and Florida, where Bear Stearns had a significant role.  Luke Woodward &

Sudhakar Raju, *The Implosion of the Alt-A Mortgage-Backed Securities Market*, J. OF RISK

MANAGEMENT IN FINANCIAL INSTITUTIONS, Vol. 2, 2 214-225, 218 (Oct. 14, 2008).

154.    By 2006, lowered credit standards further "blurred the line" between Alt-A and

subprime asset classes.  White, *supra*.  In addition to lowering underwriting standards and

skimping on documentation requirements, as described above, lenders began offering novel

loan products to entice borrowers which put them at greater risk of defaulting:

- Piggy-back loans: These loans combine a mortgage with a home-equity loan or line of credit, allowing borrowers to finance more than 80 percent of the home's value without paying for private mortgage insurance.  As of 2006, about half of all subprime loans included "piggyback" loans, and on average all borrowers financed 82 percent of the underlying value of their property, markedly up from 48 percent in 2000.  James R. Hagerty & Ruth Simon, *Home Lenders Pare Risky Loans—More Defaults Prompt Cut in 'Piggyback' Mortgages; Housing Market May Suffer*, Wall St. J., Feb. 14, 2007, at A3; Morgenson, *Crisis Looms*, *supra*.

- Interest-only mortgages: These allow borrowers to pay interest and no principal in the loan's early years, which keep payments low for a time, but require that the deferred payment of principal be made in the future through increased monthly or balloon payments.  *See* Testimony of Sandra L. Thompson, *supra*.

- Option adjustable-mortgages: The most prevalent of which are hybrid adjustable rate mortgages ("ARMs"), the loans are marketed with promotional or "teaser" rates during the loan's introductory period that later balloon to much higher rates once the introductory period has ended.  ARMs currently account for between one-half and one-third of subprime mortgages.  *See Subprime Mortgage Market: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 110th Cong. (Mar. 22, 2007) (prepared statement of Roger T. Cole, Dir., Div. of Banking Supervision and Regulation, The Federal Reserve Board, *available at* http://www.federalreserve.gov/boarddocs/testimony/2007/20070322/default.htm. Some ARM loans began to reset in 2008 and more were set to do so in 2009. Woodward & Raju, *supra* at 220.

155.    As early as 2004, industry watchdogs began expressing growing fears that

relaxed lending practices were increasing risks for borrowers and lenders in overheated

housing markets.  *See* Simon, *Concerns*, *supra*.  As lenders were making it easier for borrowers

to qualify for a loan by such practices as described above, they were also greatly increasing the

likelihood that borrowers would be unable to make payments, and that defaults would rise.  Of

particular concern was the prevalence of ARMs, which in combination with the lowered

lending standards, were more likely to result in borrowers' early payment defaults.

        **b.**     The Warnings About Foreclosures.

     156.    In May 2005, bank regulators issued their first-ever guideline for credit-risk

management for home-equity lending and, in December 2005, new guidelines for mortgage

lenders were issued as well.  *See* Office of the Comptroller of the Currency Board of

Governors of the Federal Reserve System, *Credit Risk Management Guidance for Home Equity

Lending*, May 16, 2005, http://www.occ.treas.gov/ftp/bulletin/2005-22a.pdf; *see also* Office of

the Comptroller of the Currency Board of Governors of the Federal Reserve System,

*Addendum to Credit Risk Management Guidance for Home Equity Lending*, *available at*

http://www.occ.treas.gov/ftp/bulletin/2006-43a.pdf; Office of the Comptroller of the Currency

Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional

Mortgage Products*, 71 Fed. Reg. 58,609 (Oct. 4, 2006) (final); *see also* 70 Fed. Reg. 77,249

(Dec. 29, 2005) (proposed), *available at* http://www.occ.treas.gov/fr/fedregister/70fr77249.pdf;

Testimony of Sandra L. Thompson, *supra*.  The proposed "Interagency Guidance on

Nontraditional Mortgage Products" sent a clear message to high-ranking industry insiders that

bank regulators were concerned about the lessened underwriting standards and general lax risk

management practices of subprime lenders.

     157.    In September 2005, the *Wall Street Journal* reported that "bank regulators

[were] sounding the alarm bells about rising risks in the mortgage market."  Ruth Simon &

James R. Hagerty, *Mortgage Lenders Tighten Standards—Amid Concern Over Rising Risk,

Banks Make It Harder to Qualify for Certain Home Loans*, Wall St. J., Sept. 29, 2005, at D1.

Then Federal Reserve Chairman Alan Greenspan testified that "the apparent froth in housing

markets may have spilled over into mortgage markets" and stated that the "dramatic increase"

in interest-only mortgages and "more exotic forms of adjustable rate mortgages" were "developments that bear close scrutiny." *Id.* Some lenders moved to curtail the availability of new mortgage products such as ARMs and interest-only loans. *Id. See also Federal Reserve Board's Semiannual Monetary Policy to the Congress: Hearing Before the H. Comm. on Financial Services*, 109th Cong. (July 20, 2005) (prepared statement of Alan Greenspan, former Federal Reserve Chairman) *available at* http://www.federalreserve.gov/BOARDDOCS/HH/2005/ july/testimony.htm.

158.    These government warnings were well-founded.  Between February and March of 2005, foreclosure properties available for sale jumped 50 percent.  Janet Morrissey, *Home Foreclosure Listings Surged in March, Study Shows*, A.P., Apr. 7, 2005.  In March 2005, new foreclosure inventory rose in 47 out of 50 states—signifying a "national trend."  Michele Derus, *ForeclosuresJump 57% from Last Year; Higher Interest Rates, Job Losses are Cited*, Milwaukee J. Sentinel, Apr. 7, 2005, at D1.

159.    In July 2005, the *Center for Economic and Policy Research* described the risks of a housing burst in terms of the effect on mortgage holders—and holders of mortgage-backed securities.  This prescient warning of the looming crisis explained:

> collapse of the housing bubble is likely to lead to record levels of mortgage defaults.  The ratio of home equity to home value stands at near record lows . . . . if the economy is in a recession, then many homeowners will have no choice but to default on their mortgages. . . .  Similarly, if interest rates rise, as virtually all economists expect, homebuyers with adjustable rate mortgages will find themselves paying much more on their monthly mortgages.  Many homeowners will be unable to make these higher payments.
>
> If there is a large increase in the rate of mortgage defaults, then the mortgage holders will experience big losses.  While many banks and financial institutions still hold large amounts of mortgage debt, most mortgages become the basis for mortgage-backed securities, a market that now exceeds $6 trillion.  This market will be put in danger by a large wave of defaults following the collapse of the housing bubble.  It is likely that the federal government will have to bail out the market in mortgage-backed securities to prevent a cascading series of defaults.

DEAN BAKER, CTR. FOR ECON. & POL'Y RESEARCH, ISSUE BRIEF: THE HOUSING BUBBLE FACT

SHEET 3-4 (July 2005).

160.    In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes

and the interest rates on variable rate loans, including mortgage loans, began to rise.  Subprime

borrowers who were able to afford the initially low "teaser rate" loan payments no longer could

meet their monthly payment obligations.  At the same time, home values began to decline

sharply, leading some borrowers to walk away from loans when they could not afford the

increased monthly mortgage and could not readily re-sell the property for a profit.  As a result,

many borrowers no longer paid their mortgages, causing defaults to increase significantly.

161.    By December 2005, industry analysts recognized that the housing bubble had

"burst" in the U.S. mortgage bond market, and that the situation was likely to deteriorate.  Al

Yoon, *Housing Bubble Bursts in U.S. Mortgage Bond Market*, Bloomberg.com, Dec. 6, 2005.

Delinquency peaks were estimated to increase in 2006.  *Id.*

162.    The Case-Shiller Price Index illustrates the bubble and bust expressed as year

over year change in the Composite 10 and Composite 20 indices:



Source: Standard & Poors, Press Release: National Trend of Home Price Declines Continues into the Second Half of 2008 According to the S&P/Case-Shiller Home Price Indices, Oct. 28, 2008, *available at* http://www2.standardandpoors.com/spf/pdf/index/CSHomePrice_Release_102831.pdf.  As this chart shows, the sharp decline in values began well before the start of the Class Period.  By the beginning of the Class Period in December 2006, the market was in free fall.

163.    In 2006, the conditions continued to worsen.  In 2006 alone, roughly 80,000 subprime borrowers fell into delinquency, many shortly after origination.  Ruth Simon & James R. Hagerty, *More Borrowers with Risky Loans Are Falling Behind—Subprime Mortgages Surged as Housing Market Soared; Now Delinquencies Mount*, Wall St. J., Dec. 5, 2006, at A1 [hereinafter Simon & Hagerty, *More Borrowers*].  According to the FDIC, total subprime delinquencies rose from 10.33 percent in the fourth quarter of 2004 to 13.33 percent in the fourth quarter of 2006 and foreclosures rose from 1.47 percent to 2.0 percent over the same period.  Testimony of Sandra L. Thompson, *supra*.

164.     Subprime loans with ARMs accounted for the largest rise in delinquency rates, an increase from 9.83 percent to 14.44 percent between the fourth quarter of 2004 and the fourth quarter of 2006; whereas foreclosures rose from 1.5 percent to 2.7 percent during the same period. *Id.*

165.     According to an article published in the *Wall Street Journal* in December 2006, "delinquency rates on subprime mortgages originated in the past year . . . soared to the highest levels in a decade."  The trend began in mid-2005, but accelerated in the last two to three months of 2006.  The article cites a UBS analysis stating that, "[i]n October [of 2006], borrowers were 60 days or more behind in payments on 3.9% of the subprime home loans packaged into mortgage securities this year [2006]"—a figure that was twice as large as the rate seen for new loans just a year earlier.  *See* Simon & Hagerty, *More Borrowers*, *supra*.

166.     On October 4, 2006, a group of federal agencies issued their final *Interagency Guidance on Nontraditional Mortgage Product Risks*, highlighting the risks of loosened underwriting standards and general lax risk management practices of subprime lenders.  Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Addendum to Credit Risk Management Guidance for Home Equity Lending* (Oct. 4, 2006), *available at* http://www.occ.treas.gov/ftp/bulletin/2006-43a.pdf.

167.     Not only had the government sounded early warnings, the imminent collapse of the subprime lending industry was documented by industry experts as well.  In December 2006, the *Center for Responsible Lending* issued a report predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006, at C4.

168.     Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and the FDIC, and resulting in several bankruptcy filings.  For example, Ownit Mortgage Solutions—one of the largest subprime lenders in the United States—closed its doors in December 2006.  Bradley Keoun, *Ownit Mortgage, Part-Owned by Merrill, Shuts Down This Week*, Bloomberg.com, Dec. 7, 2006.  In 2006, non-bank mortgage lenders began to suffer significant losses as well, and in the first nine months of 2007, "at least 90 [subprime] lenders [had] gone out of business."  DARRYL E. GETTER, MARK JICKLING, MARC LABONTE, & EDWARD V. MURPHY, GOV'T & FIN. DIV., CONG. RESEARCH SERV., CRS REPORT FOR CONGRESS: FINANCIAL CRISIS? THE LIQUIDITY CRUNCH OF AUGUST 2007 6 (Sept. 21, 2007), [hereinafter GETTER ET AL., CRS: FINANCIAL CRISIS?].  On January 3, 2007, Consumer Affairs warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a result."  Martin H. Bosworth, *Subprime Lender Implosion: Bad Omen For Housing Market*, ConsumerAffairs.com, Jan. 3, 2007.[3]

169.     On March 27, 2007, Sandra F. Braunstein, Director, Division of Consumer and Community Affairs, testified about the growing risks of foreclosures and the exit by several lenders from the subprime market due to defaults on an unusually large number of subprime loans.  *Subprime Mortgages: Hearing Before the Subcomm. on Financial Institutions and Consumer Credit, H. Comm. on Financial Services*, 110th  Cong. (Mar. 27, 2007) (prepared

---

[3] Between April 2007 and January 2008, the following subprime lenders failed or were on the verge of collapse: New Century Financial Corp. (the largest subprime lender at the time) failed on April 2, 2007; and in August 2007, American Home Mortgage filed for Chapter 11 bankruptcy, Countrywide Financial Corporation narrowly avoided bankruptcy with $11 billion in emergency loans, and Ameriquest (the largest subprime lender in 2005) announced that it was going out of business.  On January 11, 2008, Bank of America agreed to bail out Countrywide.

statement of Sandra F. Braunstein, Dir., Div. of Consumer and Comm. Affairs), *available at* http://www.federalreserve.gov/newsevents/testimony/Braunstein2007032.

170.    In September 2007, the Congressional Research Service reported that "surveys of mortgages originated in 2005 suggest that defaults and foreclosures will rise even higher in late 2007 and the first half of 2008."  GETTER ET AL., CRS: FINANCIAL CRISIS?, *supra* at 4.

171.    Bear Stearns knew or should have known of this dire circumstance.

172.    Yet, as described *infra*, Bear Stearns increased its mortgage business as other lenders were contracting, as regulators, analysts, and the financial press were warning of the risks, and as the mortgage industry was showing serious signs of strain.  *See also* Vikas Bajaj & Christine Haughney, *Tremors at the Door*, N.Y. Times, Jan. 26, 2007 (describing losses and collapses among mortgage lenders, increasing defaults, regulatory warnings, and waning investor interest in mortgage-backed securities).  In short, the rate of delinquency and foreclosure suggests that lenders, including Bear Stearns, underestimated the risk involved and that borrowers did not fully understand the full costs of these loans.  All of this was exacerbated by the extraordinary pace at which subprime and Alt-A mortgages had been securitized.

> **c.**    High Volumes of Mortgage-Backed Securities Compounded the Effects of Foreclosures.

173.    As described by one of Bear Stearns's own Senior Managing Directors, mortgage securitization works as follows: (1) mortgage loans are "packaged as a portfolio and moved into securitization vehicles owned by a third-party," creating mortgage-backed securities ("MBS"), which create revenue to purchase more loans; (2) cash flows are divided among debt classes, "subdivided into senior, mezzanine and subordinate, with ratings from triple-A to double-B. . . . losses on the underlying loans are allocated to the lowest-rated bonds

174.    "The growth of securitization meant that more loans could be originated by non-banks," such as Bear Stearns.  GETTER ET AL., CRS: FINANCIAL CRISIS?, *supra* at 6.

175.    By March of 2007, the U.S. mortgage securities market was $6.5 trillion, larger than the U.S. treasury market.  Morgenson, *Crisis Looms*, *supra*.  This volume resulted from a surge in securitizations in the several years prior, many of which were subprime or Alt-A mortgages:

- In 2005, $507.9 billion in subprime mortgage loans were pooled and sold as MBS, a sharp increase from $18.5 billion in 1995.  GETTER ET AL., CRS: FINANCIAL CRISIS?, *supra* at 3.

- Interest-only mortgages accounted for over 40 percent of Alt-A securitizations in 2005.  White, *supra*.

- In 2006, 35 percent of all mortgage securities issued were subprime, up from 13 percent in 2003.  Morgenson, *Crisis Looms*, *supra*.

- By 2006, "[n]onconforming originations [had] replaced agency originations as the dominant source of securitization volume," and Alt-A collateral underpin[ned] nearly 15 percent of "private label" securitizations.  White, *supra*.

- Within the category of subprime MBS, the share of ARMs was nearly 80 percent in 2006.  *The Housing Bubble and Its Implications for the Economy: Hearing Before the Subcomm. on Economic Policy and Subcomm. on Housing and Transportation, S. Comm. on Banking, Housing and Urban Affairs*, 109th Cong. (Mar. 13, 2006) (prepared statement of Richard A. Brown, Chief Economist, FDIC, *available at* http://www.fdic.gov/news/news/speeches/archives/2006/ chairman/spsep1306.html.

176.    Overall, investors had become skittish about mortgage-backed securities by 2006.  For example, "hedge funds that specialize in mortgage-backed securities had an outflow of $1.8 billion in 2006, down from an inflow of $1.8 billion in 2005."  Bajaj & Haughney, *supra*.

177.    As early as August 2006, insiders were publicly warning investment banks of the looming mortgage securities meltdown.  Mark Pittman, *Bass Shorted 'God I Hope You're Wrong' Wall Street*, Bloomberg.com, Dec. 19, 2007.  J. Kyle Bass, a former salesman for Bear Stearns, started hedge fund Hayman Capital Partners and made billions betting with mortgage bond derivatives that the MBS business would crash and burn when the housing bubble burst and delinquencies became prolific.  *Id.*  He warned an unidentified investment bank of this fact at a presentation in August of 2006, after which the firm's chief risk officer said "'God, I hope you're wrong.'"  *Id.*  But Bass was right.

178.    According to the SEC, "In terms of large drops in market prices and large asset write-downs on mortgage-backed securities, the subprime crisis began to affect the U.S. around December 2006."  OIG CSE REPORT, *supra* at 26.  Given all the warning signs that had materialized by this time, Bear Stearns should have known by *at least* December 2006 that its MBS business was putting it at serious risk—and therefore that its stock was an imprudent investment for the Plan.

179.    Warning signs continued to pile up.  For example, in May 2007, researchers Joshua Rosner and Joseph Mason "concluded in an 84-page study that the U.S. ratings companies Standard & Poor's, Moody's and Fitch had been wrong to bless billions of dollars of mortgage securities with AAA and BBB ratings."  Pittman, *supra*; *see also* Joseph R. Mason & Joshua Rosner, *Where Did the Risk Go? How Misapplied Bond Ratings Cause Mortgage Backed Securities and Collateralized Debt Obligation Market Disruptions* (presented at The Hudson Institute, May 3, 2007).  Moreover, a version of this paper had been published and presented months earlier.  *See* Joseph R. Mason & Joshua Rosner, *How Resilient Are Mortgage Backed Securities to Collateralized Debt Obligation Market Disruptions?* (draft presented at The Hudson Institute, Feb. 15, 2007), *available at* http://www.hudson.org/files/publications/ Mason_RosnerFeb15Event.pdf.[4]

180.    Yet, in early February 2007, as the "market for risky home loans was beginning to implode," Gyan Sinha, a Bear Stearns analyst, held a conference call for investors in which he told them "they had little to worry about."  Kate Kelly, *Behind Gyan Sinha's Bullish Subprime Call*, livemint.com, Jul. 12, 2007.  But mortgage trouble was about to escalate further.

181.    On February 16, 2007, S&P announced that it would no longer wait for foreclosures before downgrading associated MBS.  Bloomberg News, *S&P to Speed Mortgage Warnings; The Ratings Company, Responding to Rising Delinquencies, Will Alert Bond Investors Before Foreclosures Occur*, L.A. Times, Feb. 16, 2007.  An S&P analyst expressed that the agency had "'equal concerns'" about Alt-A loans and subprime loans based on early delinquencies.  *Id.*

---

[4] Final versions available at http://ssrn.com/abstract=1027472 and http://ssrn.com/ abstract=1027475.

182.    Indeed, risks related to Alt-A mortgages were a topic of much press coverage by early 2007. *See* Gretchen Morgenson, *Will Other Mortgage Dominoes Fall?*, N.Y. Times, Feb. 19, 2007 (discussing strain in the Alt-A sector of the CDO market); Chris Isidore, *'Liar Loans'" Mortgage Woes Beyond Subprime*, CNNMoney.com, Mar.19, 2007 (describing how growth of Alt-A had surpassed subprime and underpinned much of the real estate boom in 2004 and 2005).

183.    Significantly, in February of 2007, the ABX index, which tracks CDOs on certain risky subprime loans (rated BBB), materially declined.  In early February, the ABX index was above 90.  It then declined from 72.71 to 69.39 between February 22 and 23. Alistair Barr, *Subprime Mortgage Derivatives Index Plunges*, MarketWatch, Feb. 23, 2007. The plunge was sparked in part by a rash of bankruptcy filings by subprime lenders—by February 2007, 15 subprime lenders had gone under since 2005. *Id.*

184.    The ABX indexes, such as ABX.HE, a synthetic ABS index of U.S. home equity asset-backed securities, were created by CDS IndexCO, a consortium of 16 investment banks, including Bear Stearns, and Markit Group Limited (Markit), a financial information services company.  Securitization conduits created by Bear Stearns normally comprised five percent of each ABX.HE index.  Press Release, Markit Group Limited, CDS IndexCo and Markit Announce Roll of the ABX.HEI Indicies (July 18, 2006); *see also Markit* Group Limited website, http://www.markit.com/information/products/category/indices/abx.html.

185.    Bear Stearns's securitization conduit, Bear Stearns Asset Backed Securities I Trust 2006-HE3, represented 5 percent of the ABX index "ABX.HE.BBB-.06-2," which along with other ABX.HE indexes ran into trouble in late 2006 and early 2007.  A *Wall Street Journal* article reported at the time that "the bond market [was] signaling heightened fears

about the ability of America's more financially stretched borrowers to keep up their mortgage payments," and that "Wall Street's worry about mortgage defaults is showing up in a set of indexes called ABX.HE."  James Hagerty & Michael Hudson, *Mortgage-Default Risks Rattle Bond Investors*, Wall St. J., Jan. 27, 2007, at B4; *see also* HSBC Finance Corp., Current Report for the Period Ending Feb. 7, 2007 (Form 8-K), at Ex. 99 (Feb. 8, 2007) [hereinafter HSBC Feb. 2007 Form 8K].

186.    The dire conditions and worries about a wave of defaults at the time were confirmed in February 2007, when the second largest U.S. subprime mortgage lender HSBC Holdings PLC, said in a press release that it would post "a substantial increase in [its] provision for loan losses with respect to the Mortgage Services operations in the fourth quarter," and that the "loan impairment charges and other credit risk provisions for 2006 [would] exceed the current market consensus estimate of $8.8 billion by 20 percent."  Hagerty & Hudson, *supra*; *see also* HSBC Feb. 2007 Form 8K, at Ex. 99.

187.    A *Wall Street Journal* article on the day of the HSBC press release stated that the housing boom "party [was] over," quoting HSBC's statement that "[t]he impact of slowing house price growth is being reflected in accelerated delinquency trends across the U.S. subprime market."  Carrick Mollenkamp, *Faulty Assumptions: In Home-Lending Push, Banks Misjudged Risk—HSBC Borrowers Fall Behind on Payments; Hiring More Collectors*, Wall St. J., Feb 8, 2007, at A1.  An HSBC executive, stated in the article that "[They] made some decisions that could have been better."  *Id.*

188.    The already nervous and declining ABX housing market tracker dove from the 80-90 percent range, to the 60-70 percent range after the news.  Press Release, Hennessee Group LLC, Ledge Funds Profit off Subprime Collapse—Funds Benefit from Decline in ABX

Index (Aug. 21, 2007), *available at* http://www.hennesseegroup.com/releases/ release20070821.html.  The following chart shows the ABX dive:



*Id.*

189.    In late March of 2007, "Moody's Investors Services warned . . . that defaults and downgrades of subprime MBS could have 'severe' consequences for CDOs that invested heavily in the sector."  Alistair Barr, *Mortgage Crisis To Hit Holders of Risky Derivatives*, MarketWatch, Apr. 2, 2007.

190.    The ABX-HE-BBB- (designed to track the lowest investment-grade subprime mortgage bonds sold in the second half of 2005) "traded as high as 102.19 cents on the dollar when it started in January 2006," and by the middle of December 2007, it traded for 30 cents on the dollar.  Pittman, *supra*.

191.    Former Bear Stearns employee J. Kyle Bass described subprime credit as "the mad cow disease of structured finance."  *The Role of Credit Rating Agencies in the Structured Finance Market: Hearing Before the Subcomm. on Capital Markets, Insurance, and*

*Government Sponsored Enterprises of the H. Comm. on Financial Services*, 110th Cong. 71 (Sept. 27, 2007) (testimony of J. Kyle Bass, Managing Partner, Hayman Advisors L.P.).[5]

192.    The subprime MBS dive in early 2007 was only the beginning—and a sign of things to come in the Alt-A market in which Bear Stearns was heavily involved.  "While the deterioration of the subprime MBS market has received a great deal of attention, the implosion of the Alt-A MBS market has received far less attention.  The outstanding amount of Alt-A securities poses a significant systemic risk that is already becoming evident."  Woodward & Raju, *supra* at 224.

193.    While the full effects of the Alt-A securities implosion continue to materialize because of the extensive use of ARMs, Bear Stearns knew or should have known of the risks it and the subprime securities market posed during the entire Class Period.  For example, Bear, Stearns & Co. Inc.'s Senior Managing Director, Head of ABS & CDO Research testified before the Senate on April 17, 2007 that: "Without doubt, the rise in defaults and delinquencies has had a significant impact on the nonprime securitization market.  At this juncture, we are witnessing a significant correction in the MBS market for nonprime loans."  Sinha, *supra*.

---

[5] Bass's primary focus in his testimony was the growing uselessness—and danger—of the big rating agencies' conflict-of-interest-driven ratings of asset-backed security CDOs.  In particular, the mezzanine CDO tranches, which enable endless slicing and dicing of toxic assets, incomprehensibly ensure that a large portion of these securities are always rated "AAA."  *See also* Morgenson, *Crisis Looms*, *supra* (describing rating agency profit incentives not to cut ratings); *The Role of Credit Rating Agencies in the Structured Finance Market: Hearing Before the Subcomm. on Capital Markets, Insurance, and Government Sponsored Enterprises of the H. Comm. on Financial Services*, 110th Cong. 71 (2007) (testimony of Joseph R. Mason, [former] Assoc. Prof., Drexel University) (describing rating agencies' conflicts of interest and income earned from the companies they rate; discussing the impact of outdated rating models on securities backed by subprime mortgages).

**4.**     Bear Stearns Sought Full Vertical Integration into the Subprime and Alt-A
Lending and Securitization Industry as the Housing and MBS Markets Collapsed.

194.     A large portion of Bear Stearns's business depended on its Fixed Income
division.  According to Bear Stearns, its Fixed Income businesses included the following:
Government Bonds and Agency Obligations, Mortgage-Related Securities and Products,
Municipal Securities and Related Products, Fixed Income Derivatives, Credit-Related
Securities and Products, Foreign Exchange and Precious Metals, and Fixed Income Analytics
and Research.  2007 Form 10-K, at 7-8; *see also* 2006 Form 10-K, at 7-10 (also listing Asset-
Backed Securities (ABS) and Collateralized Debt Obligations (CDOs)).[6]  Until he was ousted
in August 2007, Defendant Spector headed "fixed income, equities, commodities and asset
management" for Bear Stearns.  Bradley Keoun & Jody Shenn, *Bear Stearns Removes Spector
After Debt Market Losses*, Bloomberg.com, Aug. 6, 2007.  Defendant Mayer was the co-head
of Fixed Income.

195.     The following chart illustrates Bear Stearns's Revenues by business segment,
and demonstrates the Company's ultimate dependence on Fixed Income and the devastating
effect on the entire Company when this segment failed due to the massive losses and write-
downs of MBS and CDOs.

---

[6] It is notable that ABS and CDO positions were not even listed as core portions of the Fixed
Income business in 2007.  While ABS and CDO positions were "unwound" as of November
30, 2007, 2007 Form 10-K, at 42, given their catastrophic effect on the Company in 2007, these
mortgage-dependent assets clearly were part of the Fixed Income operations, despite Bear
Stearns's decision not to include them in describing "Fixed Income" activities for the year.



Data Source: Bloomberg L.P. (2009) Quarterly revenues by segment for Bear Stearns Companies 2/28/2007 to 2/28/2008; retrieved Mar. 16, 2009 from Bloomberg database.  Fixed Income deteriorated in the third quarter, and then it actually created the significant loss in the fourth quarter—the Company's first ever loss.  A substantial part of Bear Stearns's Fixed Income business segment was reliant on the booming housing market.

196.    The Fixed Income division was composed largely of Bear Stearns's vertically integrated mortgage business—which included origination, purchase, securitization, holding, and trading of subprime and Alt-A mortgages and structured financial products.

197.    Bear Stearns Residential Mortgage Corporation ("Bear Res") began operations in April of 2005.  Bear Stearns, Current Report for the Period Ending Oct. 10, 2006 (Form 8-K), at Ex. 99.1 (Oct. 12, 2006) [hereinafter Oct. 12, 2006 Form 8-K].  By October of 2006, Bear Res was lending $600 million per month in primarily Alt-A loans.  *Id.*

198.     In October of 2006, Bear Stearns announced that Bear Res would purchase "the subprime mortgage origination platform of ECC Capital Corporation's subsidiary, Encore Credit.  Encore Credit, specializing in subprime mortgage origination, will operate as a separate division of [Bear Res]."  Oct. 12, 2006 Form 8-K, at Ex. 99.1.  ECC Capital Corporation ("ECC") is a mortgage finance real estate investment trust headquartered in Irvine, California, "with a particular emphasis on 'nonconforming' borrowers who generally do not satisfy the credit, collateral, documentation or other standards required by conventional mortgage lenders and loan buyers."  *Id*.  Encore Credit and ECC originated very risky Alt-A loans, such as, for example, a 40-year mortgage with interest only due for the first 24 months and an adjustable rate thereafter.  ECC Capital Corp., Annual Report (Form 10-K) (Apr. 17, 2006), at 3 (for the period ending Dec. 31, 2005).  Of Encore and ECC's originations in 2005, 26 percent ($3.6 billion) were "interest-only loans" and 85 percent ($11.5 billion) were ARMs.  *Id.* at 27.  Forty-six percent were in California.  *Id.* at 25.  Moreover, in 2004, *72 percent* of all of Encore and ECC's loans were sold to just two customers: Countrywide Securities Corporation (39 percent) and Bear Stearns (33 percent).  *Id*.

199.     Commenting on its acquisition of Encore Credit, a Bear Stearns senior managing director in the mortgage department said, "we are well positioned to continue to broaden our already formidable mortgage franchise."  Oct. 12, 2006 Form 8-K, at Ex. 99.1.  The Press Release explained that the acquisition of Encore Credit would "generate over $1 billion in loans per month."  *Id.*

200.     In 2006 and 2007, Bear Stearns reported that it "purchases, originates, sells and services entire loan portfolios of varying quality.  These loan portfolios are (i) generated by the Company's mortgage origination platform, [Bear Res], and (ii) purchased by EMC Mortgage

Corporation ("EMC"), a full service residential mortgage banking and servicing entity, from financial institutions and other secondary mortgage-market sellers."  2007 Form 10-K, at 7; *see also* 2006 Form 10-K, at 8 (similar description).

201.    EMC Mortgage Corporation was a wholly-owned subsidiary of Bear Stearns. 2007 Form 10-K, at Ex. 21.  According to Bear Stearns, "EMC specializes in the purchasing and servicing of distressed mortgage loans and real estate owned ("REO") property.  It has been a perennial leader in the distressed / non-performing loan sector dating back to its inception in 1990. . . ."  2007 Form 10-K, at 7.  In 2006, EMC bought approximately $69.2 billion in subprime and Alt-A loans.  Jed. Horowitz, *Bear Stearns Says Subprime Mortgage Exposure is Negligible,* MarketWatch, Mar. 29, 2007.

202.    Bear Stearns hired "several hundred people" to build its mortgage origination platform in the third quarter of 2006.  Bear Stearns, *Earnings Call for 3d Quarter*, *Fiscal Year* 2006,  Sept. 14, 2006, at 7 (Bloomberg LP Transcript) [hereinafter 3d Qtr. 2006 Earnings Call].

203.    Bear Stearns's origination and purchasing of risky loans was a significant source of its securitization and market-making operation in subprime, Alt-A, and other asset- and mortgage-backed securities.  At one point, Bear Stearns's own origination business arising out of Bear Res provided almost a third of the loans that it securitized and packaged.  During the third quarter of 2006, "captive origination volume [of MBS] reached a record 31 percent of total residential mortgage securitization volume."  3d Qtr. 2006 Earnings Call, *supra* at 3.  By the first quarter of 2007, this figure rose to 35 percent.  Bear Stearns, *Earnings Call for 1st Quarter*, *Fiscal Year* 2007, Mar. 15, 2007, at 3 (Bloomberg LP Transcript) [hereinafter 1st Qtr. 2007 Earnings Call].

204.    Bear Stearns's push to grow its own origination operation to fuel its

securitizations went against the grain of the larger market.

> Although experts see about a 15 percent drop in mortgage sales this year, Bear
> Stearns has built up its own ability to originate mortgages to such an extent in
> recent years that the company should be able to avoid the overall decline seen,
> Chief Financial Officer Sam Molinaro said in an interview.

> "We are not expecting to see a significant decline in mortgage-backed revenue,"
> he said.

Sanders, *Rises 36 Pct*, *supra.*

205.    Earlier in its subprime and Alt-A securitization trajectory, Bear Stearns

accelerated its securitization of exotic loans, such as ARMs to keep its profits high and offset

reduced profits in other Fixed Income segments.  Chris Sanders, *Bear Stearns Quarterly Profit*

*Falls 10 Percent*, Reuters, Sept. 22, 2004.  Moreover, Bear Stearns was at the height of its

continued pursuit of a larger presence in the MBS market at the end of 2006 and beginning of

2007, just at the time the subprime collapse accelerated.

206.    By the third quarter of 2006, MBS volumes had ballooned at Bear Stearns.

According to Defendant Molinaro on that quarter's Earnings Call:

> Commercial mortgage and CDO net revenues increased significantly when
> compared to the prior year as securitization volumes rose on favorable investor
> demand and market share gains.  For the quarter, Bear Stearns ranked as the
> *number one underwriter of mortgage-backed securities* as the company's
> securitization volumes rose to 29 billion.  *During the nine months ended August*
> *2006, we also ranked as the number one underwriter of U.S. mortgage-backed*
> *securities, capturing in excess of 11% of the overall U.S. mortgage-backed*
> *securities market.*

3d Qtr. 2006 Earnings Call, *supra* at 3 (emphasis added).  Yet, earnings on these very products

were starting to dive.  Fixed Income revenues declined 25 percent when compared to the prior

quarter.  *Id.*

207.    Bear Stearns continued to pitch MBS and mortgage securitization as an "opportunity" through all of 2007, including after its *hedge funds collapsed*.  This development of Bear Stearns's doomed business model is detailed *infra* subsection VII.A.9.  Bear Stearns's reckless approach to the mortgage industry as warning signs were intensifying demonstrates the fundamental flaws of its business model and the clear imprudence of its stock as an investment for the Plan.

208.    Bear Stearns's immersion in the mortgage securities business was destined for disaster.  For example, among Alt-A mortgage securities issued by Bear Stearns, delinquencies by 60 and 90 days reached staggering levels, particularly in Florida and California.  Woodward & Raju, *supra* at 217.  For one Bear Stearns Alt-A "CMO pool" issued on June 29, 2006, delinquencies after 60 or more days were 29.4 percent by September 2007, and they reached a whopping 41.48 percent by March 2008.  *Id.* at 217 & tbl.1 (analyzing Cusip 073871AA3).  2007 vintage Alt-A securities were on pace to deteriorate even faster.  *Id.*  A Bear Stearns Alt-A CMO issued on April 25, 2007 had delinquencies after 90 or more days at 3.26 percent in September of 2007, climbing to 22.47 percent in March of 2008—an increase of 589 percent.  *Id.* at 218 & tbl.1 (analyzing Cusip 07387RAA6).  Delinquencies for 60 or more days were higher than for 90 or more days, indicating that the situation would only deteriorate further.  *Id.*

209.    Alt-A loans were concentrated in the most overpriced markets near the peak of the residential real estate bubble.  Woodward & Raju, *supra* at 220. "By the first quarter of 2008, the market for issuance of non-agency subprime and Alt-A MBS had essentially disappeared."  *Id*. at 221.

210.    Bear Stearns engaged in high-risk mortgage securitization during a time of increased pressure in the mortgage market without adequately implementing liquidity and

capital controls to compensate for the increased risks.  The warning signs that materialized by late 2006 and early 2007 were known or should have been known by Bear Stearns as it increased its presence in the mortgage securities industry.

     **5.**     The Volume of Bear Stearns's Securitizations and Holdings Backed by Risky Mortgages Made the Company Vulnerable to Collapse.

     211.     Bear Stearns securitized, packaged, sold, and ultimately held mortgage-backed securities at an astonishing level.  When Bear Stearns's securitization outpaced its ability to sell the securities, Bear Stearns's retained interests grew, exposing it to more and more risk.

     **a.**     Securitization.

     212.     According to Bloomberg statistics, Bear Stearns's CMO underwriting, which included MBS, grew at an astounding pace between 2001 and 2005, with slightly lower volumes in 2006 and 2007.  During these years, Bear Stearns was ranked at the top of all U.S. CMO underwriters.

| | CMO Underwriting Ranking | CMO Underwriting Volume (in billions) |
|---|---|---|
| **1994** | **3** | **$ 25** |
| **1995** | **1** | **$ 7** |
| **1996** | **3** | **$ 15** |
| **1997** | **2** | **$ 35** |
| **1998** | **3** | **$ 42** |
| **1999** | **4** | **$ 32** |
| **2000** | **2** | **$ 26** |
| **2001** | **3** | **$ 73** |
| **2002** | **2** | **$ 111** |
| **2003** | **2** | **$ 112** |
| **2004** | **1** | **$ 114** |
| **2005** | **1** | **$ 133** |
| **2006** | **1** | **$ 110** |
| **2007** | **2** | **$ 82** |

Data Source: Bloomberg (2009) Collateralized Mortgage Obligations (CMO) Issuance and Underwriting Statistics; retrieved Mar. 20, 2009 from Bloomberg database.

213.     Bear Stearns securitized both "agency" (conforming to the underwriting standards of Fannie Mae and Freddie Mac), and "non-agency" (or non-conforming, and therefore riskier) mortgages and other asset-backed debt.  The Company's volume of agency securitizations was $23 billion in 2007, while its securitizations in non-agency and other asset-backed debt was nearly $74 billion.  2007 Form 10-K, at 101.  In 2006, the Company had securitized over $99 billion in non-agency and other asset-backed debt.  *Id.*



Data Source: 2007 Form 10-K, at 101; 2006 Form 10-K, at 94 (2005 and 2006 numbers); Bear Stearns, Annual Report (Form 10-K), at 76 (Feb. 14, 2005) (for the period ending Nov. 30, 2004) (2003 and 2004 numbers) [hereinafter 2004 Form 10-K].  Non-agency mortgage-backed securities continue to trade at distressed prices, while the Government's rescue of Fannie Mae and Freddie Mac has bolstered the value of agency mortgage-backed securities.

214.    Bear Stearns increased its total securitizations and retained interests in securities steadily until 2006, but when its securitization volume slowed down between 2006 and 2007—from about $139 billion to $120 billion—Bear Stearns's retained interests in securities it could not unload grew instead of decreasing with the decreased securitization volume.  Bear Stearns's own models priced these retained interests at $8 billion in 2007, where they had been close to $6 billion in 2006.  2007 Form 10-K, at 101.  Between 2005 and 2006, the "weighted average holding period for retained interest positions in inventory" increased from 90 days to 150 days, and leapt again in 2007, growing to 180 days.  *Id*. at 100; 2006 Form 10-K, at 94.

215.    Thus, Bear Stearns had to hold on to many toxic securities because it could not get rid of them.  The continuing distressed pricing of these MBS and similar financial instruments forced Bear Stearns to sell at a loss or keep building inventory while hoping that prices recovered, in part through the use of aggressive accounting such as historical pricing models and internal valuation methodologies, discussed *infra* subsections VII.A.6 and VII.A.13.

**b.**    Off-Balance Sheet MBS Exposure.

216.    Among the products it securitized, Bear Stearns maintained significant off-balance sheet exposure.

217.    Bear Stearns's financial statements state that the company "derecognizes" financial assets transferred in securitizations, and the

> *majority of the SPEs that the Company sponsors or transacts with are QSPEs [Qualified Special Purpose Entities], which the Company does not consolidate* in accordance with this guidance.  QSPEs are entities that have little or no discretionary activities and may only passively hold assets and distribute cash generated by the assets they hold.  The Company reflects the fair value of its interests in QSPEs on its balance sheet but does not recognize the assets or liabilities of QSPEs.  *QSPEs are employed extensively in the Company's mortgage-backed and asset-backed securitization businesses.*

65

. . . .

> These SPEs are commonly employed in collateralized debt obligation transactions
> where portfolio managers require the ability to buy and sell assets or in synthetic
> credit transactions.

2007 Form 10-K, at 61 (emphasis added); *see also id.* at 100.  The Company's

acknowledgement of its pervasive use of off-balance sheet QSPEs in its securitization

businesses demonstrates that the billions actually reported in its financial statements were just

the tip of the iceberg in terms of Bear Stearns's exposure to MBS and other risky securities.

218.    The perils of off-balance sheet exposure have been a topic of great interest since

Bear Stearns's collapse.  A September 18, 2008, Senate Committee on Banking, Housing and

Urban Affairs Subcommittee on Securities, Insurance, and Investment hearing, *Transparency*

*in Accounting: Proposed Changes to Accounting for Off-Balance Sheet Entities*, discussed the

role of off-balance sheet accounting standards' impact on the financial crisis.  There has been

considerable frustration during the financial crisis from market participants caused by

inadequate disclosures from large off-balance sheet users like Bear Stearns.  Without adequate

disclosures, market participants are forced to fill in the blanks for the extent of exposure to loss

that off-balance sheet entities pose to the companies that created them.

219.    Prepared testimony by John White, Director of the Division of Corporation

Finance at the SEC, and James Kroeker, Deputy Chief Accountant at the SEC, described the

relevant off-balance sheet accounting standards that sought improvement and the process that

was underway:

> The primary guidance for accounting for off-balance sheet arrangements for
> financial instruments is contained in FASB Statement No. 140, *Accounting for*
> *Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*,
> and FASB Interpretation No. 46R, *Consolidation of Variable Interest Entities*.
> FAS 140 and FIN 46R are the two sources of guidance market participants have
> identified for improvement. . . . In January 2008, the Commission staff asked the
> FASB to consider the need for further improvements to the accounting and

disclosure for off-balance sheet transactions involving securitization arrangements.  Further, in March 2008, the President's Working Group on Financial Markets made similar recommendations to improve the accounting and disclosure for these transactions. . . .  On Monday, September 15, 2008, the FASB proposed amendments to FAS 140 and FIN 46R.  Under the proposed amendments, the FASB would eliminate what is commonly referred to as the QSPE scope exception.  Eliminating the QSPE scope exception would subject all securitization transaction trusts and other vehicles to a single consolidation accounting model. . . . If the FASB adopts the proposed rule changes, we believe SPE sponsors would consolidate a significant portion of existing off-balance sheet arrangements, including some portion of the existing QSPEs, SIVs and commercial-paper conduits.

*Transparency in Accounting: Proposed Changes to Accounting for Off-Balance Sheet Entities: Hearing Before the Subcomm. on Securities, Insurance, and Investment, S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. 4-6 (Sept. 18, 2008) (prepared statement of John W. White, Dir., Div. of Corp. Finance and James L. Kroeker, Deputy Chief Acct.) *available at* http://banking.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ ID=be81458c-abc1-49aa-ae6d-0ab5f8d9fea2.

220.    The accounting standards, FASB Statement No. 140 (FAS 140) and FASB Interpretation No. 46R (FIN 46R), have been a source of controversy for accounting standard setters and market participants for many years.  Off-balance sheet entities are highly complex, often resulting in financial engineering creativity surpassing accounting standard setters' ability to amend current accounting standards in time to prevent risk of inadequate disclosures to financial statement users.  FASB member Lawrence Smith described the ongoing deliberations among FASB members playing catch up to the rapid manipulation of FAS 140:

The criteria to qualify as a QSPE relate to restrictions on the permitted activities of a QSPE.  Specifically, Statement 140 requires that the activities of a QSPE must be "significantly limited" and "entirely specified" in the legal documents creating the QSPE.  In other words, the QSPE has very restricted decision-making authority because the entity was supposed to be able to function on "autopilot." . . . This research and analysis have led Board members to the conclusion that because of the range of financial assets being securitized and the complexity of securitization structures and arrangements, the current qualifying SPE criteria are

being stretched well beyond the original intent and requirements of Statement 140 that its activities be "significantly limited" and "entirely specified." . . . After careful consideration Board members concluded that it is not possible to create an entity that functions on "autopilot" because few classes of financial assets are truly passive as envisioned in the qualifying SPE concept.

*Transparency in Accounting: Proposed Changes to Accounting for Off-Balance Sheet Entities:*

*Hearing Before the Subcomm. on Securities, Insurance, and Investment, S. Comm. on Banking,*

*Housing, and Urban Affairs*, 110th Cong. 4-5 (Sept. 18, 2008) (prepared statement of

Lawrence Smith, Member Financial Accounting Standards Board) *available at*

http://www.bank.senate.gov/public/_files/SmithTestimony91808.pdf.  Smith concluded that

"[FASB members] share [the] Subcommittee's concerns about the role [the] entities have

played in the current financial crisis" and that "the fundamental issue relates to shortcomings in

the transparency of information available to investors to enable them to understand the true

financial reporting status of reporting entities, particularly in the financial services industry."

*Id.* at 11.

221.    Off-balance sheet entities are used to keep substantial risk out of the financial

statements.  Enron extensively used off-balance sheet entities to hide critical activities from

investors and creditors ultimately ending in its demise.  The opacity of off-balance sheet

entities in the financial statements causes a great amount of confusion, distrust, and

inefficiencies for market participants.  Prepared written testimony by Elizabeth Mooney, CFA,

CPA, an accounting analyst at Capital Group Companies, pleaded to Congress regarding how

investors were being forced to work with current off-balance sheet accounting standards to

their dismay and demanded much needed reform:

The current rules are inadequate and allow institutions to have too much involvement and risk exposures with entities off the balance sheet. . . . It is well accepted that the lack of transparency in financial reporting creates unwarranted confusion and unnecessarily produces higher cost of capital, misallocates capital across industries and distorts securities valuations.  In particular, the accounting

for securitizations and special-purpose entities (SPEs) lacks sufficient
transparency for efficient capital markets, and has been a contributing cause to the
current financial crisis.  In this decade, investors have suffered substantial losses
over this accounting issue, twice: once after Enron and again in the current
mortgage crisis. . . .  Many of the losses incurred over the last year stemmed in
part from companies' ability to easily transfer loans and other assets to off-
balance-sheet entities—entities for which investors often have limited
information, with inadequate accounting for, or disclosure of, the risks retained by
such companies. . . .  We now know that a number of companies have retained
substantial risks in many of their off-balance-sheet entities, while providing at
best only limited disclosures to investors regarding their off-balance-sheet risks.
*Financial reporting should result in the <u>substance</u> of transactions, rather than
their oblique "engineered legal forms" being reported to investors.*

*Transparency in Accounting: Proposed Changes to Accounting for Off-Balance Sheet Entities:*

*Hearing Before the Subcomm. on Securities, Insurance, and Investment, S. Comm. on Banking,*

*Housing, and Urban Affairs*, 110th Cong. 1, 2, 4 (Sept. 18, 2008) (prepared statement of

Elizabeth Mooney, Accounting Analyst, Capital Group Co. ) *available*

*at* http://www.bank.senate.gov/public/_files/MooneyTestimony91808.pdf [hereinafter

Testimony of Elizabeth Mooney].

222.    Mooney cited a January 2008 research paper that "discuss[ed] research on the

reasons why loan securitizations result in poor loan origination and screening practices and

higher default rates, particularly in the subprime debacle."  The researchers found that

"Conditional on being securitized, the portfolio that is more likely to be securitized defaults by

around 20% more than a similar risk profile group with a lower probability of securitization."

Testimony of Elizabeth Mooney at 3 (citing Benjamin J. Keys, et al., *Securitization and*

*Screening: Evidence From Subprime Mortgage Backed Securities*, (Jan. 2008), *at*

http://www2.law.columbia.edu/contracteconomics/conferences/laweconomicsS08/Vig%20pap

er.pdf).

223.    A sampling of thirteen off-balance sheet securitization conduits associated with Bear Stearns,[7] whose information is available through Bloomberg, cannot be found anywhere in the 10-Ks of the Company by reference of name.  The names of the off-balance sheet entities partially speak for themselves: for example, Bear Stearns Adjustable Rate Mortgage Trust; Bear Stearns Alt-A Trust, and Bear Stearns Second Lien Trust.  Bloomberg L.P. (2009) Securitization conduits for Bear Stearns Companies 1987 to 2007. Retrieved Mar. 16, 2009 from Bloomberg database.

224.    Not only did Bear Stearns maintain significant amounts of off-balance sheet exposure, it also held MBS on its books at high levels.

    c.    Variable Interest Entities ("VIEs").

225.    Variable Interest Entities ("VIEs"), also known as Special Purpose Entities ("SPEs"), are securitization conduits—"corporations, trusts or partnerships that are established for a limited purpose. . . . The Company's primary involvement with SPEs relates to securitization transactions in which transferred assets, including commercial and residential mortgages, consumer receivables, securities and other financial assets are sold to an SPE and repackaged into securities or similar beneficial interests."  2007 Form 10-K, at 60.  Because they were "an essential part of the Company's securitization, asset management and structured finance businesses," Bear Stearns purchased, sold, and consolidated VIEs in which the Company was the primary beneficiary.  2007 Form 10-K, at 61, 104.  When a VIE is

---

[7]  These entities are: Bear Stearns Adjustable Rate Mortgage Trust; Bear Stearns Alt-A Trust II; Bear Stearns Alt-A Trust; Bear Stearns Asset Backed Securities NIM; Bear Stearns Asset Backed Securities; Bear Stearns Commercial Mortgage Securities Inc.; Bear Stearns Deutsche Bank Trust; Bear Stearns Mortgage Funding Trust; Bear Stearns Mortgage Securities Inc.; Bear Stearns Second Lien Trust; Bear Stearns Secured Investors Trust; Bear Stearns Small Balance Commercial Trust; and Bear Stearns Structured Products Inc.  *See* Bloomberg L.P. (2009) Securitized Mortgage Conduits 2000 to 2007; retrieved Mar. 20, 2009 from Bloomberg database.

"consolidated" it is retained on Bear Stearns's books and reported in its financial statements. Thus, VIEs did appear in Bear Stearns's financial statements.

226.    As part of its MBS franchise, Bear Stearns retained ever more significant amounts of these assets on its books and exposed itself to greater losses year by year.  Any issuer of MBS "may have substantial exposure if a portion of the structured securities has not been sold to investors, resulting in risky securities still being held on the issuer's balance sheet."  Woodward & Raju, *supra* at 216; *see also* Serena Ng & Michael Hudson, *Mortgage Shakeout May Roil CDO Market—Subprime Defaults Lead to Wavering At Big Street Firms*, Wall St. J., Mar. 13, 2007.  Bear Stearns was no exception.

227.    Bear Stearns retained over $33 billion in VIEs assets and therefore reported them in its 2007 financials.  2007 Form 10-K, at 104 (showing $33.5 billion in VIE assets). The following chart shows the sharp rise in Variable Interest Entities retained by Bear Stearns from 2003 to 2007—ballooning from $7 million to over $33 billion in just four years:

| Year | Assets of VIEs | VIEs Maximum Exposure to Loss | % of VIE Loss Exposure to Assets of VIEs |
|---|---|---|---|
| 2003 | $1,180 | $7 | 1% |
| 2004 | $1,900 | $75 | 4% |
| 2005 | $15,152 | $830 | 5% |
| 2006 | $30,245 | $1,165 | 4% |
| 2007 | $33,553 | $2,948 | 9% |
| | (in millions except for percentages) | | |

Data Source: 2007 Form 10-K, at 104 (2007 and 2006 numbers); 2006 Form 10-K, at 98 (2005 numbers); 2004 Form 10-K, at 77-78; Bear Stearns, Annual Report (Form 10-K), at 76-77 (Feb. 27, 2004) (for the period ending Nov. 30, 2003).  Moreover, Bear Stearns's own estimate of VIE exposure was $2.9 billion, where it had been less than 40 percent of that figure in the prior year.  Additionally, while total securitizations decreased from $121 billion to $97 billion

from 2006 to 2007, respectively, Bear Stearns found itself with more VIE assets, confirming

that it had to claim primary beneficiary more often.  Given the trajectory of these figures, Bear

Stearns's exposure was bound to increase dramatically until it collapsed.

      **d.**      MBS Were a Significant Portion of Bear Stearns's Total Assets.

228.     MBS trading inventory was held in the balance sheet line item "Financial

Instruments," which was composed of agencies, sovereign debt, corporates, derivatives, and

MBS.  MBS was the largest component of these.  On information and belief, MBS in this

category are essentially the inventory warehouse of assets that were works-in-progress to be

used for future placement in securitization conduits.  The graph below illustrates the significant

amount of in-transit mortgage related financial instruments on the balance sheet of Bear

Stearns over time.



Data Source: 2007 Form 10-K, at 97 (2006 and 2007 numbers); 2006 Form 10-K, at 91 (2005

numbers); 2004 Form 10-K, at 74 (2003 and 2004 numbers); *see also* 3d Qtr. 2007 Earnings

Call (discussion of inventory).

229.    More than a third of Bear Stearns's total assets were part of the line item Financial Instruments, and more than a third of the Financial Instruments were Mortgage Backed Securities.  In 2007, all $46.1 billion of MBS were "valued using models or other valuation methodologies."  2007 Form 10-K, at 96.  This is an example of 2007 balances:

| | | |
|---|---|---|
| Total Assets | $ | 395,362,000,000 |
| Financial Instruments | $ | 138,242,000,000 |
| Mortgage Backed Securities | $ | 46,141,000,000 |

Data Source: 2007 Form 10-K, at 82, 97.

230.    Prior to becoming a CSE firm in 2005, Bear Stearns's "concentration of mortgage securities was increasing for several years and was beyond its internal limits."  OIG CSE REPORT, *supra* at ix, 18.  Moreover, "a portion of Bear Stearns' mortgage securities (*e.g.*, adjustable rate mortgages) represented a significant concentration of market risk."  *Id.*

     **e.**     Bear Stearns Relied on Credit Derivatives to Hedge Against its MBS Vulnerabilities.

231.    Bear Stearns had billions of dollars invested in MBS and similar financial instruments and, as described above, Bear Stearns was increasing its investments in MBS and similar financial instruments during the early period of the housing bubble correction in late 2006 and early 2007.  During 2007, Bear Stearns was forced to increasingly rely on derivatives to hedge against losses on MBS and similar financial instruments.  The hedging effect of the derivatives to offset MBS and similar financial instruments losses simultaneously increased credit risk exposure related to the derivates.  Bear Stearns swapped one risk for another.

232.    Bear Stearns likely used the derivative hedging theory to comfort nervous investors.  Bear Stearns's executives repeatedly told investors that losses from MBS and

similar financial instruments during the housing bubble correction were well covered by the derivatives.  In fact, Bear Stearns was increasing its derivatives credit exposure while trying to decrease its potential losses from soured MBS and similar financial instruments.

233.    The following table summarizes the rapid increase in Bear Stearns's total derivative credit exposure during the Class Period.

| Over-The-Counter Derivative Credit Exposure | | |
|---|---|---|
| 1Q07 | $ | 11.2 |
| 2Q07 | $ | 13.7 |
| 3Q07 | $ | 16.3 |
| 4Q07 | $ | 26.3 |
| 1Q08 | $ | 44.2 |
| (In billions) | | |

Data Source: Bear Stearns, Quarterly Report (Form 10-Q), at 60 (Apr. 9, 2007) (for the period ending Feb. 28, 2007) [hereinafter 2007 First Quarter Form 10-Q]; Bear Stearns, Quarterly Report (Form 10-Q), at 63 (July 10, 2007) (for the period ending May 31, 2007) [hereinafter 2007 Second Quarter Form 10-Q]; Bear Stearns, Quarterly Report (Form 10-Q), at 63 (October 10, 2007) (for the period ending Aug. 31, 2007) [hereinafter 2007 Third Quarter Form 10-Q]; 2007 Form 10-K, at 75; Bear Stearns, Quarterly Report (Form 10-Q), at 79 (Apr. 14, 2008) (for the period ending Feb. 29, 2008) [hereinafter 2008 First Quarter Form 10-Q].

234.    As Bear Stearns increased its derivative credit exposure, it was forced to increase the amount of lower-rated derivatives.

**6.**    Bear Stearns Relied on Inadequate Risk Management Practices.

235.    As high-level executives, Defendants Cayne, Greenberg, Mayer, Molinaro, Schwartz, Spector, and Steinberg were responsible for Bear Stearns's risk management function.  Moreover, Defendant Steinberg was a member of the Management & Compensation

Committee (Risk Management and New Products).  As such, he was centrally involved in the Company's risk management infrastructure.  In Bear Stearns's 2006 Annual Report, Steinberg is quoted as saying "Our commitment to risk management is evident from the boardroom to every trading desk in the firm."  Bear Stearns Companies Inc., 2006 Annual Report for Investors, at 14.  As a member of the ESOP Committee as well, his direct knowledge of Bear Stearns's risk management practices—or lack thereof—put him on notice that Bear Stearns stock was an imprudent investment for the Plan.

> **a.**      Presentation of Risk and Risk Management in Financial Statements.

236.    The considerable risks that Bear Stearns was taking in the mortgage industry were not adequately disclosed in its financial statements.  Instead, Bear Stearns made it sound as if it had very strong, efficient, and responsive risk management procedures and oversight in place, which was far from true.  For example, the Company's 10-Ks state the following regarding "Risk Management":

> The Company's principal business activities involve significant market and credit risks.  In addition, the Company is subject to operational, legal, funding and other risks.  *Volatility and uncertainty in the global capital markets may have a significant impact on our business, operations and reputation.*  Effective identification, assessment and management of these risks are critical to the success and stability of the Company.  Comprehensive risk management procedures have been established to identify, monitor and control each of these major risks.  *Additionally, the Company's diverse business segments and practices contribute to mitigating the risks of a downturn in any one of the global capital markets.  Management ensures that a strong internal control environment exists to minimize the adverse impact these risks may create.*  The risk management process encompasses many units independent of the trading desks, including the Risk Management, Global Credit, Global Clearing Services, Controllers, Operations, Compliance, Legal and Financial Analytics & Structured Transactions ("F.A.S.T.") Departments.  The Treasurer's Department is also independent of trading units and is responsible for the Company's funding and liquidity risk management.  Funding and liquidity risk management are discussed in Management's Discussion and Analysis of Financial Condition and Results of Operations in the "Liquidity, Funding and Capital" section.

2007 Form 10-K, at 68; 2006 Form 10-K, at 65 (italicized language appears in the 2007 Form 10-K only).  After this introduction, the Company's 10-Ks describe in detail the many committees devoted to various aspects of the seemingly complex and legitimate risk management structure.  Specifically, the "Risk Committee" (2006) / "Risk Policy Committee" (2007) "provides a high level of oversight" to "trading strategies"; the "Model Review Committee" seeks to "ensure that trading models are independently vetted and controlled"; and the "Mark-to-Market Committee" is "responsible for ensuring that the approaches used to independently validate the Company's valuations are robust, comprehensive and effective." 2007 Form 10-K, at 68-69; 2006 Form 10-K, at 65-66.

237.    The 10-Ks include discussion of three key aspects of risk: "Market Risk"—which Bear Stearns describes as

> the risk of loss that may result from the potential change in the value of a financial instrument as a result of fluctuations in interest and currency exchange rates, equity, futures and commodity prices, changes in the implied volatility of interest rates foreign exchange rates, equity, futures and commodity prices, and price deterioration or changes in value due to changes in market perception or actual credit quality of either the issuer or its country of origin,

2007 Form 10-K, at 69; "Credit Risk"—which "arises from [the] potential non-performance by counterparties, customers, borrowers or debt security issuers"; and "Operational Risk"—which "is the potential for loss arising from inadequate or failed internal processes, people or systems, or from external events," 2007 Form 10-K, at 74, 76.

**b.**    Risk Modeling.

238.    The Market Risk sections of Bear Stearns's financial statements describe the Company's use of modeling to value its assets as well as Value-at-Risk ("VaR") modeling practices to determine potential risk to the entity.

(i)       Asset Valuation Modeling.

239.    Bear Stearns's financial statements gave the impression that its valuation

models for assets that were not active in the market were in a state of constant review and

updating.  The 2007 Form 10-K states that:

> The Company is an active participant in over-the-counter markets, including
> derivatives, commercial and residential mortgage loans, leveraged loans and
> Chapter 13 and other credit card receivables.  *The nature of many of these
> financial instruments is such that they are valued through the use of models.*  The
> complexities and reduced transparency inherent in financial instruments that are
> valued using models, as compared with exchange-traded prices or other quoted
> market valuations, introduce a particular element of operational risk into the
> Company's business.  *In most cases, internal valuation models are developed by
> staff within the F.A.S.T. Department.*  Traders and trading management
> supplement and review the development efforts.  A further level of review is
> performed by the independent model review team within the Risk Management
> Department.  Results of the independent model review process are presented to
> the Model Review Committee.

2007 Form 10-K, at 69-70 (emphasis added).

240.    Bear Stearns's financial statements also asserted that the Company was

constantly re-marking its model-valued assets to align with the values its counterparties were

placing on these assets:

> In certain cases, the Company is also able to compare its model-based valuations
> with counterparties in conjunction with collateral exchange agreements.  Senior
> trading managers and independent Risk Management also emphasize the
> importance of two-way trading in financial instruments valued using models in
> order to verify the accuracy of the models.

2007 Form 10-K, at 70.  In fact, however, Bear Stearns failed to re-mark assets when

counterparties informed it of their valuations.

241.    Mark disputes—"when two parties to a derivatives transaction, such as a swap,

disagree over the value of a the derivative" or in a repo transaction "when the borrower and the

lender disagree over the value of the collateral"—became more common for Bear Stearns by

the summer of 2007 and increased through its collapse in March of 2008.  OIG CSE REPORT, *supra* at 27-28.

242.    Bear Stearns manipulated mark disputes by using "traders' more generous marks for profit and loss purposes, even when Bear Stearns conceded to the counterparty for collateral valuation purposes."  OIG CSE REPORT, *supra* at 28.  This practice also resulted in inflation of gains on both sides of trades.  *Id.*

243.    Bear Stearns used its questionable judgment on marks to value the assets in its financial statements.  In its 2007 10-K, Bear Stearns valued over 60 percent of its assets with the use of internal valuation models.  2007 Form 10-K, at 82, 97 (Calculation: (Total Level 2 and Level 3 Assets) divided by Total Assets).  That is, *over $255 billion of the company's $395 billion of total assets were valued with the use of internal valuation models.*

244.    The financial statements disclose that the marks were obtained through the use of "models or other methodologies," with "a degree of subjectivity [being] required," that "this subjectivity makes these valuations inherently less reliable" on assets such as "non-agency mortgage backed securities and non exchange-traded derivatives."  2007 Form 10-K, at 63-64.  Bear Stearns goes on to represent that the assets most reliant on "internally developed models or methodologies utilizing significant assumptions or other data that are generally less readily observable from objective sources" were obtained through the use of "significant data inputs that cannot be validated by reference to readily observable data" and that the "instruments [were] typically illiquid."  *Id.* at 70.

245.    Notably, when JPMorgan was evaluating its acquisition of Bear Stearns, it estimated that *$220 billion* of Bear Stearns's $395 billion in assets were toxic and extremely overvalued.  Bryan Burrough, *Bringing Down Bear Stearns*, Vanity Fair, August 2008.

**(ii)** Value-at-Risk Modeling.

246.    Value-at-Risk ("VaR") modeling is based on probability and statistics and was

"developed and popularized in the early 1990s by a handful of scientists and mathematicians . .

. who went to work for J.P.Morgan" and started JPMorgan's spin off RiskMetrics.  Joe Nocera,

*Risk Mismanagement*, N.Y. Times, Jan. 4, 2009.  VaR expresses risk as a dollar figure.  VaR is

not a single standardized model—rather, it is a "group of related models that share a

mathematical framework."  *Id.*  Thus, different firms use different versions of VaR.  VaR

assumes "normal" market conditions and purports to measure—in the extreme short term—the

chances that a portfolio or an entire company will *not* lose more than a particular amount of

money in a given time frame.  *Id.*  For example, a 95 percent daily VaR of $30 million means

that there is a 95 percent chance that the entity will not lose more than $30 million in a day.

What can happen in the other 5 percent realm is anyone's guess.

247.    VaR became popular with institutions such as Bear Stearns, particularly as the

SEC began to require a quantitative disclosure of market risks in financial statements.  The

SEC did not, however, standardize VaR among these institutions or audit their formulas.  *See*

Nocera, *supra*.

248.    After being lobbied by Bear Stearns and other Wall Street firms, the Basel

Committee on Banking Supervision, an international rule-making body that advises national

regulators, allowed firms' individual VaR calculations to determine their capital requirements.

Nocera, *supra*.  Bear Stearns's former Chief Risk Officer Michael Alix was instrumental in

these efforts.

249.    In a letter to the Board of Governors of the Federal Reserve in August 2003,

Alix wrote on behalf of the Securities Industry Association that "for many of our [investment

bank] core activities Basel II prescribes capital requirements that appear to be excessive

relative to risk and loss experience."  Letter from Michael Alix to Board of Governors of the

Federal Reserve System (Aug. 5, 2003), *available at* http://www.bis.org/bcbs/cp3/

secindass.pdf.  Touting the virtues of mark-to-market accounting and VaR, he continued:

> Our initial analysis suggests that an internal models-based approach to calculating
> risk capital . . . is more effective at estimating risk for many credit sensitive assets
> than the weightings-based approach for banking book assets under Basel II. . . .
> we recommend that the Committee permit a trading-book approach.

*Id.*  Alix then elaborated on his view that VaR-based models should be used to calculate

required capital and complained that short-term loans, including overnight repo loans, were

subject to risk calculations that were far too high.  *Id.*

250.    Alix then testified—on behalf of Bear Stearns and the other four big investment

banks (Goldman Sachs, Lehman Brothers, Merrill Lynch, and Morgan Stanley)—before the

House Financial Services Committee in favor of using VaR-based capital requirements for

investment banks in the CSE program, repeating the themes that the banks were in danger of

being forced to meet "[o]utsized capital requirements," that allowing banks to use VaR would

align capital requirements with the "true risks of the securities business," that a benefit of

CSE's voluntary framework and exemption from capital requirements would be to encourage

"rigorous risk management practices," and that use of mark-to-market accounting should

provide comfort to regulators.  *The New Basel Accord: Private Sector Perspectives: Hearing*

*Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on*

*Financial Services*, 108th Cong. 48-50 (June 22, 2004) (testimony of Michael J. Alix, Senior

Managing Director, Bear Stearns & Co, Inc.).  Alix warned against allowing regulators to

require capital computation under a "banking book" system, because investment banks would

take a "'double hit'" if forced to maintain so much capital.  *Id.* at 52.  While Alix gave the

impression that there would be strict oversight of the VaR models, *id.* at 50 (dubbing them

"approved" VaR models), as discussed *supra*, no such oversight ever existed.  Each firm was free to create and use its own models without any unifying standards.

251.    Alix also advocated for complete freedom for investment banks to price individual securities using models: "there should be no minimum price history requirement for newly issued or less liquid securities whose risk attributes are sufficiently similar to securities with robust price histories that can serve as 'proxies' in risk management models."  Letter from Michael J. Alix and Mark W. Holloway to Jonathan G. Katz, Secretary of the SEC Re: Proposed Rule on Alternative Net Capital Requirements for Broker Dealers That Are Part of Consolidated Supervised Entities (Feb. 27, 2004), *available at* http://www.sec.gov/rules/proposed/s72103/csesteering02272004.htm.  This subjectivity, discussed above with respect to asset valuation models, only compounded the bugs inherent in VaR models and risk management on the whole.

252.    When asked to comment on Bear Stearns's VaR models in June of 2006, Alix said "The machine works."  Emily Thornton, *Inside Wall Street's Culture of Risk*, BusinessWeek, June 12, 2006.

253.    However, VaR is seriously flawed for several reasons, including:

- VaR does nothing to predict catastrophic events, such as the 1 percent or 5 percent scenarios it does not quantify, and the housing bubble's expansion in 2005 and 2006 was utterly useless in predicting what would happen in 2007 and 2008 when the bubble burst.  *See* Nocera, *supra*; *see also* Yves Smith, *Woefully Misleading Piece on Value at Risk in New York Times*, nakedcapitalism.com, Jan. 4, 2009 (describing skewed negative outcomes);

- VaR uses historical and/or "normal" market inputs and ignores the unpredictable or unprecedented.  VaR is based on a bell curve, but what is in the tails is the catastrophic loss of billions—what author Nassim Nicholas Taleb calls "fat tails"

or "black swans."[8]  Moreover, VaR failed to distinguish between leverage based on long-term debt and leverage based on overnight repo loans.  Nocera, *supra*;

- VaR does not contemplate a changing world, much less unlikely events in a changing world.  James Kwak, *Risk Management for Beginners*, baselinescenario.com, Jan. 4, 2009 (distinguishing "extreme events" typically left out of historical VaR from the entirely separate problem of a changed world where both normal and abnormal events are left out of the entire VaR equation);

- VaR uses valuation inputs that are not capable of being marked to the market.  An instrument that is traded infrequently—or never—cannot be objectively valued.  Putting a value that is estimated based on a comparable security into VaR as one of thousands of variables means that VaR has an even lower chance of accurately gauging risk; and

- VaR can be gamed.  Once banks started reporting VaR, they began to manipulate it.  One way of gaming VaR is using "asymmetric risk positions" such as credit default swaps, where the income the position generates is steady and small and the gains are included in VaR results.  However, because the risk of having to pay off CDS insurance was "assumed to be miniscule," that enormous loss was outside the probability that VaR measured.  In other words, the downside of the gamble resided in the "fat tail" and was essentially hidden from view.  Another way to game VaR is through the use of options, including put options— transactions that leave VaR unchanged.  Nocera, *supra*.

254.    Bear Stearns describes the purpose of its VaR models as being "[a]n estimation of potential losses that could arise from changes in market conditions" that "seek to predict risk of loss based on historical and/or market-implied price and volatility patterns."  2007 Form 10-K, at 71.  Yet, Bear Stearns's models were faulty—and unable to serve their stated purpose— for several reasons: (a) they were based on *historical* data; (b) they disregarded huge swaths of risk due to exclusion of market-value data; (c) they incorporated Bear Stearns's skewed asset valuations, such as valuations for Level 2 and 3 assets, and therefore constituted a doubly-

---

[8] In addition, while VaR is based on a standard bell curve, the mathematical models do not track the bell exactly.  For example, financial markets are subject to "skewness"—which means results are not symmetrical around the mean—and "kurtosis"—which means that "fat tails" encompass events that are "more likely to happen [than] a normal distribution would suggest."  Smith, *Woefully Misleading*, *supra*.

unreliable gauge of the Company's risk; and (d) they were developed and revised by Bear

Stearns alone, and accordingly lacked any external verification or corroboration.

255.    Bear Stearns's 2001 Form 10-K describes the limitations of its entity-wide VaR

calculations as follows:

> *Certain equity-method investments and non-publicly traded investments are not reflected in the VaR results.*  The VaR related to certain non-trading financial instruments has been included in this analysis and is not reported separately because the amounts are not material.  The calculation is based on a methodology that uses a one-day interval and a 95 percent confidence level.  *The Company uses a historical simulation approach for VaR*, which is supplemented by statistical risk add-ons for risk factors that do not lend themselves readily to historical simulation.  Historical simulation involves the generation of price movements in a portfolio using price sensitivities, and actual historical movements of the underlying risk factors to which the securities are sensitive.  Risk factors incorporated via historical simulation include interest rate movements, yield curve shape, general market credit spreads, equity price movement, option volatility movement (for certain option types) and foreign exchange movement, among others.  Risk factors incorporated via add-on factors include the risk of specific bond issuers, among others.

Bear Stearns, Annual Report (Form 10-K), at 71 (2/28/02) (for the period ending Nov. 30,

2001) (emphasis added).  Thus, the riskiest MBS and similar financial instruments, which were

"non-publicly traded investments"—and many off-balance sheet securitization conduit

arrangements which were accounted for as "equity-method investments"—appear to have been

excluded from VaR analyses.  In addition, by Bear Stearns's own description, the VaR results

were based on historical data.

256.    Bear Stearns represented that the "Company regularly evaluates and enhances

[entity-wide] VaR models in an effort to more accurately measure risk of loss" and that "[t]he

Company believes that its VaR methodologies are consistent with industry practices for these

calculations."  2007 Form 10-K, at 71.  However, as discussed in more detail *infra* subsection

VII.A.6.c, Bear Stearns's VaR models were severely out of date.  Moreover, the VaR

methodology used by Bear Stearns was grossly out of sync with any reasonable incorporation

of the risk of a housing market collapse.  The use of historical pricing models was not a

prudent way to reduce risk.  Rather, it increased risk and encouraged Bear Stearns as it

benefited from the housing boom, because during the upside of the housing bubble, Bear

Stearns's historical pricing models served to justify its business practices and reinforce the

false belief that a correction would not be severe, but if it were to occur it would be moderate.

During the housing bust, Bear Stearns used the very same shoddy pricing models to postpone

the disclosure of its true loss exposure to risky financial instruments.

257.    Bear Stearns included the following disclaimer about its VaR modeling,

confirming its relative uselessness for the period in which it was used:

> VaR has inherent limitations, including reliance on historical data, which may not
> accurately predict future market risk, and the quantitative risk information
> generated is limited by the parameters established in creating the models.  There
> can be no assurance that actual losses occurring on any one day arising from
> changes in market conditions will not exceed the VaR amounts shown below or
> that such losses will not occur more than once in 20 trading days.  VaR is not
> likely to accurately predict exposures in markets that exhibit sudden fundamental
> changes or shifts in market conditions or established trading relationships.  Many
> of the Company's hedging strategies are structured around likely established
> trading relationships and, consequently, those hedges may not be effective and
> VaR models may not accurately predict actual results.  Furthermore, VaR
> calculated for a one-day horizon does not fully capture the market risk of
> positions that cannot be liquidated in a one-day period.  However, the Company
> believes VaR models are an established methodology for the quantification of risk
> in the financial services industry despite these limitations.  VaR is best used in
> conjunction with other financial disclosures in order to assess the Company's risk
> profile.

2007 Form 10-K, at 71.

258.    Finally, the numbers Bear Stearns produced with its VaR model are strikingly

low, conveying the impression that after all of its calculating and supposed careful and accurate

modeling, Bear Stearns was not really at much risk relative to the size of its operation.  For

2007, the average aggregate daily value at risk calculated by Bear Stearns was $33.1 million;

for 2006 the number was $28.6 million.  Bear Stearns attributed the increase for fiscal year

2007 to "dramatic increases in volatility across credit, interest rates, and asset backed markets, and to changes in the Company's inventory positions."  2007 Form 10-K, at 72.

259.    Bear Stearns attempted to reconcile these differences, continuing its disclaimer discussion as follows:

> The Firm uses historical simulation VaR, which is driven by previously observed changes in market variables.  During periods in which volatility is increasing, VaR tends to lag since it does not incorporate swings in the relevant markets until they have actually been observed and are incorporated in the historical time series of market data being used for the VaR calculation.  This was the case in 2007, when volatility across many markets rose sharply and continuously throughout the year.  Substantial trading losses were experienced in the mortgage-related and leveraged finance areas.

2007 Form 10-K, at 73.

260.    Bear Stearns's true daily value at risk was high in both 2006 and 2007—likely much higher than $33 million—and the increase as 2007 wore on likely was much starker than these numbers suggest.  Indeed, Bear Stearns's actual losses far exceeded these numbers—an unsurprising result given the unreliability of VaR to predict low-probability but high-stakes losses.  Bear Stearns's use of and reliance on VaR was flawed both because the models were incapable of accurately projecting risk and also because VaR was not accompanied by adequate quantitative and qualitative analysis.

261.    Bear Stearns's "Risk Factors" sections in 10-K filings touch on the unreliability of VaR as well.  Specifically, Bear Stearns's risk management "policies and procedures to identify, assess and manage risks may not be fully effective," and "some of [its] methods of managing risk are based upon [its] use of observed historical market behavior.  As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate."  2006 Form 10-K, at 20; 2007 Form 10-K, at 17.

262.     Bear Stearns's risk management procedures were unreliable, in part because they relied too heavily on faulty VaR calculations created by internally created computer models based on underlying economic and market factors that maximized Bear Stearns's gains and minimized its losses, and the Plan fiduciaries—who oversaw Bear Stearns's risk management infrastructure, who ran the Company, and who signed and prepared the financial statements—knew it.

    **c.**     The Securities Exchange Commission Office of Inspector General Has Documented Severe Flaws in Bear Stearns's Risk Management and Use of VaR.

263.     Bear Stearns's risk management related to its MBS and similar financial instruments was dismal.  According to the OIG, Bear Stearns's "numerous shortcomings" included:

> lack of expertise by risk managers in mortgage-backed securities at various times; lack of timely formal review of mortgage models; persistent understaffing; a proximity of risk managers to traders suggesting a lack of independence; turnover of key personnel during times of crisis; and the inability or unwillingness to update models to reflect changing circumstances.

OIG CSE REPORT, *supra* at x; *see also id.* at 23.

264.     The OIG Report also noted the sub-par auditing practices at Bear Stearns, including a lack of sufficient auditing of liquidity and funding risk management and failure to retain internal audit workpapers.  OIG CSE REPORT, *supra* at 35, 39.

265.     The dire circumstances created by Bear Stearns's VaR modeling practices are well documented.  Before Bear Stearns was approved as a CSE in November of 2005, the SEC's Office of Compliance Inspections and Examinations ("OCIE")

> found that *Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models.*  Further, OCIE found that Bear Stearns used *outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked.*  As a result, Bear Stearns' daily VaR amounts could have been based on obsolete data.

> It was critically imperative for Bear Stearns's risk managers to review mortgage models because its primary business dealt with buying and selling mortgage-backed securities.

OIG CSE REPORT, *supra* at 20 (emphasis added).  This issue was raised with Senior Managing Director Jeffrey M. Farber in a December 2005 memorandum.

266.    In addition, during Bear Stearns's CSE application process, SEC TM staff suggested independent model reviews to assess the viability of Bear Stearns's valuation models particularly in the mortgage area.  A year later, TM remained concerned about the adequacy of the models, concluding that Bear Stearns's "model review process lacked coverage of mortgage-backed and other asset-backed securities."  OIG CSE REPORT, *supra* at 21.  Moreover,

> traders used their own models . . . for  hedging purposes and not the ones that the risk managers were reviewing.  When markets are liquid and trading is active, market prices can be used to value assets accurately.  In times of market stress, trading dries up and reliable price information is difficult to obtain.  Models therefore become relatively more important than market price in times of market stress . . . .

*Id.* Traders and risk managers in fact disagreed on hedge ratios, causing VaR spikes.  *Id.*

> At Bear Stearns, traders used hedge ratios that were consistent with the traders' own models even though the risk managers' VaR models indicated that different hedge ratios would have been more appropriate.

*Id.* at 21-22.

267.    Inconsistency in VaR numbers also plagued Bear Stearns.  For example, "risk managers had difficulty explaining how firmwide VaR numbers were related to desk-specific VaR numbers," and the OIG expert opined that this was due to disparate risk evaluation at different trading desks and a lack of a firmwide approach.  OIG CSE REPORT, *supra* at 29.  In addition, VaR numbers were inconsistently used for internal risk management and regulatory reporting.  *Id.*

268.     In 2006, risk managers at Bear Stearns had expertise in "pricing exotic derivatives and validating derivatives models" but the "business was becoming increasingly concentrated in mortgage securities. . . .  The OIG expert concluded that, at this time, the risk managers at Bear Stearns did not have the skill sets that best matched Bear Stearns' business model."  OIG CSE REPORT, *supra* at 22.  One glaring example was the mortgage pricing models' focus on prepayment risks to the exclusion of consideration for default risks.  *Id.*

269.     Bear Stearns risk management personnel had a high turnover rate, particularly when they were needed most.  The head of model validation resigned around March of 2007, "precisely when the subprime crisis was beginning to hit and the first large write-downs were being taken."  OIG CSE REPORT, *supra* at 22.  Traders trumped risk managers, and it appeared that the "risk manager who left had difficulty communicating with senior managers in a productive manner."  *Id.* at 23.

270.     It took several months for Bear Stearns to replace the senior risk manager.  By the summer of 2007 when the replacement arrived, "the risk management process was operating in crisis mode, dealing with numerous issues related to price verification, markdowns, and disputes over collateral valuations with counterparties."  OIG CSE REPORT, *supra* at 23.  Moreover, the model review group was

> understaffed at Bear Stearns for much of 2007.  As a result, the OIG expert concluded that the reviews of mortgage models that should have taken place before the subprime crisis erupted in February 2007 appears to have never occurred, in the sense that it was still a work in progress when Bear Stearns collapsed in March 2008.

*Id.*  Thus, *the mortgage crisis never factored into Bear Stearns's risk models*.

271.     Finally, Bear Stearns failed to account for factors that would affect mortgage value in its risk modeling.  These factors include housing prices, consumer credit scores, and patterns of delinquency rates.  OIG CSE REPORT, *supra* at 24.  Bear Stearns did not even come

close to examining a risk scenario involving a "complete meltdown of mortgage market liquidity accompanied by fundamental deterioration in the mortgages themselves, resulting from falling housing prices." *Id.* at 25.

272.    Defendant Cayne and Defendant Molinaro were aware of the SEC's concerns about Bear Stearns's risk management program.  According to a February 8, 2008 presentation by Molinaro at a Credit Suisse Financial Services Forum, the Company's risk management structure reports directly to the CFO.  Moreover, the Company's CEO is intimately engaged in the risk management process.

**7.**    Bear Stearns Was Extremely Leveraged and Had Insufficient Capital and Liquidity

**a.**    Leverage.[9]

273.    As a CSE, Bear Stearns had no leverage ratio limit.  OIG CSE REPORT, *supra* at ix.  Bear Stearns was leveraged at an astonishing ratio of approximately 33:1 by the end of 2007.  2007 Form 10-K, at 53 (showing gross leverage at 32.8x).  At the beginning of the Class Period, Bear Stearns's leverage ratio was 27:1 and it increased over the Class Period incrementally until it reached 33:1.  Bear Stearns, Quarterly Report (Form 10-Q), at 5 (July 10, 2006) (for the period ending May 31, 2006); Bear Stearns, Quarterly Report (Form 10-Q), at 5

---

[9] Leverage in its simplest form, is either total liabilities divided by total shareholders equity (debt to equity ratio), or total assets divided by total shareholders equity.  Either form yields similar results.  Bloomberg.com: Financial Glossary, at http://www.bloomberg.com/invest/glossary/bfglosl.htm (last visited Apr. 3, 2009) (Leverage Ratio "[m]easures of the relative value of stockholders, capitalization, and creditors obligations, and of the firm's ability to pay financing charges. Value of firm's debt to the total value of the firm (debt plus stockholder capitalization).");  OIG CSE Report, at 19 (defining leverage as debt to net capital);  2007 Form 10-K, at 52 ("Gross leverage equals total assets divided by stockholders' equity, inclusive of preferred and trust preferred equity.");  *see* also Black's Law Dictionary 926 (8th ed. 2004) ("Leverage: 1) To provide (a borrower or investor) with credit of funds to improve speculative ability and seek a high rate of return. 2) To supplement (available capital) with credit or outside funds 3) To fund (a company) with debt as well as shareholder equity.").

(October 10, 2006) (for the period ending August 31, 2006); 2006 Form 10-K, at 80; 2007 First

Quarter Form 10-Q, at 5; 2007 Second Quarter Form 10-Q, at 5-6; 2007 Third Quarter Form

10-Q, at 5-6; 2007 Form 10-K, at 82; 2008 First Quarter Form 10-Q, at 5 (Total Liabilities

divided by Total Stockholders' Equity).

274.     According to Bear Stearns's 2007 Form 10-K:

At November 30, 2007, total assets of $395.4 billion were approximately 12.2%
lower than the average of the month-end balances observed over the trailing 12-
month period, while total assets at November 30, 2006 were approximately 0.5%
higher than the average of month-end balances over the trailing 12-months prior.
Despite fluctuations in total assets at each quarter end, the Company's overall
market, credit and liquidity risk profile does not change materially, since the
reduction in asset balances is predominantly in highly liquid, short-term
instruments that are financed on a secured basis. This periodic reduction verifies
the inherently liquid nature of the balance sheet and provides consistency with
respect to creditor constituents' evaluation of the Company's financial condition.

2007 Form 10-K, at 52.  Thus, Bear Stearns understated its assets, and therefore its leverage.

For example, if approximately $395 billion was understated by 12.2 percent, the true level of

assets was closer to $450 billion, divided by $11.79 billion in shareholder equity, making the

true leverage ratio of *over 38:1*.  *See* 2007 Form 10-K, at 82.

275.     Compared to its investment bank counterparts, Bear Stearns was the most

leveraged.



Bloomberg L.P. (2009) Leverage of Wall Street Investment Banks 2000-2007; retrieved March 28, 2009 from Bloomberg database.

276.    Several experts have described the effects of high leverage ratios on investment banks.  The Congressional Research Service described that Wall Street's short term mindset incentivized them to become leveraged at the expense of increased risk.  If Wall Street bankers "borrow[ed] a high multiple of their own capital and put those funds into the same trading position, the returns to their own capital [were] magnified.  Of course, the potential losses [were] magnified to exactly the same degree."  MARK JICKLING, GOV'T & FIN. DIV., CONG. RESEARCH SERV., CRS REPORT FOR CONGRESS: AVERTING FINANCIAL CRISIS 18 (Oct. 8, 2008) [hereinafter JICKLING, AVERTING FINANCIAL CRISIS].

277.    A *Fortune* magazine article quoting Brad Hintz, an analyst for Sanford C. Bernstein, described the potential of excessive leverage to be catastrophic.  Hintz

    reckon[ed] that half the huge gains in Wall Street's profits from 2003 to mid-2007 could be attributed to increased leverage otherwise known as gambling with borrowed money that magnified earnings in a boom.  Again, it's the curse of too

much debt: If a firm's portfolio is leveraged at 33 to 1, it takes a mere drop of 3% to wipe out its entire capital.

Shawn Tully, What's Wrong With Wall Street and How To Fix It, Fortune, Apr. 14, 2008, at

70.

278.    Lynn Turner, chief accountant of the SEC from 1998 to 2001, stated in prepared

testimony for a Congressional hearing on October 7, 2008, that he believed Wall Street

investment banks like Bear Stearns were too reassuring to outsiders that their financial prowess

allowed them to control excessive leverage and the risks involved.  He testified that it was

unfortunate that

> not all the banks and those on Wall Street told everyone, including investors, what
> they had been up to.  And certainly they didn't at first tell them the loans were not
> worth $100.  But as liquidity and cash ran short, the losses became apparent and
> some institutions began to report losses.

Hearing on the Causes and Effects of the AIG Bailout: Hearing Before the H. Comm. on

Oversight and Government Reform, 110th Cong. 11-12 (Oct. 7, 2008) (prepared statement of

Lynn Turner).  Turner knew that it didn't take much for an outsider to figure out that leverage

to the degree Bear Stearns and its Wall Street counterparts had could quickly run out of cash:

> Think of it this way.  If you go out and make a $100 loan but the borrower can
> only repay say $60, then you have got something worth less than a $100.  But if
> you do that hundreds of thousands of times, as was done by the banking industry
> and Wall Street, it doesn't take a rocket scientist to figure out that sooner or later
> one runs out of cash.

Id.

279.    Bear Stearns's business model depended on leverage.  Bear Stearns appeared to

be an attractive investment for stockholders because leverage kept return on equity ("ROE")

high.[10]  Bear Stearns had ROE above 15 percent until the subprime crisis took its toll on the

---

[10] ROE is net income divided by shareholder equity.  Bloomberg.com: Financial Glossary, at
http://www.bloomberg.com/invest/glossary/bfglosl.htm (last visited Apr. 3, 2009) (defining

Company's net income.  The following chart illustrates Bear Stearns's ROE throughout the

subprime- and Alt-A mortgage boom and bust.



Data Source: Bloomberg L.P. (2009) Return on equity for Bear Stearns Companies First

Quarter 2001 to First Quarter 2008; retrieved Mar. 16, 2009 from Bloomberg database.

280.    Continuing to lure investor capital is a strong incentive to keep ROE high.  *See*

Bary, *How Sweet*, *supra* at 17; *see also* S&P Action Discussion Call, Aug. 3, 2007, *supra* at 7-

8.  Executive compensation was tied to ROE as well.  In its 2007 Proxy Statement, Bear

Stearns stated that for "approximately 1,050 individuals . . . [the] formula for calculating the

annual bonus pools shall be based upon . . . pre-tax or after-tax return on equity."  Bear Stearns

DEF 14A Notice of Proxy Statement, filed with the SEC on March 3, 2007, at 42.  The

necessity to keep ROE at this high rate was one reason that Bear Stearns could not diversify

---

ROE as an "[i]ndicator of profitability. Determined by dividing net income for the past 12
months by common stockholder equity (adjusted for stock splits).  Result is shown as a
percentage. Investors use ROE as a measure of how a company is using its money.  ROE may
be decomposed into return on assets (ROA) multiplied by financial leverage (total assets/total
equity).").

away from its fixed income business, because MBS and other structured finance assets contributed to its high net income, and the appearance of profits. Nothing would have been a comparable substitute.

281.   To keep this pace, Bear Stearns had to increase its balance sheet continuously— in other words, increase the value of its assets. If Bear Stearns had not increased its balance sheet, its ROE would have plummeted; if ROE plummeted, investors would have fled. In short, Bear Stearns painted itself into a corner. The following chart illustrates the growth of Bear Stearns's balance sheet over time: it nearly *doubled* between 2003 and 2007.



Data Source: Bloomberg L.P. (2009) Total assets for Bear Stearns Companies 2000 to 2007; retrieved Mar. 16, 2009 from Bloomberg database. As discussed *supra* subsection VII.A.6, the ultimate $395 billion asset value was extremely inflated due to Bear Stearns's faulty asset-valuation models.

282.   By 2004, Bear Stearns was constantly increasing its volume of MBS through leverage. The OIG Report describes how TM staff found that Bear Stearns "'continues to push for increased balance sheet and risk taking authority despite six limit increases since 2001.

These increases . . . brought the total permitted balance sheet usage from less than $2 billion to over $6 billion.'"  OIG CSE REPORT, *supra* at 18.

283.    Once Bear Stearns started to show vulnerability during the nascent stages of the housing bust, starting with the subprime fallout in late-2006 and 2007, market observers and participants knew it would be a difficult task for its leveraged balance sheets to be unwound without massive losses.  During booms and manias, the balance sheet grows with continued leveraging of assets that are increasing in value, but when the process reverses, massive balance sheet shrinkage is necessary to maintain high leverage:



Figure 3.  The Leverage Cycle

Source: David Greenlaw, Jan Hatzius, Anil Kashyap, and Hyun Song Shin, "Leveraged Losses: Lessons from the Mortgage Meltdown," U.S. Monetary Forum Conference Draft, Feb. 29, 2008, p. 30.

JICKLING, AVERTING FINANCIAL CRISIS, *supra* at 7.

284.    A *Fortune* magazine article written shortly after Bear Stearns takeover by JPMorgan was insightful:

> Wall Street firms used towering leverage to make lottery-like loot in a long-
> running bull market. . . . To understand why Wall Street's players [lost] big
> chunks of its capital, it's important to look at the securities they borrowed so
> heavily to buy.  Typically firms hold highly liquid assets they can unload quickly.
> That's because they rely on a constant flow of short-term funding from banks and
> the capital markets to finance their portfolios.  But this time around Wall Street

loaded up not on Treasury bills or top-rated corporate bonds but on exotic CDOs and CLOs.  The credit crunch makes those instruments extremely difficult to sell, except at steep losses.  Even if the firms hold those securities for months, there's no assurance their prices will rebound.

Tully, *supra*.

285.    The key to Bear Stearns's massive balance sheet growth was leverage.  The fate of over-leveraged subprime and Alt-A borrowers who defaulted on their mortgages when their homes became worth vastly less than they had borrowed was a microcosm of what was about to happen to the overleveraged Bear Stearns.

> **b.**    Bear Stearns Lacked Sufficient Capital and Liquidity.

286.    Capital is the difference between a firm's assets and its liabilities.  Press Release, Sec. Exch. Comm'n, Answers to Frequently Asked Investor Questions Regarding The Bear Stearns Companies, Inc. (Mar. 18, 2008), *available at* http://www.sec.gov/news/press/ 2008/2008-46.htm.  Liquidity does not necessarily flow from sufficient capitalization.  In fact, a firm "can be highly capitalized, that is, can have more assets than liabilities but can have liquidity problems if the assets cannot quickly be sold for cash or alternative sources of liquidity, including credit, obtained to meet other demands. . . . liquidity consists of cash and highly liquid securities for the parent company to use without restriction."  *Id.*

> **(i)**    Capital.

287.    According to Lee A. Pickard, a former Director of the SEC's TM—an entity charged with oversight of broker-dealers and their holding companies, including Bear Stearns—one primary reason for Bear Stearns's collapse was its lack of sufficient capital.  He wrote: "The losses incurred by Bear Stearns and other large broker-dealers were not caused by 'rumors' or a 'crisis of confidence,' but rather by inadequate net capital and the lack of

constraints on the incurring of debt."  Lee A. Pickard, *SEC's Old Capital Approach Was Tried—and True*, American Banker, Aug. 8, 2008, at 10.

288.    Harkening back to the successful lobbying by Michael Alix and other investment bankers to allow looser capital requirements for CSE firms, Pickard explained the impact of subjecting CSE firms to the "alternative net capital program" rather than the SEC's basic net capital rule.  Whereas the basic net capital rule required mark-to-market valuations and "haircuts" based on the assets' riskiness—as well as limits on debt of about 12 times net capital—the alternative program did away with such objective measures and "relies heavily on a risk management control system, mathematical models to price positions, value-at-risk models, and close SEC oversight."  Pickard, *supra*.  Essentially, the capital requirements that Bear Stearns was required to meet were grossly inadequate, in part because they relied on Bear Stearns's faulty pricing and VaR models and inadequate risk management, as described above, and in part because the alternative net capital program allowed much greater leverage than the standard rule would have.  *Id.*  Thus, in the end, Bear Stearns did not have enough capital to sustain its business model.  *Id.*; *see also* OIG CSE REPORT, *supra* at 11.

289.    In Bear Stearns's 2007 Form 10-K, it touts its "[i]ncreased use of secured funding given the view that secured funding is inherently less credit sensitive and thus more stable due to the collateralized nature of the borrowing."  2007 Form 10-K, at 48.  However the OIG Report found the increase in the use of secured funding to be a red flag: the increasing cost of unsecured financing jumped as the subprime crisis unfolded, and this financing cost "tended to undermine the viability of Bear Stearns' business model, which relied heavily on leverage."  OIG CSE REPORT, *supra* at 11-12.  Secured financing is cheaper than unsecured financing, so Bear Stearns lowered borrowing costs by shifting to secured loans.  *Id.* at 12.

Bear Stearns's Basel capital ratio decreased from over 21 percent to 11.5 percent between April 2006 and March 2008.  *Id.* at 12.  "By May 2007, Bear Stearns' short-term borrowing was 60 percent secured and by September 2007, it was 74 percent secured.  Finally, by March 2008, Bear Stearns' short-term borrowing was 83 percent secured."  *Id.*  This increasing reliance on secured financing "indicates that, although it appeared to be compliant with CSE program's [10 percent] capital requirement, the market did not perceive it to be sufficiently capitalized to justify extensive unsecured lending."  *Id.* at 13.  Ultimately, Bear Stearns "was not sufficiently capitalized to attract the funding it needed to support its business model."  *Id.* at 13.

> **(ii)**      Liquidity.

290.    "'[L]everage amplifies funding liquidity risk.'"  Counterparty Risk Management Policy Group, *Improving Counterparty Risk Management Policies* (June 1999), *quoted in* OIG CSE REPORT, *supra* at 19.

291.    Bear Stearns asserted that it "consistently maintains a highly liquid balance sheet."  2007 Form 10-K, at 51.

292.    Nevertheless, in both the 2006 and 2007 10-K "Risk Factors" section, Bear Stearns discusses liquidity risk.  The fact that Defendants Schwartz (for 2007) and Cayne (for 2006), as well as Defendant Molinaro (in both years) prepared and signed the Form 10-K Annual Reports makes clear that, as Plan fiduciaries, they knew full well throughout the Class Period that the Company could crumble under its susceptibility to a liquidity crisis at any moment.  On information and belief, many other fiduciaries knew this as well, given their top executive positions at the Company and leadership roles.

293.    Both the 2006 and 2007 Form 10-K filings state that Bear Stearns's liquidity risk "could impair [its] ability to fund operations and jeopardize [its] financial condition."

2006 Form 10-K, at 21; 2007 Form 10-K, at 18.  Moreover, the filings acknowledge that an inability to "raise money in the long-term or short-term debt markets, or to engage in repurchase agreements . . . could have a substantial negative effect on [its] liquidity."  2006 Form 10-K, at 21; 2007 Form 10-K, at 18.

294.    Yet, Bear Stearns presented itself as a company that had thought through a potential liquidity crisis and put into place the required infrastructure and risk-management to prevent such an event from sinking the Company.  The 2007 Form 10-K describes a five-point "Liquidity Risk Management" plan, which touts the Company's unencumbered collateral ($16.3 billion), liquidity ratio (defined as "the ratio of cash plus the borrowing value of unencumbered collateral in relation to total unsecured debt maturing over the next twelve months"), excess liquidity ($17.4 billion in "money market funds, bank deposits and short-term high quality money market investments"), net cash capital ($8.2 billion in surplus of long-term funding sources versus long-term funding requirements), and, most notably, a "Stress Funding Action Plan."  2007 Form 10-K, at 45-48.

295.    The "Stress Funding Action Plan" was described as follows: "This plan details immediate and medium term response to an event-driven liquidity stress.  The plan identifies the stress management group, details an external communication constituency and specifies heightened information flow needed to manage through the stress period."  2007 Form 10-K, at 46.  The 10-K also states:

> The Company maintains a stress funding action plan to ensure the ability of The Bear Stearns Companies Inc. and its affiliates to manage a liquidity crisis on a consolidated basis.  A liquidity crisis is defined as an event-driven loss of uncommitted, unsecured, confidence-sensitive funding.  The objective of the stress funding plan is to allow Bear Stearns to meet its maturing obligations as they occur over a 12-month period with minimal disruption to ongoing business operations and without having to rely upon access to additional unsecured financing.

*Id.* at 48.  Though named and described differently, the 2006 Form 10-K also purported to have a plan in place to deal with a liquidity crisis over a 12-month period.  2006 Form 10-K, at 48-50 ("Alternative Funding Strategy").

296.     Bear Stearns's year-long Stress Funding Action Plan was ultimately inadequate to deal with the crisis it faced.  Moreover, Bear Stearns was well aware of this shortcoming, and in fact demonstrated clear signs of this knowledge.  The OIG report found that:

> As early as November 2006, Bear Stearns was implementing a more realistic approach to liquidity planning than contemplated by the CSE programs' liquidity stress test.  While this more realistic approach may have helped Bear Stearns in the summer of 2007, it was not sufficient to save the firm in March 2008.  Bear Stearns' initiative to line up secured funding indicates that the crisis which occurred in March 2008 was *not totally unanticipated by Bear Stearns, in that Bear Stearns had been taking specific steps to avoid such a crisis for more than a year before it occurred.*

OIG CSE REPORT, *supra* at 16 (emphasis added).  While Bear Stearns stated that it ran "stress tests," it provided absolutely no details about these tests, much less dollar figure results.  2007 Form 10-K, at 72.

297.     By 2006, "Bear Stearns realized that the one-year period was not realistic and also recognized that secured funding might not be available in times of stress."  OIG CSE REPORT, *supra* at 15.  Indeed, in November 2006, Bear Stearns "undertook efforts to line up *committed* secured lending facilities.  The fact that Bear Stearns made a special effort to line up committed secured lending facilities indicates that Bear Stearns did not think that such facilities would automatically be available in a stressed environment."  *Id.*

298.     Moreover, as explained by Defendant Cayne, "Capital and liquidity are sort of the same.  You could have capital and not have liquidity."  Deposition Testimony of James Cayne, *In Re Bear Stearns Litigation*, Case No. 600780/08, at 45:17-19 (Sup. Ct. of the State

299.    In short, Bear Stearns *knew* it was on thin ice in terms of its liquidity risk throughout the entire Class Period.

**8.**    Bear Stearns's Reliance on Overnight Repo Loans Was a Liquidity Crisis Waiting to Happen.

300.    Bear Stearns was dependent on the repurchase—or "repo"—debt market to finance its business.  The repo market allowed investment banks like Bear Stearns to fund daily operations by placing its assets as collateral to lend against for daily operational funding needs.  Without repo financing Bear Stearns could not have covered daily operating costs.

301.    Indeed, one of Bear Stearns's systemic and fundamental mistakes was its increasing dependence on overnight repo lending.  The eventual collapse of Bear Stearns was caused by the repo market participants denying Bear Stearns funding because of its worsening condition of plummeting collateral values and general viability questions.

302.    Bear Stearns had a long history of some reliance on repo financing—indeed in its IPO filing in 1985 it described this activity.  Not only did Bear Stearns depend on repo financing as a debtor, it also extended repo financing as a creditor.

303.    Notably, the Company also recognized in 1985 the inherent risks in repo loans.  Describing its approach as a party on the lending side of repo transactions, Bear Stearns stated:

> While the Company takes steps to insure that these transactions are adequately collateralized, the large dollar amounts of these transactions could subject the Company to significant losses if parties entering into such agreements with the Company fail to meet their obligations and the Company incurs losses in liquidating its positions in the open market.

COHAN, *supra* at 205 (quoting Bear Stearns, Initial Public Offering (Form S-1) (Sept. 12, 1985)).  Having demonstrated this clear understanding of how a repo financing creditor thinks

and hedges, it would have come as no surprise to Bear Stearns that when it received repo loans from other creditors, they would treat Bear Stearns in kind—requesting sufficient collateral and making margin calls if collateral was determined to be overvalued.  Accordingly, given Bear Stearns's knowledge of its inflated asset valuations, it knew or should have known that it was likely to face margin calls, terminations in financing, and potential crisis if these loans were not renewed.

304.    In 2007, Bear Stearns had a chance to wind down its dependence on the overnight repo market but instead it placed an even more significant amount of its funding requirements on the overnight repo market.  The graph below shows the risky move towards ever more reliance on the overnight repo market in 2007.  Bear Stearns ultimately depended on loans of *$102 billion each and every night*.



Data Source: 2007 Form 10-K, at 82, 2006 Form 10-K, at 80 (2005 and 2006 numbers), 2004 Form 10-K, at 65 (2003 and 2004 numbers).

305.   While Bear Stearns's repo loan debt increased, it also increased its long-term debt while decreasing the intermediate short-term debt, likely due to the increased cost of short-term debt.  In the third quarter of 2007, Bear Stearns touted that its "approach to liquidity risk management ensures that we are able to meet all unsecured debt maturities over the next 12 months without issuing additional unsecured debt or liquidating assets.  Over the last several months we have materially reduced reliance on short term unsecured funding while simultaneously building excess liquidity at the parent company."  3d Qtr. 2007 Earnings Call, *supra* at 7.  Bear Stearns apparently had taken this step to keep from being "vulnerable to being shut off from the day-to-day loans required to fund its trading operations."  Kate Kelly & Randall Smith, *Remodeling Job: Market Swoons as Bear Stearns Blosters Finances— Brokerage Raises Cash, Cuts Short Term Debt; Spector Expected to Exit*, Wall St. J., Aug 4, 2007, at A1 [hereinafter Kelly & Smith, *Remodeling*]; *see also* S&P Action Discussion Call, Aug. 3, 2007, *supra*.  Whether out of necessity or design, this effort proved insufficient in the end.

306.   In conjunction with its discussion of decreased short-term debt, Bear Stearns also emphasized its build-up of liquid capital reserves—reaching a "record 19 billion," up dramatically from the prior year.  3d. Qtr. 2007 Earnings Call, *supra* at 7.  This is the "cash" that the Company repeatedly referred to as it was collapsing in March of 2008.  On an investor call on August 3, 2007, Treasurer Robert Upton emphasized that Bear Stearns's "liquidity and capital position is very solid."  Bear Stearns, *S&P Action Discussion Call*, Aug. 3, 2007, at 4, *supra*.

307.   When paired with its excessive overnight repo loan dependence, Bear Stearns's reduction of short term debt and build-up of cash was meaningless and misleading.

308.    One Bear Stearns executive reflected that "'When Bear's liquidity crisis developed, their repo book had expanded dramatically over the past year to the tune of two times the previous year.  During the same period Lehman's repo book had declined by roughly 25 percent.  Bear got a taste of [its] own medicine by virtue of committing the cardinal sin of overreliance on short-term funding.'"  COHAN, *supra* at 76-77.

**9.**    Bear Stearns Accelerated Its Dependence on the Mortgage Industry During the Housing Bubble Bust, Yet the Company Persistently Denied the Resulting Deterioration of Its Financial Condition and Made Misleading Statements.

309.    Bear Stearns was involved at every step in the subprime and Alt-A mortgage-backed securities enterprise.  Bear Stearns originated mortgages, bought them wholesale, packaged, securitized, and sold MBS and similar financial instruments like CDOs to investors.  Bear Stearns brazenly immersed itself into the mortgage industry thicket and made MBS operations the focal point of its business model, just as the risks were becoming clear to the entire financial industry.  Yet Bear Stearns pressed on.  MBS activity and the entire vertical integration process understandably became the focus on quarterly earnings calls as worries about the subprime mortgage market rose.  Yet, Bear Stearns sugar-coated its astonishing activities up until the very end, and the Company's financial statements and quarterly Earnings Calls provide example after example.

    **a.**    Third Quarter 2006.

310.    During the third quarter of 2006 Earnings Call Q&A, held on September 14, 2006, analyst Douglas Sipkin from Wachovia Securities asked about the role of mortgage origination in Bear Stearns's plan to increase vertical integration.  Defendant Molinaro replied confidently:

> I think that what *we are focused on is continuing to vertically integrate the platform* and we are going to continue to focus on building origination capability across the product areas.  So that will continue to be our focus and we view that as

a prudent strategy and a strategy that in the current environment where independent mortgage originators are certainly, are struggling with declining volumes, an *opportunity to gain share*. So the development of our Bear Res [Residential] platform is *going very, very well*. We are hiring a great number of originators and we are seeing our origination volumes climbing. I alluded to the fact in the prepared text that our captive origination volumes this quarter were 30% of total securitization volumes. That is a fairly significant increase, almost double where we were a year ago, and that is a direct effect of the investments that we are making in building the origination platform.

3d Qtr. 2006 Earnings Call, *supra* at 10 (emphasis added). Thus, Bear Stearns was

aggressively pursuing subprime and Alt-A loans through Bear Res at the same time the market

for such loans was beginning to crash.

           **b.**      Fourth Quarter 2006.

       311.    On December 14, 2006, the first day of the Class Period, Bear Stearns

announced "record" net revenues of $9.2 billion and net earnings of $2.1 billion. Bear Stearns,

Current Report for the Period Ending Nov. 30, 2006 (Form 8-K), at Ex. 99.1 (Dec. 15, 2006).

Bear Stearns touted its involvement in the mortgage business as the reason for a record $4

billion in net revenues in Fixed Income, "up 23% from $3.3 billion in 2005":

In the mortgage business, the record results were driven by market share gains in commercial mortgage-backed securities and the growth in captive origination volumes from the vertical integration of the mortgage platform. In addition, collateralized loan and debt origination activities increased substantially.

*Id.*

       312.    The price of Bear Stearns's stock on December 14, 2006 was $159.96.

       313.    During the fourth quarter 2006 Earnings Call, Molinaro was again asked, this

time by analyst James Mitchell from Buckingham Research Group, about the role of

origination within the larger MBS business:

There's obviously been a lot of worry in the investment community about slowing originations, the subprime scare we've seen I guess. What's your overall take on that? And if there's any way you can—in some way scale the residential

origination platform *vis-a-vis* the trading component and the other asset classes
within MBS, it would be helpful.

Molinaro replied:

> There is—obviously, there is a lot of information coming out around the mortgage
> market and a great deal of attention being focused on the subprime sector of the
> market.  I think it's important to point out, *the subprime sector does represent a*
> *relatively small piece of the overall mortgage market* and the composition of the
> subprime class that people are—really are focused on in the non-investment grade
> sector representing an even smaller component of the overall mortgage market.
> So, I think that while there's clearly been some issues in subprime, as we have
> seen, the issue has really been *more of a vintage issue* as we've got some of the
> production that was originated maybe at what now looks like the top of the cycle
> with underwriting standards diminishing, experiencing some difficulties, but I
> think that *that is and has been relatively well contained and not really spilling*
> *over into the broader market.  In fact, I would say, the broader market continues*
> *to be quite healthy and investor demand for the product continues to be quite*
> *robust.  So, I think that—I think a lot of the attention does appear to be somewhat*
> *overblown.*  Certainly, there are some issues in the subprime segment, but I would
> say the broader market is—*maybe we've seen the worst of it and I think it feels*
> *pretty good right now.*

Bear Stearns, *Earnings Call for 4th Quarter*, *Fiscal Year 2006,* Dec. 14, 2006, at 9 (Bloomberg

LP Transcript) (emphasis added) [hereinafter 4th Qtr. 2006 Earnings Call].

314.     The foregoing response from Molinaro minimized the severity of the

developing crisis and assured investors that the difficulties would pass.  Perhaps more

importantly, Molinaro's focus on *subprime* loans and the vintage 2006 loans sidestepped

entirely the fact that by October 2006, Bear Res was lending $600 million per month in

primarily Alt-A loans.  As described *supra*, Alt-A loans of a later vintage posed additional

risks that were set to crop up later than the first wave of subprime mortgage defaults.

315.     Analyst Jeff Hart of Sandler O'Neill asked for additional information on the

MBS business along these lines:

> I can't let the call go without at least hitting one more mortgage question.  As we
> see some default rises in subprime land and as we also see you originating more
> of the mortgages that you're actually securitizing and sending out, does the risk of
> defaulting mortgages coming back to you rise, or how do you look at that?

As he had done the previous quarter, Molinaro minimized the impact of the subprime situation

and encouraged analysts that it would be a benefit to Bear Stearns:

> Well, I don't—*no, it doesn't*, because essentially we're originating and
> securitizing.  But I think the point we should make about what's happening in the
> subprime sector—in other words, the vintage class that seems to be experiencing
> the most difficulty certainly coming at the end at what appears to be the heights of
> the cycle when the lending standards were the most lenient.  What's going on now
> in the market with a lot of the weaker hands getting forced out of the business, the
> business is really moving into stronger hands who have improved underwriting
> standards and are not going to be stretching as much for businesses, maybe some
> of the other shops were who really—really their livelihood was focused on
> volume.  So, what we saw in 2006, our activity in the subprime sector declined
> dramatically, largely because our standards was [*sic*] higher and our pricing was
> not at the level that would generate a lot of business.  *I think that the good news in
> the subprime sector is the business is moving into the hands of much stronger
> players in an environment where the underwriting standards are being tightened
> and the business should improve.*

4th Qtr. 2006 Earnings Call, *supra* at 12 (emphasis added).

316.    Despite Molinaro's spin, through the period of late 2006 and all through 2007

the subprime and Alt-A debacle started to spread to the broader mortgage sector and into the

real economy, creating serious problems for Bear Stearns.  Each quarter turned out to be worse

than the prior in 2007, causing Bear Stearns's financial performance to deteriorate rapidly,

especially related to MBS.

           c.    First Quarter 2007.

317.    Nevertheless, into 2007, Molinaro relentlessly pitched the subprime collapse as

a business opportunity.  On the March 15, 2007 Earnings Call, just weeks after the ABX index

had dropped precipitously and HSBC had pulled back from the subprime market, Molinaro

stated:

> To date, problems in the subprime market have not spread to the broader
> mortgage market and have been *largely contained to 2006 vintage subprime
> origination.*  The result of the dislocation being experienced in the subprime
> mortgage market will likely be a reduction in industry capacity as troubled
> originators are absorbed and underwriting standards are tightened.  These

conditions are expected to cause reductions in U.S. loan origination volumes of 25 to 30%.  While conditions will be more challenging in the short run, *we believe we're well positioned to benefit from this environment as our organic origination platforms mature and gain market share.*  In addition, we expect secondary trading opportunities may become available as a result of the uncertainty caused by the rise in delinquencies.

1st Qtr. 2007 Earnings Call, *supra* at 3 (emphasis added).  After describing Bear Stearns's approach to the mortgage industry in early 2007, Molinaro concluded:

Despite strong mortgage-backed securities trading volumes, mortgage markets became more difficult as investor concern rose over the rising default levels in the subprime mortgage market.  While subprime activities have historically represented only a small portion of our mortgage activities, investor concerns over the direction of delinquencies served to temporarily reduce liquidity in other sectors of the MBS market.  However, the development of our U.S. residential mortgage origination platform has continued to benefit us as captive origination volume reached 35% of total quarterly residential mortgage securitization volume, compared to 24% in the November 2006 quarter.

*Id.*

318.    Molinaro was not alone.  In March, "Mr. Cayne showed little sign of concern about the mortgage market at a dinner with analysts . . . according to one attendee."  Kate Kelly*, Bear CEO's Handling of Crisis Raises* Issues, Wall St. J., Nov. 1, 2007 [hereinafter Kelly*, CEO's Handling*]  Other executives expressed similar confidence.  For example Tom Marano, head of Bear Stearns's mortgage business, asserted that problems in subprime defaults were unlikely to affect Alt-A or other mortgages.  Yalman Onaran, *Bear Stearns, IndyMac Say Subprime Woes Won't Spread*, Bloomberg.com, Mar. 29, 2007.  Defendant Spector also downplayed the risks of Alt-A as the Company increased its presence in the mortgage industry.  *Id.*  Moreover, Marano said that Bear Stearns was "not a [mortgage or MBS] warehouse; we sell the product."  *Id.*  Yet, as described *supra*, Bear Stearns's retained interests steadily increased as it built its vertically integrated platform, particularly as 2007 progressed.

319.   As with prior quarters, analysts during the first quarter 2007 earnings call Q&A asked for details concerning MBS.  Analyst Guy Moszowski of Merrill Lynch asked if Bear Stearns was planning on increasing its business in mortgages:

> Do you feel like you have as much origination capacity broadly in mortgages including subprime as you want for now or do you think that there are going to be more opportunities to actually buy more platforms here and is that something that you would look at?

1st Qtr. 2007 Earnings Call, *supra* at 8.  Molinaro replied that the current market conditions present an opportunity to gain market share:

> Well, you know, *we are focused on expanding our origination capacity*.  We think that we have an excellent backbone to that business, with the development of our Bear Res platform which we built from scratch, utilizing our EMC servicing operation as the pivot point.  And then with the acquisition of Encore, bolting on a subprime origination capability.  So *we are feeling good about the origination activities* that we have and we are seeing, you know, real market share gains and real opportunities and we think *the dislocation that's going on here will only provide more opportunity for us.*  Certainly there will be fewer players, there is going to be less capacity and that should be an opportunity for us.
>
> . . . .
>
> And certainly given the trouble that many companies have faced with their subprime portfolios, you know, there certainly would appear to be plenty of opportunity over the months and quarters ahead for that kind of activity.

*Id.*

320.   Despite the optimism expressed by its CFO and the continual expansion into the MBS market that Bear Stearns pursued during this time period, between December 2006—when the subprime crisis began to hit the United States—and February 2007, Bear Stearns wrote down $168 million in second lien inventory and $240 million in residential mortgage-backed securities and structured finance products.  OIG CSE REPORT, *supra* at 26.  These write-downs were "mostly on residuals [the tranches with lowest credit quality] backed by second lien loans, Alt-A loans, and subprime mortgages."  *Id.*  While it kept such analysis from

321.    Bear Stearns's stock price peaked at $171.51 on January 12, 2007.  By March

15, 2007 the price had fallen to $148.50.

      **d.**    Second Quarter 2007.

322.    In defiance of reality, in June 2007, the Company trumpeted its success in the

leveraged finance sector as an offset to tightened conditions in the credit markets:

> Credit trading results were strong and record net revenues were reported in
> leveraged finance.  The credit business produced strong results led by credit
> derivatives and leveraged finance.  Mortgage-related revenues reflected both
> industry-wide declines in residential mortgage origination and securitization
> volumes and challenging market conditions in the sub-prime and Alt-A mortgage
> sectors.

Bear Stearns, Current Report for the Period Ending May 31, 2007 (Form 8-K), at Ex. 99 (June

14, 2007).  Up until the first quarter of 2007, Molinaro had been able to work around the

subprime news with analysts, but the tone changed starting in the second quarter of 2007:

> Fixed income net revenues for the second quarter were $962 million, down 21% .
> . . . reflect[ing] weaker U.S. mortgage market conditions . . . . Mortgage net
> revenues declined . . . .
>
> Residential mortgage origination volumes industry-wide declined when compared
> to the prior year, reflecting a combination of a weaker housing market and tighter
> sub-prime and Alt-A underwriting standards.  During the quarter, we adopted
> tighter underwriting standards in the origination of sub-prime and Alt-A
> mortgages, which served to dramatically reduce the volume of 100% CLTV
> lending, as well as stated income lending above 90% LTV, both important
> segments of the sub-prime and Alt-A market. As a result, our captive mortgage
> origination volumes declined when compared to the prior year.  Residential
> mortgage securitization activity also declined when compared to the prior year
> and the sequential quarter, reflecting lower non-agency securitization volumes.

Bear Stearns, *Earnings Call for 2d Quarter*, *Fiscal Year 2007*, June 14, 2007, at 3 (Bloomberg

LP Transcript) [hereinafter 2d Qtr. 2007 Earnings Call].  However, Molinaro then said that

MBS revenues were up:

> These results were partially offset by improved MBS net revenues, which
> increased on higher primary and secondary revenues.
>
> The increase in mortgage net revenues when compared to the February quarter
> reflects the improvement in the market conditions experienced during the quarter.

*Id.* at 4.  Analysts wondered how that could be possible.  James Mitchell asked, "I won't take

up any more of your time, but in fixed income I think did you mention that MBS revenues

were up sequentially?"  *Id.* at 8.  When Molinaro responded yes, Mitchell continued: "A bit

surprising particularly given your commentary around margins this quarter it seemed like they

were particularly depressed in securitization margins . . . .  [S]hould we expect margins to

continue to improve?"  Molinaro responded:

> That is our expectation . . . . Certainly the challenge that we're all going to have is
> the level of delinquencies and defaults in the 2006 vintage sub-prime continues to
> be a challenge, though it hasn't spilled into other sectors of the market.  And of
> course the overall level of origination volume is continuing to be challenging with
> the tightened underwriting standards and sluggish home price situation,
> origination volumes will continue to be challenging, though, though hopefully
> gradually building back off of what will—hopefully the second quarter will be a
> floor.

*Id.* at 9.

      323.     Analyst Roger Freeman of Lehman Brothers also wanted to know how MBS

revenues were up: "The—so MBS revenues were up.  Can you just quantify that the mortgage

business in its entirety including origination and servicing, how that compares sequentially for

the quarter?"  Molinaro responded:

> [A]ll facets of the mortgage business were up sequentially.  And what we were
> just talking about, the reasons for that were a variety of different factors, but the—
> certainly first quarter results were definitely impacted by the problems in the sub-
> prime market.  In the second quarter, we worked through those issues, securitized

a great deal of inventory origination volumes, the quality of the product improving. . .

*Id.*

324. And when asked about Bear Stearns's vertical integration mortgage strategy plan, Molinaro was not worried. Analyst Jeffery Harte asked:

Question, or a quick question on mortgages. Seems to be the theme. But, specifically on mortgage vertical integration, are you thinking any differently about the origination side of the mortgage business? Specifically, kind of the cost base you have to maintain or the large infrastructure, as we get deeper into an environment where origination volumes are declining?

*Id.* at 14. Molinaro responded:

Well, *we're not thinking differently about it.* Certainly, there's a lot of capacity, even though both of these, Encore which we bought which was an established operation but Bear Res, which is still growing, there's a lot of capacity to do more volume. *Really what we're doing right now is trying to hire a lot more salespeople, expand our sales relations and increase the volume of business that we're capable of putting through the platform.* We've got a very keen eye on that as well as the servicing side of the equation. If volumes don't pick up, if that's not successful, we'll have to address the operating cost; but I think at this point the strategy is clearly on trying to drive more volume through the existing platforms and we're trimming around the edges to try to right size the business for the current environment. But there's no change in strategy or change in thinking here.

*Id.* (emphasis added). Thus, Bear Stearns had no intention of lessening its reliance on the mortgage market at this point, when the risks and signs from the market—including that the housing bubble had "burst" six months earlier, as described *supra*—should have had the opposite effect.

        e.    Third Quarter 2007.

325. By the third quarter of 2007, Bear Stearns was in trouble, a fact made painfully clear by the collapse of two Bear Stearns hedge funds and the subsequent expulsion of Defendant Warren Spector, described in more detail *infra*. Between June 14, 2007 when the second quarter earnings call took place and August 3, 2007—during which time the hedge fund

**(i)**     Bear Stearns Increased Its Exposure to the Subprime and Alt-A
Mortgage Market by Backing Its Hedge Funds.

326.     Bear Stearns Asset Management ("BSAM") was home to two hedge funds: the High-Grade Structured Credit Strategies Fund ("High Grade Fund") and the High-Grade Structured Credit Strategies Enhanced Leverage Fund ("High Grade Enhanced Fund").  The hedge funds were run by Ralph Cioffi and Matthew Tannin—both of whom now have been indicted for inducing investors to keep their money in the funds.  *United States v. Ralph Cioffi and Matthew Tannin*, Cr. No. 08-415 (E.D.N.Y.).  Investors lost $1.8 billion when the funds collapsed in July of 2007.  Press Release, Sec. Exch. Comm'n., SEC Charges Two Former Bear Stearns Hedge Fun Managers With Fraud (June 19, 2008), *available at*, http://www.sec.gov/news/press/2009/2008-115.htm [hereinafter SEC Press Release, June 19, 2008].

327.     The High Grade Fund was started by Cioffi in 2003 under the supervision of Defendant Spector, who oversaw Fixed Income as well.  Cioffi created the High Grade Enhanced Fund as the housing market began to collapse in late 2006.  Matthew Goldstein and David Henry, *Bear Stearns' Bad Debt*, BusinessWeek, Oct. 11, 2007; Burrough, *supra*.  The High Grade Enhanced Fund was leveraged 100:1—borrowing 100 times its cash for trades.  Burrough, *supra*.  Both hedge funds collapsed under the weight of illiquid and over-valued mortgage-dependent assets.

328.     Defendant Spector shirked his responsibilities in giving Cioffi and Tannin free rein.  For example, "'Every time [chairman and CEO of BSAM Richard] Marin and the risk guys in BSAM would have a question with [Cioffi], [Cioffi] would get [Spector] involved, and

they'd all have this big meeting . . . and [Spector] would say to the BSAM, "You don't know what you're talking about.  Leave [Cioffi] alone.  He's doing fine."'"  COHAN, *supra* at 282.

329.    As described in detail *supra*, by early in 2007, trouble in the mortgage market had become apparent.  "Home prices were slipping, while delinquencies on loans to the weakest borrowers" were on the rise.  Kelly, *CEO's Handling*, *supra*.  "Late February brought a swoon in an index that tracks packages of subprime loans that have been sliced up and resold to investors in the form of complex securities."  *Id.*

330.    These events had serious consequences for Bear Stearns's hedge funds.  On March 1, 2007, Bear Stearns hedge fund manager Ralph Cioffi wrote in an email to BSAM managers not to "talk about [the February 2007] results to anyone or I'll shoot you . . . I can't believe anything has been this bad."  *Securities and Exchange Commission v. Cioffi & Tannin*, No. 08-cv-02457 (E.D.N.Y. 2008), Complaint (Dkt. 1), at 19.

331.    By April 2007, it had become "clear that the securities [in the hedge funds] were losing value."  Landon Thomas Jr., *Salvaging a Prudent Name*, N.Y. Times, June 29, 2007 [hereinafter Thomas, *Salvaging*].  In April 2007, Cioffi misrepresented the funds' "monthly performance by releasing insufficiently qualified estimates."  SEC Press Release, June 19, 2008, *supra*.  The SEC charged Cioffi and Tannin with, for example, telling investors that direct exposure to MBS was around 6 to 8 percent, when the total of direct and indirect subprime exposure for the funds was approximately 60 percent.  *Id.*  At the same time, Tannin wrote to Cioffi in April 2007 that:

> "[T]he subprime market looks pretty damn ugly . . . . If we believe [our internal CDO modeling] is ANYWHERE CLOSE to accurate I think we should close the funds now.  The reason for this is that if [our internal CDO modeling] is correct then the entire subprime market is toast. . . . If AAA bonds are systematically downgraded then there is simply no way for us to make money—ever."

Press Release, Dep't of Justice, Two Senior Managers of Failed Bear Stearns Hedge Funds

Indicted on Conspiracy and Fraud Charges (June 19, 2008) (emphasis in original), *available at*

http://www.usdoj.gov/usao/nye/pr/2008/2008jun19.html.

332.   On May 11, 2007, Bear Stearns filed an Initial Public Offering for Everquest

Financial, a then 9-month old financial services company formed by Bear Stearns that bought

up $720 million in CDOs, two-thirds of which were "purchased [the previous] fall from hedge

funds managed by [BSAM]."  Matthew Goldstein, *Bear Stearns's Subprime IPO*,

BusinessWeek, May 11, 2007.  According to news reports, the "deal appears to be an

unprecedented attempt by a Wall Street house to dump its mortgage bets" onto retail investors.

*Id.*  The funds purchased were valued by Bear Stearns and the IPO acknowledged that the

BSAM hedge funds' purchase of shares in Everquest was not an arm's length transaction.  *Id.*

In addition, Everquest was to rely on BSAM employees to oversee its business, and Ralph

Cioffi was slated to serve as "co-chief executive."  *Id.*  The CDO products that Everquest

purchased from BSAM's hedge funds were mainly equity and mezzanine tranches of CDOs—

the riskiest securities.  Alistair Barr, *Everquest IPO Tied to Troubled Bear Hedge Fund*,

MarketWatch, June 15, 2007.

333.   In early June, 2007, "Cioffi and his team began barring investors from pulling

money out of the funds."  Matthew Goldstein & David Henry, *Probe of Insider Trading at

Bear Stearns*, Business Week, Dec. 17, 2007.  But, as early as February or March, investors

were trying to get their money out.  *Id.*  Yet Cioffi convinced them to keep their money in, in

part by telling them that redemptions were lower than new funds flowing into the funds.  Kate

Kelly, *Credit Crunch: Bear Manager's Actions Are Subject of Inquiry*, Wall St. J., Dec. 18,

2007.

334.    On June 20, 2007, Merrill Lynch seized $800 million in assets from the two

Bear Stearns hedge funds, which Merrill Lynch sold the next day.  Jocelynn Drake, *Merrill*

*Lynch (MER) Sells Assets from Bear Stearns' (BSC) Hedge Funds*, schaeffersresearch.com,

June 21, 2007.

335.    Facts regarding Bear Stearns's massive mortgage-related exposure and the

Company's reckless business practices and risk management failures were disclosed in June

2007, when BSAM began to collapse as a result of excessive risk taken by the two hedge

funds.  On June 26, 2007 the Company announced the following:

> The Bear Stearns Companies Inc. (NYSE: BSC) announced today that it has
> offered to provide up to $3.2 billion in secured financing to The Bear Stearns
> High-Grade Structured Credit Fund (High-Grade Fund), a hedge fund managed
> by Bear Stearns Asset Management (BSAM). The Bear Stearns facility, which is
> in the form of a collateralized repurchase agreement, will enable the Fund to
> replace current secured financing, improve the Fund's liquidity and facilitate an
> orderly de-leveraging of the Fund in the marketplace.  Over the past few weeks,
> the High-Grade Fund and The Bear Stearns High-Grade Structured Credit
> Enhanced Leveraged Fund (Enhanced Fund) have experienced high levels of
> margin calls and have had difficulty in creating necessary liquidity and working
> capital to continue to operate the Funds.  BSAM will continue to work with
> creditors and counterparties of the Enhanced Fund to reduce leverage in an
> orderly manner and improve liquidity.

Bear Stearns, Current Report for the Period Ending June 22, 2007 (Form 8-K), at Ex. 99 (June

26, 2007).

336.    By June 27, 2007, Bear Stearns's $100 million Everquest scheme fell apart,

largely due to the disclosure that the BSAM hedge funds were on the verge of collapse.  David

Litterick, *Bear Fund Woes Shelve Everquest Float*, Telegraph.co.uk, June 27, 2007.

          **(ii)**    Bear Stearns's Hedge Funds Collapsed and the Company
                Scrambled to Revamp Senior Leadership.

337.    Defendant Cayne described the collapse as a "'body blow of massive

proportion'" to the firm's reputation for "sound risk management and cautious investing."

Thomas, *Salvaging*, *supra*.  Cayne portrayed his own risk management as rigorous, yet it was under his leadership that the asset management unit was operating.  The risk management practices that preceded Bear Stearns's risk-savvy reputation may have once been a reality, but by the time the hedge funds collapsed, any such prudent practices had long since disappeared.

338.    Nevertheless, as the hedge funds collapsed in June 2007, Defendant Cayne insisted that the firm was "'doing really well,'" despite recent events and the larger problem of Bear Stearns's "overexpose[ure] to the slumping mortgage market."  Thomas, *Salvaging*, *supra*.

339.    When the final days of the hedge funds arrived in July 2007, Defendant Cayne was either playing bridge or playing golf, largely inaccessible to the Company, spending 10 of 21 work days out of the office doing one or the other.  Kelly, *CEO's Handling*, *supra*.

340.    On July 17, 2007, the fund managers confirmed to investors that their holdings were "virtually worthless."  Kelly, *CEO's Handling*, *supra*.  Cayne left for a bridge tournament the next day; Spector was there too.  *Id.*

341.    In a letter Bear Stearns sent to BSAM clients on July 18, the Company stated that "there is effectively no value left for the investors in the Enhanced Leverage Fund and very little value left for the investors in the High-grade Fund."  Yet, when it came to the $1.6 billion repo facility Bear Stearns set up to bailout the hedge funds, the letter stated "approximately $1.4 billion remains outstanding on this line and we continue to believe there are sufficient assets available in the High-Grade Fund to fully collateralize the repo facility."  Bear Stearns Letter Sent to Investors Last Night; Telegraph News Website; July 19, 2007.  Bear Stearns wiped out investors in the hedge funds while taking the remaining collateral left

in the hedge fund for itself.  *See* Yalman Onaran, *Bear Stearns Tells Fund Investors 'No Value Left'*, Bloomberg.com, July 18, 2007.

342.     The hedge fund loss reported in Bear Stearns's financials was $200 million due to the "failure of the BSAM-managed high grade funds."  2007 Form 10-K, at 36.  But Bear Stearns's $200 million loss was grossly understated.  The $1.4 billion in collateral it received from the hedge funds were illiquid distressed assets (*i.e.*, complex debt securities tied to subprime mortgages) worth less than $1.4 billion because Bear Stearns used its faulty and inadequate models and assumptions to value them.  The SEC OIG report confirmed that Bear Stearns ultimately took a $500 million write-down in connection with the hedge funds bailout.  OIG CSE REPORT, *supra* at 33.  This was still insufficient.

343.     In fact, BSAM's "High Grade" fund had become a "very large, stressed repo counterparty to Bear Stearns during the summer of 2007."  OIG CSE REPORT, *supra* at 31.  Bear Stearns loaned $1.6 billion to the fund, and it was collateralized with assets estimated to be worth $1.7 to $2 billion.  *Id.*  But this hedge fund "evidently had no assets other than the collateral Bear Stearns already held.  Although the BSAM investors may have benefited to some extent from increases in the value of the collateral Bear Stearns bore all risks associated with the downside."  *Id.*  Bear Stearns overvalued the collateral, and accordingly, took a capital charge that was "far less than the capital charge consistent with sound risk management."  *Id.*

344.     Thus, Bear Stearns not only allowed investors to lose everything, keeping the collateral for itself, but by minimizing its write-down, it also kept the write-down of the distressed assets off of its books for a time.

345.     On July 26, after continued turmoil, Bear Stearns finally pulled the plug on the

hedge funds when they could not meet a margin call, seizing most of the assets in the High

Grade Structured Credit Fund to which it had lent $1.6 billion.  Kelly, *CEO's Handling*, *supra*.

346.     The funds filed for Chapter 15 Bankruptcy in the Cayman Islands on July 31,

2007.  Tiffany Kary and Christopher Scinta, *Bear Stearns Judge Rejects Ban on Hedge Fund*

*Suits*, Bloomberg.com, Aug. 30, 2007.[11]

347.     Bear Stearns grappled with the negative publicity surrounding the hedge fund

catastrophe by reorganizing senior management.  In August 2007, Defendant Spector, an

executive with a storied 24 year tenure at Bear Stearns, resigned from the Company.  However,

"[a]ccording to people inside the firm, Mr. Spector's position became untenable shortly after

the troubles of its two hedge funds became public in June.  Not only did the asset management

business report to him but he also had direct responsibility over the risk controls that were in

place there."  Landon Thomas Jr., *A Top Official at Bear Stearns Ousted Over Funds*

*Implosion*, N.Y. Times, Aug. 6, 2007.  Defendant Mayer, co-head of Fixed Income, replaced

---

[11]  The funds filed for bankruptcy protection in the Cayman Islands, where they were registered, and asked that the US Bankruptcy Court for the Southern District of New York recognize the Caymanian proceedings as a "foreign main proceeding" (protecting them from creditors in the United States).  On August 30, 2007, the Bankruptcy Court denied recognition of the foreign proceedings ruling that, "[t]he only adhesive connection with the Cayman Islands that the funds have is the fact that they are registered there."  The ruling that the petitions in the Cayman Islands were "nonmain" proceedings left the funds open to suits filed in the United States where the funds' investment manager, administrator, books, records, and liquid assets were located.  *See* Amended Decision and Order Denying Recognition of Foreign Proceeding, *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* (Bankr. S.D.N.Y. 2007) (No. 07-cv-12383) (Dkt. 25).  The funds appealed the Bankruptcy Court's decision on September 9, 2007, and on May 27, 2008 the U.S. District Court affirmed the Bankruptcy Court's decision that the Caymanian proceedings were insufficient to protect the funds from suits in the United States.  *See* Opinion, *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, (S.D.N.Y. 2007) (No. 07-cv-8730) (Dkt. 42).

Defendant Spector on the Executive Committee.  Keoun & Shenn, *supra*; *see also Bear*
*Stearns Announces Management Changes*, Business Wire, Aug. 5, 2007.

348.    Commenting on the decision to oust Defendant Spector, Defendant Cayne
stated: "[i]n light of the recent events concerning BSAM's High Grade and Enhanced Leverage
funds, we have determined to make changes in our leadership structure."  Bear Stearns, Current
Report for the Period Ending Aug. 5, 2007 (Form 8-K), at Ex. 99.1 (Aug. 9, 2007).  Defendant
Spector's departure evidenced the failed risk management and massive underperformance in
the asset management sector.  These failures would prove symptomatic of the widespread
mismanagement and reckless business practices that ultimately contributed to the Company's
collapse in market value and near bankruptcy, as alleged *infra*.  And they were not gone with
Spector's exit.  *See, e.g.*, Kelly, *CEO's Handling*, *supra* (describing Cayne's longtime spotty
attendance at risk-review meetings and absences from the office by Cayne and Spector at
critical times).

349.    As early as August 2007, the hedge funds' collapse was cited as an indicator of
mounting liquidity concerns in the constricted credit markets.  According to the following *New*
*York Times* article:

> Two Bear Stearns hedge funds were forced to liquidate, and investors lost
> everything. Investors shied away from buying new mortgage securities, and
> several lenders went out of business, unable to finance the mortgage loans they
> had promised to make.
>
> With the credit gears clogged, there has been a sudden lust for cash at many levels
> of the financial system. Last week banks in Europe and the United States tried to
> borrow so much money that central banks had to step in to keep interest rates
> from rising.

Floyd Norris & Eric Dash, *In a Spiraling Credit Crisis, Large Mortgages Grow Costly*, N.Y.
Times, Aug. 12, 2007, at A1.

350.    The collapse of its own hedge funds should have been a signal flare to the Company that overall liquidity risks were escalating.  Yet, the Company failed to alter its risk management course and/or address the imminent risks.

351.    On an August 3, 2007 conference call with investors, two days after Cayne asked Spector to resign, Cayne opened by referencing the "great deal of uncertainty in the marketplace surrounding the operating environment and specifically our firm," saying that Bear Stearns was "taking the situation seriously."  Bear Stearns, *S&P Action Discussion Call*, Aug. 3, 2007, at 1 (Bloomberg LP Transcript).  Molinaro then took over, and described the bond market as "about as bad as I've seen it" in his 22-year career.  *Id.* at 7; *see also* Kelly & Smith, *Remodeling*, *supra*.

352.    Despite its admitted major risk management oversights in its asset management division, the Company touted its overall financial vitality.  According to the following *New York Times* article:

> Bear Stearns' failure to sense the early tremors was especially glaring.  In 2006, it was rated as the best risk manager among United States brokerage firms in 2006 by Euromoney, a respected trade publication.  Unlike other firms, though, Bear's problems eventually claimed a high-profile casualty—in early August, the brokerage firm's co-president and heir apparent, Warren J. Spector, was forced to resign.
>
> The company has emphasized that in spite of the damage to its reputation, its actual financial losses were relatively small.

Nelson D. Schwartz & Vikas Bajaj, *Credit Time Bomb Ticked, but Few Heard*, N.Y. Times, Aug. 19, 2007, at A1.

### (iii)    Bear Stearns Maintained Its Opportunistic Focus on MBS and Insisted "The Worst Is Largely Behind Us."

353.    Faced with the prospect of ongoing losses related to the declining credit and mortgage markets, Bear Stearns admitted that the Company was struggling in some of its

business segments.  However, the Company's disclosures failed to indicate systematic risks

that could spread and jeopardize the Company's overall financial health.  In reporting results

for the third quarter 2007, Defendant Cayne proclaimed the following:

> The third quarter was characterized by extremely difficult securitization markets
> and high volatility levels across asset classes.  While our fixed income results
> clearly reflect these market conditions, we reported solid revenues in Investment
> Banking and record revenues in Global Equities and Global Clearing Services ….
> I am confident in the underlying strength of our business and proud of the effort
> and determination displayed by our employees during these challenging times.

Bear Stearns, Current Report for the Period Ending Aug. 31, 2007 (Form 8-K), at Ex. 99 (Sept.

20, 2007).  Despite Bear Stearns's claims, any adjustments made by the Company were grossly

inadequate.  Bear Stearns remained too closely bound to the mortgage-backed securities

market; the Company's core business remained overexposed to the deteriorating mortgage and

credit environments.  According to the Company's Quarterly Report filed in October 2007:

> The Company acts as portfolio manager in several collateralized debt obligation
> and collateralized loan obligation transactions.  In these transactions, the
> Company establishes a trust that purchases a portfolio of assets and issues trust
> certificates that represent interests in the portfolio of assets.  The holders of the
> trust certificates have recourse only to the underlying assets of the trusts and not
> to the Company's other assets.  In addition, the Company may receive variable
> compensation for managing the portfolio and may also retain certain trust
> certificates.  In certain of these transactions, these interests result in the Company
> becoming the primary beneficiary of these entities.

2007 Third Quarter Form 10-Q, at 22.

   354.   While his tone remained positive overall, Molinaro had to acknowledge the

"global liquidity crisis, coupled with the re-pricing of credit risk," along with "[i]nvestor

concerns over the subprime mortgage market" were taking their toll.  Bear Stearns, *Earnings

Call for 3d Quarter*, *Fiscal Year 2007*, Sept. 20, 2007, at 4 (Bloomberg LP Transcript)

[hereinafter 3d Qtr. 2007 Earnings Call].  Bear Stearns's Fixed Income revenues for the quarter

were down 88 percent compared with the third quarter of 2006 *and* compared to the second

quarter of 2007.  In addition,

> Net inventory mark downs of approximately $700 million were recognized during
> the quarter primarily related to mark-to-market losses experienced in residential
> mortgages and leveraged finance activities.  Mortgage revenues were a loss for
> the quarter reflecting inventory mark-downs in both whole loan collateral and
> residential and commercial mortgage backed securities inventories, partially
> offset by gains on various cash and derivative hedges.

*Id.* at 4.

355.    Origination of mortgages also "declined significantly."  *Id.*  As a result,

> MBS revenues suffered from a significant decline in securitization and trading
> volumes during July and August which reduced customer driven revenue levels.
> Declining revenue levels associated with the inability to securitize and distribute
> mortgage assets served to exacerbate the impact of inventory mark-downs on
> mortgage revenues.

*Id.*  At the end of August of 2007, Bear Stearns held $50 billion in mortgage and asset-backed

inventory.  *Id.*

356.    Despite the spiraling environment, Molinaro insisted that the decline in Fixed

Income revenue was due to the external forces driving down the value of mortgage-dependent

assets, but "not a decline in the revenue capacity of the franchise."  *Id.* at 7.  He concluded with

an up-beat tone, commenting that Bear Stearns "expect[s] market conditions in the MBS sector

will continue to stabilize as de-leveraging and asset-backed commercial paper liquidations

subside.  High-quality mortgage assets, with little exposure to default and losses, are now

trading at historically wide spreads and represent an *attractive investment opportunity*."  *Id.*

Molinaro then said that Bear Stearns believes that "the earnings capacity of our Fixed Income

franchise is firmly intact. . . .  We think the worst is largely behind us."  *Id.* at 8.  But it was

not.

357.     On September 27, 2007, the SEC's Division of Corporation Finance, the body responsible for reviewing 10-K filings, sent Bear Stearns a comment letter regarding its 2006 Form 10-K, which requested additional information on Bear Stearns's exposure to subprime mortgage securities.  OIG CSE REPORT, *supra* at 44.  Bear Stearns was required to reply within 10 business days—making Bear Stearns's response letter due October 12, 2007.  The Company requested and was granted an extension to early November 2007.  *Id.* at 45. Bear Stearns did not submit comments until January 31, 2008, approximately 3.5 months after the due date and after its *2007* Form 10-K had been filed.  *Id.*  As a result of Bear Stearns's delays, reviews of Bear Stearns's reply were not completed until April 2, 2008—long after the 2007 Form 10-K had been filed and the Company had collapsed.  *Id.* at 45-46.

358.     Bear Stearns's cheerful tone in the third quarter of 2007 made traders temporarily happy, as Bear Stearns stock climbed back up to $131.58 by October 5, 2007, before its final descent.

### f.     Fourth Quarter 2007.

359.     In October of 2007, Bear Stearns needed a $1 billion capital investment from China's government-controlled Citic Securities.  GARY SHORTER, GOV'T & FIN. DIV., CONG. RESEARCH SERV., CRS REPORT FOR CONGRESS: BEAR STEARNS: CRISIS AND "RESCUE" FOR A MAJOR PROVIDER OF MORTGAGE-RELATED PRODUCTS 2 (Apr. 9, 2008) [hereinafter SHORTER, BEAR STEARNS].

360.     On November 14, 2007, Moody's put Bear Stearns on A1 negative watch— meaning that Moody's was likely to downgrade the A1 rating in the near future.[12]  Bloomberg

---

[12] Moody's applies numerical modifiers 1, 2, and 3 in each generic rating classification from Aa to Caa.  The Modifier 1 indicates that the issue ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates that the issue ranks in the lower end of its generic category.  Bonds that are rated A possess many

L.P. (2009) Credit rating change by Moody's Investor Services for Bear Stearns Companies 11/14/2007; retrieved Mar. 16, 2009 from Bloomberg database; 2942331Q US Equity.

361.    In a presentation at the Merrill Lynch Banking & Financial Services Investor Conference on November 14, 2007, Defendant Molinaro showcased the Company's success despite difficult market conditions.  Defendant Molinaro presented the Company's relative financial health, depicting Bear Stearns as an opportunist—as opposed to a victim—in light of the distress in the economy.

- **Mortgage**
  - Diversified mortgage platform – vertical integration creates opportunities
  - Distressed franchise should benefit from current market cycle
- **Credit**
  - Capitalizing on the secular growth of global debt, corporate bond and derivative markets

Samuel L. Molinaro Jr., Bear Stearns Companies Inc. Presentation, Merrill Lynch Banking & Financial Services Investor Conference, Nov. 14, 2007, at 7.

362.    During the presentation, Molinaro among other things made significant disclosures outlined in a table about the company's risk exposure to CDOs and U.S. subprime mortgages, which on August 31, 2007, and November 9, 2007, totaled a gross amount of over $4.9 billion and $2.7 billion, respectively.  Samuel L. Molinaro Jr., Bear Stearns Companies Inc. Presentation, Merrill Lynch Banking & Financial Services Investor Conference, Nov. 14, 2007, at 10.  Molinaro stated that "the CDO warehouse [had] essentially been liquidated or

---

favorable investment attributes and are to be considered as upper medium grade obligations. Factors giving security to principal and interest are considered adequate, but elements may be present that suggest a susceptibility to impairment some time in the future. Bloomberg L.P. (2009) Credit rating change by Moody's Investor Services for Bear Stearns Companies 11/14/2007; retrieved Mar. 16, 2009 from Bloomberg database; 2942331Q US Equity.

converted into CDOs, so that is now zero," and that the new marks "conservatively reflect[ed] the conditions." *Id.* at 5-6.

363.    Bear Stearns was desperately trying to minimize its momentous exposure through the use of additional financial creativity.  The company was buying substantial amounts of asset backed security credit default swaps (ABS CDS), described in more detail *supra* subsection VII.A.5.e to attempt to counteract the losses from the toxic investments— simply swapping one risk for another and telling investors the situation was under control. Regarding the hedging strategy of the ABS CDS, Molinaro admitted that "there [was] basis exposure in [those] hedges and [they] did suffer losses there," and that "there [were] no perfect hedges, the perfect hedges selling the assets, and we have been in an environment where selling assets have been quite challenging." *Id.* at 6.

364.    In fact, the challenge was that if Bear Stearns sold the assets, large losses would ensue, limiting alternative options to those that were not much more appealing.  Bear Stearns had left itself with massive amounts of risk exposure to toxic assets, and a failed business model that it pursued until it could no longer wring any profits from it, leaving a large mess on its hands.

365.    The disclosure regarding CDO and U.S. subprime mortgage exposure was more thorough than any of Bear Stearns's prior statements.  The disclosures Molinaro provided included figures dating back to August 31, 2007, over two months earlier.  Yet, in Bear Stearns's quarterly report for the period ending August 31, 2007, no mention was made of CDO and U.S. subprime mortgage loss exposure.  Clearly, Bear Stearns was aware of the massive loss exposure to toxic assets back then, yet withheld the critical information as long as it could.

366.    Aside from the CDO and U.S. subprime mortgage exposure, Molinaro also disclosed that Bear Stearns "[would] be taking in the fourth quarter a net write-down of about $1.2 billion on [those] positions and others in [its] mortgage inventory." *Id*. at 5.  While Citigroup Inc. and Merrill Lynch & Co., Inc. reported massive write-downs in the fall of 2007, Bear Stearns portrayed itself as comparatively secure.[13]  Nevertheless, the fourth quarter of 2007 was the first time in the history of Bear Stearns that the Company reported a quarterly loss.

367.    The $1.2 billion write-down was larger than the previous quarter write-down of $700 million. *See* 3d Qtr. 2007 Earnings Call, *supra*.  The write-downs exemplify that Bear Stearns had admitted thus far that its toxic assets were $1.9 billion less in value than where they had originally valued them, with potentially many more write-downs on the way because of a continued lack of interest from investors for toxic assets, leaving Bear Stearns with little room to maneuver.

368.    The *New York Times* reported the same day that the "write-down was less than what several analysts had been expecting."  Julia Werdigier and Landon Thomas Jr., *HSBC Takes $3.4 Billion Charge*, N.Y. Times, Nov. 15, 2007, at C4.  It is no surprise that analysts were expecting more.  During the presentation, referring to the fourth quarter results, Molinaro stated that Bear Stearns "[had] a couple of weeks to go in the quarter and [didn't] want to predict that things couldn't get worse, because they seem to keep surprising people."  Samuel L. Molinaro Jr., Bear Stearns Companies Inc. Presentation, Merrill Lynch Banking & Financial Services Investor Conference, Nov. 14, 2007, at 6.

---

[13] As for the rest of the big five investment banks, in the fourth quarter of 2007, Morgan Stanley posted a $9.4 billion loss, Merrill Lynch announced $9.8 billion in losses, and Lehman Brothers wrote down $3.5 billion in mortgage-related assets.  Goldman Sachs managed to report earnings.  David Koepper, *Investment Bank Scorecard*, Portfolio.com, Jan.31, 2008.

369.    A few weeks later, in an 8-K filing showing fourth quarter and full year results

on December 21, 2007, Bear Stearns stated: "In early November the company announced that

it anticipated write-downs of approximately $1.2 billion in mortgage inventory net of hedges.

At November 30, total net inventory write-downs were $1.9 billion." The first report attributed

the loss to $1.9 billion in mortgage-related write-downs.  Bear Stearns, Current Report for the

Period Ending Dec. 20, 2007 (Form 8-K), at Ex. 99.2 (Dec. 21, 2007).  Bear Stearns's toxic

assets were at least $2.6 billion less valuable than the Company had originally priced them

earlier in the year.

370.    In the same 8-K filing Bear Stearns again disclosed its CDO and U.S. subprime

mortgage loss exposure table.  Gross loss exposure fell from just over $2.7 billion on

November 9, 2007, to just over $2.5 billion on November 30, 2007, a sign that Bear Stearns

was continuing to retreat from its once lucrative business of slicing and dicing mortgages and

creating complex financial instruments.  *Id*.  During the same time period, Bear Stearns was

paying billions of dollars to increase its use of ABS CDSs to hedge against mortgage-related

financial instruments losses.

371.    As November and December 2007 passed, Bear Stearns released performance

results, to sullen investors.  During that time, Bear Stearns's share price dropped over

18 percent, from $107.94 on November 1, 2007 to $88.25 on December 31, 2007.  It was a

sign that Bear Stearns needed to restructure its business swiftly.  The 2007 10-K results

disclosed that its major presence in complex financial instruments that turned toxic was a dead

end:

> Fixed income principal transactions revenues decreased to a loss of $215 million
> for fiscal 2007 from $3.62 billion for fiscal 2006, primarily attributable to a
> decrease in revenues in the mortgage-backed securities, leveraged finance, credit
> trading, and distressed trading areas.

2007 Form 10-K, at 37.

372.    The $1.9 billion write-down figure grew to $2.3 billion by the time the
Company filed its Form 10-K for 2007.  *Id*.  Bear Stearns reported that "[a] large component of
these write-downs were related to ABS CDOs and the unwinding of ABS CDO warehouse
facilities."  *Id.*  The total write-downs for "mortgage-related products and the pipeline of
leveraged finance commitments and loans" was $2.6 billion.  *Id.* at 36.

373.    These numbers, while dramatic, are significantly understated, because the
values Bear Stearns ascribed to these assets, even after the write-downs, were largely based on
Bear Stearns's internal valuations of its illiquid Level 2 and 3 assets that had no basis in the
market, as described *supra* subsection VII.A.6.  Moreover, Bear Stearns's 2007 Form 10-K
understated its remaining "CDOs and subprime-related exposures" by offsetting the exposure
entirely with hedges in ABS credit default swaps.  2007 Form 10-K, at 42 (indicating over $2.3
billion in ABS CDSs to bring its "U.S. Subprime Mortgage Exposure" to a negative $582
million).

374.    On the fourth quarter 2007 Earnings Call, Molinaro described "significant
declines in MBS prices and activity."  Bear Stearns, *Earnings Call for 4th Quarter*, *Fiscal Year
2007*, Dec. 20, 2007, at 2 (Bloomberg LP Transcript) [hereinafter 4th Qtr. 2007 Earnings Call].
Molinaro reported that Bear Stearns still retained approximately $46 billion in mortgages and
asset-backed loans and securities.  *Id.* at 4; *see also* 2007 Form 10-K, at 42.  Reflecting the
Annual Report's ABS credit default swap figure, Molinaro represented on the call that "ABS
CDO and subprime positions are net short."  4th Qtr. 2007 Earnings Call, *supra* at 4.  Molinaro
said that Bear Stearns believed that its "mortgage positions have been conservatively valued in

light of current market conditions and expected levels of defaults and cumulative loss estimates." *Id.*

375.    On December 20, 2007, Moody's downgraded Bear Stearns from A1 to A2, and still on a negative watch.  Bloomberg L.P. (2009) Credit rating change by Moody's Investor Services for Bear Stearns Companies 12/20/2007; retrieved Mar. 16, 2009 from Bloomberg database; 2942331Q US Equity.

376.    By the end of 2007, Bear Stearns had "closed [its] subprime originator on core credit, reducing occupancy cost, head count and technology spend, while retaining [the] ability to originate all types of mortgages through Bear Residential Mortgage Corp."  4th Qtr. 2007 Earnings Call, *supra* at 7.  Molinaro relentlessly expressed that Bear Stearns was "confident in the underlying earnings potential of the mortgage business."  *Id.*

377.    When asked what the Board of Directors would be doing to "restore confidence" and "bolster risk management practices to help ensure you guys are kind of more protected from a loss like this going forward," Molinaro responded by saying:

> Let me start with that last part first and I think that there is a lot of discussion about risk management practices and whether these losses were unexpected, surprising, etcetera.  Obviously they're unexpected and obviously they're not acceptable, the level of losses, but these are, *these losses are—weren't surprises, if you will.  I mean we understood the nature of our risks. We understood the nature of the mortgage positions that we held.*  You know, candidly we made decisions that in hindsight as it related to the hedging of these books, that didn't turn out well.  *We also made decisions, as it relates to the ramping of the CDO business, the CDO warehouse loans if you will, that in retrospect were very poorly timed and bad decisions.*  And they were certainly looked at the time, the decisions were made to do them and they didn't turn out well.

*Id.* at 12 (emphasis added).

378.    Bear Stearns's full integration in this risky market—driven by Plan fiduciaries who also managed the company and oversaw key functions and business segments—was in large part responsible for its demise.

**10.     Bear Stearns's Housing-Bubble-Related "Risk Factors" Were Disclosed Too Late.**

379.     In Bear Stearns's 2006 Form 10-K (filed on February 13, 2007), the "risk factors" it described were generalized, while in the 2007 Form 10-K (filed on January 29, 2008, just six weeks before the Company collapsed) the "risk factors" were comparatively focused and detailed.  *Compare* 2007 Form 10-K, at 15-20, *with* 2006 Form 10-K, at 19-22.

380.     The 2006 section on risk factors did warn of dire consequences from market fluctuations, counterparty risk, and other broad brush scenarios.  Yet, it did not discuss the details of a potential disaster for the company in the event that the housing market downturn which was already prevalent, would continue.  While the housing downturn was well in place before the 2006 10-K was filed, Bear Stearns decided to leave any discussion of the risks created by the housing downturn out of its 2006 10-K.  Instead, during fiscal year 2007, Bear Stearns continued with its vertical integration into the mortgage securitization business, continuing to profit from it, while denying and minimizing the repercussions of a housing market downturn.  As described above, Bear Stearns pitched the mortgage industry and MBS as an opportunity.

381.     Eventually, in late 2007 Bear Stearns had no way to deny the housing market downturn and the ramifications to its revenues and earnings, but was forced to take major write-downs on its mortgage-related investments and admit defeat by betting against the mortgage market through unwinding its profitable CDO warehouse and being in a net short position on MBS.  By the time the 2007 10-K was filed at the end of January 2008, Bear Stearns already had been forced to come clean about some aspects of its downfall due to its mortgage securitization and related activities.

382.     Bear Stearns was internally aware of the consequences of a housing market
downturn yet failed to disclose those risks through its risk factors which would have benefited
financial statement users.  Indeed, Bear Stearns stated in its 2007 10-K and omitted from its
2006 10-K that "[d]eclining real estate values could also reduce the level of new mortgage loan
originations and securitizations."  2007 Form 10-K, at 16.  This risk factor statement was
obvious but critical to the fundamental business strategies Bear Stearns had employed and on
which it became increasingly dependent.  While the 2007 10-K discussed such risks as
mortgage "delinquencies," "defaults," and "falling property prices," none of these terms appear
anywhere in the 2006 10-K, much less in any discussion of risk factors.  *Compare* 2007 Form
10-K, at 16, *with* 2006 Form 10-K.

383.     Furthermore, Bear Stearns added in the 2007 10-K a detailed paragraph on the
subprime bust, which demonstrates that its business model was dead in its tracks:

> The current global credit crisis, inventory exposure, and potential counterparty
> credit exposure, may continue to adversely affect our business and financial
> results.  During 2007, higher interest rates, falling property prices and a
> significant increase in the number of subprime mortgages originated in 2005 and
> 2006 contributed to dramatic increases in mortgage delinquencies and defaults in
> 2007 and anticipated future delinquencies among high-risk, or subprime,
> borrowers in the United States.  The widespread dispersion of credit risk related to
> mortgage delinquencies and defaults through the securitization of mortgage-
> backed securities, sales of collateralized debt obligations ("CDOs") and the
> creation of structured investment vehicles ("SIVs") and the unclear impact on
> large banks of mortgage-backed securities, CDOs and SIVs caused banks to
> reduce their loans to each other or make them at higher interest rates.  Similarly,
> the ability of corporations to obtain funds through the issuance of commercial
> paper or other short-term unsecured sources was negatively impacted.  As prices
> declined and delinquencies increased, investors lost confidence in the rating
> system for structured products as rating agencies moved to downgrade CDOs and
> other structured products.  In addition, investors lost confidence in commercial
> paper conduits and SIVs causing concerns over large potential liquidations of
> AAA collateral.  The lack of liquidity and transparency regarding the underlying
> assets in securitizations, CDOs and SIVs resulted in significant price declines
> across all mortgage-related products in fiscal 2007.  Price declines were further
> driven by forced sales of assets in order to meet demands by investors for the

return of their collateral and collateral calls by lenders.  Many banks and
institutional investors have also recognized substantial losses as they revalue their
CDOs and other mortgage-related assets downward. During the second half of
2007, the economic impact of these problems spread on a global basis and
disrupted the broader financial markets.  The combination of these events caused
a large number of mortgage lenders and some hedge funds to shut down or file for
bankruptcy.  The deterioration and recognition of substantial exposure through
derivatives and policies written by monoline insurers resulted in the downgrade of
certain of these monoline insurers. Several of these monoline insurers also
reported significant losses.  Further downgrades of these monoline insurers or
their failure could result in additional significant write-downs at many financial
institutions and could have a material adverse effect on the broader financial
markets.  Financial institutions have entered into large numbers of credit default
swaps with counterparties to hedge credit risk.  As a result of the global credit
crises and the increasingly large numbers of credit defaults, there is a risk that
counterparties could fail, shut down, file for bankruptcy or be unable to pay out
contracts.  The failure of a significant number of counterparties or a counterparty
that holds a significant amount of credit default swaps could have a material
adverse effect on the broader financial markets.  It is difficult to predict how long
these conditions will continue, whether they will continue to deteriorate and
which of our markets, products and businesses will continue to be adversely
affected.  As a result, these conditions could adversely affect our financial
condition and results of operations.  In addition, we may be subject to increased
regulatory scrutiny and litigation due to these issues and events.

2007 Form 10-K, at 16.

384.    Contrary to the tone of the foregoing passage, Bear Stearns was not an innocent

bystander and eventual victim of unforeseen and uncontrollable market conditions.  On the

contrary, Bear Stearns built its business to exploit the housing bubble and knew or should have

known that the bust would have catastrophic effects if too much of Bear Stearns's business

depended on ever-increasing home prices and mortgage volumes and unsustainable housing

market growth.

385.    The housing-market-related risk factors included in the 2007 10-K were of no

value to readers of its financial statements at that point.  It was improper and deceptive of Bear

Stearns to keep the impacts of a housing market correction out of its risk factors section in the

financial statements until the company was six weeks from complete meltdown—a meltdown

that could have occurred on any number of occasions during the Class Period, long before it actually did.

386.    Bear Stearns's details in its 2007 10-K risk factors section regarding the cause and effect process of the housing market correction were too little too late.  Bear Stearns and its leaders either did know or should have known long before January 2008—through its highly skilled personnel, through the media, congressional hearings and economic indicators—that its business model was a disaster waiting to happen.  Moreover, Bear Stearns was in talks with the SEC's TM about the risks involved in the housing market correction and was fully aware of the looming negative impacts of a housing market correction by the end of 2006.  Bear Stearns was also aware that its risk management team and processes had many shortcomings.  *See* OIG CSE REPORT, *supra* at x; *see also id.* at 23 (describing how a Bear Stearns's senior risk manager quit in March 2007 when needed most).

**11.    Bear Stearns Crumbled, But Kept Reassuring the Flock.**

387.    By the end of December, analysts were calling for Defendant Cayne's resignation.  Richard X. Bove, a securities analyst at Punk Ziegel is quoted as saying: "'He has a mind-blowing loss that is his fault, and he should take responsibility for it.'"  Landon Thomas, Jr. *Not a Jolly Season For 2 Top Bankers*, N.Y. Times, Dec. 21, 2007, at C1.

388.    In January 2008, the Bear Stearns hedge fund crisis received additional media coverage in connection with inquiries by U.S. prosecutors.  *Prosecutors Eye Bear Stearns Over Hedge Funds—CNBC*, Reuters, Jan. 4, 2008.  On this news, Bear Stearns stock continued to drop, closing at $78.87 on January 4, 2008, half as much as the year before.  Despite the increased scrutiny, Bear Stearns again failed to disclose the true condition of the Company's liquidity and capital positions.

389.    On January 8, 2008, the Board accepted the resignation of Defendant Cayne as CEO.  According to Paul Friedman, at a meeting to announce Cayne's resignation, Defendant Schwartz told employees not to worry about the stock price (which was about $71.00 per share) or credit default spreads because such numbers were determined by outsiders who "don't know what's really going on here."  According to Friedman, Schwartz's message to employees at the meeting, "They don't know that we have a vibrant franchise.  You can't have your mental state be governed by what they say.  You need to put your head down and work and go about your day, and *ignore the stock price* as best you can."  COHAN, *supra* at 16-17 (emphasis added).

390.    On February 8, 2008, Bear Stearns asserted an increase in its short subprime position to $1 billion from the $600 million it had in November of 2007.  Bradley Keoun, *Bear Stearns Is 'Short" Subprime Mortgages $1 Billion*, Bloomberg.com, Feb. 8, 2008.  According to Bloomberg, "Molinaro said today that one of the firm's biggest mistakes was 'not being conservative enough and bearish enough on the subprime market.'  The firm has reversed 'long' subprime trades that stood at $1 billion at the end of August, Molinaro said."  *Id.*

391.    On March 10, 2008, the Rabobank Group told Bear Stearns it would not roll over a $500 million loan that would be due later that week, and that it was unlikely to renew a $2 billion line of credit coming due the following week.  Kate Kelly, *Fear, Rumors Touched Off Fatal Run on Bear Stearns*, Wall St. J., May 28, 2008, at A1 [hereinafter Kelly, *Fear*]  Defendant Greenberg then went on CNBC and said that any liquidity concerns were "ridiculous."  Bear Stearns then put out a statement that "there is absolutely no truth to the rumors of liquidity problems that circulated today in the market."  Press Release, Bear Stearns Companies Inc., Bear Stearns Denies Liquidity Rumors (Mar. 10, 2008) [hereinafter Bear

Stearns Press Release, Mar. 10, 2008].  In that same Press Release, Defendant Schwartz

publicly affirmed that the Company's "balance sheet, liquidity and capital remain strong."  *Id.*

392.    Also on March 10, Moody's downgraded portions of fifteen mortgage bonds

underwritten by Bear Stearns, and the stock price fell 11 percent, to $62.30.  *See* Jeff Kearns

and Yalman Onaran, *Bear Stearns Denies "Rumors" on Liquidity After Shares Plummet*,

Bloomberg.com, Mar. 10, 2008.  Moody's also downgraded "163 bits of securities issued by

Bear that are backed by so-called Alt-A mortgages.  The cuts came as delinquencies and

foreclosures climbed higher than expected, the ratings agency said."  Alistair Barr, *Bear

Stearns Drops on Liquidity Concerns*, MarketWatch, Mar. 10, 2008.

393.    But, according to reports in the financial press, concerns about the Company's

financial condition had spread throughout the financial community, the denials of the

executives notwithstanding:

> Word began to spread among fixed-income traders nine days ago [March 4, 2008]
> that European banks had stopped trading with Bear.  Some U.S. fixed-income and
> stock traders began doing the same on Monday, pulling their cash from Bear for
> fear it could get locked up if there was a bankruptcy.

Kate Kelly, Greg Ip, & Robin Sidel, *Fed Races to Rescue Bears Stearns in Bid to Steady

Financial System—Storied Firm Sees Stock Plunge 47%*, Wall St. J., Mar. 16, 2008

[hereinafter Kelly et al., *Rescue*].  Combined with its overleveraged state, diminishing capital

reserve, and dependence on extremely short-term repo funding, investor confidence was

unsalvageable.

394.    Analyst Dick Bove, in an interview with Bloomberg on March 11 said:

> [T]he company will not be able to put its business model back together again, and
> what I'm talking about is that this company was a fully vertically integrated
> mortgage producer . . . .

> Now the second problem is that they stayed too long at the game, and therefore
> they harmed their balance sheet, which is driving up their cost of funding. . . .

> [T]hird . . . if you have to shrink your balance sheet, you can't generate the type
> of investment banking business that you once did. . . .

Interview by Bloomberg News On Demand with Richard Bove, Analyst for Punk Zigel & Co.,

on Bloomberg Radio (Mar. 11, 2008).

395.    On Tuesday, March 11, 2008, ING Groep NV "told Bear Stearns that it was

pulling about $500 million in financings."  Kelly, *Fear*, *supra*.

396.    That same day, according to CNBC reporter Charlie Gasparino, Defendant

Molinaro, the CFO, told him that "[t]here is no liquidity crisis.  No margin calls.  It's all

nonsense."  Burrough, *supra*.

397.    Also on March 11, Goldman Sachs initially denied a "novation"[14] request from

the Hayman Capital hedge fund, but later consented to it.  Roddy Boyd, *The Last Day of Bear

Stearns*, Fortune, Mar. 31, 2008.  After being "flooded" with similar requests from hedge

funds, Credit Suisse Group told traders that any "novation" requests involving Bear Stearns

"and any other 'exceptions' to normal business required the approval of credit-risk managers."

Kelly, *Fear*, *supra*.

398.    Bear Stearns put options surged—giving "purchasers the right to sell 5.7 million

Bear Stearns shares for $30 each and 165,000 for $25 apiece just nine days later."  Gary

---

[14] A novation is in the most basic sense an agreement with a third party to set aside enough cash
or bonds to pay off a borrowing party's debt should the borrower become unable to pay off the
loan.  Bloomberg.com: Financial Glossary, at http://www.bloomberg.com/invest/
glossary/bfglosl.htm (last visited Apr. 17, 2009) (defining a novation as a "[d]efeasance whereby
the firm's debt is cancelled").  Bloomberg.com: Financial Glossary, at http://www.bloomberg.
com/invest/glossary/bfglosd.htm (last visited Apr. 17, 2009) (defining defeasance as the "setting
aside by a borrower of cash or bonds sufficient to service the borrower's debt.  Both the
borrower's debt and the offsetting cash or bonds are removed from the balance sheet.  In
securities trading, where a clearing house becomes counterparty to each side of a trade, after the
trade has been agreed.  This is necessary to facilitate netting, and reduce counterparty risk
exposure.  The term has become popular recently, because of the growth of central counterparty
clearing services in European cash equities markets.").

Matsumoto, *Bringing Down Bear Began as $1.7 Million of Options*, Bloomberg.com, Aug. 11, 2008.

399.    By Wednesday, March 12, hedge funds and other clients "began yanking their funds" out of Bear Stearns.  Boyd, *supra*.   At the same time, the overnight repo lenders Bear Stearns depended on heavily to finance day-to-day operations began issuing margin calls demanding that Bear post additional collateral in light of devalued securities or simply telling Bear Stearns that they would not renew their loans the next day.  *See* Kelly, *Fear*, *supra*.

400.    Paul Friedman, COO of the Fixed-Income division at Bear Stearns said that "I had the speech down pretty good.  I could take them through our whole liquidity profile.  Do the dance around the earnings thing. . . . Through Wednesday morning, I still felt pretty good that I could conclude with, 'We've still got $18 billion in cash, and yes, we've lost some lenders, but we picked up some new ones.  Yes, some customers have taken their money out, but it's not a big deal.  Yes, we've got some people who won't take our name in the credit default swaps market, but it's not a big deal.'  By Wednesday [March 12, 2008], I couldn't do it with a straight face and feel I wasn't breaking the law."  COHAN, *supra* at 50-51.

401.    On March 12, 2008, Defendant Schwartz appeared, from a media conference in Palm Beach, Florida, on CNBC to assure the public: "Some people could speculate that Bear Stearns might have some problems. . . since we're a significant player in the mortgage business.  None of those speculations are true."  Kelly, *Fear*, *supra*.  Despite the fact that hedge fund clients had been getting cash out of Bear Stearns, Schwartz went on to say that Bear Stearns's "liquidity position has not changed at all."  CNBC video clip, *available at* http://dealbook.blogs.nytimes.com/2008/03/19/sec-eyes-bear-stearns-comments/.  "We don't see any pressure on our liquidity, let alone a liquidity crisis," Schwartz said.  *Id.*

402.    On March 12, Bear Stearns's liquid capital pool was $12.4 billion.  By March 13, the pool had dropped to $2 billion.  Sec. & Exch. Comm'n, *Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity Management*, Press Release 2008-48, Mar. 20, 2008.

403.    In his CNBC interview, Defendant Schwartz also denied that any counterparties had rejected Bear Stearns as a risk, yet this was after ING and Goldman Sachs had done so—ING denying renewal of a $500 million loan and Goldman Sachs temporarily denying a "novation" request.  As CEO, Schwartz had to know about these counterparty events.

404.    When news of the Bear Stearns liquidity crisis spread, its trading partners halted deals with the Company:

> On Thursday evening [March 13, 2008], Bear Stearns informed the Securities and Exchange Commission and Fed that it had experienced a dramatic loss of cash reserves and saw no option other than to file for bankruptcy protection Friday morning.

Greg Ip, *J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis—Central Bank Offers Loans to Brokers, Cuts Key Rate—Historic Steps*, Wall St. J., Mar. 17, 2008, at A1.

405.    On Thursday, March 13, Bear Stearns stock was $57.00, buoyed by Bear Stearns's positive spin.

406.    While Defendants Greenberg and Schwartz were telling CNBC reporters that everything was fine, there was silence inside the firm, where employees were kept in the dark about what was really going on.  One senior Bear Stearns banker described the lack of internal communication this way: "No communication.  None.  And the communication that was provided externally was poor at best.  It was really amateur hour in a big way."  COHAN, *supra*

at 40.  Moreover, Schwartz kept many high-level executives in the dark throughout the final days of Bear Stearns's collapse.  *Id.* at 45-47.

407.    Bear Stearns saw its credit default swap spread, the cost of insuring Bear Stearns's debt, rise during the end of 2007 until its collapse in mid-March.  On January 1, 2007, the cost to insure Bear Stearns's debt for five years cost $21,188 for a $10 million contract.  By January 1, 2008 the cost to insure Bear Stearns's debt for five years cost $176,503 per $10 million.  The price to insure Bear Stearns's debt eventually skyrocketed to a high of $727,143 for a $10 million contract, on March 14, 2008, the day JPMorgan began its process of acquiring Bear Stearns.  Bloomberg L.P. (2009).  *See* Credit default swap spread prices for Bear Stearns Companies 1/1/2007, 1/1/2008, 3/14/2008; retrieved Mar. 16, 2009 from Bloomberg database.  By this time, creditors had simply stopped insuring Bear Stearns debt.

408.    On March 13, Defendant Schwartz called JPMorgan CEO Jamie Dimon to ask for help.  Dimon told him he would have to talk to the Federal Reserve, and that JPMorgan could do nothing for Bear Stearns alone.  They discussed getting Bear Stearns access to the Federal Reserve's "window" for credit, which was only available to deposit banks.  Without a change in Fed policy, to get Bear Stearns access would require using JPMorgan or another deposit bank as a conduit.  SHORTER, BEAR STEARNS, *supra* at 4.

409.    On March 14, 2008, Bear Stearns announced that it would receive $30 billion in funding, siphoned through JPMorgan from the Federal Reserve, and that Bear Stearns would receive this secured funding for up to 28 days.  Alistair Barr, *Bear Stearns Bailed out by Fed, J.P.Morgan*, MarketWatch, Mar. 14, 2008 [hereinafter Barr, *Bailed out*].

410.    On Friday, March 14, the rating agencies downgraded Bear Stearns: S&P cut its long-term credit rating by three levels to BBB—one level above junk status—and suggested further downgrades.  Moody's and Fitch also cut ratings. *See* Wallace Witkowski, *S&P Lowers Bear Stearns Rating, To Review For Further Cut*, MarketWatch, Mar. 14, 2008; Wallace Witkowski, *Fitch Cuts Bear Stearns' Issuer Default, Credit Ratings*, MarketWatch, Mar. 14, 2008; Sue Chang, *Moody's Downgrades Bear Stearns to 'Baa1'*, MarketWatch, Mar. 14, 2008; Barr, *Bailed out*, *supra*.  Moody's downgraded Bear Stearns from A2, negative watch to Baa1, negative watch. Bloomberg L.P. (2009) Credit rating change by Moody's Investor Services for Bear Stearns Companies 3/14/2008; retrieved Mar. 16, 2009 from Bloomberg database. 2942331Q US Equity.  This was a rating downgrade of one level.  Bonds that are rated Baa are considered as medium grade obligations—*i.e.*, they are neither highly protected nor poorly secured.[15]

411.    The stock price dropped in one day by over 47 percent, from $57 on March 13 to $30 on March 14, 2008.  Bear Stearns's business model finally succumbed to itself and the Company's liquidity was clearly gone, as it became completely unable to meet its obligations. It became clear that Bear Stearns would have to be purchased or file for bankruptcy, because it could not open for business on Monday, March 17.  Chris Ciovacco, *Bear Stearns Given Away, Not Sold*, SeekingAlpha.com, Mar. 17, 2008 at http://www.seekingalpha.com/article/68775-bear-stearns-given-awa-not-sold.

---

[15] Within the Baa classification, "[i]nterest payments and principal security appear adequate for the present but certain protective elements may be lacking or may be characteristically unreliable over any great length of time.  Such bonds lack outstanding investment characteristics and in fact have speculative characteristics as well."  Moody's Credit Ratings and Research, 1995.

412.     Nevertheless, on Friday, March 14, Defendant Schwartz broadcast a video
message to Bear Stearns employees "telling them he was disappointed in the events of recent
days and urging them not to lose faith."  COHAN, *supra* at 72; *see also* Kelly et al., *Rescue*,
*supra* (describing video message that "employees should try not to lose heart").

413.     Over the weekend, JPMorgan sent accountants and lawyers to pore over Bear
Stearns's books to determine if JPMorgan would make an offer to buy Bear Stearns, and if so,
for what price.[16]  Bear Stearns, DEF 14A Notice of Proxy Statement, filed with the SEC on
Apr. 25, 2008 at 34.  On Saturday, March 15, 2008, JPMorgan's initial assessment was that
there might be a bid in the $8 to $12 per share range.  *Id.* at 31.  However, after spending all
night on Saturday, March 15 poring over Bear Stearns's books, JPMorgan decided that its
original estimate that $120 billion of Bear Stearns's $300 billion of assets might be worth less
than they were marked on the books fell far short: by morning it estimated that *$220 billion* of
Bear Stearns's $395 billion in assets were toxic.  Burrough, *supra*.

414.     On Sunday, March 16, 2008, Bear Stearns executives working on the deal with
JPMorgan sat at Bear Stearns's offices getting drunk.  COHAN, *supra* at 117.

415.     In the end, JPMorgan was unwilling to purchase Bear Stearns without backing
from the Federal Reserve.  Moreover, assistance from the Fed was extraordinary, invoking
provisions not used since the Great Depression, and requiring various contortions of current
policies to provide assistance to an investment bank such as Bear Stearns.  Greg Ip, *Desperate
Fed Dusts off Remedy from the Depression To Save Bear*, Wall St. J. Weekend Ed., Mar. 15-

---

[16] The only other possible purchaser was private equity firm J.C. Flowers, which conducted due
diligence on May 14 and ultimately concluded that a deal was not feasible.  Zachary R. Midler,
*Lazard May Reap $20 Million From Bear Stearns Sale (Update1)*, Bloomberg.com, Apr. 11,
2008.

16, 2008. After discussions with government officials and the Federal Reserve, JPMorgan

offered to buy Bear Stearns for $2 per share on Sunday, March 16.

416.    On the heels of the public disclosure of the Company's actual condition, the

value of Bear Stearns shares plummeted. On Monday, March 17, 2008, Bear Stearns stock

dove to $4.81 per share—a one-day loss of nearly 84 percent. The three-day loss was over 91

percent. The following table sets forth the closing price of Bear Stearns common stock

between March 11, 2008 and March 17, 2008:

| March 11, 2008 | $62.97 |
| March 12, 2008 | $61.58 |
| March 13, 2008 | $57.00 |
| March 14, 2008 | $30.00 |
| March 17, 2008 | $4.81 |

417.    The Company's collapse triggered significant government intervention,

including an unprecedented and crucial extension of credit and debt guarantees. According to

JPMorgan CEO Jamie Dimon, JPMorgan "could not and would not have assumed the

substantial risks of acquiring Bear Stearns without the $30 billion facility provided by the

Fed."[17] *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Financial*

*Regulators: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 110th

Cong. (Apr. 3, 2008) (testimony of Jamie Dimon, Chairman of the Board, Chief Executive

Office, JPMorgan Chase). JPMorgan also agreed to assume the first $1 billion lost on the

assets that were put up as collateral for the $30 billion from the Fed. *Id.* Even after securing

that extraordinary government assistance, Bear Stearns agreed to sell itself to JPMorgan for a

mere $2 per share, when its building alone was apparently worth $8 per share. Robin Sidel,

Dennis K. Berman, & Kate Kelly, *J. P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit*

---

[17] In the initial merger agreement, the Fed agreed to provide a non-recourse loan to JPMorgan for up to $30 billion of Bear Stearns's less-liquid assets. SHORTER, BEAR STEARNS, *supra* at 5.

*to Avert Crisis—Ailing Firm Sold For Just $2 a Share in U.S. Backed Deal*, Wall St. J., Mar. 17, 2008, at A1.

418.    JPMorgan's new offer of $2 per share was met by a schism between Bear Stearns's bondholders and its shareholders.  Bondholders were generally supportive of the new price, but shareholders were opposed.  On March 18, after heavy trading, the share price closed at $5.91.  SHORTER, BEAR STEARNS, *supra* at 4.

419.    In response to investor outrage over the agreed-upon sale price, Bear Stearns and JPMorgan announced on March 24, 2008 that JPMorgan had quintupled the acquisition price to $10 per share.  Bear Stearns, Current Report for the Period Ending Mar. 24, 2008 (Form 8-K), at Ex. 99.3 (Mar. 24, 2008).  JPMorgan agreed to pay 0.21753 of a JPMorgan share for each share of Bear Stearns stock.  SHORTER, BEAR STEARNS, *supra* at 5.  The stock price on March 24, 2008 was $11.25.

420.    On May 29, 2008, Bear Stearns shareholders approved the sale to JPMorgan. Just before the vote, Defendant Cayne apologized to them for Bear Stearns's collapse.  On May 30, 2008, the acquisition was completed.

421.    Defendants' failure to fulfill their fiduciary duties resulted in losses of approximately ***300 million dollars*** for the Plan.

**12.    Bear Stearns's Recklessness Made the Company a Catalyst in the Global Liquidity Crisis, Not a Victim.**

422.    Wall Street is driven to a considerable extent on trust.  As Bear Stearns continued to show a lack of leadership and prudent decision making, it continued to put its reputation and trust on the line.  The continued mishaps of Bear Stearns's leadership were combined with meaningful decreases in revenue and profits.  Bear Stearns's Fixed Income business segment was its core, which to a large extent was dependent on originating,

securitizing, and selling MBS and CDOs.  When the bottom fell out of the housing boom, Bear Stearns was left minimizing its exposure to the subprime, Alt-A, and MBS markets, hoping in vain that things turned around.  Several observers, even some from within the company itself, were of the opinion that Bear Stearns fell due to "[d]ecisions to finance itself with short-term borrowings, to pack its balance sheet with hard-to-sell and hard-to-value mortgage-backed securities, and not to diversify its revenue either geographically or by product."  *See* Cohan, *supra* at 99.

423.    Bear Stearns's business model was a deliberate creation of its leaders.  For example, the collapse came as no surprise to Defendant Molinaro: "'I wasn't that angry, because I had lived through what had happened, and I knew how we got to where we had gotten to.'"  Cohan, *supra* at 116.  Reflecting on the causes, Paul Friedman, a Bear Senior Managing Director and the COO of the Fixed-Income division, said

> [W]e're the bad guys.  We did this to ourselves.  We put ourselves in a position where this could happen.  It is our fault for allowing it to get this far, and for not taking any steps to do anything about it.  It's a classic case of mismanagement at the top.  There's just no question about it.

Cohan, *supra* at 149.  Tellingly, Friedman himself never left his own retirement savings in Bear Stearns stock, because he knew how tenuous the operation had become.  "I never believed in combining job risk and net worth risk in the same company so . . . I've always sold any freely available Bear Stearns stock the instant I received it."  Cohan, *supra* at 130.

424.    Bear Stearns's Board of Directors was also culpable.  As one top executive has readily acknowledged, Bear Stearns's Board of Directors was remarkably indifferent to the ratcheting up of enormous risk in the final years prior to the Company's collapse.  Even as Bear Stearns was folding in March of 2008, "the lack of involvement by the board or its chairman, Jimmy Cayne, was not particularly disturbing or unusual for the rank and file."

COHAN, *supra* at 60.  Fixed Income COO Paul Friedman is quoted as saying, "'We didn't have a board.  We had this group of cronies and Jimmy [Cayne].  I guess if you had a real board that had real outsiders with real expertise, you would actually get them involved and they might have some role to play, but not here.'"  *Id.*  This was the same Board of Directors responsible for appointing and monitoring the ESOP Committee.  Thus, the Board's recklessness in overseeing operations at Bear Stearns was matched by its utter failure to act to protect Participants' retirement savings decimated by the Company's foreseeable collapse.  Nonetheless, as a result of the many red flags outlined *infra*, the Board possessed ample information regarding the dire risks faced by the Company as a result of the Company's serious mismanagement.

425.    Despite his role in driving the Company into ruin long before March 2008, Defendant Cayne—Chairman of the Board of Directors—denied that the dire predicament Bear Stearns faced until Thursday, March 13, when he was jostled from a bridge tournament in Detroit to participate in a Board of Directors conference call.  As it turned out, according to Friedman, Cayne could not be bothered to stay on the call through the end.  COHAN, *supra* at 59-60.  Yet, clearly aware of the risk of Bear Stearns's over-leveraged state, Cayne commented, "'You're vulnerable to it being over at any time when you're leveraged.  You didn't have a chance.  So, that same lesson that we learned today, Long-Term Capital Management had back then [in 1998] and the tulip people had it back in the 1400s [*sic*].[18]'" COHAN, *supra* at 59.

426.    These flaws in Bear Stearns's business model and leadership had implications far beyond the demise of the Company.

---

[18] The Dutch tulip craze peak was in 1636.  *See* CalculatedRisk, June 19, 2005, *available at* http://www.calculatedriskblog.com/2005/06/times-is-global-housing-bubble-set-to.html.

427.    The collapse of Bear Stearns's hedge funds caused a major shake up in the functioning of the capital markets, straining market liquidity.  After a build-up of warning signs over the course of 2006 and early 2007, the hedge funds' collapse was the first domino to fall in the global liquidity crisis.  Because MBS held by those funds "had been originally classified as very safe and low-risk by the bond rating agencies," the subsequent "revelation that they had lost much of their value over a very short period raised doubts about the ratings of all similar bonds, and appeared to confirm what many believed: that during the boom, many market participants had significantly underestimated the risks of lending."  GETTER ET AL., CRS: FINANCIAL CRISIS?, *supra* at 8.  Indeed the collapse of the Bear Stearns hedge funds had broad effects, because it:

> suggested that other holders of subprime MBS might be experiencing similar, but as yet undisclosed, losses.  Thus, traders and lenders became less willing to deal with any fund or financial institution known (or suspected) to be a holder of subprime MBS.

*Id*.  Further, because hedge funds are highly leveraged,

> losses in hedge funds are not only a problem for their investors . . . but for their creditors and counterparties as well.  (The Bear Stearns funds had borrowed about $6 billion from other firms, including Merrill Lynch, Goldman Sachs, Bank of America, and Deutsche Bank.)  Since hedge funds are unregulated and do not disclose their sources of funds, this created uncertainty about which institutions were exposed to credit risk from hedge funds.  Many derivatives markets are also largely unregulated, which means that the identities of a hedge fund's counterparties are not widely known.  Thus, the Bear Stearns announcement led many to infer that other hedge funds were likely facing difficulties (which proved to be the case) and raised uncertainty about which associated brokers, lenders, and derivatives dealers might also face losses.

*Id.*

428.    The uncertainty that the Bear Stearns hedge funds' collapse brought into the market was identified by the Congressional Research Service as the ***first*** trigger leading to further losses at other financial institutions and a "sudden change in expectations among

market participants that made them unwilling to lend to firms or buy securities at prevailing rates and prices." GETTER ET AL., CRS: FINANCIAL CRISIS?, *supra* at 9.  As a result, on August 9, 2007, "liquidity abruptly dried up for many firms and securities markets." *Id.*

429.    Throughout August and September of 2007, the federal government took steps to stabilize the credit market in the wake of the Bear Stearns hedge funds' collapse and its fallout.  Yet, as described herein, Bear Stearns kept pushing deeper into the mortgage industry, relentlessly pitching it as an opportunity for profit that must be pursued.  This willful risk-taking by top decision makers at the Company, despite all signs in the marketplace and economy indicating that this was a path to destruction, further solidified Bear Stearns's imminent collapse.

430.    As the smallest, least diversified investment bank, Bear Stearns's aggressive downward spiral into the mortgage industry not only made it vulnerable, but it also demonstrates that it was no accident that Bear Stearns fell first.  And its demise in March 2008 further exacerbated the liquidity crisis that it had helped create through its MBS business and hedge funds.

431.    In both its hedge fund activity and its larger business model, Bear Stearns was the prototype of the "complacent" and "overconfident" mortgage lender, which spawned the economic environment susceptible to a liquidity crisis.  GETTER ET AL., CRS: FINANCIAL CRISIS?, *supra* at 13.  Importantly, the spate of subprime and Alt-A defaults and foreclosures were likely not enough on their own to cause the liquidity crisis.  Instead, the structure of investment banks like Bear Stearns, added to the foreclosure crisis, multiplied the "initial shock," and drove the liquidity freeze.  The Congressional Research Service has identified three key characteristics that produced such systemic vulnerability:

- The use of complex financial instruments, whose value is often linked by complex formulae to the value of other instruments or financial variables, and for which no active trading markets exist;

- Extensive use of leverage, or borrowed funds, which permits institutions to take larger market positions with a given capital base, increasing potential profits (but also losses); and

- The practice of moving risky financial speculation off the books, into nominally independent accounting entities, so that the results do not appear in the financial accounts of the parent financial institution.

MARK JICKLING, GOV'T & FIN. DIV., CONG. RESEARCH SERV., CRS REPORT FOR CONGRESS: CONTAINING FINANCIAL CRISIS 6 (Nov. 24, 2008) [hereinafter JICKLING, CONTAINING FINANCIAL CRISIS].  As described in detail *supra*, Bear Stearns was heavily dependent on all three of these practices.

432.    Bear Stearns's high leverage ratio was a key factor escalating the danger of its complacent mortgage lending.  Bear Stearns's leverage position not only guaranteed its own collapse, it was guaranteed to ripple through the rest of the economy.

> When leveraged investors are overwhelmed by market or liquidity shocks, the risks they have assumed will be discharged back into the market.  *Thus, highly leveraged investors have the potential to exacerbate instability in the market as a whole.*  The outcome may be direct losses inflicted on creditors and trading counterparties, as well as an indirect impact on other market participants through price changes resulting from the disappearance of investors willing to bear higher risks.  *The indirect impact is potentially the more serious effect.*  Volatility and sharp declines in asset prices can heighten uncertainty about credit risk and disrupt the intermediation of credit.  These secondary effects, if not contained, could cause a contraction of credit and liquidity, and ultimately, heighten the risk of a contraction in real economic activity.

GETTER ET AL., CRS: FINANCIAL CRISIS?, *supra* at 14 (quoting "Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management," Report of The President's Working Group on Financial Markets, April 1999, at 23.) (emphasis added).

433.    The clear risk that Bear Stearns and its reckless business practices posed to the larger economy is the primary reason that the Federal Reserve elected to intervene in the

collapse to provide a strong incentive for JPMorgan to purchase Bear Stearns and to keep the firm from bankruptcy.  SHORTER, BEAR STEARNS, *supra* at 6-11.  Because Bear Stearns held such volume of MBS, was over-leveraged, and was exposed to significant off-balance sheet risk, it held the potential to upend the larger economy if it failed.  This is why the Fed opted to reduce systemic risk and prevent financial meltdown by stepping in.  *Id*; *see also Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 110th Cong. (Apr. 3, 2008) (prepared statement of Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve).

434.    Indeed, Bear Stearns's recklessness was a reason for the Fed's intervention but also has been a source of frustration:

> In the wake of the Bear Stearns rescue, the Fed was criticized for widening the financial "safety net" to include a firm that was neither insured by the Federal Deposit Insurance Corporation nor subject to the oversight of the Fed or any other banking agency.  Bear Stearns was widely considered to have been *among the most aggressive and reckless speculators in the subprime market*.

JICKLING, CONTAINING FINANCIAL CRISIS, *supra* at 17 (emphasis added).

435.    In short, Bear Stearns was not a victim of a "run on the bank," the global liquidity crisis, or a mere failure in investor or counterparty confidence.  Rather, Bear Stearns created its own vulnerability to be the first investment bank to fail and was a significant *cause* of the deterioration in the broader economic condition that unfolded after its hedge funds collapsed.

### 13.    Bear Stearns's Practices Violated Accounting Standards.

436.    Generally Accepted Accounting Principles ("GAAP") are the conventions, rules and procedures recognized by the accounting profession as necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the Financial Accounting

Standards Board (the "FASB") and the American Institute of Certified Public Accountants ("AICPA").  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

437.    Bear Stearns violated GAAP to keep investors, creditors, and others in the dark about the true nature and extent of its exposure to loss from its vertically integrated mortgage debt security endeavor.  Bear Stearns again violated GAAP by not properly accounting and reporting for loss contingencies surrounding the lending commitments made to the failed hedge funds.  It is clear that Bear Stearns used accounting form over substance and economic reality. In particular, Bear Stearns violated GAAP in the financial statements through the misuse of:

- Statement of Financial Accounting Standard No. 115 (FAS 115), *Accounting for Certain Investments in Debt and Equity*, by significantly inflating the fair value of certain assets like MBS and similar financial instruments.  The assets, known as Trading Securities, required all changes in value during a period to be reflected in the Statement of Income.  Bear Stearns, by inflating the fair value of those assets under FAS 115, reported higher earnings.  Additionally, certain of the debt and equity investments provided as collateral from the High Grade hedge fund for liquidity support were grossly inflated when put on the books of Bear Stearns, again inflating earnings.

- Statement of Financial Accounting Standard No. 157 (FAS 157), *Fair Value Measurements*, which defines fair value, establishes a framework for measuring fair value and requires enhanced disclosures about fair value measurements.  The expanded disclosures are supposed to allow investors, creditors, and others to understand how Bear Stearns measures recognized assets and liabilities, the inputs used to develop the measurements, and the effect of the measurements on earnings during a period.  Bear Stearns significantly inflated the fair value of its MBS and similar financial instruments by using unrealistic valuation models without adequately disclosing the assumptions and valuation models applied.  By not adequately using fair value disclosures for those assets under FAS 157, Bear Stearns misled investors, creditors, and others by withholding critically important facts and assumptions.

- Statement of Financial Accounting Standard No. 140 (FAS 140), *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, relating to derecognizing off-balance sheet entities and treating the transfer of assets as true sales.  Off-balance sheet entities were used by Bear Stearns to

increase sales and revenues during the housing boom, while during the housing bust they were used to hide losses and ignore the substance of the transactions.

- FASB Interpretation No. 46, *Consolidation of Variable Interest Entities*, by not consolidating all eligible off-balance sheet entities of which it was the primary beneficiary. The off-balance sheet entities that were consolidated by Bear Stearns understated the exposure to loss and withheld critical assumptions and facts from the financial statements.

- Statement of Financial Accounting Standard No. 140 (FAS 140), Accounting for Contingencies, by not immediately notifying the public in an 8-K filing that a material future loss was probable in the outcome of the $1.6 billion repo facility provided to the High Grade hedge fund.

438.   Bear Stearns aggressively used these accounting standards as bright line tests to work around their intent and purpose. Investors, creditors, and others were misled by not receiving faithful, complete, and accurate accounting disclosures to foster adequate business and investment decisions.

439.   Bear Stearns neglected the basic tenets of financial accounting on top of the specific standards, supra. Statement of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information, was violated by egregiously missing the gist of the following qualities outlined in it:

- Bias—Bias in measurement is the tendency of a measure to fall more often on one side than the other of what it represents instead of being equally likely to fall on either side. Bias in accounting measures means a tendency to be consistently too high or too low.

- Comparability—The quality of information that enables users to identify similarities in and differences between two sets of economic phenomena.

- Completeness—The inclusion in reported information of everything material that is necessary for faithful representation of the relevant phenomena.

- Conservatism—A prudent reaction to uncertainty to try to ensure that uncertainty and risks inherent in business situations are adequately considered.

- Consistency—Conformity from period to period with unchanging policies and procedures.

- Feedback Value—The quality of information that enables users to confirm or correct prior expectations.

- Materiality—The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

- Neutrality—Absence in reported information of bias intended to attain a predetermined result or to induce a particular mode of behavior.

- Predictive Value—The quality of information that helps users to increase the likelihood of correctly forecasting the outcome of past or present events.

- Relevance—The capacity of information to make a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events or to confirm or correct prior expectations.

- Reliability—The quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent.

- Representational Faithfulness—Correspondence or agreement between a measure or description and the phenomenon that it purports to represent (sometimes called validity).

- Timeliness—Having information available to a decision maker before it loses its capacity to influence decisions.

- Understandability—The quality of information that enables users to perceive its significance.

- Verifiability—The ability through consensus among measurers to ensure that information represents what it purports to represent or that the chosen method of measurement has been used without error or bias.

Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, at 6.

### 14.   Bear Stearns's Internal Controls Were Materially Deficient.

440.   Bear Stearns's management, including its CEO and CFO, evaluated and maintained internal control over financial reporting.  The 2007 10-K described:

Internal control over financial reporting [was] a process designed to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with
generally accepted accounting principles. The Company's internal control over
financial reporting includes those policies and procedures that: (i) pertain to the
maintenance of records that, in reasonable detail, accurately and fairly reflect the
transactions and dispositions of the assets of the Company; (ii) provide reasonable
assurance that transactions [were] recorded as necessary to permit preparation of
consolidated financial statements in accordance with generally accepted
accounting principles and that receipts and expenditures of the Company [were]
being made only in accordance with authorizations of management and directors
of the Company; and (iii) provide reasonable assurance regarding prevention or
timely detection of unauthorized acquisition, use or disposition of the Company's
assets that could have a material effect on the consolidated financial statements.

2007 Form 10-K, at 76-77.

441.    Defendants in CEO and CFO roles signed the Management Report on Internal

Control Over Financial Reporting required by Sections 404 and 302 of the Sarbanes-Oxley Act

of 2002.  The 2007 and 2006 10-K's Management Report on Internal Control Over Financial

Reporting asserted that Bear Stearns's "management assessed the effectiveness of the

Company's internal control over financial reporting" based on "criteria set forth by the

Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal

Control-Integrated Framework."  Based on COSO criteria and management's assessment,

management believed that "internal control over financial reporting [was] effective."  2007

Form 10-K, at 78; 2006 Form 10-K, at 76.

442.    Management also "ensur[ed] that a strong internal control environment exist[ed]

to minimize the adverse impact [of risk factors]" and "maintain[ed] an internal control

environment that incorporate[d] various control mechanisms at different levels throughout the

organization and within such departments as Controllers, Operations, Legal, Risk

Management, Global Credit, Compliance and Internal Audit."  2007 Form 10-K, at 68, 76.

443.    As described in detail *supra*, Bear Stearns's risk management procedures and financial statement reporting were grossly inadequate.  As such, the foregoing certifications were false and misleading.

**15.    Bear Stearns's Practices Violated Banking Regulations.**

444.    Bear Stearns's Forms 10-K for 2006 and 2007 stated that "the Company is in compliance with the CSE regulatory capital requirements."  2007 Form 10-K, at 14; *see also id.* at 58, 117; 2006 Form 10-K, at 18, 55, 112.  These statement were false and misleading.

445.    As detailed in the SEC's Report dated September 25, 2008, although Bear Stearns appeared to meet the 10 percent capital rule for CSE firms, in fact its practices undermined and falsely inflated its capital reserves, thereby defeating the purpose of capital requirements.  For example, the following practices described in detail *supra* contributed to the distortion of Bear Stearns's capital reserves:

- Bear Stearns used outdated and misleading asset-valuation models and VaR models, which in turn influenced its capital requirements;

- Bear Stearns violated Basel II standards relating to capital charges when it attempted to bail out its failing hedge funds, because Bear Stearns was not capitalized against the underlying exposures it had to the hedge funds' collateral and did not properly recognize these toxic assets on its books;

- Bear Stearns manipulated mark disputes by using higher asset values for its own profit-and-loss accounting, while conceding to counterparties' lower asset values for purposes of valuing the same assets as collateral for loans to Bear Stearns, which inflated Bear Stearns's capital; and

- Bear Stearns misrepresented its VaR to the SEC, despite requests by the SEC to adjust its models.

446.    Bear Stearns's violations of even the scant banking regulations to which it was subject made its stock an imprudent investment for the Plan.

16.      **Post-Collapse Events.**

447.    On April 2, 2008, Senator Charles Schumer noted that there were "warning
signs that Bear Stearns was in trouble when two of Bear's hedge funds—funds that were
heavily invested in subprime mortgages[—]were forced to declare bankruptcy." *S. Hearing on
the Economic Outlook with Federal Reserve Board Chairman, Ben Bernanke* (Apr. 2, 2008)
(opening statement of Sen. Charles E. Schumer, Chairman, Joint Econ. Comm.).

448.    At that same hearing, Defendant Schwartz inexplicably testified that Bear
Stearns was "adequately capitalized and had a substantial liquidity cushion" and blamed the
firm's demise on a "run on the bank." *Turmoil in U.S. Credit Markets: Examining the Recent
Actions of Financial Regulators: Hearing Before the S. Comm. on Banking, Housing and
Urban Affairs*, 110th Cong. (Apr. 3, 2008) (prepared testimony of Alan Schwartz, Bear Stearns
President and Chief Executive Officer), *available at* http://www.banking.senate.gov/public/_
files/SchwartzStmt4308.pdf.

449.    At a hearing on April 3, 2008, Senator Christopher Dodd, Chair of the Senate
Banking Committee, addressed Defendant Schwartz, reminding him that months—maybe a
year—prior Schwartz had inquired about opening the Fed's "discount window" to Bear
Stearns. *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial
Regulators Before the the S. Comm on Banking, Housing and Urban Affairs,* 110th Cong. 5
(Apr. 3, 2008). ("[Y]ou and I chatted some months ago, and you raised with me this whole idea
of the discount window.  I'm going back now.  I don't know whether that was last spring
[2007] or some—I've forgot exactly when I stopped by and chatted with you at Bear Stearns
about various ideas, and you raised this issue."); *see also id*, at 16. ("And let me just say, Mr.
Schwartz, as well.  When you and I had that conversation, however many months ago, about
the discount window, I want to just say in this hearing room, I regret that others didn't listen to

you at the time.  I think it might have made a big difference.").  This disclosure by Senator

Dodd indicates that Defendant Schwartz *knew* about Bear Stearns's dire situation *months* prior

to its collapse, if not an entire year, and that he discussed the matter with a government official.

450.     At an investor conference presentation by JPMorgan CEO Jamie Dimon on May

12, 2008, he updated investors on Bear Stearns's BSAM division—of which the failed hedge

funds were part.  BSAM showed "net losses expected through 2009 . . .  includ[ing]

approximately $300 million in merger-related expenses."  JPMorgan Chase UBS Global

Financial Services Conference Presentation by Jamie Dimon, Chairman and Chief Executive

Officer, at 26.  On May 15, 2008, JPMorgan decided to "liquidate or spin off much of the asset

management arm of Bear Stearns."  BSAM had lost its trust and reputation during the summer

of 2007 when the hedge funds collapsed by being "at the epicenter of last year's subprime

mortgage meltdown" and "generat[ing] more bad news than revenues."  Joseph Giannone,

*JPMorgan To Close Or Spin-Off Most Bear Funds*, Dow Jones, May 15, 2008.

451.     On June 19, 2008, Ralph Cioffi and Matthew Tannin, who managed Bear

Stearns's failed hedge funds under the supervision of Defendant Spector, were indicted on

federal conspiracy, securities fraud (including insider trading), and wire fraud charges, alleging

that they misled investors about the value of MBS and CDOs in the hedge funds and destroyed

incriminating documents, causing investor losses of approximately $1.8 billion.  *United States

v. Ralph Cioffi and Matthew Tannin*, Cr. No. 08-415 (E.D.N.Y.).

452.     Also on June 19, 2008, the SEC filed a civil complaint against Cioffi and

Tannin, alleging—in addition to conspiracy, fraud, and destruction of documents—that Cioffi

and Tannin attempted to solicit additional investments into the failing hedge funds when they

knew that the funds were failing.  *Securities and Exchange Commission v. Ralph R. Cioffi and Matthew M. Tannin*, 08 Civ. 2457 (E.D.N.Y.).

453.    When the Fed intervened in the collapse of Bear Stearns, it created a limited liability corporation called Maiden Lane, lending it $28.82 billion, which Maiden Lane used to purchase illiquid MBS from Bear Stearns.  MARC LABONTE, GOV'T & FIN. DIV., CONG. RESEARCH SERV., FINANCIAL TURMOIL: COMPARING THE TROUBLED ASSET RELIEF PROGRAM TO THE FEDERAL RESERVE'S RESPONSE 4 (Oct. 8, 2008).  This asset pool has declined in value since being purchased with bailout money.

454.    On September 9, 2008, The Federal Trade Commission ("FTC") announced that it had settled charges against Bear Stearns Companies, LLC and its subsidiary, EMC Mortgage Corporation, for violations of the FTC Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Truth in Lending Act's Regulation Z.  Press Release, Fed. Trade Comm'n, Bear Stearns and EMC Mortgage to Pay $28 Million to Settle FTC Charges of Unlawful Mortgage Servicing and Debt Collection Practices (Sept. 9, 2008), *available at* http://www.ftc.gov/opa/2008/09/emc.shtm.  Among other things, the FTC alleged that Bear Stearns and EMC

> misrepresented the amounts borrowers owed, charged unauthorized fees, such as late fees, property inspection fees, and loan modification fees, and engaged in unlawful and abusive collection practices.  Under the proposed settlement they will stop the alleged illegal practices and institute a data integrity program to ensure the accuracy and completeness of consumers' loan information.

*Id.*

455.    As discussed *supra*, on September 25, 2008, upon the request of Senator Grassley, the Securities and Exchange Commission Office of Inspector General released its report on the demise of Bear Stearns and the role of regulators in failing to properly supervise Bear Stearns.  The report noted significant failures by the SEC's TM to address Bear Stearns's

readily apparent systemic flaws, and raised serious questions about the viability of the CSE program.

**17.     Bear Stearns's Stock Price Was Artificially Inflated.**

456.     Bear Stearns's stock price was artificially inflated due to the Company's business model during the Class Period.  Therefore, it was an imprudent investment for the Plan.

457.     The following graph shows the dramatic rise and fall of Bear Stearns's Net Income as it grew its mortgage-dependent businesses.  The increases in 2003-2006 were largely due to the Fixed Income businesses and their associated integration into subprime and Alt-A mortgage-dependent operations, as discussed *supra*.  Likewise, the plunge in 2007 resulted from the same Fixed Income activities.



Data Source: Bloomberg L.P. (2009) Annual net income for Bear Stearns Companies 2000 to 2007; retrieved Mar. 16, 2009 from Bloomberg database.

458.    The foregoing earnings are a direct result of Bear Stearns's use of faulty models to place a value on its assets, particularly illiquid Level 2 and 3 assets, as alleged *supra* subsection VII.A.6.  If Bear Stearns had used reasonable models to value its MBS, the net income they reported would have been considerably decreased.  In turn, Bear Stearns's stock would not have been bloated far beyond its actual worth.

459.    The following chart tracks Bear Stearns's stock price relative to its quarterly earnings:



Data Source: Bloomberg L.P. (2009) Quarterly net income and daily share price for Bear Stearns Companies First Quarter 2000 to First Quarter 2008; retrieved Mar. 16, 2009 from Bloomberg database.

460.    As the foregoing demonstrates, Bear Stearns's stock price rode the Fixed Income earnings wave and crashed when the bottom fell out from under Bear Stearns's mortgage-laden Fixed Income division.  Accordingly, the Company's overstated Net Income caused artificial inflation of the stock price.  Because Bear Stearns did not take timely and

accurate write-downs on its MBS and CDOs, it prolonged and exacerbated the stock price inflation. Had the Company provided truthful and accurate information, or disclosed the truth before the problem grew insurmountable, the artificial stock price inflation, and inevitable crash could have been mitigated if not avoided entirely.

**B.      Defendants Knew or Should Have Known that Bear Stearns Company Stock Was an Imprudent Investment.**

461.    Bear Stearns claimed to be running a company that was prudent and sensitive to risk. Bear Stearns set up committees, plans, and controls ostensibly to enable it to be viable in periods of significant stress in the market. Yet most of this was an illusion. Bear Stearns turned out to be a flimsy enterprise based on faulty business practices. It was overleveraged, insufficiently capitalized, and deeply mired in a risky mortgage-dependent origination and securitization business, churning out and retaining on its books increasing amounts of "toxic assets," which it overvalued with its self-serving valuation models and in turn used to understate risk to the entire entity.

462.    All of this came to a screeching halt in March of 2008, but that could have happened any day during the Class Period, because the conditions and practices in place in March 2008 were in place long before then. Warning signs abounded beginning with the subprime housing bust in late 2006, and they only grew from there.

463.    Prudent risk management practices, internal controls, and quite simply common sense by the Plan fiduciaries and Company officers and directors could have and should have prevented the disaster that occurred. That the disaster was accompanied by a growing global financial crisis—to which Bear Stearns in fact contributed—does not make the Defendants any less accountable for their reckless behavior.

464.     Wall Street was until recently considered home to the capable financial minds in the world, and Bear Stearns was no exception.

465.     The problem with management at Bear Stearns was not a matter of not knowing the consequences of its actions or being blindsided by a "run on the bank."  On the contrary, Bear Stearns's problems grew directly and predictably from poor leadership, strategy, and execution at the most senior level.  Instead of heading off a disaster, Bear Stearns executives and its Board of Directors—Plan fiduciaries—forged full force into the pursuit of lucrative winnings from risky investments and a deeply flawed business model.  To do this, Bear Stearns and its leaders had to ignore numerous and persistent red flags over the course of 16 months while all indicators, real and projected, would have led any prudent fiduciary to change course and protect Plan assets from obliteration.

466.     Given the facts described herein, based on their positions within the Company, Defendants Cayne, Greenberg, Mayer, Molinaro, Schwartz, Spector, and Steinberg—as well as Bear Stearns—knew, and based on their positions within the Company the remaining individual Defendants knew or should have known, that Bear Stearns stock was an imprudent investment for the Plan, because, among other things, the Company was plagued by severe structural problems—including overexposure to subprime and Alt-A mortgages, overexposure to mortgage-backed and collateralized debt securities, insufficient capitalization and liquidity, overleveraging, dependence on overnight repurchase financing, use of flawed and misleading models to value assets and estimate risk, colossal failures in risk management, and a lack of sound leadership, all of which caused Bear Stearns's financial statements to be misleading and which artificially inflated the value of shares of Bear Stearns's stock and the Bear Stearns Stock Fund in the Plan, and which ultimately led to the collapse of the Company.

467. Further, there is evidence that all Defendants had substantial warnings of the impending subprime crisis because as early as 2006 the imminent collapse of the subprime lending industry was widely documented. To the extent that some of the Defendants did not have actual knowledge of the riskiness of Bear Stearns's stock, the Defendants were on notice of several "red flags" that should have caused them to investigate the risks posed by Bear Stearns's business model. In fact, they conducted no such investigation.

468. The red flags include:

- In early 2005, foreclosures began to jump dramatically, signifying a "national trend";

- In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well;

- Risks of subprime mortgage securitization were the subject of researchers at the *Center for Economic and Policy Research* in July 2005;

- In September 2005, the *Wall Street Journal* reported that bank regulators were sounding "alarm bells" about rising risks in the mortgage market, and then Federal Reserve Chairman Greenspan testified about the risks of "exotic" mortgages such as "interest-only" loans and ARMs;

- By October 2005, delinquencies on subprime mortgage payments were double their level a year earlier;

- Prior to November 2005, the OCIE found that the Company did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models, and found that the Company used outdated models to value mortgage derivatives;

- By December 2005, the housing bubble had "burst" in the U.S. mortgage bond market, and industry analysts expected the situation to deteriorate;

- In 2005 and 2006, interest rate hikes, coupled with declines in home values made delinquencies and foreclosures rise considerably, particularly as to subprime and Alt-A mortgages with "interest-only" or ARM features;

- In August 2006, J. Kyle Bass, a former salesman for Bear Stearns, warned of the looming mortgage securities meltdown;

- Bear Stearns boasted that during the nine months ending in August 2006, it was the number-one underwriter of U.S. MBS, and during the third quarter of 2006 Earnings Call, Bear Stearns pitched its mortgage platform as an opportunity it would aggressively pursue;

- On September 25, 2006, Reuters reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against the securities since late 2005";

- In October 2006, in the midst of the developing mortgage crisis, Bear Stearns announced that Bear Res would purchase subprime originator Encore Credit, which specialized in "nonconforming" borrowers and focused on Alt-A and subprime loans, including "interest-only" loans and ARMs;

- In the third quarter of 2006, Bear Stearns hired hundreds of people to build its subprime and Alt-A mortgage origination platform;

- On October 4, 2006, the Federal Reserve and other banking agencies issued their final guidelines: *Interagency Guidance on Nontraditional Mortgage Product Risks* in response to the loosened underwriting standards and general lax risk management practices of subprime lenders;

- In November 2006, the SEC's TM remained concerned about the lack of adequate model review processes for MBS and other ABS;

- In early December, 2006, Ownit Mortgage Solutions, Inc. closed its doors and filed for Chapter 11 bankruptcy just a few weeks later;

- In December 2006, the subprime crisis began to affect the U.S., in terms of large drops in market prices and large asset write-downs on mortgage-backed securities, according to the SEC and its OIG CSE REPORT, *supra* at 26;

- On December 14, 2006, Bear Stearns announced "record" net revenues of $9.2 billion and net earnings of $2.1 billion, much of it due to Fixed Income and the mortgage origination and securitization platform;

- Also on December 14, 2006, Bear Stearns downplayed concerns about the subprime mortgage market, minimized risks related thereto, and reaffirmed its intent to aggressively pursue profits in the subprime and Alt-A origination and securities markets;

- On December 20, 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market;

- In 2006, Bear Stearns's risk managers did not have skill sets to match Bear Stearns's structured finance business model;

- In 2006, Bear Stearns's subsidiary EMC Mortgage Corporation bought approximately $69.2 billion in subprime and Alt-A loans, and throughout 2006 and 2007, Bear Stearns sought to continually expand its origination and securitization platforms;

- On January 3, 2007, Consumer Affairs warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a result";

- On February 8, 2007, HSBC, the largest originator of subprime loans during 2006, raised its subprime loan loss reserves to $10.6 billion to cover anticipated losses from its subprime lending, making the scale of subprime risks widely apparent and precipitating further and severe contraction in subprime origination;

- In February, 2007, the ABX index, which tracks CDOs on certain risky subprime loans, materially declined from above 90 to below 70;

- By the first quarter of 2007, more than one third of Bear Stearns's mortgage securitizations stemmed from its own subprime and Alt-A originations;

- In March, 2007, the head of the Company's model validation resigned, and it took several months for the Company to replace the senior risk manager "precisely when the subprime crisis was beginning to hit and the first large write-downs were being taken";

- On March 11, 2007, the New York Times reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy;

- On March 15, 2007, Bear Stearns minimized subprime risks and said it was "well positioned to benefit from this environment as our organic origination platforms mature and gain market share," and touted its increased reliance on its own originations for its securitizations;

- In late March of 2007, Moody's Investors Services warned that defaults and downgrades of subprime MBS could have "severe" consequences for CDOs invested in that sector;

- Yet, in March 2007, multiple top executives at Bear Stearns publicly downplayed concerns related to MBS and CDO markets;

- On April 2, 2007, New Century Financial Corp., the largest U.S. subprime lender at the time, filed for Chapter 11 bankruptcy;

- On April 17, 1007, the Company's Senior Managing Director, Head of ABS & CDO Research testified before the Senate that "Without doubt, the rise in defaults and delinquencies has had a significant impact on the nonprime securitization

market.  At this juncture, we are witnessing a significant correction in the MBS market for subprime loans";

- On May 11, 2007, Bear Stearns attempted to foist billions of dollars in worthless assets onto the public through its IPO of Everquest Financial, a company formed by Bear Stearns in which two-thirds of the assets were purchased from BSAM's highly leveraged hedge funds;

- On June 15, 2007, Bear Stearns again minimized subprime concerns and disclosed that the market shake-ups had not caused the Company to think any differently about origination of risky mortgages, and instead it was hiring more employees to boost originations;

- On June 20, 2007, Merrill Lynch seized $800 million in assets from two Bear Stearns hedge funds that were involved in securities backed by subprime loans, which Merrill Lynch then sold;

- In June 2007, under the supervision of Defendant Spector, Bear Stearns hedge fund managers Cioffi and Tannin misled investors despite their own concerns about the hedge funds' viability;

- On June 26, 2007, the Company announced that it was bailing out one of its collapsing massive hedge funds, and effectively taking onto its own books nearly $2 billion of the hedge fund's subprime-backed assets, which became worthless within weeks;

- On June 27, 2007 Bear Stearns's Everquest IPO scheme fell apart;

- In June 2007, Defendant Cayne insisted that Bear Stearns was "doing really well";

- On July 17, 2007, Bear Stearns Asset Management reported that its Bear Stearns High-Grade Structured Credit Fund had lost more than 90% of its value, while the Bear Stearns High-Grade Structured Credit Enhanced Leveraged Fund had lost virtually all of its investor capital.  The larger Structured Credit Fund had around $1 billion, while the Enhanced Leveraged Fund, which was less than a year old, had nearly $600 million in investor capital;

- In July 2007, the two Bear Stearns subprime hedge funds collapsed, filing for bankruptcy on July 31, 2007;

- Bear Stearns added nearly $2 billion in illiquid MBS and CDOs to its balance sheet when its hedge funds collapsed, but kept a write-down of these assets off of its books for a period of time, insisting that its losses were small;

- On August 5, 2007, Defendant Spector was ousted in an effort to restore confidence in the Company's management and to distance itself from the collapse of the hedge funds;

- On August 6, 2007, American Home Mortgage filed for Chapter 11 bankruptcy;

- On August 9, 2007, French bank BNP Paribas froze three of its funds exposed to United States subprime mortgages, blaming "a complete evaporation of liquidity";

- On August 16, 2007, Countrywide Financial Corporation, the largest U.S. mortgage lender, narrowly avoided bankruptcy by taking out an emergency loan of $11 billion from a group of banks;

- On August 31, 2007, President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts;

- On August 31, 2007, Ameriquest, the largest subprime lender in the United States in 2005, announced it was going out of business;

- At the end of August 2007, Bear Stearns held $50 billion in mortgage and asset-backed inventory;

- In September 2007, the Congressional Research Service reported that defaults and foreclosures were likely to rise even higher in 2007 and the first half of 2008;

- On September 20, 2007, Bear Stearns continued to view mortgages, MBS, and CDOs as an "attractive investment opportunity" and Defendant Molinaro said the Company thought "the worst is largely behind us";

- On September 27, 2007, the SEC sent Bear Stearns a comment letter related to its 2006 Form 10-K asking for more details on its exposure to subprime mortgage securities, but Bear Stearns did not respond until January 31, 2008, after it had filed its 2007 Form 10-K;

- On November 14, 2007, Moody's put the Company on negative watch;

- Also on November 14, 2007, the Company continued to tout its financial success and plans to opportunistically gain from the mortgage market;

- On December 20, 2007, Bear Stearns had announced the first loss in its eight-decade history, saying it lost about $854 million, or $6.90 a share, for the fourth quarter, compared to a profit of $563 million, or $4 a share, for the same time last year. In interim reports, the firm also said it had written down $1.9 billion of its holdings in mortgages and mortgage-based securities, up from the $1.2 billion it had anticipated the month before, but then that $1.9 billion figure grew to $2.3 billion by the time the Company filed its Form 10-K in January 2008;

- On December 20, 2007, Moody's downgraded Bear Stearns, and the Company remained on negative watch;

- Also on December 20, 2007, Defendant Molinaro said that Bear Stearns "understood the nature of our risks" and that it made "poorly timed and bad decisions" related to MBS and CDOs;

- On December 22, 2007, the *Economist* estimated subprime defaults would reach a level between $200 and $300 billion;

- By 2007, Bear Stearns's retained interests in illiquid MBS and CDOs had grown to new heights, it had to hold such interests longer than in 2005 or 2006; Bear Stearns's exposure to related losses grew steadily over this time period as well;

- In 2007, Bear Stearns's model review group was understaffed and often operated in "crisis mode," and, moreover, failed to take into account a mortgage market meltdown in risk and valuation modeling, while during the same period, Bear Stearns's CFO and CEO were directly responsible for risk management, yet failed to address known concerns about risk and valuation modeling;

- By the end of 2007, Bear Stearns's leverage ratio was at least 33:1, an increase from the already high ratio of 27:1 at the end of 2006;

- In 2007, Bear Stearns needed $102 billion in extremely short-term repo lending just to maintain daily operations, an increase from $70 billion in 2006;

- On January 8, 2008, Defendant Cayne was forced to resign;

- On January 11, 2008, Bank of America made an agreement to bail out Countrywide for $7.16 per share, approximately 16% of its value of $44.55 per share less than a year before;

- On February 8, 2008, the Company announced that it had increased its short subprime position from $600 million in November 2007 to $1 billion in an effort to hedge its trading positions in subprime mortgages;

- Between April 2006 and March 2008, Bear Stearns's capital reserves decreased, at the same time it was increasing leverage;

- On March 10, 2008, Rabobank Group told the Company it would not roll over a $500 million loan coming due later that week and was unlikely to renew a $2 billion line of credit coming due the following week;

- Also on March 10, 2008, Moody's downgraded portions of mortgage bonds underwritten by Bear Stearns;

- On March 11, 2008, ING Groep NV yanked $500 million in financing and other banks were reluctant to grant "novation" requests from Bear Stearns's counterparties;

- On March 12, 2008, hedge funds and other clients began yanking their funds out of Bear Stearns;

- Throughout early 2008, the cost of insuring Bear Stearns's debt in credit default swaps surged;

- Throughout the Class Period, Bear Stearns violated Accounting Standards, Bear Stearns's Internal Controls were materially deficient, and the Company violated Banking Regulations;

- On March 13, 2008, Defendants Schwartz made frantic phone calls to the Federal Reserve and to JPMorgan CEO Jamie Dimon in an effort to negotiate a rescue package;

- Also on March 13, 2008, Bear Stearns informed the SEC and the Fed that it would have to file for bankruptcy the next day;

- On March 14, 2008, the Company announced $30 billion in funding provided by JPMorgan and backstopped by the federal government;

- Also on March 14, all three rating agencies downgraded Bear Stearns;

- On March 15 and 16, 2008, Bear Stearns and JPMorgan hammered out an acquisition deal;

- On March 17, 2008, JP Morgan offered to acquire Bear Stearns at a price of $236 million, or $2 per share. The Company's share prices tumbled to $4.81, a drop of 84%;

- Investor outrage followed, and the terms of the acquisition deal were renegotiated, with the final purchase price of $10 per share announced on March 24, 2008; and

- On May 30, 2008, JPMorgan completed its acquisition of Bear Stearns at the renegotiated price of $10 per share.

469.    Given the size of the Plan's investment in Bear Stearns stock, the turmoil faced

by the high-risk loan market, and the precipitous decline in the price of Bear Stearns stock,

prudent Plan fiduciaries would have fully investigated the risks faced by the Company,

carefully monitored the Plan's investment in Company stock and taken appropriate actions to

protect the Plan's Participants.  Instead, Defendants did nothing to protect Plan Participants from the enormous losses.

470.    Further compounding the problem and losses to the Plan, as described *supra*, several Defendants, including Defendants Cayne, Greenberg, Molinaro, Schwartz, and Spector downplayed the risks faced by the Company, both to the market and directly to Plan Participants, thereby falsely assuring Participants that their retirement savings in Bear Stearns stock were not imperiled.

471.    Defendants' failure to disclose the true risks posed to the Plan as a result of its investment in Bear Stearns stock resulted in the Plan holding huge amounts of unduly risky Company stock at inflated prices.

472.    Prudent fiduciaries of the Plan would not have ignored the numerous red flags described above and would not have allowed the risk of loss to the Plan's participants and beneficiaries to increase to unacceptable levels.

473.    As a result of the Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the Company's true financial condition, any generalized warnings of market and diversification risks that Defendants made to the Plan's Participants regarding the Plan's investment in Bear Stearns stock did not effectively inform the Participants of the past, immediate, and future dangers of investing in Company stock.

474.    Defendants failed to conduct an appropriate investigation into whether Bear Stearns stock was a prudent investment for the Plan and failed to provide the Participants with information regarding Bear Stearns's risky business plan so that the Participants could make informed decisions regarding their investments in Company stock in the Plan.

475.     An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Bear Stearns stock, under these circumstances, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses and would have made different investment decisions.

476.     Because Defendants knew or should have known that Bear Stearns stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its Participants from unreasonable and entirely predictable losses incurred as a result of the Plan's continued investment in Company stock.

477.     Accordingly, it was imprudent for the Plan's fiduciaries to invest in and continue holding Bear Stearns stock in the Plan stock during the Class Period.

478.     Bear Stearns stock was an imprudent investment for the Plan as it posed an inordinate risk of significant loss, and this risk is not one that should have been borne by the participants and beneficiaries of the Plan.  The Plan's fiduciaries disregarded the Company's deteriorating and dreadful financial circumstances when it came to managing the Plan's investment in Bear Stearns stock, and were unwilling or unable to act prudently to rescue the Plan's investments.  Under the circumstances, the continued investment of hundreds of millions of dollars of Participants' retirement savings in Bear Stearns stock was reckless and imprudent, contrary to the best interests of the Plan's participants and beneficiaries, and an abuse of their discretion as fiduciaries.

479.     Defendants had available to them several different options for satisfying their duties, including:

- making disclosures to co-fiduciaries;

- making appropriate public disclosures as necessary;

- discontinuing or limiting further investment in Bear Stearns stock under the Plan;

- consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants and beneficiaries of the Plan;

- divesting the Plan of Company stock;

- informing Participants of the risks of holding their investment in the Plan and/or requiring Participants to liquidate their accounts and transfer the proceeds to their accounts in the separate 401(k) Plan; and/or

- resigning as fiduciaries of the Plan to the extent that, as a result of their employment by Bear Stearns, they could not loyally serve the Plan and its Participants in connection with the Plan's acquisition and holding of Bear Stearns stock.

480.    Despite the availability of these and other options, Defendants failed to take any meaningful action to protect Participants from losses as a result of the Plan's investment in Bear Stearns stock.

**C.    Defendants Failed To Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Bear Stearns Stock in the Plan.**

481.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its Participants which includes the duty to speak truthfully to the plan and its Participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

482.    During the Class Period, on information and belief, Defendants made direct and indirect communications with Participants in the Plan which included statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, and press releases, in which Defendants failed to disclose that Company stock was not a prudent retirement investment.  The Company regularly communicated with employees, including Participants, about the performance, future financial and business

prospects of the Company's common stock, which was, far and away, the single largest asset of the Plan.

483.    In fact, as late as March 10, 2008, when the Company's stock traded at the still-artificially-inflated price of $62.30 per share, the Company affirmatively misled the Plan's Participants, and the investing public, regarding the Company's financial condition.  On that date, the Company issued a press release, which stated:

> The Bear Stearns Companies Inc. today denied market rumors regarding the firm's liquidity.  The company stated that there is absolutely no truth to the rumors of liquidity problems that circulated today in the market.

> Alan Schwartz, President and CEO of The Bear Stearns Companies Inc., said, "Bear Stearns' balance sheet, liquidity and capital remain strong."

Bear Stearns Press Release, Mar. 10, 2008, *supra*.

484.    Additionally, Defendant Schwartz in particular (as well as other top-ranking officers of the Company and the Company itself) communicated directly with employees and Participants regarding the Company's stock price and the risks presented to the Company but aggressively and falsely downplayed those risks.  *See, e.g.*, COHAN, *supra* at 16-17 ("You need to put your head down and work and go about your day, and ignore the stock price as best you can.").

485.    Even though Defendants knew of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its Participants from their heavy investment in imprudent Bear Stearns stock.

486.    In addition, Defendants failed to provide Participants with complete and accurate information regarding the true financial condition of the Company.  As such, Participants in the Plan could not appreciate the true risks presented by investments in

Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plan.

487.     Specifically, Defendants failed to provide the Plan's Participants with complete and accurate information regarding the Company's serious mismanagement and improper business practices, including, among other practices: overexposure to subprime and Alt-A mortgages, overexposure to mortgage-backed and collateralized debt securities, insufficient capitalization and liquidity, overleveraging, dependence on overnight repurchase financing, use of flawed and misleading models to value assets and estimate risk, colossal failures in risk management, and a lack of sound leadership.  As such, the Participants were not informed of the true risks of investing their retirement assets in the Plan in Bear Stearns stock.

**D.      Defendants Suffered from Conflicts of Interest.**

488.     As ERISA fiduciaries, the ESOP Committee Defendants are required to manage the Plan's investments, including the investment in Bear Stearns stock, solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to them. This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

489.     Conflicts of interest abound when a company that invests plan assets in company stock collapses.  As the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'"  *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

490.    Defendants failed to investigate whether to take appropriate and necessary action to protect the Plan, and instead, chose the interests of the Company over the Plan by continuing to offer Bear Stearns stock as an investment option, and maintain investments in Bear Stearns stock in the Plan.  Moreover, executive compensation was tied to Bear Stearns's performance—and its inflated stock price.

491.    Bear Stearns executives engaged in stock trading that enriched them during the Class Period, yet did nothing to preserve Participants' retirement savings in the Plan. Specifically, the following defendants sold shares during the Class Period for Realized Values as set forth below:

| Name | Shares | Realized Value |
|------|--------|----------------|
| Cayne, James E. | 219,036 | $23,010,474 |
| Greenberg, Alan C. | 257,275 | $34,594,027 |
| Mayer, Jeffrey | 102,408 | $9,115,336 |
| Molinaro, Samuel L. Jr. | 38,552 | $4,230,828 |
| Schwartz, Alan D. | 91,233 | $9,867,001 |
| Spector, Warren J. | 116,255 | $19,066,373 |

492.    Specifically, Defendants Greenberg, Molinaro, Cayne, and Spector sold Bear Stearns stock valued at more then $57 million before the hedge fund crisis hit the Company, demonstrating that "company insiders seem to prove pretty good at knowing when their own stock is overvalued and when the future risks do not justify the price."  Brett Arends, *Bear Stearns Fat Cats Cashed Out at the Top*, TheStreet.com, Aug. 8, 2007.  By selling $57 million in stock at the peak, these four Defendants saved almost $16 million.  *Id.*

493.    Moreover, in December 2007, Bear Stearns executives Defendants Cayne, Greenberg, Schwartz, and Molinaro sold significant holdings in Bear Stearns Stock, valued at $15.4 million, $8.8 million, $6 million, and $2.5 million, respectively.  Alistair Barr & Dan Gallagher, *Bear Execs Sold Some Stock in December*, MarketWatch, Mar. 21, 2008.

## VIII.  THE RELEVANT LAW

494.    ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part,

that a civil action may be brought by a participant for relief under ERISA section 409,

29 U.S.C. § 1109.

495.    ERISA section 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary

Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan
> resulting from each such breach, and to restore to such plan any profits of such
> fiduciary which have been made through use of assets of the plan by the fiduciary,
> and shall be subject to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

496.    ERISA sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B),

provide, in pertinent part, that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of
> the participants and beneficiaries, for the exclusive purpose of providing benefits
> to participants and their beneficiaries, and with the care, skill, prudence, and
> diligence under the circumstances then prevailing that a prudent man acting in a
> like capacity and familiar with such matters would use in the conduct of an
> enterprise of a like character and with like aims.

497.    These fiduciary duties under ERISA sections 404(a)(1)(A) and (B) are referred

to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the

law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other

things:

(a)    The duty to conduct an independent and thorough investigation into, and to

continually monitor, the merits of all the investment alternatives of a plan, including in this

instance the Bear Stearns Stock Fund, which invested in Bear Stearns stock, to ensure that each

investment is a suitable option for the plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they

occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the

participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the

plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (i) a negative duty not to

misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that

silence might be harmful; and (iii) a duty to convey complete and accurate information

material to the circumstances of participants and beneficiaries.

498.    ERISA section 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-

Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or
> omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in
> the administration of his specific responsibilities which give rise to his status as a
> fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

499.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary

responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may

be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of

company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be

incentivized to limit their responsibilities as much as possible and to ignore the conduct of

other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur,

[I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

500.    Plaintiffs therefore bring this action under the authority of ERISA section 502(a)(2) for relief under ERISA section 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA section 404(a)(1) and ERISA section 405(a).

## IX.   DEFENDANTS' INVESTMENT IN BEAR STEARNS STOCK IS NOT ENTITLED TO A PRESUMPTION OF PRUDENCE

501.    Some courts have applied a presumption of prudence to decisions by Plan fiduciaries to invest plan assets in company stock in plans that qualify as ESOPs under the Internal Revenue Code and rules of the Department of the Treasury promulgated thereunder. The presumption is based on the dual purpose of an ESOP to allow employee ownership on the one hand, and save for retirement on the other.  *See, e.g., Moench v. Robertson*, 62 F.3d 553, 569, 571 (3d Cir. 1995) (explaining dual purpose of ESOP plans and adopting presumption of prudence to balance these concerns).

502.    As these courts have made clear, when a presumption of prudence applies, "Plaintiffs may then rebut this presumption of reasonableness by showing that a prudent

503.    If the fiduciaries know or if an adequate investigation would reveal that company stock is no longer a prudent investment for the purported ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.  *See Rankin v. Rots*, 278 F. Supp. 2d 853, 878 (E.D. Mich. 2003) ("A fiduciary is not required to blindly follow the Plan's terms.").  Even where a governing plan document requires the investment of plan assets in company stock, such a requirement does "not *ipso facto* relieve [plan fiduciaries] of their fiduciary obligations."  *Id*. at 870.

504.    Here, the governing plan documents do not contain such a requirement.  While the Plan document states that it is designed to invest primarily in qualifying employer securities, no provision of the Plan document purports to require that all or a portion of the Plan's assets remain invested in employer stock.

505.    The *Moench* presumption is an evidentiary presumption, not appropriately applied to the allegations of a Complaint before evidence is adduced.  Nevertheless, some courts have applied the presumption by inquiring whether the facts as alleged in the Complaint are sufficient if taken as true to overcome the presumption.  The facts alleged here meet that test.  As alleged in more detail above, not only was Bear Stearns stock so risky during the Class Period that it was an inappropriate investment for Plan, but due to undisclosed adverse information, the stock was significantly overpriced.  As that information was revealed, the value of the shares fell.  It is never appropriate for a fiduciary to permit a plan to overpay for an asset.  Certain fiduciaries, at least the Company and Defendants Cayne, Greenberg, Mayer,

Molinaro, Schwartz, Spector, and Steinberg knew the facts that made it imprudent to invest in

Company stock, the others either knew or were on notice of red flags that should have

triggered an independent investigation that would have revealed risks of investing in Bear

Stearns stock, particularly in light of the conflicts of interest detailed above that burdened the

decision making process of the Plans' fiduciaries.

506.    The facts supporting the conclusion that Bear Stearns stock was an

inappropriate and imprudent investment for the Plan include, as detailed previously:

- A precipitous stock price decline from over $171 to under $5 per share during the
  Class Period;

- Risk of imminent further collapse of the Company's stock price based on the
  Company's practices as described in detail herein;

- the Defendants' conflicted status;

- The Company's seriously deteriorating financial condition and serious, if not
  gross, mismanagement and reliance on an unsustainable business model, as
  discussed herein and as evidenced by, among other things:

  o    Bear Stearns's dramatic increase in exposure to subprime and Alt-A
       mortgage origination, purchasing, securitization and sales in related ABS
       and CDO markets such as MBS and CMOs throughout the Class Period,
       despite recognizable signs of distress in the housing market, including
       rapidly rising delinquency rates on subprime and Alt-A loans as well as
       illiquidity in the market for securities backed by such loans;

  o    The ongoing inflation of asset values on MBS and CDOs and the
       underestimation of firm-wide risk, due to the Company's calculating its
       worth based on faulty and outdated VaR assumptions, which disregarded
       the actual housing market, credit market, and liquidity conditions affecting
       the value of MBS and CDOs heavily composed of subprime and Alt-A
       mortgages;

  o    Bear Stearns's increasingly reckless business practices, which over-
       leveraged and under-capitalized the Company, and placed too much
       emphasis on escalating risky business development in debt securities
       dependent on the housing market, resulting in the Company's ultimate
       reliance on nightly $100 billion repo loans to continue operations;

o   Bear Stearns's void in sound management at the top, resulting in the Company's failure to adequately and accurately re-measure the Company's risks during the housing market bubble correction;

o   The Company's failure to detect and adequately respond to the sector-wide pressure on Wall Street banks with businesses that heavily relied on debt securities backed by poorly performing subprime and Alt-A mortgages that led to tightened credit conditions and increased illiquidity in mortgage securitization markets;

o   Bear Stearns's business model and lack of adequate supervision, which precipitated the collapse of two hedge funds managed by Bear Stearns Asset Management;

o   Bear Stearns's failure to effectively restructure senior management in the wake of the hedge funds' collapse, especially with regard to macro risk management controls;

o   Frequent and escalating warnings from a wide variety of industry insiders, analysts, government agencies, journalists, and investors about the perils of subprime and Alt-A mortgages and securities dependent on these risky loans throughout the Class Period;

o   The Company's repeated false and misleading statements regarding the dire circumstances it faced as a result of its mortgage-dependent business model throughout the Class Period which caused the price of Bear Stearns stock to be artificially inflated;

o   The sheer magnitude of Bear Stearns's subprime and Alt-A loss exposure and over-leveraged condition, which made the Company particularly vulnerable to a liquidity crisis at any moment during the Class Period;

o   Concerns about the foregoing practices expressed by the SEC during the Class Period;

o   Bear Stearns's violations of Accounting Standards, materially deficient Internal Controls, and violations of Banking Regulations during the Class Period; and

o   Downgrades by credit agencies during the Class Period.

507.   While eligible individual account plans, like the Plan here, are excused from the duty to diversify, they are not excused from the duty to invest prudently.  A portfolio with an undue percentage of very risky investments, no matter how well diversified, is not a prudent retirement investment.  ERISA's exemption from diversification for company stock does not

508.    The imprudence of continued investment by Defendants in Bear Stearns stock

during the Class Period under the circumstances present here is recognized in DOL regulations:

> [B]ecause every investment necessarily causes a plan to forego other investment
> opportunities, an investment will not be prudent if it would be expected to provide
> a plan with a lower rate of return than available alternative investments with
> commensurate degrees of risk or is riskier than alternative available investments
> with commensurate rates of return.

29 C.F.R. § 2509.94-1.

509.    Based on these circumstances, and the others alleged herein, it was imprudent

and an abuse of discretion for Defendants to continue to maintain investment in Bear Stearns

stock, and, effectively, to do nothing at all to protect the Plan from significant losses as a result

of such investment during the Class Period.

## X.    CAUSES OF ACTION

**A.    Count I:  Failure To Prudently and Loyally Manage the Plan and Assets of the
Plan (Breaches of Fiduciary Duties in Violation of ERISA Section 404 by
Defendants Bear Stearns and the ESOP Committee).**

510.    Plaintiffs incorporate the allegations contained in the previous paragraphs of

this Complaint as if fully set forth herein.

511.    At all relevant times, Bear Stearns and the ESOP Committee Defendants

(collectively, the "Prudence Defendants") were fiduciaries within the meaning of ERISA

512.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or authority or control over management or disposition of a plan's assets are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Bear Stearns stock in the Plan were prudent and that such investments were consistent with the purpose of the Plan.  As such, the Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

513.     The duties of loyalty and prudence requires a fiduciary to disregard the provisions of a plan when he or she knows or reasonably should know that complying with the provision would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow the provisions of a plan if doing so would lead to an imprudent result or would harm plan participants or beneficiaries, nor may a fiduciary allow others to do so.

514.     The duties of loyalty and prudence also require fiduciaries to speak truthfully to plan participants, not to mislead them regarding the plan or plan assets, and to disclose all material information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, to refrain from providing inaccurate or misleading information or concealing material information, and to correct

inaccurate, incomplete or misleading information provided by others if the fiduciary knows or should know that the plan participants may relying upon that information in making decisions.

515.    Here, particularly because Plan Participants had the right to liquidate their accounts in the Plan, sell their Bear Stearns stock, and transfer the sale proceeds to their accounts in the 401(k) plan, all Defendants had the fiduciary responsibility for ensuring that Participants had full, complete and accurate information such that Participants could make fully informed decisions about how to handle their accounts.  Defendants had the fiduciary obligation to provide all such necessary information to Participants or, alternatively, the Prudence Defendants were required to take all necessary steps to protect the financial interests of Plan Participants in light of Defendants' knowledge that the Participants lacked such knowledge.

516.    The Prudence Defendants breached their duties to prudently and loyally manage the Plan's assets by allowing the Plan to invest in and hold Bear Stearns stock.  During the Class Period, Defendants knew or should have known that Bear Stearns stock was not a suitable and appropriate Plan investment.  Investment in Bear Stearns stock during the Class Period clearly did not serve the Plan's stated purpose of helping participants meet their future financial needs, and in fact caused significant monetary losses to the Plan and Participants' retirement savings.  During the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plan Participants from the inevitable losses that they knew would ensue as a result of the Company's mismanagement and improper business practices.

517.   The Prudence Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Bear Stearns stock when they knew or should have known that it was not a suitable and appropriate Plan investment.

518.   The Prudence Defendants further breached their duties of loyalty and prudence by failing to ensure that Participants liquidated their accounts in the Plan and transferred the sale proceeds to the investment options available in the 401(k) Plan.  With actual or constructive knowledge that Plan Participants did not have full and complete information about the Company's mismanagement and improper business practices, and thus were unable to make fully informed decisions about whether to retain their accounts in the Plan, the Prudence Defendants had the fiduciary obligation to either inform Plan Participants of the need to take action to protect their financial interests or, if necessary, to liquidate the Plan on Participants' behalf to ensure that they did not suffer a financial loss.

519.   Further, during the Class Period, upon information and belief, Defendant knew or should have known that the Company fostered a positive attitude toward the Company's stock and allowed Plan participants to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  Had Defendants taken appropriate steps to comply with their fiduciary obligations, Participants could have liquidated some or all of their holdings in the Plan and thereby eliminated, or at least reduced, losses to the Plan.

520.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses in the hundreds of millions of dollars and Plaintiffs and the Participants indirectly lost a significant portion off their retirement investment.

521.     Pursuant to ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA section 409(a), 29 U.S.C. § 1109(a), the Prudence Defendants are liable to restore all such losses to the Plan caused by their breaches of fiduciary duties.

**B.     Count II: Breach of Duty To Avoid Conflicts of Interest (Breaches of Fiduciary Duties in Violation of ERISA Section 404 by All Defendants).**

522.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

523.     At all relevant times, Defendants were fiduciaries within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

524.     ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), provides that a fiduciary is required to discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

525.     Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities, and by otherwise placing their own or the Company's interests above the interests of the Participants with respect to the Plan's investments in Bear Stearns stock.

526.     As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered hundreds of millions of dollars in losses.  Had Defendants had discharged their fiduciary responsibility to manage and invest the Plan's assets prudently, the losses suffered by the Plan would have been minimized or avoided altogether.

527.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses in the hundreds of millions of dollars and Plaintiffs and the Participants indirectly lost a significant portion off their retirement investment.

528.    Pursuant to ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA section 409(a), 29 U.S.C. § 1109(a), Defendants are liable to restore all such losses to the Plan caused by their breaches of fiduciary duties.

**C.    Count III: Failure To Adequately Monitor Other Fiduciaries (Breaches of Fiduciary Duties in Violation of ERISA Sections 404 and 405 by Bear Stearns, the Director Defendants and the Executive Committee Defendants).**

529.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

530.    At all relevant times, as alleged above, Bear Stearns, the Director Defendants and the Executive Committee Defendants (collectively, the "Monitoring Defendants") were fiduciaries within the meaning of ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A).

531.    At all relevant times, the scope of the fiduciary responsibility of the Monitoring Defendants included the responsibility to appoint, evaluate and monitor other fiduciaries as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Bear Stearns | Executive Committee ESOP Committee | ¶¶ 95, 98 |
| Director Defendants | Executive Committee ESOP Committee | ¶ 101 |
| Executive Committee | ESOP Committee | ¶ 106 |

532.    The duty to monitor requires the periodic review of the actions and performance of the monitored fiduciaries to ensure that the fiduciary appointees are properly performing

their responsibilities.  The duty to monitor also includes a concomitant obligation on the part of

the appointing party to ensure that the fiduciary appointee has all material information

necessary for the appointee to properly exercise his or her fiduciary responsibilities.  In this

case, that means that the Monitoring Defendants had the duty to ensure that their appointees:

(a)     possessed the necessary credentials and experience to fulfill their duties;

(b)     were provided with adequate financial resources to do their job;

(c)     had adequate information to do their job of overseeing the Plan's investments;

(d)     had ready access to outside, impartial advisors when needed;

(e)     maintained adequate records of the information on which they were basing their

decisions and analysis with respect to the Plan's investment; and

(f)     reported regularly to the Company, the Director Defendants and/or the Executive

Committee Defendants.

533.    The Monitoring Defendants breached their fiduciary duties by, among other

things, (a) failing to ensure that their appointees had access to knowledge about the Company's

mismanagement and improper business practices, which made Bear Stearns stock an imprudent

investment for the Plan; (b) failing to ensure that their appointees appreciated the immense and

imprudent risk of investing and maintaining the Plan's assets in Bear Stearns stock; (c) failing

to monitor the performance of their appointees; and (d) failing to replace their appointees once

it became clear that their appointees were not taking all necessary steps to protect the interests

of the Plan Participants.

534.    The Monitoring Defendants knew or should have known that the ESOP

Committee Defendants were allowing the Plan to remain invested in Bear Stearns stock and

were not taking any necessary steps to protect the interests of Plan Participants.  Despite such

knowledge, the Monitoring Defendants failed to take any action to protect the Plan or Plan Participants from the consequences of these failures.

535.    In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to their appointees complete and accurate information about the financial condition of Bear Stearns that they knew or should have known that their appointees needed in order to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from their appointees, the Monitoring Defendants breached their monitoring duties under the Plan and ERISA.

536.    The Monitoring Defendants also liable for the breaches of their co-fiduciaries pursuant to ERISA section 405(a), 29 U.S.C. § 1105(a), for, among other things, enabling the breaches of co-fiduciaries and taking no steps to remedy the breaches by co-fiduciaries of which they were aware.  For instance, the Monitoring Defendants enabled the fiduciary breaches of the ESOP Committee Defendants by failing to monitor their performance, failing to provide then with all necessary and material information, and by failing to take all necessary steps to protect the interests of the Plan Participants.  Similarly, the Monitoring Defendants were aware of the numerous fiduciary breaches committed by the ESOP Committee Defendants but took no steps to remedy those breaches or otherwise protect the interests of the Participants during the Class Period.

537.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses in the hundreds of millions of dollars and Plaintiffs and the Participants indirectly lost a significant portion off their retirement investment.

538.     Pursuant to ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA section 409(a), 29 U.S.C. § 1109(a), the Monitoring Defendants are liable to restore all such losses to the Plan caused by their breaches of fiduciary duties.

## XI.   CAUSATION

539.     The Plan suffered approximately 300 million dollars in losses because the Plan's assets were imprudently invested by Defendants in Bear Stearns stock during the Class Period, in breach of Defendants' fiduciary duties.

540.     Defendants are liable for the Plan's losses in this case because the Plan's investment in Bear Stearns stock was the result of the Prudence Defendants' decision to maintain the assets of the Plan in Bear Stearns stock and not informing Plan Participants of the need to protect their financial interests such as by informing Plan Participants of the risks of investment in Bear Stearns stock so that they could make informed decisions about their retirement funds, as well as the Monitoring Defendants' failure to monitor and provide full and complete information to the ESOP Committee Defendants.

541.     Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Bear Stearns stock as an investment alternative when it became imprudent, and divesting the Plan of Bear Stearns stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## XII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY

542.     The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Bear Stearns stock during the Class Period.

543.    As a consequence of the Defendants' breaches, the Plan suffered significant

losses.

544.    ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant

to bring a civil action for appropriate relief under ERISA section 409, 29 U.S.C. § 1109.

Section 409 requires "any person who is a fiduciary…who breaches any of the…duties

imposed upon fiduciaries…to make good to such plan any losses to the plan…."  Section 409

also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

545.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty

result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have

maintained its investments in the challenged investment and, instead, prudent fiduciaries would

have invested the Plan's assets in the most profitable alternative investment available to them.

The Court should adopt the measure of loss most advantageous to the Plan.  In this way, the

remedy restores the Plan's lost value and puts the Participants in the position they would have

been in if the Plan had been properly administered.

546.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the

form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan

resulting from the breaches of fiduciary and co-fiduciary duties alleged above in an amount to

be proven at trial based on the principles described above, as provided by ERISA section

409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the

breaches alleged above, as provided by ERISA sections 409(a) and 502(a)(2), 29 U.S.C.

§§ 1109(a) and 1132(a)(2); (c) reasonable attorney fees and expenses, as provided by ERISA

section 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d)

taxable costs and interest on these amounts, as provided by law; and (e) such other legal or equitable relief as may be just and proper.

547.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## XIII.   CLASS ACTION ALLEGATIONS

548.    **Class Definition.**  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

549.    All persons, other than Defendants, who were Participants in or beneficiaries of the Plan at any time between December 14, 2006 and March 24, 2008 and whose accounts included investments in Bear Stearns stock.

550.    **Class Period.**  The fiduciaries of the Plan knew or should have known at least by December 14, 2006 that the Company's material weaknesses were so pervasive that Bear Stearns stock could no longer be offered as a prudent investment for the retirement Plan. Investment in Bear Stearns stock was imprudent at least during the period from December 14, 2006 to March 24, 2008.  Plaintiffs reserve the right to amend the Class Period based on subsequent discovery.

551.    **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe, based on the Plan's Form 5500 for Plan Year 2006, that there are over 8,400 Participants in the Plan.

552.   **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b)   whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)   whether Defendants violated ERISA; and

(d)   whether the Plan has suffered losses and, if so, what is the proper measure of damages.

553.   **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs assert derivative claims on behalf of the Plan pursuant to ERISA section 502(a)(2), and, thus, Plaintiffs' claims are by definition identical to those of Class members.

554.   **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

555.   **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because, in light of the derivative nature of the claims asserted, prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical

matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

556.     **Other Rule 23(b) Requirements.**   Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.     A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.     A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA section 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

H.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated this April 20, 2009.

Presented by
DEALY & SILBERSTEIN, LLP

Milo Silberstein (MS 4637)
225 Broadway, Suite 1405
New York, NY 10007
Telephone: (212) 385-0066
Facsimile:  (212) 385-2117

*Interim Liaison Counsel for the Class*

KELLER ROHRBACK L.L.P.
Lynn L. Sarko
Derek W. Loeser
Erin M. Riley
Gretchen S. Obrist
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384

KELLER ROHRBACK L.L.P.
David S. Preminger (DP-1057)
dpreminger@kellerrohrback.com
275 Madison Avenue, Suite 1425
New York, New York 10016
Telephone:  (212) 878-8890
Facsimile:  (212) 867-6878

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Joseph H. Meltzer
Edward W. Ciolko
Mark K. Gyandoh
James A. Maro
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile:   (610) 667-7056

*Interim Co-Lead Counsel for the Class*